**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**CARMEN OTERO MC CULLOCH,**

               **PLAINTIFF,**

      v.

**TOWN OF MILAN, TOWN OF MILAN TOWN**
**BOARD, JOHN V. TALMADGE, Town**
**Supervisor, and ALFRED LO BRUTTON,**
**PAULINE COMBE-CLARK, DIANE MAY, and**
**ROSS WILLIAMS, Councilpersons,**

         **And**

**TOWN OF MILAN PLANNING BOARD,**
**LAUREN KINGMAN, Chairman, and**
**Members JEFFREY ANAGOS, PETER GOSS,**
**SHEILA MARGIOTTA, MARY ANN**
**HOFFMAN, AND PAULINE COMBE-CLARK**

         **And**

**GARY E. BECK, Zoning Enforcement Officer,**
**Town of Milan, And**

**Frank Margiotta, Barbara Hughey,**
**And Charlotte Norman**

         **DEFENDANTS**.
_____

**Civil Action No.**

**COMPLAINT**

      Plaintiff, Carmen Mc Culloch, for her Complaint against the defendants alleges

as follows:

## NATURE OF THE ACTION

      1.  This is an action pursuant to the Fair Housing Act, Title VIII of the Civil

Rights Act of 1968, 42 U.S.C. §3601 _et seq._ (FHA), the U.S. Constitution, Fifth and

Fourteenth Amendments, the Declaratory Judgment Act, 28 U.S.C. §2201, 42 U.S.C.

§1983, the New York State Constitution, Article I, §§1, 6, 7, 9, and 11, the New York State Eminent Domain Procedure Law, the New York State Conservation Law, and the New York State Town Law. This action also includes additional claims against Defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman for intentional interference with contract and for intentional interference with economic advantage.

2.  Plaintiff, who was born in Puerto Rico of Puerto Rican parents, is a citizen of the United States and a resident of New York City, residing at 2 Tudor City Place, New York, New York. She is over age 21 and has full legal capacity. Plaintiff has served as a member of the U.S. Government Senior Executive Service. She has served as the New York Regional Director of the U.S. Department of Labor, Office of Federal Contract Compliance Programs and as the New York Regional Deputy Director of the U.S. Department of Housing and Urban Development (HUD) and retired from that position in 2006.

3.  Defendant Town of Milan is a municipal corporation organized and existing under the laws of the State of New York, with its principal place of business at Wilcox Memorial Town Hall, 20 Wilcox Circle, Milan, New York 12571 in Dutchess County.

4.  At all relevant times, the Town of Milan was and is governed by a the Town Board of the Town of Milan (Town Board).  The current Town Board consists of the Town Supervisor, John V. Talmadge, and four Council Members, Pauline Combe-Clark, Alfred Lo Brutto, Diane May, and Ross Williams. Each of these persons resides in the Town of Milan. Members of the Town Board are elected by vote of residents of the Town of Milan. The actions described herein were taken by the Town Board under color of state law.

5.   At all relevant times, the Town had a Town Planning Board. The Town of Milan Planning Board (MPB) has as its Chairman Lauren Kingman, and as its other members Jeffrey Anagos, Peter Goss, Sheila Margiotta, Mary Ann Hoffman, and Pauline Combe-Clark. Each of these persons resides in the Town of Milan. The MPB members are appointed by the Town Board. Upon information and belief, during the course of proceedings relating to Plaintiff's Property, Lauren Kingman, the MPB Chairman, has kept the Town Supervisor, John V. Talmadge, advised of the developments relating to Plaintiff's project, and consulted with Mr. Talmadge; all actions taken by the MPB have been with the approval of the Town Board; and all actions described herein taken by the MPB were taken under color of state law.

6.   At all relevant times, Frank Margiotta, Barbara Hughey, and Charlotte Norman, all residents of the Town of Milan, served as volunteers to the MPB and Town Board.  Frank Margiotta and his spouse, Sheila Margiotta, who is on the MPB, reside at 1022 Willowbrook Road which is very near Plaintiff's Property that is at issue in this case.

7.   Original jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction is based on 28 U.S.C. §1367 (a) in that all the claims presented herein are based on a common set of facts and form part of the same case or controversy.

8.   Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) in that the acts described herein occurred in the District. The residences of Plaintiff and Defendants are in the District.

9.   By this action, Plaintiff seeks the relief as set forth in each cause of action.

10. Plaintiff requests a jury trial on each claim for which trial by jury is available.

## FACTS

11. Plaintiff is the owner of a parcel of land of 35.12 acres situated in the Town of Milan, west of the Taconic State Parkway and between the Taconic State Parkway and Willowbrook Road, just south of Route 199 (the Property). The Property is known as 1331 Willowbrook Road.  There is a house and barn on the Property.

12. Plaintiff acquired this property on January 9, 2004, with the intent of subdividing the Property into 6 lots.

13. The property is located in an area that is zoned by the Town of Milan as R5, for 5 aces lots, residential development.

14. Prior to acquiring the Property, Plaintiff, through her authorized representatives, appeared before the MPB at the September 2003 session of the MPB.

15. At that session Plaintiff advised the MPB that she was considering the purchase of the afore-mentioned property, for purposes of a 6-lot subdivision.

16. At that session, the MPB indicated that it saw no impediment to the proposal, as long as there were two separate common driveways, as the Milan Subdivision Regulations provided for no more than four (4) houses on any one common driveway.

17. Plaintiff commissioned Michael Dalbo, a licensed surveyor, to do a survey of the property. His survey showed the property to contain 35.12 acres. After his survey, Plaintiff closed on the purchase of the property.

18. After acquiring the property, Plaintiff commissioned Mr. Dalbo and Guy Tirims, a licensed professional engineer, to do tests and to recommend the site locations for the septic systems, home sites, and locations for the two common driveways.

19. On April 21, 2004 Plaintiff submitted an application for subdivision approval for the six-lot subdivision that she had named "Woodland Hills", providing for five new lots, and for the existing house and barn to be on another lot.

20. The plans submitted, dated April 18, 2004, contained the proposed home sites, proposed septic area sites, proposed common driveways, and large areas near the Taconic State Parkway, the edges of most of the property, and in the interior of the property, that Plaintiff indicated were to be maintained as open space, that is, to have no buildings.

21. At the same time that Plaintiff submitted the plans and the application for subdivision approval, she also submitted the completed Long Form Environmental Assessment Form (Long "EAF") that is referenced in 6 NYCRR §617.20 and in 6 NYCRR §§617.2 and 617.14.

22. After Plaintiff's submission, there were proceedings before the MPB on May 5, 2004, June 2, 2004, July 7, 2004, September 1, 2004, October 6, 2004, November 3, 2004, and December 8, 2004. In addition, there were numerous other submissions, studies, and correspondence.

23. On or about December 15, 2004, Plaintiff commenced an action against the MPB, in the New York State Supreme Court, Dutchess County, pursuant to Article 78 of the New York Civil Practice Law and Rules. Among other things, she sought to compel the MPB to render a decision on her application for preliminary approval of her subdivision application.

24. In late December 2004, the MPB advised Plaintiff that it was suspending further proceedings on Plaintiff's application for subdivision approval, pending the determination by the Court in Plaintiff's action to compel the MPB to render a decision.

25. (a) The Town's subdivision regulations provide at §177-35 that a person aggrieved by any decision of the MPB could seek judicial review "within 30 days after the filing of the Planning Board's decision in the office of the Town Clerk". (b) It further provided that "Commencement of any such proceeding would stay all further actions or proceedings". (c) The Town and the MPB effectively prevented review of any decisions by not making decisions. (d) If Plaintiff did not agree to the demands being made, the MPB did not make any rulings, nor did it file any decision in the Town Clerk's office. (e) Instead, during these delays, the MPB imposed new requirements and new studies on Plaintiff. (f) All during the course of proceedings, from April 2004 to the present, the MPB has never filed any decision in the Office of the Town Clerk. (g) In January 2005, Plaintiff withdrew her action under Article 78, without prejudice, and advised the MPB that there was now no reason to delay further, and that she wanted the proceedings to proceed to completion.

26. There were further proceedings and submissions to the MPB during the period January through June 2005.

27. On June 29, 2005, the MPB approved a resolution granting conditional final approval to Plaintiff's subdivision request. Among the conditions imposed by the MPB were that Plaintiff complete all of the infrastructure work provided for in the plans that had been conditionally approved, within a certain period of time, and that Plaintiff enter into a Conservation Easement Agreement with the Town and the MPB with respect to an area of approximately 17 acres of Plaintiff's Property.

28. The Proposed Lot Information Table, as it appears on the subdivision plat that was conditionally approved, and as shown on the final subdivision plat, shows as

follows:

| Lot Number | Lot Area (sq. ft.) | Lot Area Acres | Area included in the Conservation Easement Area (sq. ft.) | Per Lot Percentage of Lot |
|---|---|---|---|---|
| 1 | 247,382 | 5.68 | 52,468 | 21.2 |
| 2. | 225,912 | 5.19 | 101,961 | 45.1 |
| 3. | 257,555 | 5.91 | 160,784 | 62.4 |
| 4. | 224,808 | 5.16 | 117,805 | 52.4 |
| 5. | 274,789 | 6.31 | 146,944 | 53.4 |
| 6. | 303,561 | 6.97 | 193,174 | 63.6 |
| Totals | 1,534,008 | 35.22 | 773,136 | 50.4 |

29. Upon information and belief, on Friday, November 4, 2005, Lauren Kingman, the Chairman of the MPB, visited Plaintiff's Property where work was being done by Plaintiff's contractor, Rodney Silvernail. Mr. Kingman asked Mr. Silvernail who had given him permission to cut trees along Willowbrook Road. Mr. Silvernail told Mr. Kingman that he had been required to cut those trees so that the subdivision work provided for in the plans could be done.

30. (a) Upon information and belief, on Saturday, November 5, 2005, Defendant Gary E. Beck visited the site and served a STOP WORK ORDER on Rodney Silvernail; (b) Mr. Silvernail was working on that day, and he had expected to work on Sunday, November 6, 2005, and Monday, November 7, 2005, to do the work, including the digging of the trenches for laying the underground utilities, that had been required by CH Energy (CH). (c) CH had advised Plaintiff that they would lay the wire for the underground utilities on Tuesday, November 8, 2005, after Mr. Silvernail completed the prep work.

31. Upon information and belief, on Sunday, November 6, 2005, Plaintiff's representatives met with Mr. Beck because they wanted to know why the STOP WORK

ORDER had been issued by him. Mr. Beck advised that Plaintiff had violated the conditional Final Subdivision Plans approved by the MPB by cutting trees along Willowbrook Road.

32. Upon information and belief, there has never been anything in any plans presented to the MPB or approved by the MPB that prohibited the cutting of trees along Willowbrook Road.

33. The treatment of Plaintiff with regard to the cutting of trees along Willowbrook Road was and is different than the treatment that has been accorded to local residents. Previously, to accommodate neighbors, the MPB had ordered that Plaintiff relocate the entrance of one of the common driveways for the project, and to do that Plaintiff was required to cut at least 10 trees along Willowbrook Road.

34. (a) Upon information and belief, Plaintiff's representatives advised Mr. Beck that they had been required to install underground utilities by those conditional Final Approved Plans, and that Plaintiff had been required to build the two common driveways by those Final Approved Plans. (b) Mr. Beck was shown the plans that CH had created, and the contract provision that Plaintiff was required to execute in order to obtain electric service, including the provisions that required that Plaintiff clear the CH easement areas of trees and brush. (c) Mr. Beck advised that those plans of CH had to be approved by the MPB, and that if the Town Highway Superintendent determined that trees had to be cut for safety purposes, his action also had to be approved by the MPB if he wanted to have trees cut.

35. Upon information and belief, the requirements imposed by Mr. Beck and Mr. Kingman, on behalf of the MPB, were illegal. Action by a municipality to control or

prevent the work of the public utility in providing service or a Town Highway Superintendent in determining what requirements are necessary to maintain the safety of the public roads is preempted by New York state laws granting authority to the public utility and the Town Highway Superintendent.

37. Upon information and belief, no local resident who has to install utilities for a subdivision, or for any other purpose, is required to have the plans of the utility or the requirements of the Town Highway Superintendent approved by the MPB. For local residents, the approval of the subdivision plans or land use that call for the installation of the utilities constitutes approval to do the work necessary to comply with those plans.

38. Ultimately, in order to have Mr. Kingman and the MPB lift the STOP WORK ORDER, Plaintiff had to agree to do "remedial work", which cost more than $10,000, had to do the work that CH was scheduled to do on November 8, 2005, but much later, and at additional costs, and incurred a total of at least $25,000 in damages. There never was any order of the MPB entered with the Town Clerk regarding this matter.

39. Plaintiff had intended to have all the work done within the time provided for by the MPB, so that Plaintiff would not have to post a bond assuring completion of the work.

40. In whole or in part because of the delay caused by Mr. Kingman and the MPB, and Mr. Beck, the construction was delayed and Plaintiff had to post a bond of $38,000 to assure completion of the work that was in progress.

41. On June 26, 2006, the MPB, through Lauren Kingman, signed the conditional Final Subdivision Plat, so that it could be filed in the Dutchess County Clerk's Office. That 5-page plat was filed in the Dutchess County Clerk's Office on June 29, 2006.

42. Upon information and belief, on June 29, 2006, the Town Board, acting through the Town Supervisor, executed a Conservation Easement Agreement with Plaintiff. That same day, there was a closing, at which Plaintiff conveyed to the Town rights to the Conservation Easement Area of approximately 17 acres. Plaintiff had to provide and pay for title insurance, closing costs, and the Town's expenses for this closing. The Conservation Easement Agreement was filed with the Dutchess County Clerk's Office on June 30, 2006.

43. The Conservation Easement Agreement that Plaintiff had been shown, prior to the approval of June 29, 2005, and told she would have to execute later, was different than the Conservation Easement Agreement that Plaintiff ultimately had to execute on June 29, 2006. The later Agreement was much more onerous.

44. After the MPB had approved of Plaintiff's subdivision, the Town of Milan Added §220-39 (B) (8) to its Zoning Ordinance, which related to "Donor donations", and stated: "The Town Board may request a donation for costs relating to acceptance and ongoing monitoring of the conservation easement."

45. Upon information and belief, this requirement of making a "donation" is illegal. The Town Law §§268-269 provide for enforcement and remedies, and state that "enforcement expenses" shall be a Town charge. The Town Law sets forth the exclusive method for enforce violations of the law. The Milan local law that purports to authorize imposition of conditions for approval of land use decisions is in direct contravention of the Town Law, so it is illegal.

46. After Plaintiff's subdivision had been approved, Lauren Kingman, acting for the MPB and the Town Board, told Plaintiff's representative that Plaintiff had to pay an

"assessment" so that the Town would not be required to spend its own monies to engage in inspections of compliance with the Conservation Easement Agreement.

47. Plaintiff's representative advised Mr. Kingman that there had been no such requirement as of the time that Plaintiff's subdivision was approved and that Plaintiff would not pay any such amounts.

48. Upon information and belief, Mr. Kingman and the MPB then retaliated against Plaintiff for refusing to make a "donation", by requiring of Plaintiff an alternative method that would lessen or eliminate the commitment of time and money for the Town and the MPB to review compliance.

49. As of September 2007, Plaintiff had a potential purchaser, L. S., for Lot 5 of that 6-lot subdivision. Mr. L. S. wanted to build a solar heated home on Lot 5, and, if he purchased this Lot 5, he wanted to be able to cut trees in the area of Lot 5 that was part of the Conservation Easement Area, as part of the general maintenance of the property, and use the cut and downed trees, and other brush for firewood. This potential purchaser, to whom Plaintiff had provided a copy of the Conservation Easement Agreement, wanted assurances that he would be able to do that.

50. The Conservation Easement Agreement appeared to permit what L.S. was requesting. Section 4 of the Conservation Easement Agreement provides for rights reserved to the Grantor and his or her assigns. That section states:

> Specifically EXCEPTED and RESERVED from the grant of this easement are the rights and privileges described below, which are reserved to the Grantor, together with the right to grant the same or similar non-exclusive rights to others:
>
> > A. Horticultural and managed forest land, equestrian, passive recreational and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and similar activities.

B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practices.

51. On October 1, 2007, Plaintiff sent a fax letter to the MPB Chairman, Lauren Kingman, asking that he and the MPB provide such assurances, for the benefit of Mr. L. S., and that they do so in writing, so that other potential purchasers would know that this is permitted.  On or about October 5, 2007, the Town Board, and the MPB and Mr. Kingman advised Plaintiff's representative that, unless the owner had a Forest Management Program established and approved by the NYS Department of Environmental Conservation (DEC), and was acting pursuant to such a program, no live tree that was in the Conservation Easement Area could be cut.

52. This condition by the Town Board, the MPB and Mr. Kingman is impossible to fulfill, and it is arbitrary and capricious.

53. Plaintiff contacted the N.Y.S. DEC. By a letter dated October 23, 2007, the N.Y.S. DEC, through Senior Forester Barbara J. Lucas-Wilson, advised Plaintiff that:

Unfortunately, I cannot grant your request for a Forest Management Plan for the 6.3 acre lot in your subdivision. This parcel is too small to manage effectively. Forest Management Plans that the Department of Environmental Conservation writes for private landowners are non-binding guidelines and recommendations based on a landowners goal and objectives for their forested land. If you would like some non-specific, general guidelines for forest management, I would be happy to write those up.

54.  Upon information and belief, a Forest Management Program is set up with the full in-put of the owner of the property. A Forest Management Program is a very personal thing. The owner has to determine, *e.g.*, whether the owner is interested in preserving one species, or in having a multitude of species, whether the owner wants to promote growth of ground plants, or trees, or vegetables, whether the owner wants to

have an open area for ground plants, whether there are invasive species in the forested area, whether there are sick trees, deformed trees, whether the owner wants to fence an area on the ground to prevent animals from eating the plants and many other issues. These are long-term programs. No owner, such as Plaintiff, who is seeking to sell lots to the general public would logically develop such a personalized program and impose it as a requirement on whomever purchases the particular lot, and burden the purchaser with such duties. By doing so the owner would be so restricting the part of the general public that would be interested in purchasing such a lot, rendering the lot unmarketable at any reasonable price.

55.  Though the N.Y.S. DEC only has voluntary Forest Management Programs, Mr. Kingman, the Town Board and the MPB have required that Plaintiff and the successors to Plaintiff, as owners of the lots in the Property, have binding, involuntary, Forest Management Programs; otherwise, no live tree may be cut in the Conservation Easement Area.

56.  None of this Property that is Lot 5 is visible from any public way. Upon information and belief, no other property owner who is a local resident is burdened with such a restriction that he or she cannot cut any tree unless he or she has in place and is following a NYS DEC Forest Management Program. Upon information and belief, there is no reasonable conservation purpose served by such a restriction, and such a restriction that prohibits the cutting of any tree is actually contrary to "generally accepted forest conservation practices".

57.  The same section of the Conservation Easement Agreement that appears to permit for the cutting of trees "in accordance with generally accepted forest conservation

practices", also appears to allow for cutting of brush, pruning and other activities. If the cutting of a tree is not permitted without a NYS DEC Forest Management Program in place and being followed, then even these other activities would require such a program.

58.  Upon information and belief, because of the actions by the Town, the MPB, and Mr. Kingman, Plaintiff lost a potential customer for Lot 5. Furthermore, Defendants' latest actions, when added to Defendants' prior actions, have so burdened Plaintiff's Property, for no good reason, that Defendants' actions constitute a "taking" of more than 50% of Plaintiff's property, without compensation and without due process.

59. If Plaintiff and persons who purchase the lots from her cannot cut a tree, then they cannot use the part of their property burdened by the Conservation Easement at all, and cannot even do that which is necessary and proper, like eliminating invasive species, to maintain the part of their property that is in the Conservation Easement Area. On the other hand, if they must act pursuant to a Managed Forest Plan, which has been determined by someone else, they would be required to assume duties and obligations that would run with their lot that are far beyond what they might want to do, would cost them considerable time and money, and deter them from purchasing Plaintiff's lots.

## FIRST CAUSE OF ACTION – AGAINST DEFENDANTS TOWN, TOWN BOARD, MPB, AND DEFENDANTS MARGIOTTA, HUHGEY AND NORMAN FOR VIOLATION OF THE FHA AND PLAINTIFF'S DUE PROCESS RIGHTS

60. Plaintiff incorporates with full force and effect the allegations made in paragraphs 1-59 of this Complaint.

61. (a) Upon information and belief, Defendants Town Board, MPB, Gary Beck, Frank Margiotta, Barbara Hughey, and Charlotte Norman (Defendants) have treated Plaintiff differently, and adversely, because of her place of residence and her national

origin. (b) Defendants have one standard for treatment of local residents, that is, residents of the Town of Milan who are making subdivision applications and/or other uses of their land. (c) They have another standard for treatment of "City People" who are engaging in those same activities. (d) The term "City People", as used by Defendants and used herein, refers to persons who are residents of the City of New York. (e) Upon information and belief, Defendants do not believe that City People know how to respect the land. (f) For that reason, Defendants impose onerous, unreasonable, arbitrary standards and restrictions on City People who make subdivision applications or other uses of their land. (g) This difference in treatment is particularly odious under the FHA, the U.S. Constitution and that of New York State because most City People, like Plaintiff, are minorities, and most residents of the Town of Milan are white.

62. This action is authorized by the FHA, and is instituted pursuant to 42 U.S.C. §3601 *et seq*.

63. The FHA prohibits acts by those who refuse to make available or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin. Under the FHA, it shall be unlawful to make unavailable a dwelling to any person based on the above factors.

64. A dwelling means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof.

65. Plaintiff is an aggrieved person within the meaning of the FHA.

66. Plaintiff has attempted to develop building lots for dwellings in the Town of

Milan. Her intent was to thereafter sell those building lots.

67. Plaintiff was and is a resident of the State of New York and anticipated that the market for those lots would primarily be other persons from the City of New York.

68. Upon information and belief, Defendants design and intent is to keep City People compacted together, in the City, and to use conservation laws, and artificial, arbitrary, and unnecessary barriers as a guise to accomplish this.

69. Upon information and belief, this difference in treatment is not rationally related to any legitimate state interest.

**A. The difference in treatment of local residents and City People can and does have a statistically significant adverse impact against minorities**

70. Upon information and belief, this distinction in treatment has an adverse and statistically significant impact against minorities, such as Plaintiff, because most City People are minorities, and most Town residents are white.

71. The 2000 Census, which is the most recent census, indicated that New York City had a total population of 8,085,742 persons as of that time; that 44% of these persons were White, 28% were African-American, 27% were Hispanic, and 10% Asian. The population density for New York City was 26,402 persons per square mile. The population density for Manhattan, where Plaintiff resides, was 66,940 persons per square mile. The same Census indicated that 880,000 of the residents of New York City were Puerto Rican, like Plaintiff.

72. The 2000 Census for the Town of Milan had substantial errors. The 2000 Census was corrected due to an error in the total population count of Milan. Corrected population count results from a process called Count Question Resolution Program.

Milan's total population in 2000 was 2,356, not 4,559 as originally reported. Due to the original error in total population, the U.S. Census corrected for four categories, Total population, Total Housing Units, Vacant Housing Units and Group Quarters population. They failed to correct any other data rendering the 2000 Census useless for demographic study.  The original population density of Milan, based on a population of 4,559 persons was 126 persons per square mile. Using the lower figure of 2,356 as the population for the Town of Milan gives a density of 65 persons per square mile.

73. Upon information and belief, the White population of Milan is at least 70% of the total and is a substantially higher percentage than the percentage of the White population of New York City. Upon information and belief, the population for each minority group in Milan is substantially less than the minority percentage of the population in New York City.

74. Upon information and belief, all of the members of the Town of Milan Town Board are white, as are all the members of the MPB, and all the other defendants in this action.

75. Any rules or standards that discriminate against "City people" can and will have a statistically significant adverse impact against minorities. In fact, because 66% of the population of New York City is minorities, the Town Board and the MPB know that by discriminating against New York City residents, they are more than likely, that is, at least 66% of the time, discriminating against a minority.  In the instant case, the Town and the MPB have actually discriminated against a minority, because Plaintiff is a minority.

76. The proceedings thus far, and continuing to this day, demonstrate that

17

defendants Town, MPB, and Margiotta, Hughey, and Norman have discriminated against, and continue to discriminate against New York City residents and minorities, including Plaintiff.

**B. Local residents Mr. and Mrs. Burns have been treated differently than Plaintiff because of their place of residence.**

77. Plaintiff's Property has more than 900 feet of frontage on Willowbrook Road. Early in the process for subdivision approval, Plaintiff attempted three times to have the MPB approve of Plaintiff's cutting of some trees and brush along Willowbrook Road, so Plaintiff could increase sight distance along that road, not only for persons using the common driveways for Plaintiff's project, but also for the benefit of other persons who were using Willowbrook Road. Each time Plaintiff made the request, the MPB, at the urging of defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman, prohibited Plaintiff from taking such action.

78. The minutes of the MPB even incorporate one of these rejections. The MPB minutes of June 2, 2004 state "Mr. Mc Culloch asked if there would be a problem in clearing brush to make it safer, and Chairman Kingman said the regulations are once an EAF is submitted, no vegetation can be touched."

79. In fact, there is no regulation that prohibits the cutting of brush. Upon information and belief, the action of Mr. Kingman and the MPB in denying this request was arbitrary and capricious, served no legitimate state purpose, and was designed and intended to prevent Plaintiff from being able to obtain the requisite sight distance, but Plaintiff obtained the requisite sight distance nonetheless.

80. Later, on October 7, 2004, the same issue of cutting brush along Willowbrook

Road was raised. By this time, both of the common driveways for the project had been set, one being Otero Drive, to the north part of the Plaintiff's Property, and the other, being Mc Culloch Drive, being to the south side of Plaintiff's Property. Both of these common driveways came out to Willowbrook Road.

81. Upon information and belief, the persons who resided at 1315 Willowbrook Road are Mr. and Mrs. Burns; they have a 6.43 acre parcel and part of their property is across from the common driveway that was named Mc Culloch Drive. At the meeting of the MPB on October 7, 2004, Mr. Burns objected to the location of Mc Culloch Drive. He said "As a resident for 30 years, I have rights". He said that the location of this common driveway would lead to cars coming from that common driveway and shining onto the property that they owned. Upon information and belief, the legitimacy of this objection was questionable, since the Burns had a high thick fence along this area, but Plaintiff attempted to address this concern. Plaintiff advised Mr. Burns at the public meeting that this was the only location possible for this common driveway and that Plaintiff had on three occasions sought permission to cut trees and brush so as to provide for greater sight distance, but that such permission had been denied. In view of the fact that no trees could be cut, Plaintiff said, the proposed location of the common driveway was the only location feasible.

82. The result of this objection by Mr. Burns show that his "thirty years" as a resident of Milan did, indeed, give Mr. and Mrs. Burns rights that Plaintiff did not have, rights that superseded those of Plaintiff. Because Mr. Burns opposed the common driveway coming out onto Willowbrook Road near his house, the MPB required Plaintiff to change the location of the common driveway, and directed Plaintiff to cut not only

brush, but also 10 trees so that the sight distance for the new location of the common driveway known as Mc Culloch Drive could be achieved. This action was taken by the MPB at the December 2004 meeting of the MPB solely as an accommodation to Mr. and Mrs. Burns. The MPB did not require Mr. and Mrs. Burns to pay for any "remedial work" for cutting such trees, and, in fact, required Plaintiff to cut those trees. This treatment of Mr. and Mrs. Burns was in direct contradiction to the MPB's prior treatment of Plaintiff, because the MPB had three times earlier denied to her the right to cut trees because the EAF had already been filed and Chairman Kingman said the filing of the EAF bars the cutting of any trees or any other action pertaining to the property being considered.

83. Still later, in November 2005, Plaintiff had to cut trees along Willowbrook Road, in order to satisfy the requirements of the Town Highway Superintendent, and CH. On this occasion, Mr. Kingman and the MPB caused a STOP WORK ORDER to issue and claimed that the cutting of trees along Willowbrook Road violated the subdivision plans. Plaintiff was required to do "remedial work" to "correct" for this cutting of trees, and the cost of that remedial work, incurred in and after November 12, 2005, and the delay in the project cost Plaintiff more than $25,000.

84. By its conduct, the Town Board and the MPB has demonstrated that there is one standard applied to Plaintiff regarding the cutting of trees along Willowbrook Road and another standard applied when a local resident is affected.

**C. Local resident Paul Hughes has been treated differently than Plaintiff**

85. The common driveway at the north part of Plaintiff's property was across from property owned by Paul Hughes. Mr. Hughes is a long time resident of the Town of Milan. Until recently, he had been a member of the Town Zoning Board of Appeals.

86. The property owned by Mr. Hughes is at the corner of Willowbrook Road and Route 199. Mr. Hughes purchased this property on August 23, 2002, for $30,000. Upon information and belief, the reason the price was so cheap was because this property was mostly wetland and, therefore, not useable. It was zoned as residential when Mr. Hughes purchased it. Mr. Hughes had it re-zoned soon after he acquired it, so that it is now zoned Commercial, Storage, Warehouse and Distribution Facilities. Mr. Hughes then established his business, Red Hook Fence and Deck Co. at this location.

87. Upon information and belief, this property owned by Mr. Hughes has a stream going through it. That stream flows on the westerly side of Willowbrook Road, parallel to Willowbrook Road. The land along the stream, and all the land on the westerly side of Willowbrook Road to that stream, is "DEC wet-lands". This designation is for extremely sensitive land and the designation means that there can be no filling of these areas.

88. Upon information and belief, since he acquired this property, Mr. Hughes has been filling these DEC wet-lands. Upon information and belief, Lauren Kingman and the Town of Milan Highway Superintendent know that this is DEC wet-lands and knew that Mr. Hughes had been filling these lands illegally. They had done nothing to stop him from doing so. In fact, Mr. Kingman and the MPB required Plaintiff to make major changes to her proposed sub-division so that Plaintiff's project would not interfere with Mr. Hughes' illegal and environmentally repugnant actions.

89. When Plaintiff acquired her Property, there was an existing culvert that ran under Willowbrook Road from Plaintiff's Property to that of Mr. Hughes. This culvert was north of the location for the common driveway that was to become Otero Drive. This culvert permitted for water from Plaintiff's Property to flow over to the DEC wet-lands

area of Mr. Hughes' property, the same wet-lands that Mr. Hughes was illegally filling.

90.   The Plaintiff's original plans to the MPB called for use of this culvert. The MPB and the Town Highway Superintendent required that Plaintiff modify her plans very substantially. Plaintiff was required to provide for the existing culvert to be closed off. Plaintiff was required to have a culvert go under Otero Drive, to another catch basin area, and then to have another culvert go from there under Willowbrook Road, much further to the south, to an area of Mr. Hughes' property where he had not yet filled in the wet-lands. This change required substantial additional expense for Plaintiff, and the increase in the costs for construction of the project, because of this change, amounted to more than $20,000. This work was done after the STOP WORK ORDER was lifted.

91.   Plaintiff's representative addressed this to Mr. Kingman at the site when the actual installation for this extra culvert work was being done. Plaintiff's representative told Mr. Kingman that it was unfair that Plaintiff had to change the plans and incur the additional expense, and that it was unfair that Mr. Kingman and the MPB was imposing so many requirements on Plaintiff, in name of the 'environment', when it was permitting Mr. Hughes to fill in DEC wet-lands, in violation of the law. Mr. Kingman's response was "He's an old-timer. We can't do anything about what he does."

92.  The MPB had the opportunity to do something about what Mr. Hughes was doing. Upon information and belief, Mr. Hughes came before the MPB because he needed site plan approval for his facilities. The MPB did not impose any environmental restraints on Mr. Hughes, nor did it require that he remedy the harm that he had already done to the environment because of his illegal filling.

93.  After he had the initial buildings constructed on his property, Mr. Hughes

made application to the Zoning Board of Appeals, for a variance, so that he could make even more changes to his property.

94. A representative of Plaintiff attended those proceedings, intending to object to the fact that Mr. Hughes had taken to selling used cars from the front of his property. On that evening, three of the four Members of the Zoning Board of Appeals who were present had their own personal matters pending before the Zoning Board of Appeals. As the matter for each one, including the matter for Mr. Hughes, came up, that member politely excused himself, to the giggles of the persons in attendance, while the other members ruled on the application of the member who had excused himself. Each matter presented by a member of the Zoning Board of Appeals on his own behalf was approved.

**D. Local residents and one of the volunteers for the MPB both voiced discriminatory animus against City People. The MPB has treated Plaintiff differently because she is a City Person**

95.  With regard to Plaintiff's application for subdivision approval, one of the Town's residents who attended the public hearings and objected to Plaintiff's proposed subdivision asserted as her objection that the project should be rejected because "City people" did not know how to treat the land, and that they clear cut woods.

96. George Vengren is an arborist who had been retained by Plaintiff as an expert for purposes of Plaintiff's subdivision application. He is from Red Hook, New York, which is the town next to the Town of Milan. During the course of proceedings, Mr. Vengren had toured Plaintiff's property with the volunteers, defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman. During that tour, one of these persons complained to George Vengren, that "City People" had purchased land near her own

property and that they had cut down many trees, and that now she could see their house and they could see her house. She complained that "City People" did not know how to respect the land.

**E. Local residents Borenstein, Napolitano, Carreola, and Savoury have been treated differently than Plaintiff**

97.  Defendants Town Board and MPB have consistently imposed different standards of performance and requirements on Plaintiff that they have not been imposed on local residents.

98.  Plaintiff filed a FOIL request and as a result received documents relating to other sub-divisions that had been presented to the MPB during the same time period when Plaintiff's subdivision request was pending.

99.  Plaintiff received from the MPB offices data relating to the following subdivisions: Borenstein, Napolitano, Carrezola, AMD, and Savoury. Upon information and belief, the AMD subdivision application was by an owner who was not a local resident. She abandoned her application. The owners of all these other properties that were presented for subdivision approval were local residents.

100. David Borenstein's (Pasture Rock) subdivision had a two-phase development plan and the MPB granted a Negative Declaration of Significance and the project later received preliminary and final approval. Mr. Borenstein did not have to do special studies to justify his answers to questions that were presented on the Environmental Assessment Form that is required by the N.Y.S. DEC, and that has to be provided to the MPB.

101.  The Borenstein project is much larger than Plaintiff's project: it has more acreage (112 acres to Plaintiff's 35 acres); it has much more forest (108 acres to

Plaintiff's 26 acres); it indicated that it will be permanently removing more forest (about 14 acres of forest, while Plaintiff indicated that she would be removing 5 acres of forest); the Borenstein project indicated that it had more wetlands, including a stream that went into the Wappinger's Creek and NYS Freshwater Wetland RC-4 (about 5 acres, and Plaintiff's property had none) (Even if Plaintiff's 'pond' is counted as 'wetland', Plaintiff has less than 1/10 of an acre of wetland); the Borenstein project provided for more houses and more lots than Plaintiff's project (at least 15 for the Borenstein project and 5 new houses for Plaintiff's project). The Borenstein project indicated that the depth to bedrock was 0' to 3', and that the depth to the water table was 0' to 3'. Plaintiff's project indicated that the depth to bedrock was 3' to 10' and that the water table depth was 10' to 100' (Estimated). Both projects indicated that the predominant soil was Nassau Cardigan Complex.

102. The MPB retained a company called Greenplan, Inc. to review Plaintiff's project, and to review the Borenstein project. The principal of Greenplan is Ted Fink.

103. At an early part of the subdivision process, the applicant is required to complete an Environmental Assessment Form (EAF). The applicant has to certify that the answers provided are true and correct. Plaintiff did this.

104. The EAF Part 1, Part B, Question 4, asks "How many acres of vegetation will be removed from the site?" Plaintiff's answer was that 5-7 acres would be disturbed, but that 0 acres of such vegetation would be removed from the site. The EAF Part 1, Part B, Question 5, asks "Will any mature forest (over 100 years old) or other locally important vegetation be removed by the project?" Plaintiff answered "No". The MPB demanded that Plaintiff change her answers, to give false answers. When Plaintiff refused

to do that, the MPB forced Plaintiff to hire experts to prove the truth of the answers.

105. The treatment of Plaintiff by Mr. Fink and the MPB was different than the treatment that was accorded to local residents, who made the same answers to these EAF questions.

106. Mr. Fink rejected Plaintiff's answers to the questions involving depth to bedrock and depth to water table, citing the soil maps. Yet, the Borenstein project indicated that bedrock and the water table were 0' to 3' and Borenstein was not required to do any further studies.

107. Mr. Fink required that Plaintiff indicate each of the 52 deep tests that Plaintiff did on a plat, and indicate soil type, depth to bedrock, depth to water table, type of soil, for each deep test hole. He did not reject any of the answers given for the Borenstein project, nor did he impose this requirement on the Borenstein project.

108. In Part 1, Part A of the EAF, Question 11 states: "Does the site contain any species of plant or animal life that is identified as threatened or endangered?" Both the Borenstein project and Plaintiff's project had identical answers, that is, "No, according to DEC". The Borenstein project was not asked to do any studies to prove the validity of their answer. Plaintiff was required to do many studies, including an Environmental Impact Statement, just to have her project considered for purposes of determining whether a Positive or Negative Declaration of Significance should issue.

109. The EAF Part 1, Part B, Question 5, asks "Will any mature forest (over 100 years old) or other locally important vegetation be removed by the project?" Both the Borenstein project and Plaintiff's EAF answered "No". The Borenstein answer was not questioned, and Borenstein did not have to do any further studies. Plaintiff's response

was contested, even though Plaintiff had submitted expert witness reports from George Vengrin and Michael Nowicki to support her response. Even then, Plaintiff's response and the documentation supporting it, had not been sufficient for the MPB.

110.  Plaintiff had been required to limit the area which she can use to less than 50 % of her total acreage. Borenstein did not have to agree to such a restriction.

111. Plaintiff has been required to restrict development to building envelopes, which *in toto*, would average less than 2 acres per building lot. Borenstein's Pasture Rock Development did not have such a restriction.

112. The MPB has required that for Plaintiff's Property that was outside the building envelopes, Plaintiff's place the land into a formal Conservation Easement Agreement, enforceable by the Town, and operative pursuant to the New York State Environmental Conservation Law. The Borenstein Pasture Rock Subdivision did not have to do that.

113. The EAF Part 1, Part B, Question 18, asks "Will project use herbicides or pesticides?" Both the Borenstein project and Petitioners' project answered this question "No". Ted Fink did not criticize the answer of Borenstein. Ted Fink indicated that Plaintiff had to change her answer to "Yes", Mr. Fink said, because homeowners who occupy Plaintiff's lots might be using pesticides and herbicides to control insects. There is no rational reason why did he not require the Borenstein project to put a "Yes" answer. Borenstein's Pasture Rock is also a residential subdivision and if it is to be presumed that the prospective purchasers of Plaintiff's lots will use pesticides and herbicides, then one would expect the same presumption to apply to the prospective purchasers of Borenstein's Pasture Rock lots.

114. The Borenstein application is not the only one in which there is an inconsistency of treatment. In fact, many persons put the same answers as were put by Borenstein and Plaintiff on the EAF, but only Plaintiff had memos from Ted Fink telling her to change the response.

115. In the EAF Part 1, Part A, Question 11 asks "Does project site contain any species of plant or animal life that is identified as threatened or endangered.?" Petitioners answered "No" and Napolitano, Carrezola, and Savoury also answered "No". Plaintiff was the only one to have Ted Fink criticize the answer and require Petitioners to do special studies to justify her response.

116. In the EAF Part 1, Part B, Question 5 asks "Will any mature forest (over 100 years old) or other locally important vegetation be removed by this project?" Everyone, including Plaintiff, answered this question "No". Only Plaintiff was required by Ted Fink to do special studies to justify her answer.

117. In the EAF Part 1, Part B, Question 18 is "Will project use herbicides or pesticides?" Carrezola, Savoury, and Plaintiff all answered "No", but Ted Fink told only Plaintiff that she had to change her answer.

118. Plaintiff also filed a FOIL request for any reports that were done by the volunteers, Margiatta, Hughey, and Norman, with respect to these other subdivisions. No reports from these three volunteers were provided to Plaintiff. Upon information and belief, these volunteers did not do reports on the subdivisions being presented by these local residents.

119. Upon information and belief, Borenstein, Carrezola, Napolitano and Savoury are residents of Milan, and have been residents for long periods.

120. Upon information and belief, the Town and the MPB has never told a local resident that he or she cannot cut even one tree on that residents own property.

121. The Town and the MPB have discriminated against Plaintiff, by disparate treatment and by disparate impact, because her place of residence is New York City and because of her national origin.

122. Plaintiff has incurred damages of more than $100,000 because of the changes that had to be made in the construction work to accommodate local resident Paul Hughes and local residents Mr. and Mrs. Burns, because of the damages incurred from the issuance of the illegal STOP WORK order, and because of the extra studies and expert witness fees incurred by her to refute the false statements by the volunteers.

123. The Town and the MPB have imposed on Plaintiff, by reason of the Conservation Easement and the manner in which they have interpreted and applied it, terms and conditions that they do not apply to local residents, in violation of her rights as set forth above. The restrictions imposed reduce the total value of these lots by an amount of not less than $15,000 per lot, for a total of at least $90,000.

124. Frank Margiotta, Barbara Hughey, and Charlotte Norman did a preliminary report in May 2004 stating that the forested land on Plaintiff's Property was a "climax forest", which was not true, that one of the building sites was adjacent to a location where these volunteers "observed a rare lady slipper", which was not true, that one of the proposed common driveways "would compromise the root systems of large trees", which was not true, that the "forest cover on the site is a beautiful example of an undisturbed woodland", which was not true, and that the little pond "has almost certainly been affected by filling and dredging", which was not true. This report was treated by the MPB

as true and factual, and the MPB used it, and other reports and statements made at public hearing by these persons, to justify its demand that Plaintiff surrender control of more than 50% of her property to a Conservation Easement.

125. Thereafter, these three volunteers persisted in making false statements to the MPB throughout the proceedings that led up to the MPB's approval of the subdivision plats that were filed on June 29, 2006 and the Conservation Easement that was filed on July 30, 2006. During the November 2004 meeting of the MPB, Mr. Margiotta, continued to insist that there was a climax forest on Plaintiff's Property and told the MPB that he wanted to revisit the site of the project and "make sure that all the trees that he wanted to protect were in the Conservation Easement Area, and that, if they were not, he wanted to have them included". Until the Conservation Easement Agreement was actually executed, he was visiting the Property and identifying trees he liked on Plaintiff's Property and telling the MPB to add them to the Conservation Easement Area. The MPB acceded to his requests, and during the following months Mr. Margiotta added more trees to the Conservation Easement Area that he had been instrumental in having imposed.

126. Thereafter, these defendants continued with their false statements during the period when Plaintiff had to make the infrastructure to the project, which was not completed until September 2007.

127. Upon information and belief, these volunteers acted based on the premise that developments by persons who were from the City were irresponsible and 'bad', and that opposition to such developments by any means, including the making of false statements, was justified and 'good'. They did not make such assumptions and false statements with regard to projects being done by local residents.

128. From the beginning, these volunteers, who called themselves the Conservation Advisory Council, sought to have a Conservation Easement and harsh restrictions imposed on Plaintiff and her proposed development. At the end of their first report they stated this: "Conservation easement considerations and/or reconfigueration of the lots would lessen CAC concerns regarding this proposed subdivision. For example, some of the sensitive flora could be protected via a conservation easement swath through the subdivision." "Because this subdivision raises some serious environmental concerns, the developer should be asked to consider a cluster housing arrangement instead."

129. Plaintiff was ultimately required to have a Conservation Easement swath through the subdivision, as these defendants requested, even though there was no "sensitive flora" on the Property.

130. The statements made by these persons in their initial report, and thereafter, were false, and known to be false when made. Upon information and belief, these statements were made to derail this project, or to make it so costly to build, or so costly for Plaintiff to complete the subdivision process, and do the studies ordered by the MPB to refute the statements, as to cause Plaintiff to abandon the project.

131. Upon information and belief, this process of obstruction by making false statements was intentional and malicious. Prior to the commencement of one of the meetings before the MPB, one of Plaintiff's representatives told defendant Mr. Margiotta that Plaintiff could not find any "Lady slipper" near the site of house number 3, as indicated in his report; his response was a jocular "I guess the deer ate it".

132. Plaintiff had to have an arborist submit a study completely contradicting the statements by these defendants, and demonstrating that this Property was previously used

as pasture land, and that this was not a climax forest.

133.  The environmental expert hired by Plaintiff, Mike Nowicki, gave the same conclusion as Mr. Vengrin about the nature of the wooded areas.

134. Upon information and belief, the Forester of the N.Y.S. DEC walked the same Property recently, on October 16, 2007, and she gave an oral assessment of the Plaintiff's Property similar to the written assessment that had been made by George Vengrin.

135. The actions of these three volunteers caused harm to Plaintiff by causing her to incur at least $30,000 in additional costs to retain experts to refute the claims made by these defendants, to make changes to engineering plans, and for other costs directly related to these false statements.  Upon information and belief, the actions by these persons were motivated in whole or in part by the fact that Plaintiff was a City Person, and not a local resident.

136.  Plaintiff requests a jury trial on this claim.

**WHEREFORE,** Plaintiff requests that the Court:

(a)  Order Defendants pay to Plaintiff damages in the amount of at least $150,000 because of the extra costs and expenses incurred by Plaintiff be reason of the difference in treatment accorded to Plaintiff in violation of the FHA;

(b)  Order Defendants plus consequential damages in an amount of another $150,000, because of the delays caused by Defendants' actions, and the reduction in the value of her lots, by reason of the difference in treatment to Plaintiff, pursuant to the FHA;

(c)  Order Defendants to pay punitive damages in the amount of $500,000;

(d) Order Defendants to pay reasonable costs and attorney's fees to Plaintiff pursuant to the provisions of the FHA.

(e) Issue a Declaratory Judgment that the Conservation Easement Agreement constitutes a taking for which Plaintiff has been denied just compensation, and order that she be awarded just compensation for the taking;

(f) Issue a Declaratory Judgment that the Conservation Easement does not prohibit Plaintiff, or her successors and assigns from cutting trees or removing brush, for firewood, in accordance with generally accepted conservation practices;

(g) Enjoin Defendants from taking any adverse actions against Plaintiff or her successors and assigns for cutting trees or removing brush, in accordance with generally accepted conservation practices;

(h) Issue a Declaratory Judgment that the actions by Lauren Kingman, the MPB and Gary Beck in issuing a STOP WORK ORDER against Plaintiff in November 2005 was in retaliation for Plaintiff's refusing to comply with and opposing the illegal demands of the Town, the MPB and Mr. Beck for a donation or assessment to fund the Town's review of compliance by Plaintiff with the Conservation Easement Agreement, and award damages of at least $50,000 to Plaintiff, and additional consequential and punitive damages in the amount of another $150,000;

(i) Grant such other relief to Plaintiff as the Court deems just and proper.

**SECOND CAUSE OF ACTION - AGAINST THE TOWN, TOWN BOARD AND THE MPB FOR A DECLARATORY JUDGMENT THAT DEFENDANTS' ACTIONS CONSTITUTE A 'TAKING' OR "EXACTION", WITHIN THE MEAING OF THE U.S. AND N.Y.S. CONSTITUTIONS, FOR A DECLARATORY JUDGMENT THAT THE CONSERVATION EASEMENT IS NULL AND VOID, AND/OR INJUNCTIVE RELIEF TO UNDO THE TAKING WITHOUT COMPENSATION AND WITHOUT DUE PROCESS**

137. Plaintiff incorporates with full force and effect the allegations set forth in paragraphs 1-136 of this Complaint.

138. The Fifth Amendment of the United States Constitution provides "nor shall private property be taken for public use, without just compensation".

139. The Takings Clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment to the U.S. Constitution.

140. The New York State Bill of Rights has similar provisions in Article I, §§1, 6, 7, and 11.

141. Even if the government does not seize or occupy a property, a government regulation can work a taking if it "goes too far". The MPB has imposed exactions on Plaintiff as a condition for granting to her subdivision approval. The exactions have "gone too far". They have a substantial adverse effect in encumbering the Property of Plaintiff, they have substantially interfered with the reasonable investment backed expectations of Plaintiff, and they do not substantially advance legitimate state interests.

142. There is no essential nexus between what these Defendants have required, and are requiring of Plaintiff, and the public interest, and no proportionality between what they are requiring and the public interest that they purport to protect.

143. The parcel of approximately 36 acres that Plaintiff selected for purchase was selected precisely because it was not in an area that was classified as an environmental protection overlay district.

144. This land is not in a flood-plain, it does not border a major creek, and it is not an established wooded area. There were and are no NYS DEC Regulated Wetlands on this Property.

145.  There was nothing on record and nothing in fact that distinguished this Property as an environmentally sensitive area.

146.  Plaintiff had engaged in every good faith and prudent effort, prior to her purchase of this Property, to assure that there could not be any legitimate issues raised regarding the subdivision that she had proposed.

147. Upon information and belief, the MPB manufactured specious issues, to try to inhibit or prevent the proposed subdivision, solely because Plaintiff is from New York City, what the locals call one of the "City people".

148. By letter dated July 13, 2004, the New York State Office Of Parks, Recreation and Historic Preservation, Historic Preservation Field Services (OPRHP) advised the MPB that "Our office has no concerns regarding archeology and the project: additional archeological survey is not warranted".

149. By letter dated September 24, 2004, the New York State Office of Parks, Recreation and Historic Preservation, Historic Preservation Field Services Bureau stated that it did not have concerns about the development proposed by Plaintiff.

150.  By letter dated June 30, 2004, the Director of the Natural Heritage Program stated that it had no record of known occurrences or rare or state-listed animals or plants, significant natural communities, or other significant habitats, on or in the immediate vicinity of your sites.

151. Plaintiff's Property is not environmentally remarkable. Until Plaintiff attempted to subdivide this Property, no one, including officials in the Town of Milan, paid any attention to it, or thought it worthy of some kind of protections, for some or any reason.

152.   The determination of whether there has been a taking of property is a balancing test, sometimes referenced as a "rough proportionality" test, that involves consideration of the perceived environmental impact, whether it is real, and what limitations have been placed on the subservient landowner.

153.   The efficacy of municipal law and actions is based not just on the language of the statute or order, but it is based on the manner in which the municipal government applies that law or language. In the instant case, that means that it not just the language of the Conservation Easement Agreement, but the manner in which Lauren Kingman and the MPB have dictated it must be interpreted by their pronouncements of October 2007.

154.   The rulings by the Town and the MPB have effectively and actually precluded Plaintiff and her successors from use of the Conservation Easement Areas.

155.   The New York State Eminent Domain Procedure Law § 101 provides that:

> It is the purpose of this law to provide the exclusive procedure by which property shall be acquired by exercise of the power of eminent domain in New York state; to assure that just compensation shall be paid to those persons whose property rights are acquired by the exercise of eminent domain; . . . There must be a determination of the need and location of any public project, and offer and negotiations when private property rights are being taken

156. The Town, Town Board, and the MPB have effectuated a "taking" of Plaintiff's Property without complying with the provisions of the EDPL.

**WHEREFORE,** Plaintiff requests that the Court issue

(a) a Declaratory Judgment that the action of the Town of Milan, and the MPB, in imposing the Conservation Easement Agreement on Plaintiff as a condition of subdivision approval, and in thereafter interpreting that Conservation Easement Agreement as prohibiting the cutting of trees, or pruning of vegetation on the area covered by the Conservation Easement Agreement, has effectuated a "taking" or

"exaction" within the meaning of the U.S. Constitution and the New York State Constitution;

(b) a Declaratory Judgment that the Town of Milan and the MPB violated the rights of Plaintiff by not providing for any compensation to Plaintiff for the "taking" or "exaction" that it has made of Plaintiff and that they have not followed the procedures of the Eminent Domain Procedure Act in providing for compensation;

(c) a Declaratory Judgment that the Conservation Easement Agreement that the Town imposed on Plaintiff as a condition for subdivision approval is null and void; alternatively, an Order requiring that the MPB and the Town Board undertake the appropriate steps for setting the compensation due to Plaintiff for the taking of her Property.

(d) an Injunction restraining the Town of Milan, the MPB, or their successors or assigns, from seeking by any means, direct or indirect, to enforce the Conservation Easement Agreement, unless and until they follow the procedures set forth in the EDPL for compensation to Plaintiff for taking her Property; and

(e) granting to Plaintiff such other make whole relief to Plaintiff to place Plaintiff in the position that she would have had if the Town of Milan and the MPB had not engaged in the illegal actions;

(f) awarding to Plaintiff costs and attorney's fees and granting to Plaintiff such other relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION – AGAINST THE TOWN, TOWN BOARD, THE MPB FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE U.S. AND NEW YORK STATE CONSTITUTIONS AND 42 U.S.C. § 1983**

157.  Plaintiff incorporates with full force and effect the allegations previously set

forth in paragraphs 1-156 of the Complaint.

158. The U.S. Constitution and the New York State Constitution, as applicable in this case, provide that all citizens of the U.S. and New York State shall be treated the same, no matter where they are resident. The wrongful acts of public officials are subject to scrutiny pursuant to 42 U.S.C. §1983.

159. Defendants have acted one way with respect to Plaintiff and another way with respect to treatment of local residents. This distinction in treatment is arbitrary and capricious.

160. Upon information and belief, this difference in treatment is based on the presumption by the Town Board and the MPB that City People don't know how to deal with nature, therefore the Town Board and the MPB must impose requirements down to the finest, most minute detail, such as prohibiting the cutting of any tree on the Plaintiff's Property that has been proposed for subdivision approval.

**WHEREFORE,** Plaintiff requests that the Court issue

(a) a Declaratory Judgment that the action of the Town of Milan, and the MPB, in imposing the Conservation Easement Agreement on Plaintiff as a condition of subdivision approval, and in thereafter interpreting that Conservation Easement Agreement as prohibiting the cutting of trees, or pruning of vegetation on the area covered by the Conservation Easement Agreement, is arbitrary and capricious, and serves no valid state purpose;

(b) a Declaratory Judgment that the Conservation Easement Agreement that the Town imposed on Plaintiff as a condition for subdivision approval is null and void;

(d) an Injunction restraining the Town of Milan, the MPB, or their successors or

assigns, from seeking by any means, direct or indirect, to enforce the Conservation Easement Agreement; and

(e) granting to Plaintiff such other make whole relief to Plaintiff to place Plaintiff in the position that she would have had if the Town of Milan and the MPB had not engaged in the illegal actions;

(f) awarding to Plaintiff costs and attorney's fees and granting to Plaintiff such other relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION – AGAINST DEFENDANTS MARGIOTTA, HUGHEY AND NORMAN FOR INTENTIONAL INTERFERENCE WITH CONTRACT, AND FOR INTENTIONAL INTERFERENCE WITH PLAINTIFF'S PROSPECTIVE ECONOMIC ADVANTAGE

161. Plaintiff incorporates with full force and effect the allegations set forth in paragraphs 1-160 above.

162. The sub-division proceedings before the Town Board and the MPB and Plaintiff lead to a contract. The contract is embodied in the Subdivision Plats that were signed in this case by Lauren Kingman, as Chairman of the Town of Milan Planning Board, by Plaintiff and her professional engineer and surveyor. These subdivision plats reflected the work that was to be done by Plaintiff as part of the Subdivision.

**WHEREFORE,** Plaintiff requests that the Court:

A.      Issue a Declaratory Judgment that the statements made by these defendants were false, and known to be false when made;

B.      Order these defendants to pay damages in an amount of at least $50,000 or such other amount as is established at trial;

C.      Order these defendants to pay compensatory damages in an amount of at least $50,000, or such other amount as is established at trial;

D.        Order these defendants to pay punitive damages in the amount of at least $100,000 to deter them in the future from engaging in the kind of conduct that they used in opposing Plaintiff's subdivision.

**FIFTH CAUSE OF ACTION – FOR A DECLARATORY JUDGMENT THAT THE CONSERVATION EASEMENT AGREEMENT DOES NOT BAR PLAINTIFF OR HER SUCCESSORS FROM CUTTING TREES FOR THE GENERAL MAINTENANCE OF THEIR PROPERTY, EVEN IF THEY USE THE TREES CUT FOR FIREWOOD**

163. Plaintiff incorporates with full force and effect the allegations set forth in paragraphs 1-162 above.

164.  For the reasons stated, Plaintiff seeks a declaration that there has been a taking, and that the Conservation Easement Agreement which effectuated the taking was and is null and void, because it violated Plaintiff's due process rights and her rights to compensation for the taking.

165.   In the event that the Court determines that the relief sought in the prior causes of action should be denied, Plaintiff requests the Court to consider this cause of action and act upon it and give the relief requested by it.

166. The Conservation Easement Agreement permits for Plaintiff and her assigns, under the heading of General Maintenance, to take actions, "including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practices".

**WHEREFORE,** Plaintiff requests a Declaratory Judgment that Plaintiff and her assigns may cut trees in accordance with generally accepted forest conservation practices, and that they do not have to have a NYS DEC Forest Management Program or Plan in place in order to do that, and that they may use the wood and any other materials that they cut

for any purpose they chose, including, but not limited to, using it for firewood.

**SIXTH CAUSE OF ACTION – FOR A DECLARATORY JUDGMENT THAT THE CONSERVATION EASEMENT AGREEMENT IS NULL AND VOID**

167. Plaintiff incorporates with full force and effect the allegations set forth in paragraphs 1-166 of the Complaint.

168. Plaintiff was forced to accept the Conservation Easement Agreement in whatever form the Town, the Town Board and the MPB presented it, as a condition for being granted subdivision approval.

169. The Conservation Easement Agreement provided in paragraph 2, relating to the rights of the Grantee, which was the Town of Milan, that the purpose was "To preserve and protect the open space and forested character of the Easement Area pursuant to the values identified in the Town's master plan".

170. Upon information and belief, the Town did not have any valid Master Plan as of the date that it forced Plaintiff to agree to this Conservation Easement Agreement. The Town enacted a Master Plan to replace its previously existing Master Plan, but the new plan that purportedly was in effect as of this time was later struck down as illegal by the Dutchess County Supreme Court, Judge Brands. Therefore, any Conservation Easement Agreement is null and void because it was not authorized by law.

170. The Conservation Easement Agreement uses the term "forested character", but that term is so indefinite as to be impossible to Administer, as demonstrated by the MPB's interpretation rendered in October 2007. Sometimes it is necessary and appropriate to cut certain trees, like black locust, because they are invasive and damaging to other trees. Other times, it is necessary and appropriate to cut certain trees because

they adversely impact on the growth of other trees.  The MPB's latest order of October 2007 that Plaintiff does not have the right to cut any trees at all in the Conservation Easement Area prevents Plaintiff and her successors and assigns from even maintaining the 'forested character' of the property.

171.  In par. 3 (E) of the Conservation Easement, the Town provided that "there will be no use of rifle ranges or motorized vehicles, such as snow-mobiles and off-road recreational vehicles, upon the Conservation Easement Area except to provide access to all parts of Grantor's property for normal management, security, or emergencies purposes as deemed necessary by Grantor." This limitation excluded Plaintiff and her successors, and their children, from using the property for recreational purposes involving ATVs, snowmobiles, and the like.   This limitation is arbitrary and capricious, and totally unnecessary. The NYS DEC itself permits for the use by landowners of mechanized vehicles in lands being administered by the NYS DEC. See New York State Environmental Conservation Law §§190.11; 190.12.

172. Another part of the Conservation Easement Agreement, par. 5(A), states:

"Grantee (the Town of Milan) may bring an action at law or in equity in a court of competent jurisdiction to enforce the terms of this Easement, to enjoin the violation, by temporary or permanent injunction, to recover any damages, including recovery of reasonable attorney's fees, to which it may be entitled for violation of the terms of this Easement. . ."

173. Upon information and belief, this section of the Conservation Easement is illegal because it imposes a penalty that is not permitted because of Town Law §§268-269, which defines the enforcement mechanisms and remedies available, and preempts the Town from exceeding those mechanisms. It is illegal for the Town to force Plaintiff to accept a remedy not otherwise available to the Town as a condition for Plaintiff to obtain

something to which Plaintiff is otherwise entitled, that is, subdivision approval.

WHERFORE, Plaintiff requests that the Court:

(a) Enter a Declaratory Judgment that the Conservation Easement Agreement is invalid, in whole or in part:

(b) Enjoin the Town, the Town Board, and the MPB from enforcement of the Conservation Easement Agreement.

(c) Grant to Plaintiff such other relief as is just and equitable.

Dated: November 1, 2007                    Respectfully submitted,


_____/s/_____
Kenneth Mc Culloch (3372)
Attorney for Plaintiff
516 Fifth Avenue, 12th Floor
New York, N.Y. 10036
Tel. 212-398-9508
e-mail KMcCulloch@BRGSLAW.com