UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| **CARMEN OTERO MC CULLOCH,** | Civil Action No. 07 CIV 9780 (LAP) (RLE) |
| **PLAINTIFF,** | **ATTORNEY'S DECLARATION** |
| v. | |
| **TOWN OF MILAN, TOWN OF MILAN TOWN BOARD, JOHN V. TALMADGE,** Town Supervisor, and **ALFRED LO BRUTTON, PAULINE COMBE-CLARK, DIANE MAY,** and **ROSS WILLIAMS**, Councilpersons; **TOWN OF MILAN PLANNING BOARD, LAUREN KINGMAN,** Chairman, and Members **JEFFREY ANAGOS, PETER GOSS, SHEILA MARGIOTTA, MARY ANN HOFFMAN, AND PAULINE COMBE-CLARK;** And **GARY E. BECK,** Zoning Enforcement Officer, Town of Milan; And Frank Margiotta, Barbara Hughey, And Charlotte Norman | |
| **DEFENDANTS**. | |

_____

**DECLARATION OF KENNETH MC CULLOCH IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Kenneth Mc Culloch, an attorney admitted to practice in the United States District Court for the Southern District of New York, declares under penalties of perjury that the statements made herein are true and correct.

1. I am the attorney for Plaintiff Carmen Otero Mc Culloch (Plaintiff). I make this Declaration in opposition to Defendants' motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure (Fed.R.Civ.P.) Rule 12 (b) (6).

2. The Declaration filed in support of the motion to dismiss by Terry Rice, Defendants' attorney (Rice Declaration), asserts that Plaintiff has "concocted . . .

1

violations . . . to federalize routine, run-of-the-mill land use disputes. . . ." *Id.*¶3. Defendants acknowledge that Plaintiff cannot "generally cut down live trees" on her property, Defendants' Memo in Support of Motion to Dismiss (Defendants' memo), p. 26, but seek to trivialize the significance of this and every other imposition imposed against her, and ignore that Plaintiff's claims arise from violation of the Fair Housing Act, 42 U.S.C. §3601 *et seq*. (FHA) and other civil rights statutes, as though this is no "big deal". The Rice Declaration is inaccurate and omits many key facts.

3. Discrimination is a "big deal". The Town of Milan (Town) has 65 residents per square mile.[1] New York City has 26,402 residents per square mile, and Manhattan, where Plaintiff resides, has 66,940 residents per square mile. Defendants see enormous pressure coming from New York City, to populate their Town. Even worse, as the Town sees it, there is likely to be an enormous influx of minorities, foreigners and the other "undesirables" who populate New York City but who can hardly be found in the Town.

4. The Milan Comprehensive Plan (MCP)[2] demonstrates a strong concern for an influx of New York City residents. It states at the very beginning that one "important

---

[1] The statistics noted in this memo were asserted in the Complaint at ¶¶71-75.

[2] The Milan Comprehensive Plan (MCP) was referenced in the Complaint at ¶¶169-170 and Plaintiff's Sixth Cause of Action asserts that the Conservation Easement Agreement (CEA) is null and void because the MCP is void, and has been declared void. In a footnote 1, at what is actually page 14 of the unnumbered Rice Declaration filed in support of Defendants' motion to dismiss, Defendants state "Documents referenced in the Complaint may properly be referred to in a 12(b) (6) motion." Defendants thereafter provide citations to authority that are not repeated here. Plaintiff has provided a copy of the MCP as Exhibit 1 to this Declaration. It is also available on-line at www.milan-ny.gov, and by then clicking under "Town Planning", and then to "Comprehensive Plan". The decision of Judge Brands of the Dutchess County Supreme Court, dated February 7, 2007, declaring the former MCP null and void is also referenced in the Complaint at ¶170 and it is annexed to this Declaration as Exhibit 2. The MCP that was operative during most of the events described in the Complaint was the MCP that was declared null and void.

reason" that the Town up-dated its Comprehensive Plan was that "Development pressure is expanding north from the New York metropolitan areas following the Taconic State Parkway. The areas in southern and mid-Dutchess County have already experienced a major impact, and there is a marked increase in subdivision activity in Milan." 1.2. It further states that "Today, the TSP serves as a major commuting route for those people that want to live in the rural splendor while they continue to work in the metropolitan area, 70 miles to the south." 9.2.

    5. Plaintiff's property abuts the TSP, which is a north-south route, and is adjacent to east-west major road in the Town, which is Route 199. Complaint ¶11.

    6. The MCP indicates that the only residents who received the "Community Values Survey" that formed the basis for the MCP were the Town's residents, 1.3, and the only needs considered were those of the residents of Milan. "Milan's citizens value the rural quality of life the Town offers and want to keep Milan rural." 2.1. The intent of the Town and the MCP was to "KEEP MILAN RURAL", 7.1, to keep density below 150 persons per square mile, 3.4, to avoid "Explosive growth" that "threatens our rural character and risks causing even higher taxes to support our schools," 2.1, to have public services provided by other municipalities, but not by Milan, to keep Milan "affordable and accessible *to current residents*", 9.3, and to use the land use regulations to implement this self-centered policy. The MCP provided for developers to have higher density in return for providing for some units that would have to be sold or rented at reduced cost to the Town's *municipal employees* or *the Town's senior residents.* 3.3.

    7. The MCP on its face shows that it, and the Milan zoning laws which must be enacted pursuant to the MCP, have been enacted and administered with an exclusionary

3

purpose. Defendants have not provided a properly balanced and well-ordered plan for the community, and Defendants have not considered, as they must, regional needs and requirements.

8. Defendants' aim in zoning and administration of its zoning and land use regulations might be summed up by the phrase "that each community should take care of its own first", an objective which is constitutionally impermissible. *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 649 (2nd Cir. 1971), *cert. denied* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971). A municipality may not enact zoning regulations, nor administer them, exclusively for the benefit of its residents while ignoring regional needs. Thirty two years ago, the Town of New Castle tried to do the same thing that the Town of Milan is doing today. New Castle banned apartment houses, (Milan has done the same thing in its MCP, 7-7, and its zoning ordinances) because it was experiencing the same kind of growth which Milan feels at this time, and had the same concerns, that is, an influx of City People. In *Berenson v. Town of New Castle*, 38 N.Y. 2d 102, 378 N.Y.S.2d 672 (1975), the New York Court of Appeals rejected the New Castle zoning, finding that ". . . residents of Westchester County, as well as the larger New York City metropolitan region, may be searching for multiple-family housing in the area (New Castle) to be near their work and for a variety of other social and economic reasons. There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met". *Id.* at 111.

9. Treating persons differently, on the basis of residency has been rejected. "The goal of preventing an influx of outsiders is constitutionally impermissible. The residency requirement is not rationally related to the goal of planning". *Cole v. Housing Authority*,

435 F.2d 807 (1st Cir. 1970), at 813; *see also, Allen v. Town of North Hempstead*, 121 Misc. 2d 795, 469 N.Y.S.2d 528, 533 (one-year residency requirement to be eligible for certain senior citizen housing is constitutionally impermissible); *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (a durational residency requirement may not be enacted for the purpose of rewarding long-term residents for past contribution to the community).

    10. Discrimination against persons on the basis of residency is also a violation of civil rights laws when the use of that factor has a statistically significant adverse impact against minorities or any protected group. *Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792 (3d Cir. 1991); *United States v. City of Warren,* 759 F. Supp. 355 (E.D. Mich. 1991); *U.S. v. Cicero*, 786 F.2d 331 (7th Cir. 1986); *U.S. v. Elmwood Park,* 43 FEP Cases 995, 1987 WL 9586 N.D.Ill. 1987). In the *Town of Harrison* case, the Town's police force was largely white. The Town precluded persons who were not residents from applying for positions as police officers. This policy was found to be discriminatory because there was a substantial representation of African-Americans in Newark, and they were precluded from being considered for these positions. There was no defense that justified the policy.

    11. The Town has used conservation regulation as a subterfuge to hide its real intent. It made Plaintiff prove that her property was not 'suitable habitat' for a species of bats that had been found on the west side of the Hudson River, more than 70 miles from her property, yet it has done and is doing everything possible to prevent human persons who are resident in N.Y.C., just 70 miles away, from having 'suitable habitat' for their needs. It proudly proclaims that Milan residents want to keep the Town "the way it is".

The MCP notes that housing for senior citizens is a problem, 7-7, and then "recommends some senior housing units as a planned purpose development alternative, with set-asides granting first priority to *Milan residents* who might wish to relocate to such housing". 7-16. This is precisely the kind of thinking adjudicated to be illegal in *Allen v. Town of North Hempstead*, *supra*.

12. The MCP notes that its services are provided by other Towns, 8.2, notes that only 1% of the entire Town is zoned for commercial development, *id*., notes that strip malls should not be allowed even in the commercial areas, *id*., and makes no provision as of right for rehabilitation centers, nursing homes, group homes, housing for the impaired, shopping centers, and other uses that the public in general needs. It does not want City problems, or New York City's huddled masses that were beckoned by the Statue of Liberty. The presumptions that Defendants have articulated and acted upon is that (a) City People, that is, New York City residents, *see* Complaint ¶61 (d), do not know how to take care of the environment; and (b) they do not know how to take care of themselves, and the Town wants no part in addressing the problems of City People. *See* MCP.

13. The Town wants people who can afford large estates, pay a great deal in taxes, but not use much in resources, like schools. Even when the "rules" are stated to be the same for local residents as they are for "City People", Defendants make sure that the rules are bent, or not applied at all, to local residents. *See* Complaint ¶¶77-121.

14. This case is a "big deal" because this kind of provincialism and exclusionary practices has no place in the U.S., not in Mississippi in the 1960's nor in Milan, N.Y., in 2007. Defendants are nothing less than modern-day Nativists, using land use regulations rather than violence to achieve their goals. The same practices used against Plaintiff have

6

a chilling effect on other minorities, letting them know in no uncertain terms that they are not wanted in Milan and that they should avoid it. Correcting the illegal conduct and making the Town pay for it with dollars and cents is one of the best ways to terminate its practices.

15. The Complaint has alleged that the Town has an institutionalized policy of favoring Milan residents, and disfavoring City People and minorities, of using land use regulations, and the MCP to accomplish this, and of using (a) delay and (b) requiring persons like Plaintiff, who are City People and who are minorities, to sacrifice some substantive rights and claims, in order to have the benefit of other rights and entitlements.

16. The parts of the MCP set forth previously show favoritism to local residents. Other references to the MCP show how the MCP uses delay as a tool to implement its policy. The MCP states that "By *slowing* residential development, school taxes will rise less rapidly. On the other side of this equation is the addition of new, large-lot homes that more than pay their way in taxes." 2.5. To better provide for large-lots, the MCP proposed a zoning overlay, so that any lot would need at least 10 acres. 3.3. The MCP proposed that the Town Board "pass zoning and subdivision regulations that *require* developers to . . . use conservation subdivisions. . . . Town regulations and Planning Board procedures *will expedite the application process for developers who further the vision of Milan and plan their subdivisions accordingly"*. 3.4. It further provides that "Offering builders the option to either complete a conventional subdivision plan . . . or to use a net building acreage formula that can work to the builder's advantage . . . *by expediting the approval process*". 7-13.

17. The speed of the application process should be the same, as long as the project

complies with the pertinent rules and regulations. Bowing to Defendants' illegal demands for a Conservation Easement Agreement (CEA), or any other illegal demands, because that is the Town's "vision", should not cause a change in the time that the process takes.

18. The Complaint alleged facts showing that the Town's discriminatory plan was implemented against Plaintiff. It alleged that the MPB purposely delayed Plaintiff's project because Plaintiff would not agree to the conditions that it was demanding, namely, that Plaintiff agree to devote a substantial part of her property, that is, more than 50% to a CEA. *Id*. at ¶¶ 22-25. This was part of the Town's plan to delay development unless and until Plaintiff acceded to the CEA, which was part of the Town's "vision".

19. Defendants have claimed that Plaintiff's claims are time-barred. Defendants' Memo, p. 4. The Complaint alleges that the most recent series of events of discrimination occurred in September and October 2007. *Id.* ¶49, 51-53, 120. Plaintiff filed her complaint on November 5, 2007, less than two weeks after receiving the November 23, 2007 letter from the New York State Department of Environmental Conservation (DEC) advising that it would not do a Forest Management Program (FMP) for Lot No. 5 of Plaintiff's property, the lot for which she had a prospective purchaser. November 3 and 4, 2007 was a week-end, so this Complaint was filed within 30 days of October 5, 2007, the date that Mr. Kingman advised of the condition, and just two weeks after Plaintiff's receipt of the DEC letter.

20. The Complaint alleged that imposition of this prohibition in what had previously designated as the 17-acre CEA *totally* eliminated any beneficial purpose to Plaintiff and her successors that could have been served by the area within the CEA, adversely affected the non-CEA areas, and drastically reducing the value of the

8

remaining portions of the lots. *Id.* at ¶123; *see also*, ¶¶57-59. These allegations establish that, contrary to Defendants' argument at p. 24 of their legal memo, Plaintiff has claimed, as provided in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992), that "all economically beneficial use" of this 17-acre CEA area has been taken from her.

21. Defendants assert that the "trigger" date for filing this action was June 29, 2005, because that was the date that Defendants granted conditional final approval of the subdivision. *See* Defendants' Memo, at p. 4. The allegations in the Complaint show that this argument is without merit.

22. As of June 29, 2005, Plaintiff could only *start* building the infrastructure that she had been required to undertake as a result of the alleged discriminatory treatment, acts like the changing of the culvert, to accommodate the local person Paul Hughes, *id.* at ¶¶85-94, and changing the driveway and cutting trees along Willowbrook Road to accommodate local residents Mr. and Mrs. Burns. *Id* at ¶¶77-84.

23. At this point in this case, the Court only has to determine whether the action is timely; it does not even have to consider the "continuing violation" theory to determine that. *At a minimum*, substantial acts that caused damages to Plaintiff are within the two-year limitation period provided for in the FHA.[3]

---

[3]The following acts were within the two year period prior to this commencement of this action:
(1) the issuance of the STOP WORK order, on November 5, 2005, which continued in effect until it was rescinded;
(2) the 'remedial' work that Plaintiff had to agree to do in order to have the STOP WORK order rescinded;
(3) the extra costs that Plaintiff had to incur because of the STOP WORK order, because the delay caused Plaintiff to "lose" CH as the contractor for placing the utility lines (CH schedules its work months in advance and because Plaintiff was not ready for it, at the time that had been scheduled, Plaintiff either had to wait months again, or pay someone else to do the work that CH had already been paid to do);

9

24. The Complaint alleged that even when Plaintiff was doing this work, Mr. Kingman caused a 'STOP WORK' order to issue, on November 5, 2005, which was also within 2 years of the filing of the Complaint. *Id*. at 30. That 'STOP WORK' order was also discriminatory, illegal, and arbitrary and capricious. *Id*. at 33-35. The trees that Plaintiff had caused to be cut had already been cut, and there was no threat that any other trees would be cut. The 'STOP WORK' order was used by Mr. Kingman solely to impose additional planting and other work requirements on Plaintiff, and these other conditions were never part of the plans that had been conditionally approved. *Id*. at ¶38.

25. The Final Subdivision Plat was not signed by Mr. Kingman until June 26, 2006. *Id.* at 41. The final CEA was not filed with the Dutchess County Clerk's office until June 30, 2006. *Id*. at 42. The final work was not done, and the final inspection was

---

(4) the costs for the Letter of Credit that Plaintiff had to obtain, because Plaintiff could not complete the work in the time provided for by the Town's subdivision regulations, because of the delay caused by the STOP WORK order, so Plaintiff had to post the L/C and request an extension;
(5) the work that Plaintiff had to do to accommodate Paul Hughes and Mr. and Mrs. Burns, which was part of the work stopped by the STOP WORK order;
(6) damages caused by the imposition of the CEA that was a condition of the Final Approval of June 26, 2006, and because the CEA required of Plaintiff as a condition of Final Approval was much more onerous than the CEA that had been shown to Plaintiff earlier;
(7) the damages that occurred because of Mr. Kingman's directive of October 5, 2007, which banned the cutting of any live tree in the CEA (This damage was (a) the complete elimination of any value to Plaintiff of the 17-acre CEA, (b) a severe diminution in value to the balance of the lots, and (c) a delay in Plaintiff's ability to market those lots);
(8) the assessment against Plaintiff of $22,600 for the Town's own expenses for the town planner, consultants, engineers, and attorney's fees, including the attorney's fees incurred by the Town for its defense to Plaintiff's earlier Article 78 proceeding, and this was timely because Plaintiff did not receive the accounting of how her escrow account funds were disbursed until November 2007;
(9) the Closing costs and fees in June 2006 that Plaintiff incurred when the Final CEA was approved and had to be conveyed to the Town; and
(10) the additional work that Plaintiff had to do to delineate the CEA because of Defendant Frank Margiotta's continuing to visit Plaintiff's property, after November 5, 2005, to identify additional trees that he wanted to have included in the CEA.

not done by the Town's engineer until September 2007.

26. The Complaint alleged that Defendants acted in violation of New York State law by requiring her to pay for costs that the Town should have paid. *Id.* ¶45. Neither the Complaint nor the motion to dismiss indicates when this occurred, so there are no facts to rule that this claim is time-barred. (In fact, Plaintiff did not receive an accounting for the disbursements from her escrow account until after November 5, 2007. Until that time, Plaintiff did not know, and could not have known, what expenses the Town was paying from this account.)

27. The Complaint alleges a continuing course of discriminatory conduct relating to the CEA that does not stop, not when the conditional final approval was given, not even when the final approval was given, because Defendants have persisted in imposing different standards on Plaintiff throughout the proceedings, and to the present time. *Id.* at ¶¶30, 32. It also alleges that the CEA presented to Plaintiff prior to Defendants' actions on June 29, 2005, was different from the CEA that Plaintiff ultimately had to execute on June 29, 2006, and that the later was much more onerous. *Id.* at ¶43.

28. The same continuing conduct is alleged against the individually defendants, Frank Margiotta, Barbara Hughey, and Charlotte Norman, *id.* at ¶125, and that the CEA was changed to accommodate Mr. Margiotta's demands. *Id.* at ¶43.

29. Defendants have asserted at p. 6 of their memo that Plaintiff has not alleged facts to justify that she is a person "aggrieved" within the meaning of the FHA.

30. Plaintiff has alleged that she is Puerto Rican, that she is a resident of New York City, *id.* at ¶2, that the Defendants discriminate against her and residents of New York City, that she was personally treated differently because she is from New York

11

City, *id*. at ¶61, that a large proportion of at least 66% of the persons in New York City are minorities, like her, that almost all of the local persons are white, that all of the public officials and all of the Defendants are white, *id*. at ¶72-74, that local persons are treated differently than the manner in which she was treated, that the lots she was seeking to create would be marketed to persons from New York City, that Defendants used "City People" to refer to persons from New York City, ¶67, that Defendants made more onerous demands of her during the subdivision process, and in applying zoning laws, and in interpreting zoning and land use regulations with respect to her subdivision, than they used with respect to local residents, that the zoning laws and restrictions were not even applied with respect to local persons, that she was required to change the plans, at substantial expense, solely to accommodate local residents, and that the Defendants did all of this because they were acting on an assumption that City People did not know how to take care of the land.

31. Plaintiff alleged substantial facts to demonstrate that she was treated differently than local residents because she was one of the City People. *See* ¶¶70-123. She presented substantial statistical evidence in ¶71-76 to demonstrate that this difference in treatment against City People and in favor of local residents could and did adversely affect minorities, such as herself, in violation of the FHA.

32. Defendants have claimed that Plaintiff should have utilized procedures other than this Complaint to initiate review.

33. Plaintiff has alleged that Defendants' own actions prevent any possible review. Plaintiff alleged that the Town's regulations provide that a person aggrieved may seek judicial review "within 30 days *after the filing of the Planning Board's decision in*

*the office of the Town Clerk" Id*. at ¶25. Plaintiff has further alleged that "all during the proceedings, from April 2004 to the present, Defendant MPB has never filed any Decision in the office of the Town Clerk". *Id.* That includes Mr. Kingman's oral directive that prohibited the cutting of any live trees in the Conservation Easement Area. *Id.* These have been alleged as facts, and must be accepted as such for purposes of this motion.

34. Since no decision at all has been filed, no time for commencing an Article 78 proceeding commenced. Furthermore, Defendants' failure to adhere to the administrative procedures is notorious and has already been legally established.[4] In addition, Plaintiff alleged that the CEA imposed on Plaintiff recited that the imposition of and administration of the CEA was being taken pursuant to the MCP. ¶169. It further alleged that the MCP that the Town enacted on January 26, 2006 was adjudicated to be invalid on February 7, 2007. ¶170. *See* n. 4 below. As of the time that the CEA was executed on June 26, 2006, the Town had no valid MCP. *Id.*

35. Plaintiff has quoted in ¶155 of the Complaint from the EDPL which states that "It is the purpose of this law to provide the *exclusive* procedure by which property shall be acquired by eminent domain. . . There must be a determination of the need and location of any public project, and offer and negotiations when private property rights are being taken". The CEA gave certain property rights from Plaintiff to the Town, but the

---

[4] *See Red Wing Properties, Inc. v. Town of Milan, et al.,* Index No. 2883/06, Decision dated February 7, 2007, invalidating Town's Master Plan ("The court's review is limited to whether the Town's determination violated lawful procedures, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion. While any one of the procedural defects standing alone could possibly be construed as a mere irregularity and inconsequential, this court cannot ignore the cumulative nature of several procedural errors nor assign relative importance to each one as that is a legislative responsibility. To ignore them all would seem to defeat the purpose of the statutes requiring these procedures"). A copy of this unpublished decision is Exhibit 2 to this Declaration.

Town never made the determination of need, and never had an offer and negotiations. Further, the Town Planning Board never entered Mr. Kingman's decision of October 5, 2007, as required by §177-35 of the Milan Subdivision Regulations. *Id.* at ¶25 (c).

36. In *Stanley v. Bd. of Appeals of Village of Piermont,* 168 Misc. 797 (Sup. Ct., Rockland Co., 1938), the Court held that the words "filed in the office of the Board", in a statute requiring a decision of the village board of zoning appeals to be filed in the office of the Board, meant delivery of decision to the village clerk to be kept on file. *See also, Mc Cartney v. Village of East Williston,* 149 A.D.2d 556-7 (2d Dept. 1989), in which the Court held that motion to dismiss was property denied, because it was the burden of the municipality to establish that a vote had been taken, and that the vote of each member was reflected in the record filed, so as to establish that the board formally acted as a government body. Since the municipality had not met this burden, its motion was denied.

37. The New York Court of Appeals has ruled that the question of whether an administrative determination is "final and binding" can be a "thorny" issue, and that the nature of the record made in connection with the particular administrative action is a factor in determining whether the statutory standard has been met. *Yarbough v. Franco*, 95 N.Y.2d 342, 717 N.Y.S.2d 79, 740 N.E.2d 224 (2000). A challenge that would have been on an empty record does not have to be made. *Id.* at 347.

38. Based on the allegations in the Complaint, Plaintiff has alleged that there was no procedure available to Plaintiff to seek compensation in state court proceedings. By their motion to dismiss, Defendants want this Court to assume that they did everything that they were supposed to have done, and the brief statements in the Complaint show that such is not the case. If Defendants want to assert arguments about accrual of

14

Plaintiff's rights to assert any kind of claim, then Defendants must establish that the jurisdictional prerequisites existed as of the time that they assert the claim should have been made. Plaintiff has alleged compliance with the second part of the *Williamson* requirement because this condition of exhausting state remedies only exists "if a procedure is available to the claimant". *Id.*

39. Defendants argue that Plaintiff should have initiated an Article 78 proceeding "within 30 of the filing of the June 2005 decision" (Defendant's memo, p. 5). By this argument, Defendants seek to by-pass all of the steps that the municipality must allege to establish that Plaintiff *could have* filed an Article 78 proceeding at a particular time, and the fact allegations in the Complaint showing that Plaintiff could not have done this: (a) there was no decision filed in June 2005; (b) there is nothing in the record for this motion to indicate that there was a decision filed in June 2005; and (c) the only thing that happened in June 2005 was a conditional final approval.

40. Defendants claim at p. 15 of their memo that Plaintiff did not have any "property interest" in the 17-acre CEA. The Complaint alleges facts to show that as of the date when conditional final approval was granted on June 26, 2005, Plaintiff had a "property right" to the subdivision, and to the 17-acre CEA as of June 26, 2005. *See Sullivan v. Town of Salem et al.*, 805 F.2d 81, 84 (2d. Cir. 1986) (the "property interest" arises when the person has more than a unilateral expectation of a right, and when the person has a clear claim of entitlement to that right). As of June 26, 2005, Plaintiff had only to complete the infrastructure provided for, and execute the CEA so as of that time she had a property interest in the 17-acre CEA. That property interest was not the same as it had been, and it was completely extinguished by the directive that Plaintiff not cut trees

or bushes in the CEA.

41. Defendants claim at p. 24 of their memo that there was no "taking" of Plaintiff's property because all beneficial use of the property was not taken from her. The Complaint alleges facts to show that the only possible use that remained to her from the 17-acre CEA was passive recreation, that is walking in the CEA, and that was taken from her when Mr. Kingman ordered that no trees or brush be cut in this area. *Id*. at ¶¶58-59, 154 ("The rulings by the Town and the MPB have effectively and actually precluded Plaintiff and her successors from use of the Conservation Easement Area". *Id*. at ¶154).

42. The conditional final approval was a contract, and it was valid. It created rights in Plaintiff, and obligations to do what was provided for in the conditional final approval, in order to obtain the final approval, and the right to have the subdivision and sell lots. One of the things that Plaintiff was required to do was to enter into the CEA. Defendants knew about the CEA, because, as alleged in the Complaint, even at the very beginning of the subdivision process, their report recommended that the MPB require Plaintiff to enter into a CEA. These defendants knew of the CEA, as originally drafted, and as it was amended, and they caused it to be changed, to Plaintiff's detriment. As alleged in the Complaint, Frank Margiotta was going onto Plaintiff's property and identifying trees that he wanted to have included in the CEA, and the MPB did what he wanted. The actions of these defendants caused the MPB to require that the original CEA be changed, to reflect the inclusion of these other trees. There was a change demanded by the MPB because of the actions of these persons. There was resulting damages to Plaintiff. All of this is alleged in the Complaint. *See* ¶¶124-135.

43. Plaintiff has also alleged a claim for tortious interference with prospective

16

economic advantage, that it was accomplished through unlawful means, that is, by making false statements to the MPB, and that the purpose was to harm Plaintiff, which was accomplished. *Id. See also*, ¶¶161-162.

Dated: January 24, 2008

/s/_____

Kenneth Mc Culloch (KM 3372)