UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————

CARMEN OTERO MC CULLOCH,                    Civil Action No. 07 CIV 9780
                                             (LAP) (RLE)

                    PLAINTIFF,
                                             NOTICE OF MOTION
            v.                               FOR INJUNCTIVE RELIEF
                                             WITH PROPOSED FINDINGS
TOWN OF MILAN, TOWN OF MILAN TOWN            AND ORDER ATTACHED
BOARD, JOHN V. TALMADGE, Town
Supervisor, and ALFRED LO BRUTTON,
PAULINE COMBE-CLARK, DIANE MAY, and
ROSS WILLIAMS, Councilpersons, And

TOWN OF MILAN PLANNING BOARD,
LAUREN KINGMAN, Chairman, and
Members JEFFREY ANAGOS, PETER GOSS,
SHEILA MARGIOTTA, MARY ANN
HOFFMAN, AND PAULINE COMBE-CLARK
And GARY E. BECK, Zoning Enforcement Officer,
Town of Milan, And

Frank Margiotta, Barbara Hughey,
And Charlotte Norman

                    DEFENDANTS.
———————————————————————

        **PLEASE TAKE NOTICE** that upon the annexed Affidavits of Carmen Otero

Mc Culloch, dated February 21, 2008, Ron Gasparro, dated January 30, 2008, Gregory

M. DeSylva, dated February 19, 2008, and the Declaration of Kenneth Mc Culloch dated

February 22, 2008, and upon the prior proceedings in this action, Plaintiff will move this

Court, at the Courthouse at 500 Pearl Street, New York, New York 10007, on the 14th

day of March, 2008, at 9:30 A.M., or as soon thereafter as the matter may be heard, for an

injunction pursuant to the Federal Rules of Civil Procedure, Rule 65, and other rules

relating to the motion, restraining the Defendants, their successors and assigns, from

taking any adverse action against Plaintiff, or her successors and assigns, because they have engaged in the following activities on their own lands, which are part of the Conservation Easement Areas of the Woodland Hills subdivision in Milan, New York, and from imposing any condition for engaging in these activities:

A. Horticultural and managed forest land, equestrian, passive recreational and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and similar activities.

B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practices.

C. For purposes of this injunction, the following activities shall be deemed to be consistent with "generally accepted forest conservation practices": cutting of living trees with a diameter not in excess of five (5) inches diameter at breast height measured from the down slope side. Trees, even if larger, may be removed which endanger public safety, are diseased or invasive, damaged or fallen, or need to be cleared to ensure the health of other trees.

The complete provisions of the injunction sought, together with the reasons for its issuance, are set forth in the proposed Order that is annexed to this motion.

Dated: February 25, 2008

Kenneth Mc Culloch, Esq. (KM3372)

_____

Attorney For Plaintiff
516 Fifth Avenue, 12th Fl.
New York, New York 10036
Tel. 212-398-9508

To:    Terry Rice, Esq.
        Rice & Amon
        Four Executive Boulevard, Suite 100
        Suffern, New York 10901
        Attorney for Defendants

**PROPOSED FINDINGS AND ORDER**

**Findings of Fact**

1.        Plaintiff acquired a parcel of land of approximately 35 acres in the Town of Milan, Dutchess County, New York in about January 2004 and has been the owner of this property since that time. In or about April 2004, Plaintiff made application to the Defendant Milan Planning Board (MPB) for permission to divide this property into 6 lots, each to be 5 to 7 acres. Affidavit of Carmen Otero Mc Culloch (COM Aff't.) ¶3. Plaintiff is Puerto Rican and a resident of New York County, in N.Y.C. *Id.*

2.        In or about June 2006, the MPB granted permission for the subdivision, subject to conditions. One condition was that Plaintiff complete the infrastructure that was provided for in the plans. Another condition was that Plaintiff identify at least 17 acres of the property to a conservation easement area, and enter into a written Conservation Easement Agreement (CEA) with the MPB and the Defendant Town of Milan (Town) with respect to that area of approximately 17 acres. *Id.*

3.        Part of each lot is within the CEA. The remaining parts of each lot which are not within the CEA are approximately 1 to 3 acres. Affidavit of Ron Gasparro (Gasparro Aff't.) ¶¶12-13.

4.        In or about June 2006, the subdivision plans and the CEA, which was approved and executed by the MPB and the Town, were filed in the Dutchess County Clerk's Office. Thereafter, Plaintiff paid for and completed the infrastructure provided for in the plans. Declaration of Kenneth Mc Culloch (KJM Decl.) ¶3.

5.        As of about September 2007, Plaintiff had completed the infrastructure and obtained approvals of the Town's Engineer and other persons, so that she could sell

1

the lots as legal building lots. KJM Decl. ¶¶25-26; Exhibit 14.

6.     Plaintiff has invested more than $700,000 into the acquisition of this property and the development process. She has no mortgage on the property, but the investment of $700,000 constituted approximately 90% of the cash that she had. The lots are for sale, and the total amounts listed for all the lots add up to approximately $1.2 million. COM Aff't. ¶7.

7.     As of about September 2007, Plaintiff had a prospective purchaser for one of the lots, Lot 5. This lot was approximately 6.31 acres, about one-half in the CEA and the other half not in the CEA. It was improved with all of the infrastructure, like underground utilities and a common driveway permitting access to this lot, and it also had a good well producing approximately 20 gallons per minute. KJM Decl. ¶7

8.     Plaintiff furnished copies of the subdivision plans and the CEA to the prospective purchaser, Mr. L.S. Mr. L.S. had advised Plaintiff that he intended to construct a solar home on the lot and to cut firewood on the property, including the part of the lot that was within the CEA. He asked if that would be permitted. Plaintiff advised that she thought this would be permitted, but that she would obtain assurances from the MPB to that effect. *Id.* ¶8.

9.     The CEA states in pertinent part, under the heading of Reserved Rights, in ¶4, as follows:

> Specifically EXCEPTED and RESERVED from the grant of this easement are the rights and privileges described below, which are reserved to the Grantor, together with the right to grant the same or similar non-exclusive rights to others:
>
> A. Horticultural and managed forest land, equestrian, passive recreational and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and

similar activities.

    B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practices.

Id. Exhibit 2, at ¶4.

10. By a letter dated October 1, 2007 to Lauren Kingman, the Chairman of the MPB, Plaintiff presented this question:

> Specifically, may the owner of a Lot in Woodland Hills that included land that is part of the Conservation Easement Area ( all of the lots have at least parts in the Conservation Easement Area) cut down trees for firewood, for personal use, prudently, and as part of a forest management program on his or her own land? We think that the answer is "Yes", but we would like to have the Planning Board say so, and do so in writing, to avoid having this question raised in the future, as it is being raised now.
>
> In a later part of this letter Plaintiff further stated: "Larry said that he is very conservation minded, and that he wants to be able to gain part of the heat for his prospective house from firewood. He said he knows about conservation. He is talking about thinning out the underbrush and the smaller trees in a way that would be good for the remaining trees, and also allow him to have firewood."

Id. Exhibit 3.

11. On or about October 5, 2007, Lauren Kingman advised Plaintiff that no live tree could be cut in the CEA unless and until there was a Forest Management Program (FMP) instituted and approved by the New York State Department of Environmental Conservation (DEC) with respect to the part of the property in which such cutting was to be done. *Id.* ¶10.

12. Plaintiff immediately contacted the DEC to obtain the FMP that Mr. Kingman had indicated would be required. The person with responsibility for this work within the DEC and for the area where this property was located was Barbara Lucas Wilson. The usual use of the FMP is for large wooded parcels of 50 acres or more, and

for instances in which the owner of such large wooded properties intended to harvest timber for sale and profit. There are tax benefits to the owner for having such a program, but they are only available for such large wooded parcels. *Id*. ¶¶11, 46.

12.    By a letter dated October 23, 2007, the N.Y.S. DEC, through Senior Forester Barbara J. Lucas-Wilson, advised Plaintiff that:

> Unfortunately, I cannot grant your request for a Forest Management Plan for the 6.3 acre lot in your subdivision. This parcel is too small to manage effectively. Forest Management Plans that the Department of Environmental Conservation writes for private landowners are non-binding guidelines and recommendations based on a landowners goal and objectives for their forested land. If you would like some non-specific, general guidelines for forest management, I would be happy to write those up.

> KJM Decl., ¶11, and Exhibit 4.

13. Because Plaintiff cannot satisfy the requirement imposed by the MPB as a condition for cutting any live tree in the areas covered by the CEA, she and her successors and assigns cannot cut any live tree in those areas. COM Aff't., ¶4. The CEA provides for a broad array of remedies to the Town in the event that there is a violation of the CEA, including damages, costs and attorney's fees, and other relief including restoration of the portion of the Easement Area so injured. It further provides that enforcement of the CEA is totally within the discretion of the Town and that abstention in one instance shall not be deemed a waiver of the Town's rights to commence legal or equitable action thereafter for the violation or any other similar violation. CEA, pp. 7-8, Exhibit 2 to the KJM Decl.

14. Plaintiff had indicated to the potential purchaser that she would advise him when she had the assurances from the MPB that he sought. She has not done that, because she did not have such assurances, and he has not had further contact with

Plaintiff with regard to the purchase of Lot 5. KJM Decl. ¶8.

15. Plaintiff asserts that the Defendants' actions are arbitrary and capricious, that the are discriminatory, in violation of the equal protection clause and other parts of the U.S. Constitution, and in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §3601 *et seq.* (FHA), and that Defendants have acted against her because she is a minority, i.e., Puerto Rican, and because she resides in New York City. COM Aff't., ¶¶2-3. She asserts that Defendants discriminate against persons from New York City, and that such discrimination has an adverse and disparate impact against minorities, because the representation of minorities in New York City is far greater than the representation of minorities in the Town. *Id.* ¶¶16-26.

16. Barbara Lucas Wilson of the DEC provided to Plaintiff a list of Cooperating Foresters, who worked with the approval of the DEC. KJM Decl. ¶46. One of the names on that list was Gregory M. DeSylva, C.F.  Plaintiff has submitted an Affidavit from Mr. DeSylva in which he states:

> There are occasions when "generally accepted forest conservation practices" require the cutting of trees or the removal of brush. For example, the cutting of live trees may be appropriate and necessary to remove diseased trees or invasive species, to clear some trees to ensure the health of other trees, or to remove trees that endanger public safety. For this reason, an absolute ban on the cutting of any live tree is not consistent with what is required by "generally accepted forest conservation practices".

> Affidavit of Gregory M. DeSylva, ¶3.

17. Mr. Gasparro is an experienced real estate broker, and had been a contractor and a member of the Planning Board of the Town of Pleasant Valley, Dutchess County, New York. In his affidavit, Mr. Gasparro states:

10. It had been my understanding that because of these provisions (subsections A and B ¶4 of the CEA) of the cutting of trees would be permitted, "in accordance with generally accepted forest conservation practices". I did not view this provision as requiring a formal FMP created by the DEC as a condition to the cutting of trees. If the term "General maintenance of property, . . . in accordance with generally accepted forest conservation practices" means that a DEC FMP must be in place before any live tree might be cut in the areas covered by the CEA, then it seems to me, and more importantly, it will appear to prospective buyers, that such a DEC FMP must be in place in order for the owner to do any of the things that are described in subsection B above. In other words, the prohibition of cutting any live tree would also include a prohibition of "pruning, cutting, planting, landscaping, and clearing of trees and other vegetative matter" unless a DEC FMP is in place.

11. In my opinion, this restriction completely eliminates the value of the part of the property for each lot that is in the CEA. Prospective purchasers will not be able to use the CEA part of their lots to do anything. They cannot walk in that part of their property if they cannot prune it. I know this property, and I know that there is a great deal of brush and "living fence" type of vegetation on this property. The brush and some trees have to be cut in order to make a path through this CEA part of each lot.

16. In all my years as a developer, builder, and as a member of the Town of Pleasant Valley Planning Board, I have never encountered a situation in which a town imposed an absolute ban on a person cutting trees or removing brush from his or her own property. As a person who was formerly a member of the Town of Pleasant Valley Planning Board, and as a realtor, I do not think that the Town of Milan's ban on the cutting of any live tree is reasonable. I have been advised that even in instances in which the Town of Milan has imposed a requirement that there be a CEA, it has also specifically stated in those CEAs that the cutting of live trees is permitted. In my opinion, there is nothing environmentally unusual about this property. The Town's actions appear to me to be arbitrary and capricious.

18. Mr. Gasparro's Affidavit is also pertinent because it bears on the effect

of Defendants' restrictions, and its conduct in the past, on the marketability of these lots,

the economic effect of Defendants' actions, the uncertainty created by Defendants'

actions, on irreparable harm, and the reasons that Plaintiff seeks a permanent injunction.

He states:

13. I know the way that prospective customers look at property. These lots are each 5 to 7 acres, but, because of the restrictions, they are, in effect,

lots of about 1 to 3 acres. If this CEA area cannot even be used for cutting of trees, or clearing of brush, then the area is not only useless, but it will be considered by prospective purchasers as a detriment. I believe that they will be concerned that because they cannot cut any live tree in the CEA part of the lot that they are buying, they will be concerned that they will not be able to cut diseased trees that exist in the CEA area, and that they will not be able to eliminate or curtail invasive species in the CEA area. They also will be concerned that even if a large tree in the CEA area poses a potential problem to persons or property that is not in the CEA, they still would not be allowed to cut it.

14. There is a further problem that the Town of Milan has created with respect to the sale of these lots. People do not want to 'buy problems'. I have been kept abreast of the subdivision process for these lots. It seems to me that this prohibition against cutting of any live tree in the CEA is just the latest in a series of events that the Town has instituted to hinder or eliminate the use of these lots by Carmen Mc Culloch for residential purposes. If persons learn of this, and they are likely to learn of this attitude by the Town vis-à-vis these lots, persons are not likely to purchase these lots.

15. In my opinion, it is necessary that there be a permanent resolution of this issue, and any other issue that the Town wants to raise about the uses of the CEA and the lots themselves. Prospective purchasers will not want to hear that there is some kind of preliminary injunction in place. That only creates uncertainty. When persons pay substantial amounts for property, they want certainty and predictability with regard to the uses to which they can put the property.

17. In my opinion, unless and until it is finally determined what can be done in the CEA, if anything, these lots must be considered to be 1-3 acre lots, and marketed and sold as such. Given the uncertainty, I estimate that the value of these lots is reduced by an amount of $30,000 to $60,000 per lot because of the restrictions that have been imposed and that are in existence with respect to these lots.

19.   Plaintiff claims that she has been treated differently than others similarly situated, in many respects, and with respect to this CEA. There had been no instances prior to the time that Plaintiff made her application for subdivision approval in which the Defendants required the applicant to enter into a CEA as a condition of subdivision approval. KJM Decl. ¶24. Since 2004, there have been approximately 40 instances in

which person sought approval of the MPB for subdivision approval or other land use for which approval was needed. *Id*. ¶18. There have only been four (4) other instances in which Defendants have required the applicant to enter into a CEA at all. *Id*. These are the Quarfelt, Savoury, Napolitano and Carrezola subdivisions. *Id*.  In all those other instances Defendants have specifically provided that these persons, all "locals", have not had restrictions preventing them form cutting trees in the CEA. *See* Mc Culloch Decl. ¶¶ 17-20, and Exhibits 9-13 thereto.

20. Defendants' attorney, Janis Gomes Anderson of Van DeWater & Van DeWater, told Plaintiff that the Town had a "Form" CEA and that Plaintiff would have to execute the "Form" CEA that was required of others. *See* McCulloch Decl. ¶12-18. Defendants' attorney sent the "Form" CEA to Plaintiff by e-mail on November 1, 2005, *id*. Exhibit 5, and by e-mail again on February 6, 2006. *Id*. Exhibit 6. ("The form I sent you is generally the form used by the Town of Milan for conservation easements (another copy is attached for your convenience)". *Id*.

21. The "Form" CEAs sent to Plaintiff by Defendants' attorney, Ms. Gomes Anderson, on November 1, 2005 and again on February 6, 2006 stated at page 5, as part of the rights reserved to the Grantor, as follows:

> *A.* General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices *but no living tree with a diameter in excess of five (5) inches in diameter at breast height measured from the down slope may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damages or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformity with sound land and forest management practices to minimize erosion and adverse impacts on natural resources.*
>
> *Id.* ¶15.

8

22. When it came time for Plaintiff to actually execute the "Form" CEA, the part that is in italics above was omitted from the CEA that Plaintiff had to execute. *Id.* Exhibit 2, at pp. 5-6. Once again, Plaintiff was told that the "Form" CEA that she had to execute, which had now been changed so that the language in italics had been removed, was the same as that which other persons had to execute. *Id.* at ¶16.

23. Plaintiff did not learn until after January 2, 2008 that this was not true. On January 2, 2008, Defendants sent Plaintiff the CEAs that had been executed by those four other persons. *See* Defendants' transmission letter, KJM Decl. Exhibit 9. Each of those other CEAs contained the same language as that in the original "Form" CEA. *Id.* at ¶¶19-20.

24. The Quarfelt CEA, KJM Decl. Exhibit 10, stated at p. 9, among rights reserved to the Grantor, as follows:

> B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices but no living tree with a diameter in excess of five (5) inches at breast height measured from the downward slope side, may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damaged or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformity with sound land and forest management practices to minimize erosion and adverse impact on natural resources.

25. The Savoury (Hidden in the Hills) CEA, KJM Decl., Exhibit 11, stated at pp. 9-10, exactly the same language as that set forth above with respect to the Quarfelt subdivision application. The Napolitano (Stonewood) CEA, KJM Decl. Exhibit 12, stated at pp. 4-5, exactly the same language as that set forth above with respect to the Quarfelt and Savoury subdivision CEAs. The CEA produced by Defendants for the Carrezola

subdivision was not executed. It is KJM Decl. Exhibit 13, and states at p. 7, exactly the same language as that set forth above for the CEAs of Quarfelt, Savoury, and Napolitano.

26.  All of these persons, Quarfelt, Savoury, Napolitano, and Carrezola, are local persons and not New York City residents. Their addresses are indicated on the Exhibits 10-13, respectively.  The "locals" were given the original "Form" Agreement. *Id*. ¶19, and Exhibits 10-13. Plaintiff was the only party who had to execute a CEA that had language in her CEA that was different from the "Form" CEA. *Id.*

27. As a condition for seeking subdivision approval, Plaintiff was required to place money into an escrow account, which was at the disposal of the MPB. *Id.* ¶25. Over the course of proceedings, Plaintiff placed $22,602.25 into that account. *Id.* On or about November 1, 2007, Plaintiff was furnished with the accounting for that money, that is, how the MPB spent it. *Id.* Among the back-up materials submitted to Plaintiff with the accounting was a bill that included legal work done on February 1, 2005. It is part of Exhibit 14 to the KJM Decl., and is marked Exhibit 14A. It indicates "Background research on legal requirements for conservation easements . . . in preparation of conservation easement for Carrezola Subdivision. Web research for sample conservation easement". *Id* ¶26.

28. The materials sent to Plaintiff by the MPB as part of that accounting, *see* KJM Decl. Exhibit 14A, show that part of that work for Carrezola was billed to Plaintiff's escrow account and part to the Quarfelt escrow account. KJM Decl. ¶¶26-28. Presumably, this allocation of attorney's expenses was justifiable because the CEA being prepared for Carrezola was also to be used for Plaintiff and Quarfelt.

29. The "Form" CEA sent to Mr. Mc Culloch by Ms. Gomes Anderson, *see* KJM

Decl., Exhibits 5 and 6, was the same in pertinent part as the CEA that was later furnished to him as being the Carrezola and Quarfelt CEA. *Comp.* KJM Decl. Exhibit 5, p. 5 with Exhibit 10, pp. 8-10, and Exhibit 13, p.7.

30. Defendants charged the escrow of Plaintiff and Quarfelt for work done on the Carrezola CEA because Plaintiff and Quarfelt were going to have the same "Form" CEA as Carrezola; Plaintiff was told that the CEA that Plaintiff was to execute was the same "Form" Agreement that was being used for others. Defendants then required Plaintiff to execute a CEA different in pertinent part from the "Form" CEA and different from the Carrezola CEA (and different from the CEA used for Savoury, Napolitano, and Quarfelt). *Id.* ¶28.

31. Defendants thereafter billed Plaintiff for the work that Van DeWater & Van DeWater did so as to change the "Form" CEA to make it different from the "Form" CEA, and the Carrezola CEA. *Id.*

32. Defendants have manipulated the subdivision process so that persons who are not local persons, *i.e.*, City People, cannot use the treatment of locals as a precedent to argue for similar treatment under similar circumstances. For example, local resident Morton Getman did not have enough land to create a two-lot subdivision. At the meeting of the MPB on October 19, 2005, Chairman Kingman described how the MPB intended to grant him an exception, while not establishing a precedent for others, like minorities and City People. The minutes of that meeting state:

> Morton Getman Area Variance Recommendation – Chairman Kingman distributed a review of the case. The major concern of the board members was setting a precedent for creating substandard lots. Mr. Williams, Chair of the ZBA, said he would work with Janis Gomes, Planning and Zoning Attorney, to work a resolution so it would be extremely limited, only applying to a situation with these circumstances such as where the lot was originally a 3 acre lot, the lots were

combined, zoning was changed, and now the applicant wants to change the configuration back to the original lot. Ms. Williams said Ms. Gomes seems to be of the view that if the resolution is written correctly, it will not set a precedent.

*See* KJM Decl. ¶30. Mr. Morton later obtained approval of the subdivision that he sought, and the approval was accomplished in such a manner that City Persons and minorities would not be able to cite the Morton situation as a precedent for their own requests for approval. *Id.*

33. The "Janis Gomes" referenced in the MPB minutes of October 19, 2005, is the same Janis Gomes Anderson who told Plaintiff that the language of her CEA was the same as the language of the CEAs that other persons were required to execute. *Id.*

34. Defendants have an institutionalized practice of favoring local residents over New York City residents. The Milan Comprehensive Plan (MCP) demonstrates a strong concern about the influx of New York City residents. It states at the very beginning that one "important reason" that the Town up-dated its Comprehensive Plan was that "Development pressure is expanding north from the New York metropolitan areas following the Taconic State Parkway. The areas in southern and mid-Dutchess County have already experienced a major impact, and there is a marked increase in subdivision activity in Milan." 1.2. It further states that "Today, the TSP serves as a major commuting route for those people that want to live in the rural splendor while they continue to work in the metropolitan area, 70 miles to the south." 9.2. COM Aff't. ¶17. Plaintiff's land abuts the Taconic State Parkway and is very close to Route 199, which is the major east-west highway for northern Dutchess County.  *Id.*

35. The MCP indicates that the only needs considered were those of Town's residents, and the only needs addressed in the MCP were those of the Town's residents.

The intent of the Town and the MCP was to "KEEP MILAN RURAL", 7.1, to keep density below 150 persons per square mile, 3.4, to avoid "Explosive growth" that "threatens our rural character and risks causing even higher taxes to support our schools," 2.1, to have public services provided by other municipalities, but not by Milan, to keep Milan "affordable and accessible *to current residents*", 9.3, and to use the land use regulations to implement this self-centered policy. The MCP provided for developers to have higher density in return for providing for some units that would have to be sold or rented at reduced cost to the Town's *municipal employees* or *the Town's senior residents*. 3.3. *Id*. ¶18. The MCP also directs that the MPB slow down development, and delay the approval process for land use applications, unless persons agree to convey a CEA to the Town; *see* MCP, 2.5; 3.3; 3.4, 7-13. *Id.* ¶19.

36.  The MCP and the Milan zoning laws have been enacted and administered with an exclusionary purpose. Defendants have not provided a properly balanced and well-ordered plan for the community, and Defendants have not considered regional needs and requirements. *See* COM Aff't. ¶¶17-20.

37.  Treating local residents different from New York City residents has an adverse and disparate impact against minorities. *Id.* ¶22.

38. The 2000 Census, which is the most recent census, indicated that New York City had a total population of 8,085,742 persons as of that time; that 44% of these persons were White, 28% were African-American, 27% were Hispanic, and 10% Asian. The population density for New York City was 26,402 persons per square mile. The population density for Manhattan, where Plaintiff resides, was 66,940 persons per square mile. The same Census indicated that 880,000 of the residents of New York City were

Puerto Rican, like Plaintiff. *Id*. ¶23.

39. The 2000 Census for the Town of Milan had substantial errors. The 2000 Census was corrected due to an error in the total population count of Milan. Corrected population count results from a process called Count Question Resolution Program. Milan's total population in 2000 was 2,356, not 4,559 as originally reported. Due to the original error in total population, the U.S. Census corrected for four categories, Total population, Total Housing Units, Vacant Housing Units and Group Quarters population. They failed to correct any other data rendering the 2000 Census useless for demographic study. The original population density of Milan, based on a population of 4,559 persons was 126 persons per square mile. Using the lower figure of 2,356 as the population for the Town of Milan gives a density of 65 persons per square mile. *Id.* ¶24.

40. Assuming that the representation of minorities in Milan is statistically the same for the corrected population as it was for the uncorrected data, and using other sources, the non-minority population of Milan is approximately 78% of the total and is a substantially higher percentage than the percentage of the non-minority population of New York City. The population for each minority group in Milan is substantially less than the minority percentage of the population in New York City. *Id*. ¶25.

41. Any rules or standards that discriminate against "City People" can and does have a statistically significant adverse impact against minorities. In fact, because 66% of the population of New York City is minorities, the Town Board and the MPB know that by discriminating against New York City residents, they are more than likely, that is, at least 66% of the time, discriminating against a minority. In the instant case, Defendants have actually discriminated against a minority, because Plaintiff is a minority. *Id.* ¶26.

42. Defendants have treated Plaintiff differently than local residents Mr. and Mrs. Burns. The difference in treatment of Plaintiff as opposed to the treatment of Mr. and Mrs. Burns was *because* of residence. KJM Decl. ¶31.

43. Plaintiff tried to trim brush along Willowbrook Road, and was denied permission to do so. Mr. Burns wanted the common driveway that is Mc Culloch Drive moved, and he invoked this status as a resident: "As a resident for 30 years I have rights". Indeed, he did have rights, rights that Plaintiff did not have, because Defendants required that common driveway to be relocated, even though it meant trimming brush and cutting trees along Willowbrook Road. *See* KJM Decl. ¶¶31-37. Later, when Plaintiff cut trees along this same Willowbrook Road, as required for utility lines, Defendants once again said Plaintiff could not do so, and issued a "STOP WORK" Order because they had done so. *Id*. *See* KJM Decl. ¶¶31-37.

44. Defendants have treated Plaintiff differently than local resident Paul Hughes. *Id.* ¶¶38-44. The difference in treatment was *because* of residence.

45. Local resident Paul Hughes filled DEC wetlands, and Plaintiff was required to relocate culverts so as not to interfere with this illegal action by Mr. Hughes. The reason given by Mr. Kingman for this disparate treatment was "He's an old timer, we can't do anything about him." KJM Decl. ¶¶38-44. Left unstated, but equally obvious, was that Plaintiff was not a resident, and Defendants would do whatever they wanted with regard to their treatment of her, including requiring her to do extra work, and incur extra expenses so that Mr. Hughes could do what he wanted..

46. Milan residents opposed Plaintiff's subdivision because they believed that City People do not know how to treat the land. *Id*. ¶45.

47. The documents that Plaintiff submitted to Defendants as part of the subdivision process identified her place of residence as being in New York County of New York City and provided her surname, Otero, to Defendants. Otero is a Spanish-surname. COM Aff't. ¶3.

48. Defendants' actions have created irreparable harm to Plaintiff. Plaintiff has lost one prospective customer for one of the lots, Lot 5, KJM Decl. ¶8, but it is difficult, if not impossible to assess whether that customer and Plaintiff would have reached agreement and closed on the sale of this lot even if Defendants had said "Yes" to the question posed in her letter dated October 5, 2007.

49. Plaintiff is 65 years old and retired. COM Aff't. ¶2. She has substantial obligations, and she is counting on the sale of these lots for income. If she sells these lots, she will have cash of somewhere from $900,000 to $1.12 million. *Id.* ¶11. That amount will be able to reasonably provide to her an annual income of an amount between $54,000 to $72,000. *Id.*

50. These are difficult times to be a seller. Gasparro Aff't. ¶5. It is even more difficult to be a seller in these times when the seller cannot provide assurances to the prospective purchaser about what uses, if any, the purchaser will be able to make of the area of the lots that is within the CEA. All of this creates an uncertainty. *Id*. ¶¶11, 13-15.

51. Plaintiff's attempts to market and sell these lots has been hampered, and perhaps even deterred completely, because of the restrictions imposed by Defendants. This has created hardship on Plaintiff. *Id.*

52. Because Plaintiff has not been able to sell these lots, Plaintiff has been forced to make other financial decisions. In November, 2007, she and her husband sold a home

that they had in Pleasant Valley, but they would not have sold that home if they had been able to sell even one of these lots. COM Aff't. ¶9. It is difficult, if not impossible, to place a value on the loss that she suffered in this regard.

53. Plaintiff has a car with 85,000 miles on it. *Id.* ¶10. Plaintiff wanted to purchase a new car, and actually did make the down payment for that new car, a Prius. However, the next day, she cancelled that purchase, because she felt she could not prudently use her available resources for such purposes, and that she had to conserve the limited cash resources that she did have available for the expenses that she knew would be coming. It is difficult, if not impossible, to place a value on the loss that she suffered in this regard. *Id.* Plaintiff does not feel comfortable that she can continue to meet her financial obligations without the need to return to work. *Id.* ¶11.

**Conclusions of law**

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction is based on 28 U.S.C. §1367 (a) in that all the claims presented herein are based on a common set of facts and form part of the same case or controversy. Plaintiff has properly invoked the jurisdiction of this Court by asserting claims under federal statutes and the U.S. Constitution.

2. Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) in that the acts described herein occurred in the District. The residences of Plaintiff and Defendants are in the District.

3. Plaintiff is "aggrieved" within the meaning of the FHA. The FHA has a broad definition of who is a person "aggrieved" under the FHA. *Havens Realty Corp. v. Coleman, supra,* at 372, 102 S. Ct. at 1121 (the sole requirement for standing under the

17

FHA is the "[Article] III minima of injury in fact". To meet this standard, plaintiff must allege that he or she has suffered a distinct and palpable injury and that the injury is traceable to the defendant's discriminatory conduct". *Id*. at 376). *See also*, *Assisted Living Associates LLC v. Moorestown Tp.,* 996 F.Supp. 409, 425 (D.N.J. 1998) ("Congress has provided a cause of action under 42 U.S.C. §3613 to a particularly broad group of potential plaintiffs: 'an aggrieved person', which is defined to include 'any person who (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person *will be injured* by a discriminatory housing practice that is *about to occur*.' 42 U.S.C. §3613(i) (emphasis added)." An increase in the costs for development constitutes an actionable injury. *Id*. at 425, citing to 7 other cases also. *See LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996) ("An injury need not be economic or tangible to confer standing (Citations omitted)". *Id.* at 425.

4. The FHA makes it unlawful "to refuse to sell or rent . . .  or otherwise make unavailable or deny a dwelling to a person because of . . . national origin". 42 U.S.C. §3604(a). In *LeBlanc-Sternberg v. Fletcher*, *supra*, the Second Circuit stated that "The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions. (Citations omitted)". *Id*. at 424.

5. The FHA applies to zoning regulations *and to the interpretation and application of zoning regulations*. *See LeBlanc-Sternberg v. Fletcher*, *supra* ("where it has been established that a zoning ordinance will likely be applied in a discriminatory manner, it is unnecessary that the municipality actually so apply it before the ordinance

may properly be challenged" *Id.* at 425); *Regional Economic Community v. City of Middletown*, 294 F.3d 35, 45-46 (2d Cir. 2002) ("All three statutes (FHA, ADA, and the Rehabilitation Act), apply to municipal zoning decisions". *Id.* at 45-46), *cert. denied*, 537 U.S. 813 (2002); *Tsombanidis v. West Haven Fire Dept., et al.*, 352 F.3d 565, 574 (2d. Cir. 2003) (FHA applies to interpretation of fire code, and action was not mooted because municipality changed its interpretation of the fire code); *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007). *See also* listing of cases cited in *Assisted Living Associates LLC v. Moorestown Tp., supra,* at 425.

6. The facts set forth in the Complaint and the motion establish that Plaintiff is aggrieved, has standing, and that her claims are "ripe" for adjudication.

7**.** Plaintiff has stated a cause of action for violation of the FHA. The principles developed under Title VII are applicable in FHA cases. *See Regional Economic Community, supra.* ("We analyze claims of intentional discrimination under the FHA . . . under the familiar *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973), burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. (citations omitted)" *Id*. at 48-49). "An FHA violation may be established on a theory of disparate impact or one of disparate treatment." *LeBlanc-Sternberg v. Fletcher, supra* at 425. "A disparate-treatment claim requires proof of 'differential treatment of similarly situated persons or groups' (citations omitted)". *Reinhart v. Lincoln County*, 482 F.3d 1225, 1229 (10th Cir. 2007).

8. The FHA applies to claims of disparate treatment, *i.e*., "intentional" conduct.

The "intent to discriminate" for purposes of determining whether a *prima facie* case has been stated may be inferred from the totality of the circumstances, including "the fact, if it is true, that the law bears more heavily on one [group] than another". *LeBlanc-Sternberg, supra* at 425, citing *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976).

9. "If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons". *LeBlanc-Sternberg, supra,* at 425.  Statements made at public meetings, or by public officials, may be considered in assessing whether the action was taken for improper motive. *Id.* at 425-6; *see also, Regional Economic Community, supra* at 50-51 wherein the Second Circuit quoted extensively from administrative proceedings to determine "intent".

10.  In *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court stated that "intent" could be inferred, and set forth factors from which intent could be derived. *Id.* at 265.  "Intent" is established if discrimination was *one* significant factor in the decision making process. *Regional Economic Community, supra at 49 (*"to establish a prima facie case of discrimination (under the disparate treatment theory) under the FHA . . . the plaintiffs must present evidence that "animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Id.* (Emphasis as in original); *see also, Hispanic Counseling Center, Inc.v. Village of Hempstead*, 237 F.Supp.2d 284, 292-93 (E.D.N.Y. 2002).

10. The FHA applies to conduct that is discriminatory even if the discrimination

was not intentional. A disparate impact claim challenges a facially neutral policy that "actually or predictably results in . . . discrimination." *Tsombanidis, supra* at 575, citing *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir. 1988), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). In a disparate impact case, the plaintiff does not have to show that the policy was formulated with discriminatory intent. *Id.* at 934. "[A] showing of significant discriminatory effect suffices to demonstrate a [prima facie] violation of the Fair Housing Act." *Hallmark Developers, Inc. v. Fulton County, GA.*, 466 F.3d 1276, 1286 (11th Cir. 2006).

11. The Town *openly* discriminates in favor of Town residents, and against City People, and *openly* states that delay should and will be used to force persons like Plaintiff to consent to Conservation Easements. The facts establishing this are in the Milan Comprehensive Plan (MCP) Defendants' aim in zoning and administration of its zoning and land use regulations might be summed up by the phrase "that each community should take care of its own first", an objective which is constitutionally impermissible. *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 649 (2nd Cir. 1971), *cert. denied* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971). A municipality may not enact zoning regulations, nor administer them, exclusively for the benefit of its residents while ignoring regional needs.

12. The Town of New Castle tried to do the same things that the Town of Milan is doing today. New Castle banned apartment houses, (Milan has done the same thing in its MCP, 7-7, and its zoning ordinances) because it was experiencing the same kind of growth which Milan feels at this time, and had the same concerns, that is, an influx of City People. In *Berenson v. Town of New Castle*, 38 N.Y. 2d 102, 378 N.Y.S.2d 672

(1975), the New York Court of Appeals rejected the New Castle zoning, finding that ". . . residents of Westchester County, as well as the larger New York City metropolitan region, may be searching for multiple-family housing in the area (New Castle) to be near their work and for a variety of other social and economic reasons.  There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met". *Id.* at 111.

13. Treating persons differently, on the basis of residency has been rejected. "The goal of preventing an influx of outsiders is constitutionally impermissible. The residency requirement is not rationally related to the goal of planning". *Cole v. Housing Authority*, 435 F.2d 807 (1st Cir. 1970), at 813; *see also, Allen v. Town of North Hempstead*, 121 Misc. 2d 795, 469 N.Y.S.2d 528, 533 (Sup. Ct. Nassau Co. 1983) (one-year residency requirement to be eligible for certain senior citizen housing is constitutionally impermissible); *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969) (a durational residency requirement may not be enacted for the purpose of rewarding long-term residents for past contribution to the community).

14. Discrimination against persons on the basis of residency is also a violation of civil rights laws when the use of that factor has a statistically significant adverse impact against minorities or any protected group. *Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792 (3d Cir. 1991); *U.S.  v. City of Warren,* 759 F. Supp. 355 (E.D. Mich. 1991); *U.S. v. Cicero*, 786 F.2d 331 (7th Cir. 1986); *U.S. v. Elmwood Park,* 43 FEP Cases 995, 1987 WL 9586 N.D.Ill. 1987). These cases noted above were analyzed under the disparate impact theory. The same kind of statistical data that has been alleged in this case sufficed to state a claim in those cases.

15. In the *Town of Harrison* case, the Town's police force was largely white. The Town precluded persons who were not residents from applying for positions as police officers. This policy was found to be discriminatory because there was a substantial representation of African-Americans in Newark, N.J., and they were precluded from being considered for these positions.

16. Defendants' conduct cannot be excused because of assumptions made by Defendants about City People. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (Employer violated Title VII because it refused to accept applications from women with pre-school age children, while hiring men with pre-school age children, based on the assumption that women have to take care of the children, so they are more likely to miss work for that reason. Even though 80% of the employer's work force was females, the Supreme Court held that the sex-plus discrimination was as unlawful as a refusal to hire based on sex alone. *Id.* at 544).

17. Defendants' policy of imposing more onerous standards on minorities and City People, and of banning minorities and City People from cutting any live tree on their property, is disparate treatment. It is just as discriminatory as a policy of refusing to accept subdivision applications from persons who are minorities and City People. As in the *Town of Harrison* case, and the others cited with it, there is no rational basis for the difference in treatment. Defendants' explicit policy of favoring Milan residents, and disfavoring City People, may be neutral on its face insofar as race or national origin are concerned, but it has a discriminatory impact on minorities. Plaintiff is a minority, and she has been adversely affected by the policy.

18. A violation of the FHA can also be established if a challenged practice or

ordinance discriminates against protected class members on its face and serves no legitimate governmental interest. *Horizon House Developmental Servs. v. Township of Upper Southampton,* 804 F.Supp. 683, 693 (E.D. Pa. 1992), *aff'd.*, 995 F.2d 217 (3d Cir. 1993). The Town's MCP discriminates on its face in favor of Town residents and against City People.

19.    The principles summarized by this Court in *MasterCard International Incorporated v. Federation Internationale De Football Association*, 464 F. Supp.2d 264 (S.D.N.Y. 2006) (J. Preska) are equally applicable in this case:

> It is well-settled that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. (Citation omitted). "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." (Citations omitted).
>
> A showing of irreparable harm is required for both preliminary and permanent injunctive relief. (Citation omitted). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." (Citation omitted). The Court of Appeals has stated that a showing of "probable irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction'". (Citations omitted). Accordingly, the element of irreparable harm is considered first.

*Id.* at 300.

20. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Assocs., Inc. v. Saban Entm't., Inc*., 60 F.3d 27, 37 (2d Cir. 1995), quoted in MasterCard, supra, at 299-300.

21. Each of the following has been found to satisfy this definition:

a. The loss of the opportunity to sell her unique products, that is, these lots, at the earliest possible time, and with certainty for the potential purchasers about what they will

be permitted to do in the CEA. *See Tom Doherty, supra.*

b. "[A] threatened imminent loss that will be very difficult to quantify at trial", *Doherty, supra,* 60 F.3d at 38; *Muze v. Digital On-Demand, Inc.*, 123 F. Supp. 118, 131 (S.D.N.Y.2000) (citing *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d. Cir. 1981); Muze, 123 F.Supp. 2d at 131 (granting injunction where "short-and long-term harm" was not "precisely calculable in money damages").

22. In the absence of an injunction, Plaintiff will suffer each of these forms of irreparable harm. Plaintiff has already had to sell a different property to obtain money, because she had not been able to sell Lot 5 to Mr. L.S. It is difficult to precisely calculate whether Mr. L.S. would have purchased Lot 5 if Defendants had given the assurances that Plaintiff sought. It is difficult, if not impossible, to calculate whether Plaintiff received the best possible price for the house in Pleasant Valley that she sold. The point is that she would not have sold that house, if she had sold one of the Lots in Woodland Hills. She would have purchased a new car, if she had sold one of those lots. She would not consider coming out of retirement, and returning to work at age 65, if she had sold one or more of those lots. All of these are life style decisions, and the economic impact of these decisions, are not precisely, if at all, calculable in money damages.

23. In his affidavit, Ron Gasparro, the realtor who is familiar with this property, has described the property and the impact that Defendants' actions have had on prospective purchasers. He indicated that the loss of value for each lot varied from $30,000 to $60,000 per lot. He also indicated that this is a difficult market for anyone to be a seller. If Plaintiff sells these lots at "fire-sale" prices, under the circumstances that Defendants have created, it is difficult, if not impossible, to calculate whether the low

sale price was because of the difficult market, or because of the arbitrary and unreasonable restrictions that have been imposed by Defendants.

24. To obtain a permanent injunction, a plaintiff must prove its claim "by a preponderance of the evidence." *Mc Neil-P.C.C., Inc. v. Bristol-Myers, Inc.*, 938 F.2d 1544, 1548 (2d. Cir. 1991).   Plaintiff has established her claim by a preponderance of the evidence.

25. The role of the MCP is significant. New York's Town Law §263 requires that Town zoning regulations be made in accordance with a comprehensive plan. *Randolph v. Town of Brookhaven*, 37 N.Y.2d 544, 547, 375 N.Y.S.2d 315 (1999). The purpose of this requirement is to ensure that the zoning regulations benefit the entire community and not just individual or special interests. *Asian Ams. For Equality v. Koch*, 72 N.Y.2d 121, 131, 531 N.Y.S.2d 782, 527 N.E.2d 265 (1999). Defendants' discriminatory actions described in the documents submitted in support of the motion show that Defendants were acting in conformance with the MCP's intent to discriminate in favor of Milan residents, and against all others, especially City People. The MCP presents a conscious, deliberate attempt to slow the influx of persons from New York City. The Town residents have stated in public hearings relating to Plaintiff's subdivision that City People do not know how to take care of the land. Plaintiff is one of those City People. The statistics show that this policy has and is expected to have a statistically significant adverse impact against minorities, because most of these City People are minorities.

25.  The CEA which Defendants required Plaintiff to execute states that the CEA is pursuant to the Master Plan of the Town of Milan. KJM Decl., Exhibit 2, p. 1.

26. It was and is arbitrary and capricious, and a difference of treatment to Plaintiff

for Defendants to take the following actions:

a. The CEA provides that Plaintiff can cut trees and remove brush. It is contrary to the terms of the CEA for Defendants to claim that she cannot cut trees at all, given the language in the CEA.

b. The CEA states that Plaintiff may undertake those actions "in accordance with generally accepted forest conservation practices". It is contrary to those terms for Defendants to not allow that "trees may be removed which endanger public safety, are diseased, damaged or fallen, or need to be cleared to ensure the health of other trees" when that is obviously conduct that is consistent with "generally accepted forest conservation practices", and actually required by "generally accepted forest conservation practices:. DeSylva Aff't. ¶37

c. Defendants made no mention in the DEC of the need for Plaintiff to have a DEC FMP in place as a condition for cutting any live trees. In fact, the CEA specifically provided for cutting live trees without reference to there being a DEC FMP. It is bad faith for Defendants to impose this requirement *post-facto*, when Defendants know that Plaintiff cannot act contrary to Defendants' demands without incurring the possibility of substantial damages and costs, and after letting Plaintiff incur all of the costs necessary to create the infrastructure required of her.

d. The CEA for Plaintiff is more permissive to her than the CEA that Defendants required for the only other subdivisions for which a CEA was required, *i.e.*, the Carrezola, Napolitano, Savoury, and Quarfelt subdivisions.

e. Assuming, however, that the provisions of the CEA for these other subdivisions, and the "Form" CEA, were more permissive to the Grantor, Defendants

acted improperly, and in a discriminatory manner, in not providing the "Form" CEA language to Plaintiff, after telling her that the "Form" CEA was the one she would have to execute, but in giving the "Form" CEA to these other persons.

f.. Since the "Form" CEA and the CEAs of these other persons permits for the cutting of trees up to 5 inches in diameter, at breast height, when measured from the downward slope, Defendants acted improperly and in a discriminatory manner by prohibiting Plaintiff and her successors from engaging in the same conduct, unless and until she had a DEC FMP in place. These other persons were not required to have a FMP from the DEC in place in order to cut such trees.

g. Defendants treated Plaintiff differently than local residents Mr. and Mrs. Burns precisely *because of* place of residence, *i.e.*, Mr. and Mrs. Burns were local residents, and Plaintiff was one of the City People. When Plaintiff wanted to cut trees and clear brush along Willowbrook Road, Defendants did not permit such actions. When Mr. and Mrs. Burns wanted a change of one of the common driveways, which necessitated cutting of brush and trees along Willowbrook Road, Defendants required this.

h. Defendants treated Plaintiff differently than local residents Paul Hughes, precisely *because of* place of residence, *i.e.*, Mr. Hughes was an "old timer", and Plaintiff was one of the City People.

27. Plaintiff has demonstrated that a balancing of the hardships decidedly tips in favor of Plaintiff. Plaintiff has demonstrated that she will suffer irreparable harm if the injunctive relief is not granted.

28. Defendants cannot demonstrate that they will suffer any harm if the injunctive relief is granted. In fact, if it is granted, Plaintiff will be in the same position that she

would have been in, absent the illegal and arbitrary interpretation of the CEA that Defendants have put forward. It is hard for Defendants to even argue that Plaintiff should not be allowed what she seeks, when what she seeks are the same rights that Defendants have permitted by reason of the CEAs granted to local residents for the subdivisions of Carrezola, Savoury, Napolitano, and Quarfelt.

29. For the reasons stated, Plaintiff is entitled to permanent injunctive relief. Plaintiff is entitled to

1.) A permanent injunction restraining the Defendants, their successors and assigns, from taking any adverse action against Plaintiff, or her successors and assigns, because they have engaged in the following activities on their own lands, which are part of the Conservation Easement Areas of the Woodland Hills subdivision in Milan, New York, and from imposing any condition for engaging in these activities:

A. Horticultural and managed forest land, equestrian, passive recreational and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and similar activities.

B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practices.

For purposes of this injunction, the following activities shall be deemed to be consistent with "generally accepted forest conservation practices": cutting of living trees with a diameter not in excess of five (5) inches diameter at breast height measured from the down slope side. Trees, even if larger, may be removed which endanger public safety, are diseased or invasive, damaged or fallen, or need to be cleared to ensure the health of

other trees.

2.) Reasonable costs and attorneys' fees pursuant to the provisions of the FHA.

     30. Plaintiff will submit the Injunction Order for signature, on notice to Defendants. The parties will confer on the amount to be awarded. If they agree, they will submit their agreement to the Court within ten (10) days. If they do not agree by that time, Plaintiff shall submit the request for costs and fees to the Court.

So Ordered:                        _____

                                     Hon. Loretta A. Preska, U.S.D.J.