**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**CARMEN OTERO MC CULLOCH,**

                         **Civil Action No. 07 CIV 9780**
                          **(LAP) (RLE)**

         **PLAINTIFF,**

     v.

**TOWN OF MILAN, TOWN OF MILAN TOWN**
**BOARD, JOHN V. TALMADGE, Town**
**Supervisor, and ALFRED LO BRUTTON,**
**PAULINE COMBE-CLARK, DIANE MAY, and**
**ROSS WILLIAMS, Councilpersons, And**

**TOWN OF MILAN PLANNING BOARD,**
**LAUREN KINGMAN, Chairman, and**
**Members JEFFREY ANAGOS, PETER GOSS,**
**SHEILA MARGIOTTA, MARY ANN**
**HOFFMAN, AND PAULINE COMBE-CLARK**
**And GARY E. BECK, Zoning Enforcement Officer,**
**Town of Milan, And**

**Frank Margiotta, Barbara Hughey,**
**And Charlotte Norman**

              **DEFENDANTS**.
_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR INJUNCTIVE RELIEF**


Dated: February 22, 2008          Respectfully submitted,

                                Kenneth Mc Culloch (3372)
                                Attorney for Plaintiff
                                516 Fifth Avenue, 12th Floor
                                New York, N.Y. 10036
                                Tel. 212-398-9508
                                e-mail KMcCulloch@BRGSLAW.com

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**………………………………………………..1

**BACKGROUND FACTS**………………………………………...1

**Plaintiff is suffering irreparable harm**………………………………4

**Plaintiff has demonstrated a likelihood of success**………………………..8

**POINT - PLAINTIFF'S MOTION SHOULD BE GRANTED**…………15

**Alternative Procedures For Achieving The Relief Sought**………………19

**CONCLUSION**……………………………………………………20

# TABLE OF AUTHORITIES

**Page**

*Cases cited*

*Allen v. Town of North Hempstead*, 121 Misc. 2d 795,
469 N.Y.S.2d 528 (Sup. Ct. Nassau Co. 1983)………………………………19

*Berenson v. Town of New Castle*, 38 N.Y. 2d 102,
378 N.Y.S.2d 672 (1975)……………………………………………………18

*Cole v. Housing Authority*, 435 F.2d 807 (1st Cir. 1970)……………………19

*Cohen v. Brown University,* 809 F.Supp. 978, 984 (D.R.I. 1992),
*aff'd.*, 991 F.2d 888 (1st Cir. 1993)
*on remand*, 879 F.Supp. 185 (D.R.I. 1995) …………………………………20

*King  v. New Rochelle Municipal Housing Authority*,
442 F.2d 646, 649 (2nd Cir. 1971), *cert. denied*
404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971)………………………....18

*MasterCard International Incorporated v. Federation
Internationale De Football Association*, 464 F. Supp.2d 264
(S.D.N.Y. 2006) (J. Preska)……………………………………..…………17, 18

*Newark Branch, NAACP v. Town of Harrison*,
940 F.2d 792 (3d Cir. 1991)………………………………………………19

*New York State National Organization for Women v. Randall Terry*,
704 F.Supp. 1247, 1262 (S.D.N.Y. 1989), *aff'd as modified*,
886 F.2d 1247, 1262 (2d Cir. 1989)  ………………………………………..18

*Saini v. International Game Technology*,
494 F.Supp. 2d 913, 919 (D.Nev. 2006)…………………………………….16

*Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322,
22 L.Ed.2d 600 (1969)………………………………………………………19

*U.S. v. Cicero*, 786 F.2d 331 (7th Cir. 1986)………………………………...19

*U.S.  v. City of Warren,* 759 F. Supp. 355 (E.D. Mich. 1991)………………19

*U.S. v. Elmwood Park,* 43 FEP Cases 995,
1987 WL 9586 N.D.Ill. 1987)………………………………………………19

***Statutes and other authorities***

Federal Rules of Civil Procedure (Fed.R.Civ.P.), Rule 57…………………19

Fed.R.Civ.P. Rule 65(a)…………………………………………………….17

Fed.R.Civ.P., Rule 65(d)………………………………………………………18

## INTRODUCTION

This memo is submitted by Carmen Otero Mc Culloch (Plaintiff) in support of her motion for injunctive relief against the Town of Milan (the Town), the Milan Planning Board (MPB) and the Town's Zoning Administration Officer, Gary E. Beck, (Defendants) from taking any adverse action against Plaintiff, her successors and/or assigns because they have taken the following action with respect to the area that is identified as the conservation easement area covered by a Conservation Easement Agreement for each of the six lots that comprise the development known as Woodland Hills in the Town of Milan:

> General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices.

This motion is supported by the Affidavits of Plaintiff, Ron Gasparro, and Gregory M. DeSylva, and the Declaration of Kenneth Mc Culloch. Injunctive relief is warranted because Plaintiff has suffered and continues to suffer irreparable harm because of illegal action by Defendants, and because there is a great likelihood that she will be successful at trial in establishing that Defendants' actions are arbitrary and capricious, and that they are illegal and discriminatory in violation of applicable laws.

## BACKGROUND FACTS

In January 2004, Plaintiff had purchased a property of approximately 35 acres in the Town of Milan with the intent of subdividing the property into six lots and selling the lots. Affidavit of Carmen Otero Mc Culloch (COM Aff't), ¶3. By June 2006, Plaintiff had obtained subdivision approval from the Town and the MPB for the subdivision, subject to her completing the infrastructure for the development known as Woodland

Hills. As a condition of obtaining such approval, Plaintiff was required by the Town and the MPB to designate approximately 17 acres of the 35 acres as conservation easement area, and to agree that such 17 acres would be subject to a Conservation Easement Agreement (CEA). *Id.* The lots were each 5-7 acres and a part of each lot was in the area covered by the CEA. *Id.*

The CEA provided that Plaintiff and her successors and assigns could act on the part of her property covered by the CEA as follows:

> B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices.

Declaration of Kenneth J. Mc Culloch (KJM Decl.), Exhibit 2, p. 6.

One of Plaintiff's expert witnesses, Gregory M. DeSylva, C.F., was perplexed by Plaintiff's request for his affidavit for purposes of this motion. He did not understand, and perhaps the Court will not understand, how there could be an issue regarding the cutting of trees in the CEA when the CEA itself provided that Plaintiff and her successors could cut trees in the areas covered by the CEA.

The need for Mr. DeSylva's Affidavit[1] and for emergency immediate relief from this Court has arisen because Defendant MPB, through its Chairman, Lauren Kingman, has directed that no live tree can be cut in the areas of Plaintiff's property that are

---

1. Mr. DeSylva states in ¶3 of his Affidavit:

There are occasions when "generally accepted forest conservation practices" require the cutting of trees or the removal of brush. For example, the cutting of live trees may be appropriate and necessary to remove diseased trees or invasive species, to clear some trees to ensure the health of other trees, or to remove trees that endanger public safety. For this reason, an absolute ban on the cutting of any live tree is not consistent with what is required by "generally accepted forest conservation practices".

covered by the CEA. KJM Decl. ¶¶9-11. Mr. Kingman and the MPB has directed that no live tree may be cut in any of those areas unless and until there is a Forest Management Program (FMP) established by the New York State Department of Environmental Conservation (DEC) relating to those areas covered by the CEA. *Id.* Plaintiff tried to comply with this directive. *Id.* However, the DEC does not do FMPs for relatively small parcels, so it declined to create a FMP for Lot 5. *Id.*; *see also*, KJM Decl. 4 for DEC's letter rejecting Plaintiff's request for a FMP. Because the condition imposed by Mr. Kingman and the MPB is impossible to comply with, neither Plaintiff nor any purchaser can cut any live tree in any of the areas covered by the CEA

Each of the six lots in Plaintiff's Woodland Hills subdivision is 5 to 7 acres and a part of each lot is in the area covered by the CEA. Affidavit of Ron Gasparro (Gasparro Aff't.) ¶12. The useable area of each lot is approximately 1-3 acres. *Id.* ¶13. Lot 5 became the catalyst for this action because Plaintiff had a potential purchaser for Lot 5. KJM Decl. ¶¶7-8. The prospective purchaser was Larry Strickland. *Id.* He was given a copy of the subdivision plats and the CEA relating to the Woodland Hills subdivision; he indicated that he wanted to be able to cut trees for firewood in the area of Lot 5 that was within the CEA, and that he would be doing so in a manner consistent with "generally accepted forest conservation practices".[2] *Id.* Plaintiff had sought assurances from Mr. Kingman and the MPB that such cutting of trees could be done, the response of these Defendants was negative, as explained above. *Id.*

---

[2] The question that Plaintiff posed to Defendants in writing was "Specifically, may the owner of a Lot in Woodland Hills that includes land that is part of the Conservation Easement Area (all of the lots have at least parts in the Conservation Easement Area) cut down trees for firewood, for personal use, prudently, and as part of a forest management program on his or her own land?" *See* KJM Decl., Exhibit 3 for the letter that Plaintiff sent to Defendants. Defendants' response is and has been "No".

Lot 5 is 6.31 acres, about one-half within the CEA area and the other one-half outside the CEA area. Gasparro Aff't., ¶12. It has a good well, producing 20 gallons per minute. KJM Decl. ¶7. Like all of the lots, it has underground utilities and a common driveway to the lot. *Id*. The listed price for this lot when Mr. Strickland inquired about it was $225,000. *Id*. The immediate effect of Defendants' action was the loss of interest by Mr. Strickland in purchasing Lot 5. KJM Decl. ¶8.

**Plaintiff is suffering irreparable harm.** Defendants treat City People, *i.e.,* persons from New York City, and minorities, like Plaintiff, different from local persons. *See* COM Aff't ¶¶16-26. Based on the presumption that City People and minorities, like Plaintiff, are environmental idiots insofar as dealing with nature is concerned, Defendants act as though they cannot be trusted to deal with their own property in accordance with "generally accepted forest conservation practices", and that they must have from the DEC a special program to identify what tree, if any, may be cut, has actually placed Plaintiff and her successors in the position that they cannot act in accordance with "generally accepted forest conservation practices". Neither Plaintiff nor her successors, *i.e.*, purchasers, are permitted to cut trees even if they are diseased or invasive species; similarly, they cannot clear some trees to ensure the health of other trees or to remove trees that endanger public safety[3]. As Mr. DeSylva states in his Affidavit, ¶ 3, "an absolute ban on the cutting of any live tree is not consistent with what is required by "generally accepted forest conservation practices.'" This situation creates irreparable harm to Plaintiff and her successors.

---

[3] Lot 5, and many of the other lots, have the area covered by the CEA so close to the location for the house proposed for the lot that there is a serious concern that large trees in the CEA that fall may endanger the house and the occupants. KJM Decl. ¶47.

The CEA, at pp. 5-6, states that Plaintiff, has certain specified rights.

A. Horticultural and managed forest, equestrian, passive recreational open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing, and similar activities.

KJM Decl. Exhibit 2, p. 5.

Plaintiff cannot "manage a forest" if Plaintiff cannot cut trees or remove brush. DeSylva Aff't. ¶3. Plaintiff cannot engage in "private trail walking" if Plaintiff cannot make the trail. Gasparro Aff't. ¶11. Paths through the woods do not exist naturally. Walking through woods that have stickers and "natural fence" vegetation and that might be infested with ticks from deer, which is the status of much of the areas covered by the CEA, is not a "walk in the park". Defendants' actions render the areas covered by the CEA unfit for any purpose. *Id.* [4]

Some of the trees in the CEA show evidence of disease and should be eliminated for that reason. KJM Decl. ¶7. If they are not eliminated, the disease that infects these trees could spread to other trees, not only in the area covered by the CEA, but in the area that is not covered by the CEA. The time to do pruning and removal of brush and diseased trees is during the Winter, because it is much more difficult to do this work in a prudent manner once the vegetation starts growing again in the Spring.

---

[4] The Gasparro Aff't. states:

> 11. In my opinion, this restriction completely eliminates the value of the part of the property for each lot that is in the CEA. Prospective purchasers will not be able to use the CEA part of their lots to do anything. They cannot walk in that part of their property if they cannot prune it. I know this property, and I know that there is a great deal of brush and "living fence" type of vegetation on the property. The brush and some trees have to be cut to make a path through the CEA part of each lot.

Defendants' actions have effectively prevented Plaintiff from marketing and selling her lots. This has caused irreparable harm to Plaintiff. Plaintiff is 65 years old and retired. She has invested more than 4 years and more than $700,000 in acquiring this property, effecting the subdivision, and building the infrastructure required. COM Aff't. ¶2. Plaintiff has no mortgage on this property, but the cash investment that she has made in this property constitutes more than 90% of her liquid resources. *Id*. ¶¶7-8. Plaintiff has substantial other obligations on a continuing basis. *Id*. Because she has invested so much of her liquid assets into this property, Plaintiff has not had sufficient liquid assets to pay her monthly obligations and she has had to make financial decisions that she otherwise would not have made. *Id*. ¶¶9-10.

If Plaintiff had been able to sell lot 5 to Mr. Strickland in or around September or October 2007, she would have had cash available to pay other expenses. Since she did not have that cash available, she and her husband sold a house in Pleasant Valley, New York, about 11 miles from this property, that they had been using for week-ends and vacations since 2000. They sold that house in November 2007. There was a substantial mortgage on that house. The amount realized from the sale of that house in Pleasant Valley was less than the amount that she would have realized on the sale of Lot 5 to Mr. Strickland. Plaintiff would not have sold that house if she had been able to sell even one lot from the Woodland Hills subdivision. *Id*. ¶9

Plaintiff owns a car that has more than 85,000 miles on it. *Id*. ¶10. She wants to purchase a new car. Recently, over President's Day week-end, Plaintiff placed a $500 deposit on a new Prius. *Id.* The dealer was to give her a $3000 credit on her current car. The next day, she cancelled that purchase because it would have required her to assume

6

debt. *Id*. She has delayed purchasing a new car because she needs to conserve her existing liquid assets to meet monthly expenses that will come due in the near future. *Id*. If Plaintiff had sold even one lot from the Woodland Hills subdivision, she would have purchased that new car. *Id*.

If Plaintiff sells the lots, she will be able to have sufficient funds so that she will not have to consider coming out of retirement and returning to work. *Id*. ¶14. Under current circumstances, however, that is precisely what she has to consider. It is difficult if not impossible to place a dollar value on the damages that she would have suffered if she does have to go back to work.

Defendants' restrictions have substantially reduced, if not eliminated, her ability to market and sell these lots. Even if they could be sold, the current status reduces the value of the lots by substantial amounts. In his Affidavit, real estate expert Ron Gasparro states at ¶6 that the restrictions imposed by reason of there being areas designated as conservation easement area, and the CEA, as applied by Defendants, "reduce the prospective market for those lots. Most prospective buyers would prefer not to have restrictions placed on the property that they are considering acquiring." Mr. Gasparro then goes on in ¶¶ 13-15 of his Affidavit to explain why there has to be a permanent injunction issued so as to avoid irreparable harm. Mr. Gasparro concludes by stating in his affidavit that "I estimate that the value of these lots is reduced by an amount of $30,000 to $60,000 per lot because of the restrictions that have been imposed and that are in existence with respect to these lots." *Id*. ¶17.

Defendants should not be opposed to this motion. They should want Plaintiff to be able to market and sell her lots for as much as possible, because the more she obtains

from such sales, the less potential damages Defendants face. Instead, Defendants have been adamant in their arbitrary and capricious conduct, necessitating this motion. Their intent is obviously to bring Plaintiff to the brink of financial ruin, and thereby "teach" City People and Puerto Ricans that they are not wanted in Milan.

**Plaintiff has demonstrated a likelihood of success.** Defendants' actions are arbitrary and capricious. They are discriminatory against Plaintiff. Defendants have never imposed this restriction on cutting of trees on anyone else. The actions against Plaintiff are discriminatory, based on residence because even where Defendants have imposed a CEA on local persons, they have never imposed a requirement that such persons have a DEC instituted FMP in place as a condition for cutting trees or clearing brush in the areas covered by the CEA.   Defendants have also been malicious and deceptive in imposing this requirement.

1. The CEA specifically states that Plaintiff can cut trees and remove brush in the areas covered by the CEA. Defendants' directive that Plaintiff cannot undertake such action is directly contrary to the written language of the CEA and arbitrary and capricious for that reason.

2. The CEA states that the cutting of trees and clearing of brush could be undertaken pursuant to "generally accepted forest conservation practices." Plaintiff's written request to Defendants mirrored the language of the CEA. *See* n. 2 *supra*. Only when Plaintiff presented her letter did Defendants say that acting according to "generally accepted forest conservation practices" was not good enough, that there had to be a DEC FMP in place.

3. If Defendants intended to require a DEC FMP as a condition for cutting of any live tree in any part of the CEA for any lot, then they could have and should have stated that in the CEA. Plaintiff and her successors can be required by other provisions of the CEA to pay very substantial damages and to pay the costs and attorneys' fees of Defendants if they act contrary to Defendants' directive. *See* CEA, Exhibit 2 to Mc Culloch Decl. at ¶¶6-8.

4. Ron Gasparro has been a real estate broker, builder, and a member of the Town of Pleasant Valley Planning Board. In all of his years he never heard of any planning board imposing a requirement that an owner not be allowed to cut down trees or cut brush. He thought that Defendants' actions were arbitrary and capricious. Garparro Aff't. ¶16.

5. Barbara Lucas Wilson[5] of the DEC provided a list of DEC Cooperating Foresters to Plaintiff, and from that list Plaintiff selected Gregory M. DeSylva. His affidavit shows establishes that Defendants' actions are arbitrary and capricious. DeSylva Aff't. ¶3.

6. Defendants' treatment of others shows that Defendants have been arbitrary and capricious. There have only been four (4) other instances in which Defendants have required the applicant to enter into a CEA at all, and in all those other instances Defendants have specifically provided that these persons, all "locals", have not had restrictions preventing them form cutting trees in the CEA. *See* Mc Culloch Decl. ¶¶ 17-20, and Exhibits 9-13 thereto.

---

[5] Ms. Lucas Wilson could not give her own affidavit because the legal department of the DEC told her she was not allowed to "get involved" in a dispute between the Town and Plaintiff. KJM Decl. ¶46.

7. The language of Plaintiff's CEA is actually more beneficial to Plaintiff and less restrictive than the language of the four other CEAs that Defendants required of applicants. *See* Mc Culloch Decl. ¶21. Nevertheless, those others could cut trees without having a FMP instituted by the DEC, but Plaintiff has not been allowed the right to do so.

8. Assuming that the CEA for these other persons is more beneficial to them than Plaintiff's CEA is to her, Plaintiff still will prevail because she suffered disparate treatment. Defendants' attorney, Janis Gomes Anderson of Van DeWater & Van DeWater, told Plaintiff that the Town had a "Form" CEA and that Plaintiff would have to execute the "Form" CEA that was required of others. *See* McCulloch Decl. ¶12-18. Defendants' attorney sent the "Form" CEA to Plaintiff by e-mail on November 1, 2005, *id*. Exhibit 5, and by e-mail again on February 6, 2006. *Id*. Exhibit 6. ("The form I sent you is generally the form used by the Town of Milan for conservation easements (another copy is attached for your convenience)".

The "Form" CEAs sent to Plaintiff by Defendants' attorney, Ms. Gomes Anderson, on November 1, 2005 and again on February 6, 2006 stated at page 5, as part of the rights reserved to the Grantor, as follows:

> *B.* General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices *but no living tree with a diameter in excess of five (5) inches in diameter at breast height measured from the down slope may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damages or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformity with sound land and forest management practices to minimize erosion and adverse impacts on natural resources.*

When it came time for Plaintiff to actually execute the "Form" CEA, the part that is in italics above was omitted from the CEA that Plaintiff had to execute. *Id*. Exhibit 2,

at pp. 5-6.  Once again, Plaintiff was told that the "Form" CEA that she had to execute, which had now been changed so that the language in italics had been removed, was the same as that which other persons had to execute. *Id*. at ¶16.

Plaintiff did not learn until January 2, 2008 that this was not true. On January 2, 2008, Defendants sent Plaintiff the CEAs that had been executed by those four other persons. *See* Defendants' transmission letter, KJM Decl. Exhibit 9.  Each of those other CEAs contained the same language as that in the original "Form" CEA. *Id.* at ¶¶19-20.

The Quarfelt CEA, KJM Decl. Exhibit 10, stated at p. 9, among rights reserved to the Grantor, as follows:

> B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices but no living tree with a diameter in excess of five (5) inches at breast height measured from the downward slope side, may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damaged or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformity with sound land and forest management practices to minimize erosion and adverse impact on natural resources.

The Savoury (Hidden in the Hills) CEA, KJM Decl., Exhibit 11, stated at pp. 9-10, exactly the same language as that set forth above with respect to the Quarfelt subdivision application. The Napolitano (Stonewood) CEA, KJM Decl. Exhibit 12, stated at pp. 4-5, exactly the same language as that set forth above with respect to the Quarfelt and Savoury subdivision CEAs. The CEA produced by Defendants for the Carrezola subdivision was not executed. It is KJM Decl. Exhibit 13, and states at p. 7, exactly the same language as that set forth above for the CEAs of Quarfelt, Savoury, and Napolitano.

All of these persons, Quarfelt, Savoury, Napolitano, and Carrezola, are local persons.

Their addresses are indicated on the Exhibits 10-13, respectively. The "locals" were given the original "Form" Agreement. *Id*. at ¶19, and Exhibits 10-13. Plaintiff was the only party who had to execute a CEA that had language in her CEA that was different from the "Form" CEA.

9. The conduct of Defendants in this instance is even more egregious because Defendants charged Plaintiff for work done on the "Form" CEA done for one of those four local persons, Carrezola. *Id*. at ¶¶24-28.[6]

Among the back-up materials submitted to Plaintiff with the accounting was a bill that included legal work done on February 1, 2005, a date which was almost one year after Plaintiff made her application for subdivision approval. It is part of Exhibit 14 to the KJM Decl., and is marked Exhibit 14A. It indicates "Background research on legal requirements for conservation easements . . . in preparation of conservation easement for Carrezola Subdivision. Web research for sample conservation easement" The materials sent to Plaintiff by the MPB as part of that accounting, *see* KJM Decl. Exhibit 14A, show that part of that work for Carrezola was billed to Plaintiff's escrow account and part to the Quarfelt escrow account. KJM Decl. ¶¶26-28. Presumably, this allocation of attorney's expenses was justifiable because the CEA being prepared for Carrezola was also to be used for Plaintiff and Quarfelt. The "Form" CEA sent to Mr. Mc Culloch by Ms. Gomes Anderson, *see* KJM Decl., Exhibits 5 and 6, was the same in pertinent part as the CEA that was later furnished to him as being the Carrezola and Quarfelt CEA. *Comp.*

---

[6] Plaintiff was required to submit payments to an escrow fund that was administered by the MPB. On or about on or about November 1, 2007, Plaintiff received an accounting for the disbursements from her escrow account. The accounting, and the cover letter by which it was furnished to Plaintiff, is KJM Dec. Exhibit 14. The total amount Plaintiff paid in is $22,602.25. The amounts paid to Greenplan, Inc. were $8182.50; to Paggi, Martin & Del Bene $6810.60; and to Van DeWater & Van DeWater $7051.34.

KJM Decl. Exhibit 5, p. 5 with Exhibit 10, pp. 8-10, and Exhibit 13, p.7.

In sum, Defendants charged the escrow of Plaintiff and Quarfelt for work done on the Carrezola CEA because Plaintiff and Quarfelt were going to have the same "Form" CEA as Carrezola; Plaintiff was told that the CEA that Plaintiff was to execute was the same "Form" Agreement that was being used for others.[7] Defendants then required Plaintiff to execute a CEA different in pertinent part from the "Form" CEA and different from the Carrezola CEA (and different from the CEA used for Savoury, Napolitano, and Quarfelt).

Defendants' conduct is even more outrageous because Defendants thereafter billed Plaintiff for the work that Van DeWater & Van DeWater did so as to change the "Form" CEA to make it different from the "Form" CEA, and the Carrezola CEA. *Id*.

10. This kind of disparate treatment is used by Defendants to make sure that City People cannot use the treatment of locals as a precedent to argue for similar treatment under similar circumstances. For example, local resident Morton Getman did not have enough land to create a two-lot subdivision. At the meeting of the MPB on October 19, 2005, Chairman Kingman described how the MPB intended to grant him an exception, while not establishing a precedent for others, like minorities and City People. The minutes of that meeting state:

> Morton Getman Area Variance Recommendation – Chairman Kingman distributed a review of the case. The major concern of the board members was setting a precedent for creating substandard lots. Mr. Williams, Chair of the ZBA, said he would work with Janis Gomes, Planning and Zoning Attorney, to work a resolution so it would be extremely limited, only applying to a situation with these circumstances such as where the lot was originally a 3 acre lot, the lots were combined, zoning was changed, and now the applicant wants to change the

---

[7] When Mr. Mc Culloch had asked during the administrative proceedings if the "Form" CEA that was being required of Plaintiff had ever been used with respect to anyone else, he was specifically told that it had been used for the Carrezola subdivision. *Id*. ¶28.

configuration back to the original lot. Ms. Williams said Ms. Gomes seems to be of the view that if the resolution is written correctly, it will not set a precedent.

*See* KJM Decl. ¶30. Mr. Morton later obtained approval of the subdivision that he sought, and the approval was accomplished in such a manner that City Persons and minorities would not be able to cite the Morton situation as a precedent for their own requests for approval. *Id.*

The "Janis Gomes" referenced in the MPB minutes of October 19, 2005, is the same Janis Gomes Anderson who told Plaintiff that the language of her CEA was the same as the language of the CEAs that other persons were required to execute.

11. Defendants have an institutionalized practice of favoring local residents over New York City residents. *See* COM Aff't. ¶¶17-20. Defendants have treated Plaintiff differently than local residents Mr. and Mrs. Burns. *See* KJM Decl. ¶¶31-37. Defendants have treated Plaintiff differently than local resident Paul Hughes. *Id.* ¶¶38-44.

12. The facts show that this difference in treatment that is *because* of residence. The Milan Comprehensive Plan (MCP) blatantly states that residents are to be favored over New York City residents, COM Aff't. ¶¶17-20. Such treatment has a statistically significant adverse effect against minorities. COM Aff't. ¶¶26-29.

13. The difference in treatment of Plaintiff as opposed to the treatment of Mr. and Mrs. Burns was *because* of residence. Plaintiff tried to trim brush along Willowbrook Road, and was denied permission to do so. Mr. Burns wanted the common driveway that is Mc Culloch Drive moved, and he invoked this status as a resident: "As a resident for 30 years I have rights". Indeed, he did have rights, rights that Plaintiff did not have, because Defendants required that common driveway to be relocated, even though it meant trimming brush and cutting trees along Willowbrook Road. *See* KJM Decl. ¶¶31-

14

37. Later, when Plaintiff cut trees along this same Willowbrook Road, as required for utility lines, Defendants once again said Plaintiff could not do so, and issued a "STOP WORK" Order because they had done so. *Id*.

14. Local resident Paul Hughes filled DEC wetlands, and Plaintiff was required to relocate culverts so as not to interfere with this illegal action by Mr. Hughes. The reason given by Mr. Kingman for this disparate treatment was "He's an old timer, we can't do anything about him." Left unstated, but equally obvious, was that Plaintiff was not a resident, and Defendants would do whatever they wanted with regard to their treatment of her, including requiring her to do extra work, and incur extra expenses so that Mr. Hughes could do what he wanted. KJM Decl. ¶¶38-44.

15. Milan residents opposed Plaintiff because they believed that City People do not know how to treat the land. *Id*. ¶37.

**POINT - PLAINTIFF'S MOTION SHOULD BE GRANTED**

Plaintiff seeks a preliminary and permanent injunction in the language set forth in the Proposed Order attached to the motion. The reason that Plaintiff seeks a permanent injunction, as well as a preliminary injunction, is that Plaintiff is trying to sell lots and parts of each lot are covered by the CEA. A preliminary injunction would certainly be helpful. However, as real estate expert Ron Gasparro states in his Affidavit, a permanent injunction is requested.[8]

---

[8] Gasparro Aff't. ¶15  "…it is necessary that there be a permanent resolution of this issue, and any other issue that the Town wants to raise about the uses of the CEA and the lots themselves. Prospective purchasers will not want to hear that there is some kind of preliminary injunction in place. That only creates uncertainty. When persons pay substantial amounts for property, they want certainty and predictability with regard to the uses to which they can put the property."

The manner by which Plaintiff achieves the relief that she seeks is not as important as the fact that she obtains such relief. One method for achieving such relief is that used by this Court in *MasterCard International Incorporated v. Federation Internationale De Football Association*, 464 F. Supp.2d 264 (S.D.N.Y. 2006) (J. Preska). In that case, this Court noted that the Federal Rules of Civil Procedure (Fed.R.Civ.P.), Rule 65(a), permits for the "trial in the action on the merits to be advanced and consolidated with the hearing on the application (for a preliminary injunction)." *Id.*

In the instant case, Plaintiff does not believe that a hearing will be necessary, for either the preliminary injunction, nor for the permanent injunction, because Plaintiff believes that the important facts, which are set forth in the Proposed Order submitted with the motion, are undisputed. "The cases best suited for preliminary relief are those in which the important facts are not disputed, and the parties simply disagree about what the legal consequences are of these facts." *Saini v. International Game Technology*, 494 F.Supp. 2d 913, 919 (D.Nev. 2006). That reasoning is equally applicable to cases in which permanent injunctive relief is sought.

The principles summarized by this Court in the *MasterCard* case are equally applicable in this case:

> It is well-settled that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. (Citation omitted). "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." (Citations omitted).
>
> A showing of irreparable harm is required for both preliminary and permanent injunctive relief. (Citation omitted). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." (Citation omitted). The Court of Appeals has stated that a showing of "probable irreparable harm is 'the single most important prerequisite for the

issuance of a preliminary injunction'". (Citations omitted). Accordingly, the element of irreparable harm is considered first.

*Id.* at 300.  Fed.R.Civ.P., Rule 65(d) provides that

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance, shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained . . .

Plaintiff has set forth in detail in the Proposed Order that accompanies this motion the reasons for the issuance of this preliminary and permanent injunction, the reasons that there is irreparable harm, and the reasons that Plaintiff should prevail on the merits.

Sometimes courts consider other factors, such as whether there is a balancing of equities in favor of granting such relief. *See, e.g., New York State National Organization for Women v. Randall Terry*, 704 F.Supp. 1247, 1262 (S.D.N.Y. 1989), *aff'd as modified*, 886 F.2d 1247, 1262 (2d Cir. 1989), in which the Court also noted that "Irreparable harm is one basis for showing the inadequacy of any legal remedy." *Id.* at 1262, n. 20. This Court discussed this factor in its *MasterCard* decision. *Id.* at 313 *et seq*. The facts that support the conclusion that there is a balancing of the equities in favor of Plaintiff are also set forth in the proposed Order.

Finally, sometimes courts consider the effect on the public interest of a grant or denial of the restraint. The facts supporting Plaintiff's position with regard to that factor are also presented in the proposed Order.

Plaintiff's proposed Order closely follows the provisions of the CEAs that Defendants found acceptable for purposes of the "Form" CEA and the CEAs for Carrezola, Napolitano, Savoury, and Quarfelt. In that sense, the granting of the relief

sought would merely be placing Plaintiff in the position that she was told she had, that she should have had, and thought she did have, prior to Defendants' directive.

The only difference between the relief provided for in proposed Order submitted by Plaintiff and the wording of those other CEAs is that they specifically state that the persons may cut trees, but limit that to trees that are no more than 5 inches in diameter at breast height measured from the downward slope. Michael Callan, an officer of the DEC, advised that sometimes it is appropriate to cut a larger tree so as to permit for the growth of smaller, but more vigorous trees or to permit for a larger variety of trees to flourish. *See* Mc Culloch Decl., ¶46. For that reason, Mr. Callan opined that this kind of provision might not be "in accordance with generally accepted forest conservation practices". Additionally, some large trees in the CEA will eventually endanger houses. *Id.* ¶47.

Defendants' conduct is illegal. Defendants' aim in zoning and administration of its zoning and land use regulations might be summed up by the phrase "that each community should take care of its own first", an objective which is constitutionally impermissible. *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 649 (2nd Cir. 1971), *cert. denied* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971). A municipality may not enact zoning regulations, nor administer them, exclusively for the benefit of its residents while ignoring regional needs. In *Berenson v. Town of New Castle*, 38 N.Y. 2d 102, 378 N.Y.S.2d 672 (1975), the New York Court of Appeals rejected the Town of New Castle zoning, which precluded apartment houses (Milan also precludes apartment houses) finding that ". . . residents of Westchester County, as well as the larger New York City metropolitan region, may be searching for multiple-family housing in the area (New Castle) to be near their work and for a variety of other social and economic

reasons. There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met". *Id.* at 111.

Treating persons differently on the basis of residency has been rejected. "The goal of preventing an influx of outsiders is constitutionally impermissible. The residency requirement is not rationally related to the goal of planning". *Cole v. Housing Authority*, 435 F.2d 807 (1st Cir. 1970), at 813; *see also, Allen v. Town of North Hempstead*, 121 Misc. 2d 795, 469 N.Y.S.2d 528, 533 (Sup. Ct. Nassau Co. 1983) (one-year residency requirement to be eligible for certain senior citizen housing is constitutionally impermissible); *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969) (a durational residency requirement may not be enacted for the purpose of rewarding long-term residents for past contribution to the community).

Discrimination against persons on the basis of residency is also a violation of civil rights laws when, as in the instant case, the use of that factor has a statistically significant adverse impact against minorities or any protected group. *Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792 (3d Cir. 1991); *U.S. v. City of Warren,* 759 F. Supp. 355 (E.D. Mich. 1991); *U.S. v. Cicero*, 786 F.2d 331 (7th Cir. 1986); *U.S. v. Elmwood Park,* 43 FEP Cases 995, 1987 WL 9586 N.D.Ill. 1987).

**Alternative Procedures For Achieving The Relief Sought.** Relief by issuance of an injunction is not the only way that remedy for Plaintiff may be provided. The Fifth Cause of Action in Plaintiff's Amended Complaint is for a declaratory judgment that the conservation easement does not bar Plaintiff or her successors from cutting live trees for the general maintenance of her property. Pursuant to Fed.R.Civ.P., Rule 57, the Court could address this motion as one for a Declaratory Judgment, and grant Plaintiff the relief

she seeks via that procedure. Such a determination would be appropriate because Defendants' actions have been and are arbitrary and capricious. If this Court proceeds in that way, it would be acting in a manner similar to the manner in which a state court would be acting if it were entertaining this claim as an Article 78 proceeding.

Plaintiff requests relief, plus costs and attorney's fees, as permitted by the Fair Housing Act. Like most civil rights statutes, *see, e.g., Cohen v. Brown University,* 809 F.Supp. 978, 984 (D.R.I. 1992), aff'd., 991 F.2d 888 (1st Cir. 1993), *on remand*, 879 F.Supp. 185 (D.R.I. 1995), the FHA permits for injunctive relief to be awarded.

## CONCLUSION

For the reasons stated, Plaintiff respectfully requests that the Court grant the relief requested, in the form presented in the proposed Order, or pursuant to some other procedure that the Court finds just and equitable.

Dated: February 22, 2008                    Respectfully submitted,

_____/s/_____
Kenneth Mc Culloch (3372)
Attorney for Plaintiff
516 Fifth Avenue, 12th Floor
New York, N.Y. 10036
Tel. 212-398-9508
e-mail KMcCulloch@BRGSLAW.com