**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**CARMEN OTERO MC CULLOCH,**

                                  **Civil Action No. 07 CIV 9780**
                                    **(LAP) (RLE)**

                       **PLAINTIFF,**

          v.

**TOWN OF MILAN, TOWN OF MILAN TOWN**
**BOARD, JOHN V. TALMADGE, Town**
**Supervisor, and ALFRED LO BRUTTON,**
**PAULINE COMBE-CLARK, DIANE MAY, and**
**ROSS WILLIAMS, Councilpersons, And**

**TOWN OF MILAN PLANNING BOARD,**
**LAUREN KINGMAN, Chairman, and**
**Members JEFFREY ANAGOS, PETER GOSS,**
**SHEILA MARGIOTTA, MARY ANN**
**HOFFMAN, AND PAULINE COMBE-CLARK**
**And GARY E. BECK, Zoning Enforcement Officer,**
**Town of Milan, And**

**Frank Margiotta, Barbara Hughey,**
**And Charlotte Norman**

                  **DEFENDANTS**.
_____

     **AFFIDAVITS OF CARMEN OTERO MCCULLOCH, RON GASPARRO,**
     **AND GREGORY M. DESYLVA IN SUPPORT OF PLAINTIFF'S**
                **MOTION FOR INJUNCTIVE RELIEF**


Dated: February 22, 2008             Respectfully submitted,

                                 Kenneth Mc Culloch (3372)
                                 Attorney for Plaintiff
                                 516 Fifth Avenue, 12th Floor
                                 New York, N.Y. 10036
                                 Tel. 212-398-9508
                                 e-mail KMcCulloch@BRGSLAW.com

1

## AFFIDAVIT OF CARMEN OTERO MC CULLOCH

Carmen Mc Culloch, being duly sworn, deposes and states:

1.  I am the Plaintiff in this action. I make this Affidavit in support of my motion for an injunction. The specific nature of this injunction is set forth as part of the motion.

2.  I reside at 2 Tudor City Place, New York, New York. My full maiden name is Carmen Otero Ferreras. I was born in Puerto Rico. My mother and father were both born in Puerto Rico. I attended school in Puerto Rico. After graduating from law school in Puerto Rico, I moved to New York City. I have been active in organizations that seek equal treatment of minorities. My first job after coming to New York City was with the Puerto Rican Community Development Corporation. I worked for Harlem Assertion of Rights, as a Compliance Officer for the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP), as Director of Affirmative Action for Pan Am World Airways, N.Y. Regional Director for OFCCP, as Assistant Secretary of Labor for the Commonwealth of Puerto Rico, and as New York Regional Deputy Director for the U.S. Department of Housing and Urban Development. I am now 65 years old and retired.

3.  In January 2004, I purchased a property of approximately 35 acres in the Town of Milan (Town) with the intent of subdividing the property into 6 lots and then selling the lots. By June 2006, I had subdivision approval for the 6-lot subdivision, subject to completion of the infrastructure required by the plans, and subject to my entering into a Conservation Easement Agreement (CEA) with the Town. Each lot was 5 to 7 acres. The Town required that I dedicate about 17 acres to conservation easement areas, and that I enter into the CEA covering these areas as a condition for subdivision approval. A part of each lot was in areas covered by the CEA. This CEA is Exhibit 2 to the Declaration of

Kenneth J. Mc Culloch that has been submitted in support of this motion. I have done everything required of me by the Town and the Milan Planning Board (MPB) to obtain subdivision approval, and to complete the process. My address establishing me as a resident of New York City was on the application for subdivision that I originally presented to the MPB in about April 2004. My maiden name of Otero, which was my father's surname, was placed by me on one of the common driveways for this project. My married name of Mc Culloch was placed on the other common driveway. The name Otero is a Spanish surname. These common driveways had to be identified and named on the subdivision plats early in the subdivision process.

4.   Lauren Kingman was the Chairman of the MPB at all time relevant for purposes of this motion. As set forth in the Declaration of Kenneth Mc Culloch, as of September 2007, I had a potential purchaser for Lot 5, which is one of these 6 lots; that purchaser wanted assurances that he would be allowed to cut trees in the conservation easement area that was part of Lot 5; on or about October 5, 2007, Mr. Kingman advised that no live tree could be cut unless there was a Forest Management Program (FMP) developed by the New York State Department of Environmental Conservation (DEC) for the area; I tried to obtain the DEC FMP required; DEC will not develop such a program. As a result, I cannot cut any live tree on any part of the property that is within the area covered by the CEA.

5.   This requirement imposed by Mr. Kingman and the MPB is arbitrary and capricious, and it has been imposed on only me and my property and has caused irreparable harm to me.

6.   The directive means that I cannot cut down any tree that is diseased, invasive, or

that interferes with the growth of any other tree. For this reason, I cannot manage the property "in a manner in accordance with generally accepted forest conservation practices" even though I am required by the terms of the CEA to do so. Similarly, Defendants' actions create the same irreparable harm for anyone who purchases the lots. Furthermore, I cannot reasonably market and sell the lots if I cannot make the lots more attractive by cutting trails or removing brush and culling some trees that show evidence of disease.

7.    I am trying to sell these lots. I have more than $700,000 of money invested in the acquisition of this property, and in the development of this property, so that it has been changed from just being 35 acres to being 6 legal lots of 5 to 7 acres each, with each having all the roads and underground utilities installed, and all the approvals needed so that the lots can be sold as building lots. The total purchase price for all of these lots had been established by me as an amount of more than $1.2 million. This potential sale price was established after due consideration of competing properties and other factors.

8.    I have no mortgage on this property, but the cash investment that I have made in this property constitutes more than 90% of my liquid resources. I have substantial other obligations on a continuing basis. Because I have invested so much of my liquid assets into this property, I have not had sufficient liquid assets to pay my monthly obligations. I have had to make financial decisions that I otherwise would not have made.

9.    If I had been able to sell lot 5 to Mr. Strickland in or around September or October 2007, I would have had cash available to pay other expenses. Since I did not have that cash available, my husband and I sold a house in Pleasant Valley, New York, about 11 miles from this property. We had been using for week-ends and vacations since

2000. We sold that house in November 2007. There was a substantial mortgage on that house. Consequently, the amount realized from the sale of that house in Pleasant Valley was less than the amount that I would have realized on the sale of Lot 5 to Mr. Strickland. I would not have sold that house in Pleasant Valley if I had been able to sell even one lot from the Woodland Hills subdivision.

10. I currently own a car that has more than 85,000 miles on it. I wanted to purchase a new car. Over President's Day week-end in 2008, I placed a $500 deposit on a new Prius. The dealer was to give me a $3000 credit for my current car. The next day, I cancelled that purchase because it would have required me to assume debt. I have delayed purchasing a new car because I feel it is financially prudent and necessary that I reserve my existing liquid assets to meet monthly expenses that will come due in the near future. If I had sold even one lot from the Woodland Hills subdivision, I would have felt financially comfortable in purchasing that new car.

11. Assuming I could sell these lots, I estimate that I would have available to me an amount of at least $900,000 and possibly as much as $1.2 million. Further assuming that I invested that money and achieved a return of 6%, I would have an annual income of $54,000 to $72,000. With that income, and those assets, I would feel comfortable in meeting my continuing financial obligations, without the need to go back to work. Instead of being in that position, I continue to have tax obligations and other obligations relating to these lots, and as a result I have to spend at least $15,000 per year, instead of receiving money. It is difficult if not impossible to place a dollar value on the damages that would be incurred by me if I have to go back to work instead of staying retired.

12. Any potential purchaser of any of these lots will be purchasing a legal lot that is 5

to 7 acres. Any potential purchaser, such as Larry Strickland, wants to know what he or she can do in the areas that are covered by the CEA. When and if such persons are told that he or she cannot cut down any live tree in the CEA area, those persons, like Larry Strickland, have been deterred and will continue to be deterred from purchasing the lot, or lots. This is especially true because the restrictions prevent persons from properly managing the property.

13. Because of the restrictions imposed by Mr. Kingman and the MPB, all of the efforts to sell these lots have been fruitless.

14. I have suffered and I am suffering irreparable harm because I cannot properly maintain the property, and I cannot sell the lots because any prospective purchaser cannot properly maintain these lots.

15. I have requested a permanent injunction against Defendants because a preliminary injunction will still not provide to prospective purchasers the comfort and assurances that they need when purchasing a building lot for their home.

16. I believe that the Defendants have treated me differently, and adversely, because of my national origin and because I am a resident of New York City.

17. The Milan Comprehensive Plan (MCP) is available on the Town's web-site, which is www.milan-ny.gov, and by them clicking to "Town Planning". The MCP demonstrates a strong concern about the influx of New York City residents. It states at the very beginning that one "important reason" that the Town up-dated its Comprehensive Plan was that "Development pressure is expanding north from the New York metropolitan areas following the Taconic State Parkway. The areas in southern and mid-Dutchess County have already experienced a major impact, and there is a marked

increase in subdivision activity in Milan." 1.2. It further states that "Today, the TSP serves as a major commuting route for those people that want to live in the rural splendor while they continue to work in the metropolitan area, 70 miles to the south." 9.2. My land abuts the Taconic State Parkway and is very close to Route 199, which is the major east-west highway for northern Dutchess County.

18. I believe that the only residents consulted for the MCP were the Town's residents, the only needs considered were those of Town's residents, and the only needs addressed in the MCP were those of the Town's residents. The intent of the Town and the MCP was to "KEEP MILAN RURAL", 7.1, to keep density below 150 persons per square mile, 3.4, to avoid "Explosive growth" that "threatens our rural character and risks causing even higher taxes to support our schools," 2.1, to have public services provided by other municipalities, but not by Milan, to keep Milan "affordable and accessible *to current residents*", 9.3, and to use the land use regulations to implement this self-centered policy. The MCP provided for developers to have higher density in return for providing for some units that would have to be sold or rented at reduced cost to the Town's *municipal employees* or *the Town's senior residents.* 3.3.

19. The MCP also directs that the MPB slow down development, and delay the approval process for land use applications, unless persons agree to convey a CEA to the Town; *see* MCP, 2.5; 3.3; 3.4; 7-13.

20. The MCP and the Milan zoning laws have been enacted and administered with an exclusionary purpose. Defendants have not provided a properly balanced and well-ordered plan for the community, and Defendants have not considered regional needs and requirements.

21. The Declaration of Kenneth Mc Culloch describes the specific instances in which I have been treated differently than local residents and non-minorities.

22. Defendants' difference in treatment of myself and other New York City residents has a disparate adverse impact against minorities. Based on statistical data that I have obtained from various web-sites the demographics are set forth below.

23. The 2000 Census, which is the most recent census, indicated that New York City had a total population of 8,085,742 persons as of that time; that 44% of these persons were White, 28% were African-American, 27% were Hispanic, and 10% Asian. The population density for New York City was 26,402 persons per square mile. The population density for Manhattan, where I reside, was 66,940 persons per square mile. The same Census indicated that 880,000 of the residents of New York City were Puerto Rican, like me.

24. The 2000 Census for the Town of Milan had substantial errors. The 2000 Census was corrected due to an error in the total population count of Milan. Corrected population count results from a process called Count Question Resolution Program. Milan's total population in 2000 was 2,356, not 4,559 as originally reported. Due to the original error in total population, the U.S. Census corrected for four categories, Total population, Total Housing Units, Vacant Housing Units and Group Quarters population. They failed to correct any other data rendering the 2000 Census useless for demographic study.  The original population density of Milan, based on a population of 4,559 persons was 126 persons per square mile. Using the lower figure of 2,356 as the population for the Town of Milan gives a density of 65 persons per square mile.

25.   Assuming that the representation of minorities in Milan is statistically the same for the corrected population as it was for the uncorrected data, and using other sources, the non-minority population of Milan is approximately 78% of the total and is a substantially higher percentage than the percentage of the non-minority population of New York City. The population for each minority group in Milan is substantially less than the minority percentage of the population in New York City.

26. Any rules or standards that discriminate against "City People" can and does have a statistically significant adverse impact against minorities. In fact, because 66% of the population of New York City is minorities, the Town Board and the MPB know that by discriminating against New York City residents, they are more than likely, that is, at least 66% of the time, discriminating against a minority.  In the instant case, Defendants have actually discriminated against a minority, because I am a minority.

Dated: February 21, 2008                   _____/s/_____

                                           Carmen Otero Mc Culloch


On this 21st day of February 2008, there came before me, Carmen Otero Mc Culloch, a person known to me, and she swore that the statements made herein were true and correct.

**NOTARY PUBLIC**

**Kenneth Mc Culloch, NOTARY PUBLIC**

9

**RON GASPARRO**, being duly sworn, deposes and states:

1.   I am a real estate broker, and a principal of the real estate firm that is called Realty Stop Agency. My office is on Route 44 in Pleasant Valley, New York, in central Dutchess County.  We have a number of real estate sales persons who work for the firm. Our firm is well-known, has been in business for more than 12 years, and is a member of the Mid-Hudson Multiple Listing Service. Based on all of this, I am very familiar with, and knowledgeable about, the real estate market in Dutchess County and surrounding areas.

2.   I have been a developer, a building contractor, and a member of the Town of Pleasant Valley Planning Board, in addition to being a real estate broker.

3.   I know Carmen Mc Culloch and Kenneth Mc Culloch, her husband. I have served as a real estate broker in selling property for Mr. and Mrs. Mc Culloch. In addition, I and my agency have sold property owned by others to them. Currently, I have listed for sale the 6 lots that are owned by Carmen Mc Culloch in the Town of Milan that are known as Woodland Hills Estates subdivision.

4.   I am familiar with all of these lots. I have in my possession the five-pages of the filed subdivision plats that relate to these lots, and that identify the Conservation Easement area of approximately 17-acres that is identified on these plats. I have in my possession, and I am familiar with the text of the Conservation Easement Agreement that was required by the Town of Milan as a condition for the subdivision and which indicates what can be done in the Conservation Easement area. I am familiar with the other documents that relate to this subdivision.

5.    As of this time in early 2008, the real estate market generally is not good for

1

sellers. Builders generally are being very careful in acquiring new building lots for their inventory, and some are even selling building lots that they already have.

6.   The restrictions imposed by reason of the Conservation Easement Area and the Conservation Easement Agreement that relate to the Woodland Hills Estates subdivision, in and of themselves, reduce the prospective market for those lots. Most prospective buyers would prefer not to have restrictions placed on the property that they are considering acquiring.

7.   I have been advised that Carmen Mc Culloch had a prospective purchaser for Lot No. 5 of this subdivision, and that this prospective purchaser wanted assurances that he would be able to cut firewood in the part of Lot 5 that was included in the Conservation Easement Area, if he purchased Lot 5. I have also been advised that Carmen Mc Culloch, through her husband and attorney, Kenneth Mc Culloch, sent a letter to the Chairman of the Milan Planning Board asking for assurances that such cutting of firewood would be permitted. I have attached as **Exhibit 1** to this Affidavit a copy of that letter.

8.   I have also been advised that the Milan Planning Board, through its Chairman, Lauren Kingman, advised that no live tree could be cut in the Conservation Easement Area unless and until there was a Forest Management Program (FMP), created by the New York State Department of Environmental Conservation (DEC) and that any cutting of trees could only be done pursuant to such a FMP. I have also been advised that the DEC has declined to create a FMP for Lot 5. I have been asked to comment on the effects of these actions on the marketability for these lots.

9.   First of all, I find it appropriate to comment on this restriction, and its impact on the lots. The Conservation Easement Agreement provides at pages 5-6 that:

Specifically EXCEPTED and RESERVED from the grant of this easement are the rights and privileges described below, which are reserved to the Grantor, together with the right to grant the same or similar non-exclusive rights to others:

A.    Horticultural and managed forest land, equestrian, passive recreational and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and similar activities.

B.    General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practice.

10. It had been my understanding that because of these provisions the cutting of trees would be permitted, "in accordance with generally accepted forest conservation practices". I did not view this provision as requiring a formal FMP created by the DEC as a condition to the cutting of trees. If the term "General maintenance of property, . . . in accordance with generally accepted forest conservation practices" means that a DEC FMP must be in place before any live tree might be cut in the areas covered by the CEA, then it seems to me, and more importantly, it will appear to prospective buyers, that such a DEC FMP must be in place in order for the owner to do any of the things that are described in subsection B above. In other words, the prohibition of cutting any live tree would also include a prohibition of "pruning, cutting, planting, landscaping, and clearing of trees and other vegetative matter" unless a DEC FMP is in place.

11. In my opinion, this restriction completely eliminates the value of the part of the property for each lot that is in the CEA. Prospective purchasers will not be able to use the CEA part of their lots to do anything. They cannot walk in that part of their property if they cannot prune it. I know this property, and I know that there is a great deal of brush

and "living fence" type of vegetation on this property. The brush and some trees have to be cut in order to make a path through this CEA part of each lot.

12. From information available to me, I know that the parts of each lot that are in the CEA are as follows:

| Lot Number | Lot Area (sq. ft.) | Lot Area Acres | Area included in the Conservation Easement Per Lot Area (sq. ft.) | Percentage of Lot |
|---|---|---|---|---|
| 1 | 247,382 | 5.68 | 52,468 | 21.2 |
| 2. | 225,912 | 5.19 | 101,961 | 45.1 |
| 3. | 257,555 | 5.91 | 160,784 | 62.4 |
| 4. | 224,808 | 5.16 | 117,805 | 52.4 |
| 5. | 274,789 | 6.31 | 146,944 | 53.4 |
| 6. | 303,561 | 6.97 | 193,174 | 63.6 |
| Totals | 1,534,008 | 35.22 | 773,136 | 50.4 |

13. I know the way that prospective customers look at property. These lots are each 5 to 7 acres, but, because of the restrictions, they are, in effect, lots of about 1 to 3 acres. If this CEA area cannot even be used for cutting of trees, or clearing of brush, then the area is not only useless, but it will be considered by prospective purchasers as a detriment. I believe that they will be concerned that because they cannot cut any live tree in the CEA part of the lot that they are buying, they will be concerned that they will not be able to cut diseased trees that exist in the CEA area, and that they will not be able to eliminate or curtail invasive species in the CEA area. They also will be concerned that even if a large tree in the CEA area poses a potential problem to persons or property that is not in the CEA, they still would not be allowed to cut it.

14. There is a further problem that the Town of Milan has created with respect to the sale of these lots. People do not want to 'buy problems'. I have been kept abreast of the subdivision process for these lots. It seems to me that this prohibition against cutting of

any live tree in the CEA is just the latest in a series of events that the Town has instituted to hinder or eliminate the use of these lots by Carmen Mc Culloch for residential purposes. If persons learn of this, and they are likely to learn of this attitude by the Town vis-à-vis these lots, persons are not likely to purchase these lots.

15. In my opinion, it is necessary that there be a permanent resolution of this issue, and any other issue that the Town wants to raise about the uses of the CEA and the lots themselves. Prospective purchasers will not want to hear that there is some kind of preliminary injunction in place. That only creates uncertainty. When persons pay substantial amounts for property, they want certainty and predictability with regard to the uses to which they can put the property.

16. In all my years as a developer, builder, and as a member of the Town of Pleasant Valley Planning Board, I have never encountered a situation in which a town imposed an absolute ban on a person cutting trees or removing brush from his or her own property. As a person who was formerly a member of the Town of Pleasant Valley Planning Board, and as a realtor, I do not think that the Town of Milan's ban on the cutting of any live tree is reasonable. I have been advised that even in instances in which the Town of Milan has imposed a requirement that there be a CEA, it has also specifically stated in those CEAs that the cutting of live trees is permitted. In my opinion, there is nothing environmentally unusual about this property. The Town's actions appear to me to be arbitrary and capricious.

17. In my opinion, unless and until it is finally determined what can be done in the CEA, if anything, these lots must be considered to be 1-3 acre lots, and marketed and sold as such. Given the uncertainty, I estimate that the value of these lots is reduced by

an amount of $30,000 to $60,000 per lot because of the restrictions that have been imposed and that are in existence with respect to these lots.

_____/S/_____

Ron Gasparro

On this 30th day of January 2008 before me came Ron Gasparro, a person known to me, or who presented proof to me of his identity, and he swore that the above statements were true and correct.

_____

Notary Public

Decborah Bjorkman, Notary Public

6

**KENNETH J. MC CULLOCH, ESQ.**
**516 FIFTH AVENUE, 12TH FLOOR**
**NEW YORK, N. Y. 10036**
**TEL. 212-398-9508; FAX  212-398-9512**
**Cell-phone 917-748-0771**

October 1, 2007
By fax to 845-897-0042

Town Of Milan
1415 Route 199
P.O. Box 42
Red Hook, New York 12571
Tel. 845-758-5133
Attn:   Lauren Kingman
        Chairman, Town Planning Board

Re:     Woodland Hills Subdivision

Dear Lauren,

As you know, my wife owns the six lots known as the Woodland Hills Subdivision, and I have been acting as her attorney. Recently an issue has arisen that we think requires clarification from the Planning Board regarding precisely what is meant by the terms of the Conservation Easement. We think it is to our own best interests, and that of the Planning Board, and that of prospective purchasers, to have this clarified.

Specifically, may the owner of a Lot in Woodland Hills that includes land that is part of the Conservation Easement Area (all of the lots have at least parts in the Conservation Easement Area) cut down trees for firewood, for personal use, prudently, and as part of a forest management program on his or her own land? We think that the answer is "Yes", but we would like to have the Planning Board say so, and do so in writing, to avoid having this question raised in the future, as it is being raised now.

We have a prospective purchaser for Lot 5. His name is Larry Strickland. His cell-phone number is 914-474-1119. Larry and his family currently live in the Town of Stanford. Though he still has a 914 area code for his cell-phone, Larry works in Dutchess County also. I walked the boundaries of Lot 5 with Larry and his wife. I pointed out the conservation easement areas. I gave him and his wife a complete copy of the subdivision plat. I also gave him the Conservation Easement.

Larry and his family are precisely the kind of persons that I think the Town would want to have living in Milan. He is conservation minded, and he wants to build a solar home. By that I think he means a home that at least in part is heated by solar energy. He has had training regarding this. Larry had a few questions that I could not answer, so I told him to call Mike Dalbo, our surveyor. I then called Mike and asked Mike to answer whatever questions Larry or his wife had.

I had not heard back from Larry, so I called Mike Dalbo again. He told me that he had answered Larry's questions, but that Larry had some concerns about the Conservation Easement areas, and the Town's "looking over his shoulder" regarding what he did on his own property. I then called Larry again earlier today. He told me that he wanted to be able to cut firewood, and that he wanted to be able to do so from the forested area that is part of the Conservation Easement area on Lot 5. Larry said that he is very conservation minded, and that he wants to be able to gain part of the heat for his prospective house from firewood. He said he knows about conservation. He is talking about thinning out the underbrush and the smaller trees in a way that would be good for the remaining trees, and also allow him to have firewood.

It is not important that my wife and I think that this can be done. What is important is that you and the Planning Board say that this can be done. If Larry and his wife have this perception, that this may create a problem with the Town, then it is likely that others have that concern also. We have not sold any lots yet. I do not mean to say that if this issue is clarified that Larry will purchase Lot 5. We still have to agree on price and terms. I have told Larry that we are flexible on those, and those are subjects over which we have total discretion. The perception of potential purchasers, however, is not something that we have control over. Even if Larry and his wife were to tell me that they are not interested in this lot, for some other reason, we would still want to have this subject clarified, because it affects other potential purchasers.

We have purposely avoided mention of particular words or language in the Conservation Easement because that language apparently can and does lead to confusion. We would like to have this clarified, for now and the future, and we request the assistance of you and the Planning Board to do so.

Larry pointed out to me that the kind of use he intends seems to be the perfect first home to be built in Woodland Hills. We think that we have made a nice, conservation-minded development. It is now finished. It would be a counter-productive if we, my wife and I, and the Town, made such a restrictive development that no one wanted to buy a lot and build a house in it. I told Larry that I would be writing to you, and calling you for this kind of clarification, and that I would let him know what happens. Thank you for your assistance in this matter.

Very truly yours,

/s/

Kenneth Mc Culloch

P.S. If you want to call Larry and talk with him about this, I would urge you to do so. I think it would be helpful so you can appreciate how conservation minded he is.

Exhibit 1 to Affidavit of Ron Gasparro

## AFFIDAVIT OF GREGORY M. DESYLVA

Gregory M. DeSylva, being duly sworn, deposes and states:

1.  I am a Consultant Forester as part of the New York State Department of

Environmental Conservation (DEC) Cooperating Forester Program. I have attached my resume and

the DEC document listing me as a Cooperating Forester.

2.  I have been advised by Mr. Kenneth Mc Culloch that his wife, Carmen

McCulloch, owns property in the Town of Milan, that such property has been subdivided into six (6)

lots, and that part of each lot is in an area that is designated as a conservation easement area. Mr. Mc

Culloch has also advised me that a provision of the Conservation Easement Agreement relating to

this property states that the owner of the property may engage in "General maintenance of property,

including pruning, cutting, planting, landscaping, and other clearing of trees and other vegetative

materials in accordance with generally accepted forest conservation practices".

3.  There are occasions when "generally accepted forest conservation practices"

require the cutting of trees or the removal of brush. For example, the cutting of live trees may be

appropriate and necessary to remove diseased trees or invasive species, to clear some trees to ensure

the health of other trees, or to remove trees that endanger public safety. For this reason, an absolute

ban on the cutting of any live tree is not consistent with what is required by "generally accepted

forest conservation practices".

Dated: February 19, 2008 _____/s/_____

Gregory M. DeSylva

On this 19th day of February, 2008, Gregory M. DeSylva came before me and swore that the
statements made above were true and correct.

**NOTARY PUBLIC Peggy Hayes**

1



# Sylvan Forestry Services

342 Zipfeldburg Road
Rhinebeck, NY 12572                    (845) 876-8073

**Gregory M. DeSylva**
**Consulting Forester**

## Qualifications:

* Bachelor of Science, Colorado State University School of Forestry.
* Master of Forest Science, Yale School of Forestry & Environmental Studies.
* Full-time consulting forester since 1979; based in Dutchess County, N.Y. since 1980.
* More than 300 timber sales.
* Over 150 forest management plans, mostly for the N.Y. State Forest Tax Law Program.
* Member of the N.Y. State DEC "Cooperating Consultant Forester Program".

## Services:

*Timber Sales:* Complete services, including timber appraisal, timber marking, bid solicitation, contract preparation, and logging inspection.

*Timber Stand Improvement:* Expert stand analysis and marking for thinning and cull removal.

*Forest Management Plans:* Plans for woodlots 10 acres or larger. Forest Tax Law plans and tax benefit analyses for New York forests over 50 acres. (Qualifying woodlands are eligible for property tax savings of up to 80%).

*Timber Appraisals:* Accurate estimation of standing timber volumes and values.

*Timber Damage Appraisals:* Accurate, impartial estimation of losses due to unauthorized or improper logging.

*Boundary Marking:* Quality painting and posting to maintain valuable survey lines and to guard against timber trespass.

*Logging Ordinance Expertise:* Extensive experience in advising municipalities in the development of logging ordinances and in the setting of logging permit conditions.

## Freedom from Conflicts of Interest:

One of the most important factors to consider in choosing a consulting forester is freedom from conflicts of interest. Not everyone calling him/her self a consulting forester is free of such conflicts. We strongly believe that a consulting forester must not be employed by or be associated with any lumber mill, logger, or other timber buyer. Our strict adherence to this principle means that your interests will be fully and properly served if you utilize our services.

## Exhibits to Affidavit of Gregory M. DeSylva, C.F.



# DEC

## NEW YORK STATE COOPERATING FORESTER PROGRAM



**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**
Eliot Spitzer, *Governor*

# Cooperating Foresters

### Revised January 2008

| Cooperating Forester | Regions Served Affiliations | Cooperating Forester | Regions Served Affiliations |
|---|---|---|---|
| **Consultant Forester** **Asdal, Clifford** 183 Canal Road Wurtsboro, NY 12790 (845) 888-4914 - office | 3 4 <br><br> NYICF | **Industrial Forester** **Blasko, Michael** South Central Forest Products LLC P.O. Box 6 Greene, NY 13778 (607) 656-4759 - office (607) 656-4759 - FAX | 7 |
| **Consultant Forester** **Baldwin, Todd R.** PO Box 663 Shokan, NY 12481 (845) 246-7105 - office | 1 2 3 4 5 <br><br> SAFCF | **Consultant Forester** **Boyce, Deborah A.** HCR 2 Box 1A Jay, NY 12941 (518) 946-7040 - office (518) 946-7722 - FAX | 5 <br><br> NYICF <br> SAFCF |
| **Consultant Forester** **Batley, Dana** Empire State Forestry Service 140 Genung Circle Ithaca, NY 14850 (607) 272-4768 - office | 4 7 8 <br><br> NYICF | **Consultant Forester** **Boyce, Herbert J.** HCR 2 Box 1A Jay, NY 12941 (518) 946-7040 - office (518) 946-7722 - FAX | 5 <br><br> NYICF <br> ACF <br> SAFCF |
| **Consultant Forester** **Bauer, Curtis H.** Forecon Inc 1890 E. Main Street Falconer, NY 14733-9781 (716) 664-5602 - office (716) 664-6648 - FAX | 9 <br><br> NYICF <br> ACF | **Consultant Forester** **Braun, Bernard B.** Bernard B. Braun & Associates PO Box 2 Richmondville, NY 12149 (518) 231-2382 - office | 3 4 5 6 7 <br><br> NYICF <br> SAFCF |
| **Consultant Forester** **Beers, David** Connwood Foresters 115 Peck Road Winsted, CT 06098 (860) 384-1214 - office | 3 4 | **Consultant Forester** **Brockelbank, Jeff** Forecon Inc 1890 E. Main Street Falconer, NY 14733-9781 (716) 664-5602 - office (716) 664-6648 - FAX | 9 |
| **Industrial Forester** **Bennett, Kurt E.** 1532 Whiting Rd Memphis, NY 13112 (315) 730-7198 - office (315) 536-0031 - FAX | 7 8 9 | **Consultant Forester** **Brooks, Arthur L.** Brooks Forestry & Resource Mgt. Co LLC 549 County Rte. 45 Central Square, NY 13036 (315) 676-7810 - office | 6 7 8 <br><br> NYICF <br> SAFCF |
| **Consultant Forester** **Bick, Steven** PO Box 284 Thendara, NY 13472 (315) 369-6424 - office | 4 5 6 <br><br> ACF <br> SAFCF | | |

02/22/08  FRI 11:22  [TX/RX NO 8371]  ☑004

| Cooperating Forester | Regions Served Affiliations | Cooperating Forester | Regions Served Affiliations |
|---|---|---|---|
| **Consultant Forester** **Brown, Craig R** Woodland Investment Services Inc. 2926 Powderhouse Road Corning, N Y 14830 (607) 936-2482 - office (607) 936-2483 - FAX | 7 8 | **Consultant Forester** **Chick, Timothy A.** 51 Juniper Circle Lake Placid, NY 12946 (518) 523-4235 - office | 5 |
| **Consultant Forester** **Bullard, Brian S** Forecon Inc. 1890 E. Main Street Falconer, NY 14733-9781 (716) 664-5602 - office (716) 664-6648 - FAX | 8 9 | | SAFCF |
| | SAFCF | **Consultant Forester** **Cipperly, Richard** North Country Forestry LLC 8 Stonehurst Dr. Queensbury, NY 12804 (518) 793-3545 - office | 4 5 |
| **Consultant Forester** **Burch, Gary E** Burch Hill Forestry 1678 Burch Rd Granville, NY 12832 (518) 632-5436 - office | 5 | | SAFCF |
| **Consultant Forester** **Burger, Mark E.** PO Box 354 Brewerton, NY 13029 (315) 415-5507 - office | 7 9 | **Consultant Forester** **Collin, Peter A.** PO Box 243 Portageville, NY 14536 (585) 468-2714 - office | 8 9 |
| | | **Consultant Forester** **Davis, Robert S** Sustainable Forestry Advisors, LLC P.O. Box 187 Skaneatles, NY 13152-0187 (315) 685-7335 - office (315) 685-3265 - FAX | 3 4 5 6 7 8 9 |
| **Consultant Forester** **Burns, Michael J.** PO Box 51 Nelliston, NY 13410 (518) 993-2815 - office | 3 4 5 6 | | NYICF |
| | | | SAFCF |
| **Consultant Forester** **Burpoe, Timothy** Timberland Assets & Management LLC 92 Cherry Tree Lane Saranac Lake, NY 12983 (518) 354-2055 - office | 5 6 | **Consultant Forester** **Del Vescovo, Anthony** 46 Stoppel View Lane Round Top, NY 12473 (518) 622-3608 - office | 3 4 5 |
| | | | NYICF |
| | SAFCF | | SAFCF |
| **Consultant Forester** **Chebetar, Vincent P.** 996 Arnett Blvd. Rochester, NY 14619-1432 (585) 235-7341 - office | 8 9 | **Consultant Forester** **Denham, Edward A** New England Woodland Mgt. P.O. Box 440 48 Maple Hill Rd. West Stockbridge, MA 01266 (413) 232-4000 - office (413) 232-7777 - FAX | 4 |
| | NYICF ACF | | SAFCF |
| | | **Consultant Forester** **Desylva, Gregory M.** Sylvan Forestry Services 342 Zipfeldburg Road Rhinebeck, NY 12572 (845) 876-8073 - office | 3 4 |

**January 2008**

02/22/08  FRI 11:22  [TX/RX NO 8371]  ☑005