UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

CARMEN OTERO MC CULLOCH,

                                 **Civil Action No. 07 CIV 9780**
                                  **(LAP) (RLE)**

          **PLAINTIFF,**
     v.

TOWN OF MILAN, TOWN OF MILAN TOWN
BOARD, JOHN V. TALMADGE, Town
Supervisor, and ALFRED LO BRUTTON,
PAULINE COMBE-CLARK, DIANE MAY, and
ROSS WILLIAMS, Councilpersons, And

TOWN OF MILAN PLANNING BOARD,
LAUREN KINGMAN, Chairman, and
Members JEFFREY ANAGOS, PETER GOSS,
SHEILA MARGIOTTA, MARY ANN
HOFFMAN, AND PAULINE COMBE-CLARK
And GARY E. BECK, Zoning Enforcement Officer,
Town of Milan, And

Frank Margiotta, Barbara Hughey,
And Charlotte Norman

                **DEFENDANTS**.

_____

### DECLARATION OF KENNETH MC CULLOCH IN SUPPORT OF PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

**KENNETH MC CULLOCH**, an attorney admitted to practice in the State of

New York and the U.S. District Court for the Southern District of New York, declares

under penalties of perjury that the statements made herein are true and correct.

1.   I am the attorney for Carmen Otero Mc Culloch (Plaintiff). I make this

Declaration in support of Plaintiff's motion for injunctive relief.

2.   I represented Plaintiff during the administrative proceedings before the Town of

Milan (Town), and the Milan Planning Board (MPB) with regard to her application for

subdivision approval of a parcel of approximately 35 acres into six lots. The subdivision was and is known as Woodland Hills. The proceedings for subdivision approval commenced on or about April 2004. I am familiar with the proceedings before the Town and the MPB relating to that subdivision application.

3.    On or about June 29, 2006, the MPB approved of Plaintiff's application for a six-lot subdivision, subject to certain conditions. The approved subdivision plat, consisting of five-pages, is annexed to this Declaration as **Exhibit 1**. It was filed in the Dutchess County Clerk's office on or about June 29, 2006, as Filed Map Number 11944.

4.    As a condition of subdivision approval, Plaintiff was required to designate approximately 17 acres of the 35-acre parcel as conservation easement area. A part of each of the six lots contained part of the conservation easement areas. The parts of the property that are within the conservation easement area are delineated on the Filed Map, pages 2 and 3, by cross-hatching.

5.    In addition to requiring that Plaintiff designate approximately 17 acres as conservation easement areas, the MPB and the Town required that Plaintiff enter into a formal Conservation Easement Agreement (CEA) with the Town, relating to the conservation easement areas.

6.    The CEA between the Town and Plaintiff is **Exhibit 2** to this Declaration. This CEA was approved by the Town Board, and executed by the Town Supervisor, and Plaintiff, on June 29, 2006. It was filed in the Dutchess County Clerk's Office on June 30, 2006. A copy of the Dutchess County Clerk Recording Page is the first page of **Exhibit 2**.

7.    In about September 2007, a person named Larry Strickland contacted me, as the

representative of Plaintiff, and inquired about purchase of Lot 5 of the six-lot subdivision. This lot has additional benefits for the buyer, like a well that produces 20 gallons per minute and a septic system that will not require any fill.

8. Mr. Strickland indicated from the outset that his intention was to build a solar home on the lot. After we walked the property, he told me that he wanted to be able to cut firewood from the conservation easement area that was part of Lot 5, and asked if that would be allowed. I told him that I thought it would be permissible, but that I would contact the MPB and advise him when I had their assurances that it would be allowed. I did not receive those assurances, and I have not contacted Mr. Strickland to tell him that.

9. On October 1, 2007, I sent by fax the letter attached as **Exhibit 3** to Lauren Kingman, the Chairman of the Milan Planning Board.

10. On or about October 5, 2007, I received a call from Mr. Kingman. He told me that the CEA meant that no live tree could be cut in the conservation easement areas, unless and until there was a formal Forest Management Program (FMP) established by the New York State Department of Environmental Conservation (DEC), and such cutting was in accordance with such a formal FMP.

11. I contacted the DEC, and was directed to Barbara Lucas-Wilson, as the person who would have responsibility for establishing a formal FMP. I toured the property at Woodland Hills with Ms. Lucas-Wilson. Thereafter, Ms. Lucas-Wilson sent me the letter that is annexed as **Exhibit 4** indicating that she and the DEC would not prepare a formal FMP for Lot 5 because it was too small a parcel.

**Plaintiff has been treated different from local persons.**

12. During the course of the administrative proceedings before the MPB, I was told as

3

early as December 2004 that the MPB had a "Form" CEA and that everyone had to execute the same basic form CEA.

13. The attorney for the MPB was the law firm of Van DeWater & Van DeWater. One of the attorneys at that firm who worked on the Woodland Hills subdivision for the Town was Janis Gomes Anderson. On November 1, 2005, Ms. Gomes Anderson sent me an e-mail and attached a copy of the draft CEA that she said Plaintiff would be required to execute as a condition for final approval of her subdivision. I have attached a copy of that e-mail, and that draft CEA as **Exhibit 5**.

14. Later, on February 6, 2006, Ms. Anderson sent me another e-mail. It is **Exhibit 6**. In that e-mail of February 6, 2006, Ms. Anderson states "The form I sent you is generally the form used by the Town of Milan for conservation easements (another copy is attached for your convenience)." The form CEA that Ms. Anderson attached to her e-mail of February 6, 2006 was the same as the one that she had previously sent with her e-mail of November 1, 2005.

15. The "Form" CEAs that had been sent to me by Ms. Gomes Anderson on November 1, 2005 and February 6, 2006 stated at page 5, as part of the rights reserved to the Grantor, as follows:

> B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices *but no living tree with a diameter in excess of five (5) inches in diameter at breast height measured from the down slope may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damages or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformity with sound land and forest management practices to minimize erosion and adverse impacts on natural resources.*
>
> C. *In accordance with ECL §49-0305 (3) (b), this Easement shall not limit, restrict or modify the right to construct, operate or continue the use of any facility, or*

*impede any activity, duly authorized under the applicable provisions of the federal natural gas act (15 U.S.C. §§ 717-717 w.)*

16. The actual CEA that Plaintiff was required to execute, and that she did execute, as a condition for approval of her subdivision application, is **Exhibit 2**. It contains at page 5 the language set forth in paragraph 16 above, but the part marked by italics had been omitted. Again, I was told that this was the "Form" agreement that everyone had to execute, and it was this "Form" Agreement that Plaintiff had to execute as a condition for subdivision approval.  I asked her for the name of someone who had to execute the CEA in the same "Form" as the "Form" CEA that Plaintiff was being required to execute, and she said this "Form" had been executed by Carrezola.

17. In October 2007, I requested from the MPB a copy of the minutes of the MPB for the years 2004 to October 2007. **See Exhibit 7**. After receiving those documents, especially the documents furnished in response to Item No. 1 of that request, I identified matters that had been before the MPB during that time period and made further requests for documents. **Exhibit 8** is a copy of the request that I made to the Town and the MPB on or about December 12, 2007. The 40 matters referenced in the Item 1 of that request were matters for which there had been an application for subdivision or land use made to the MPB. I identified these from the minutes of the MPB that had been furnished to me. In only four (4) instances had the MPB required that the applicant enter into a CEA.

18. In response to my request of December 12, 2007, the Town and the MPB produced four (4) CEAs. These were for the Quarfelt, Savoury (Hidden in the Hills), Napolitano (Stonewood), and Carrezola subdivision applications. The cover letter of the response is **Exhibit 9**, and these four CEAs are **Exhibits 10-13,** respectively. In the electronic filing of this Declaration I have annexed just the pertinent portions of these

CEAs that are Exhibits 10-13 because each is extensive and there are space limitations in doing the electronic filings. The complete versions of these **Exhibits 10-13** are included in the courtesy copy furnished to the Court. I believe that Defendants' counsel has a complete version of these documents because the transmission memo, **Exhibit 9**, shows a copy going to Terry Rice, Esq. who is counsel for Defendants.

19. The four CEAs produced to me by the Town are *more restrictive* than the CEA for Plaintiff's property, yet each of those other applicants who had a CEA was not required to have a DEC-created Forest Management Program (FMP) as a condition for cutting any live trees.

      a.  The Quarfelt CEA, **Exhibit 10**, stated at p. 9, among rights reserved to the Grantor, as follows:

> B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with generally accepted forest conservation practices but no living tree with a diameter in excess of five (5) inches at breast height measured from the downward slope side, may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damaged or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformity with sound land and forest management practices to minimize erosion and adverse impact on natural resources.

> C. In accordance with ECL §49-0305 (3) (b), this Easement shall not limit, restrict or modify the right to construct, operate or continue the use of any facility, or impede any activity, duly authorized under the applicable provisions of the federal natural gas act (15 U.S.C. §§ 717-717 w.)

      b.  The Savoury (Hidden in the Hills) CEA, **Exhibit 11**, stated at pp. 9-10, exactly the same language as that set forth above with respect to the Quarfelt subdivision application.

      c.  The Napolitano (Stonewood) CEA, **Exhibit 12**, stated at pp. 4-5, exactly

the same language as that set forth above with respect to the Quarfelt and Savoury

subdivision CEAs.

   d. The CEA produced by Defendants for the Carrezola subdivision was not

executed. It is **Exhibit 13**, and states at p. 7, exactly the same language as that set forth

above for the CEAs of Quarfelt, Savoury, and Napolitano.

  20. All of these persons, Quarfelt, Savoury, Napolitano, and Carrezola, are local

persons. Their addresses are indicated on the **Exhibits 10-13,** respectively.

  21.  Plaintiff's CEA in pertinent part is actually more beneficial to Plaintiff's rights

than the CEAs of these other persons because it provides that Plaintiff may engage in

"pruning, cutting, planting, landscaping, and clearing of trees in accordance with

generally accepted forest conservation practices", and does not thereafter contain the

limitations that follow the word "but" in the CEAs of these other persons. The directive

of Mr. Kingman and the MPB that renders Plaintiff's CEA *more restrictive* than the

CEAs of these other persons, by requiring that Plaintiff, and Plaintiff alone, have a DEC-

instituted FMP in place as a condition to engaging in any of the work described in this

section is arbitrary and capricious, and constitutes a difference in treatment of Plaintiff

that is adverse to her. It is arbitrary and capricious that Mr. Kingman and the MPB would

interpret this provision as they have done, against Plaintiff, because it means, among

other things, that the removal of trees that are diseased, damaged, or that need to be

removed because they endanger the public safety or to ensure the health of other trees is

not "in accordance with generally accepted forest conservation practices".

  22. Neither Mr. Kingman nor the MPB required that any of these persons obtain a

FMP established by the DEC in order for them to show that they were acting "in

accordance with generally accepted forest conservation practices". Mr. Kingman and the

MPB imposed that requirement as of October 5, 2007, on Plaintiff, and on Plaintiff alone,

knowing full well, that this requirement had not been imposed on these other persons.

Mr. Kingman and the MPB knew this because the MPB was required to approve any

CEA before it was presented to the Town Board for approval. Furthermore, they knew

that this would be an impossible condition for Plaintiff, and her successors and assigns, to

satisfy and that the DEC would not do a FMP for such relatively small lots of 5-7 acres.

FMPs are generally done for large wooded parcels of 50 acres or more where the owner

seeks to harvest trees for sale and profit, and for tax benefits provided by law.

    23. If the MPB had a "Form" CEA, as Ms. Gomes Anderson stated to Plaintiff, and if

that "Form" CEA provided for better rights than those provided to the Plaintiff by reason

of the CEA that Plaintiff was required to execute, then Defendants discriminated against

Plaintiff by not allowing her the right to have the "Form" CEA, while allowing the other

local persons to have the Form CEA

    24. Furthermore, I do not believe that the Town had a "Form" CEA as of April 2004,

the date when Plaintiff made her application for subdivision approval. The basis for this

belief is that the Town never produced any CEA, or any form whatsoever, which pre-

dated the commencement of proceedings on the Woodland Hills subdivision. In addition,

the Town charged Plaintiff, apparently among others, for drafting the "Form" CEA that

was originally presented to her, **Exhibit 5**, and the modified CEA that was later presented

to her, *i.e.*, **Exhibit 2**.

    25. During the course of proceedings before the MPB, Plaintiff was required to

submit payments to an escrow fund that was administered by the MPB as a fiduciary for

Plaintiff. Plaintiff commenced making such payments on May 5, 2004, and continued to make such payments thereafter. On or about on or about November 1, 2007, I received on behalf of Plaintiff an accounting for the disbursements from the amounts paid by Plaintiff. The accounting, and the cover letter by which it was furnished to Plaintiff, is **Exhibit 14**. As part of **Exhibit 14**, Plaintiff has made and included a summary of the amounts she contributed and disbursements of her money to various parties by the MPB. The total amount Plaintiff paid in is $22,602.25. The amounts paid to Greenplan, Inc. were $8182.50; to Paggi, Martin & Del Bene $6810.60; and to Van DeWater & Van DeWater $7051.34. Greenplan was a firm that the MPB retained for environmental purposes relating to Plaintiff's subdivision application. Paggi, Martin & Del Bene was the engineering firm that Plaintiff retained for purposes of Plaintiff's subdivision application. Van DeWater & Van DeWater was the law firm that the MPB used with respect to Plaintiff's subdivision application.  All these firms do work regularly for the MPB. The MPB determined whether Plaintiff or the MPB should be charged for work, and it also determined whether Plaintiff's account should be charged for work done for someone else's subdivision, *i.e.*, that of Carrezola.

26. Among the back-up materials submitted to Plaintiff with the accounting under letter of October 29, 2007 was a bill that included legal work done on February 1, 2005, a date which was almost one year after Plaintiff made her application for subdivision approval. It is part of **Exhibit 14**, and is marked as **Exhibit 14A.** It indicates "Background research on legal requirements for conservation easements . . . in preparation of conservation easement for Carrezola Subdivision. Web research for sample conservation easement"  The materials sent to Plaintiff by the MPB as part of that

accounting, see **Exhibit 14A**, show that part of that Carrezola work was billed to Plaintiff's escrow account, and part to the Quarfelt subdivision escrow account. The reference to "Haggerty", which account was also charged, is to Ellen Haggerty, who is the principal for the Quarfelt subdivision, as can be seen from viewing the signature page for Exhibit 10 the this Declaration.

27. This allocation of attorney's expenses was because the CEA being prepared for Carrezola was also to be used for the CEAs of Plaintiff and Quarfelt. The "Form" CEA sent to me by Ms. Gomes Anderson, *see* **Exhibits 5 and 6**, was the same in pertinent part as the CEA that was later furnished to me as being the Carrezola CEA and the Quarfelt CEA. *Comp.* **Exhibit 5, p. 5, with Exhibit 13, p.7, and Exhibit 10, pp. 8-10.**

28. In sum, Defendants charged the escrow accounts of Plaintiff and Quarfelt for work done on the Carrezola CEA because Plaintiff and Quarfelt were going to have the same "Form" CEA as Carrezola. Plaintiff was told that the CEA that Plaintiff was to execute was the same "Form" Agreement that was being used for others, and Carrezola's CEA was specifically mentioned by Janis Gomes Anderson. In June 2006, Defendants then required Plaintiff to execute a CEA that was different in pertinent part from the "Form" CEA and different from the Carrezola CEA. In fact, from other billings by Van DeWater & Van De Water that were furnished to Plaintiff as part of the accounting, not only did Defendants bill work on the Carrezola "Form" CEA to Plaintiff, but Defendants thereafter billed Plaintiff for the work that Van DeWater & Van DeWater did so as to change the "Form" CEA to make it different from the "Form" and different from the Carrezola and Quarfelt CEAs.

29. I was present for some of the administrative proceedings relating to the Carrezola

10

subdivision application. During those proceedings, the proponents of the Carrezola subdivision mentioned to the MPB that the reason for the Carrezola subdivision was so that Carrezola could sell part of the Carrezola property to pay for personal expenses that Carrezola would be incurring. I believe it was tuition for college for one of the Carrezola children. Carrezola is a resident of the Town.

30. From the MPB minutes I obtained from Defendants, I saw that local resident Morton Getman did not have enough land to create a two-lot subdivision. At the meeting of the MPB on October 19, 2005, Chairman Kingman described how the MPB intended to grant him an exception, while not establishing a precedent for others, like minorities and City People. The minutes of that meeting state:

> Morton Getman Area Variance Recommendation – Chairman Kingman distributed a review of the case. The major concern of the board members was setting a precedent for creating substandard lots. Mr. Williams, Chair of the ZBA, said he would work with Janis Gomes, Planning and Zoning Attorney, to work a resolution so it would be extremely limited, only applying to a situation with these circumstances such as where the lot was originally a 3 acre lot, the lots were combined, zoning was changed, and now the applicant wants to change the configuration back to the original lot. Ms. Williams said Ms. Gomes seems to be of the view that if the resolution is written correctly, it will not set a precedent.

Other minutes show that Mr. Morton later obtained approval of the subdivision that he sought, and the approval was accomplished in such a manner that City Persons and minorities would not be able to cite the Morton situation as a precedent for their own requests for approval. The "Janis Gomes" referenced in those minutes is the same Janis Gomes Anderson who acted for Defendants to create the "Form" CEA, and the CEAs for Carrezola, Napolitano, Savoury, and Quarfelt, and for Plaintiff.

31. During the course of the administrative proceedings, Plaintiff in other instances was treated differently, and more harshly, than local persons. Plaintiff's Property has

more than 900 feet of frontage on Willowbrook Road. Early in the process for subdivision approval, acting for Plaintiff, I attempted three times to have the MPB approve of Plaintiff's cutting of some trees and brush along Willowbrook Road, so Plaintiff could increase sight distance along that road, not only for persons using the common driveways for Plaintiff's project, but also for the benefit of other persons who were using Willowbrook Road. Each time I made the request, the MPB prohibited Plaintiff from taking such action.

32. The minutes of the MPB reference to one of these rejections. The MPB minutes of June 2, 2004 state "Mr. Mc Culloch asked if there would be a problem in clearing brush to make it safer, and Chairman Kingman said the regulations are once an EAF is submitted, no vegetation can be touched."

33. There is no regulation that prohibits the cutting of brush; the action of Mr. Kingman and the MPB in denying Plaintiff's request was arbitrary and capricious and served no legitimate state purpose. I believe it was designed and intended to inhibit Plaintiff from being able to obtain the requisite sight distance, but Plaintiff obtained the requisite sight distance nonetheless.

34. Later, on October 7, 2004, the same issue of cutting brush along Willowbrook Road was raised. By this time, both of the common driveways for the project had been set, one being "Otero Drive", to the north part of the Plaintiff's Property, and the other, being "Mc Culloch Drive", being to the south side of Plaintiff's Property. Both of these common driveways came out to Willowbrook Road.

35. Based on my review of property records, the persons who resided at 1315 Willowbrook Road are Mr. and Mrs. Burns; they have a 6.43 acre parcel and part of their

property is across from the common driveway that was named Mc Culloch Drive. At the meeting of the MPB on October 7, 2004, Mr. Burns objected to the location of Mc Culloch Drive. I was present when He said "As a resident for 30 years, I have rights"; I advised Mr. Burns at the public meeting that this was the only location possible for this common driveway and that Plaintiff had on three occasions sought permission to cut trees and brush so as to provide for greater sight distance, but that the MPB has denied such permission. In view of the fact that no trees could be cut, I told Mr. Burns at the public hearing, the proposed location of the common driveway was the only location feasible.

36.  I was told by the MPB that because Mr. Burns opposed the common driveway coming out onto Willowbrook Road near his house, the Plaintiff had to change the location of the common driveway. This required that Plaintiff cut not only brush, but also cut approximately 10 trees so that the sight distance for the new location of the common driveway known as Mc Culloch Drive could be achieved. This action was taken by the MPB at the December 2004 meeting of the MPB solely as an accommodation to Mr. and Mrs. Burns. Whereas when Plaintiff sought to clear brush, "Chairman Kingman said the regulations are once an EAF is submitted, no vegetation can be touched," when the local persons said that they wanted the location of that driveway changed, those specious regulations apparently disappeared. Plaintiff was required to clear brush and cut trees, even though the EAF had been submitted, and even though it was still operative. This treatment of Mr. and Mrs. Burns was in direct contradiction to the MPB's prior treatment of Plaintiff.

37. Still later, in November 2005, Plaintiff had to cut trees along Willowbrook Road, in order to satisfy the requirements of the Town Highway Superintendent, and Central

13

Hudson Electric and Gas Company (CH). The plans required Plaintiff to install utilities for each lot, and CH had to install these utilities. CH drafted plans showing what was required of Plaintiff in the way of clearing of vegetation so that CH could do its work. I know this because I saw these plans. On this occasion, Mr. Kingman and the MPB caused a STOP WORK ORDER to issue. Mr. Kingman later claimed that the cutting of trees along Willowbrook Road violated the subdivision plans. This was not true. There was nothing in the subdivision plans that prohibited any cutting of trees or removal of brush along Willowbrook Road. No part of the area designated as conservation easement area was along Willowbrook Road. Thereafter, Mr. Kingman told me that Plaintiff was required to do "remedial work" to "correct" for this cutting of trees. On the prior occasion, when some trees had to be cut along Willowbrook Road to accommodate the requirements that Plaintiff satisfy Mr. and Mrs. Burns, there was no remedial work required. It was arbitrary and capricious, and disparate treatment, for Mr. Kingman and the MPB to claim that the cutting of trees to satisfy the CH plans violated the subdivision plans, but that the cutting of trees to satisfy Mr. and Mrs. Burns did not violate the subdivision plans.

38. I am familiar with the plans for the Woodland Hills subdivision. The common driveway at the north part of Plaintiff's property was across from property owned by Paul Hughes. I know that Mr. Hughes is a long time resident of the Town of Milan because he told me that. I know that until recently Mr. Hughes had been a member of the Town Zoning Board of Appeals because I attended at least one meeting of the Town's Zoning Board of Appeals and Mr. Hughes sat as one of the members.

39. The property owned by Mr. Hughes is at the corner of Willowbrook Road

and Route 199. From property records, I ascertained that Mr. Hughes purchased this property on August 23, 2002, for $30,000. I know that this property was zoned as residential when Mr. Hughes purchased it because he told me that. I know that it is now zoned Commercial, Storage, Warehouse and Distribution Facilities because property records show that to be the case. Mr. Hughes established his business, Red Hook Fence and Deck Co. at this location.

40. I know from personal observation that this property owned by Mr. Hughes has a stream going through it. That stream flows on the westerly side of Willowbrook Road, parallel to Willowbrook Road. The land along the stream, and all the land on the westerly side of Willowbrook Road to that stream, is "DEC wet-lands". This designation is for extremely sensitive land and the designation means that there can be no filling of these areas.

41. I know that Mr. Hughes has been filling these DEC wet-lands because I have seen him doing so. I know that Lauren Kingman knows that this is DEC wet-lands and that Mr. Hughes had been filling these lands illegally because I told this to Mr. Kingman at the site. In fact, Mr. Kingman and the MPB required Plaintiff to make major changes to her proposed sub-division so that Plaintiff's project would not interfere with Mr. Hughes' filling of the DEC wetlands that are on his property.

42. I know from personal knowledge that when Plaintiff acquired her Property, there was an existing culvert that ran under Willowbrook Road from Plaintiff's Property to that of Mr. Hughes. This culvert was north of the location for the common driveway that was to become Otero Drive. This culvert permitted for water from Plaintiff's Property to flow over to the DEC wet-lands area of Mr. Hughes' property, the same wet-

lands that Mr. Hughes was filling.

43. Plaintiff's original plans to the MPB called for use of this culvert. The MPB and the Town Highway Superintendent required that Plaintiff modify her plans very substantially. Plaintiff was required to provide for the existing culvert to be closed off. Plaintiff was required to have a culvert go under Otero Drive, to another catch basin area, and then to have another culvert go from there under Willowbrook Road, much further to the south, to an area of Mr. Hughes' property where he had not yet filled in the wet-lands.

44. I addressed this to Mr. Kingman at the site. I told Mr. Kingman that it was unfair that Plaintiff had to change the plans and incur the additional expense, and that it was unfair that Mr. Kingman and the MPB was imposing so many requirements on Plaintiff, in name of the 'environment', when it was permitting Mr. Hughes to fill in DEC wet-lands, in violation of the law. Mr. Kingman's response to me was "He's an old-timer. We can't do anything about what he does."

45. With regard to Plaintiff's application for subdivision approval, one of the Town's residents who attended the public hearings and objected to Plaintiff's proposed subdivision asserted as her objection that the project should be rejected because "City people" did not know how to treat the land, and that they clear cut woods. I was present when this statement was made.

46. When I was initially told by Mr. Kingman that Plaintiff needed a DEC approved FMP I contacted the New Paltz office of the DEC and spoke with Michael Callan. I explained the situation, but he referred me to Barbara Lucas Wilson, who works out of Dutchess County, because this property is within her jurisdiction. During the course of my discussion with Mr. Callan, he told me the same things that are set forth in

the Affidavit of Gregory M. DeSylva. Barbara Lucas Wilson also told me those same things. Mr. Callan also told me that sometimes it is even appropriate to cut large trees, rather than smaller trees, because it may be prudent to make space for the smaller trees to flourish by removing living large trees that interfere with their ability to do so. I had asked Barbara Lucas Wilson to submit an affidavit making statements similar to those made by Mr. DeSylva. After I sent her the Affidavit, she told me that she checked with her supervisor, and that her supervisor had checked with the DEC legal department, regarding permission to sign the affidavit, and that the legal department had advised that she should not execute the affidavit because the DEC did not want to get involved in the dispute between Plaintiff and the Town. Ms. Lucas Wilson advised me that DEC maintained a listing of Cooperating Foresters, provided the list to me, and suggested that I contact one of those persons. I contacted Mr. DeSylva. He is closest to the property.

47. There is another reason why Plaintiff and her successors must be allowed to cut trees in a prudent manner. Some of the trees that are in the CEA are large and very close to the locations on the subdivision plats that have been identified as the home locations. This is especially true with respect to Lot 5, because Defendants, at the urging of Frank Margiotta, had amended the CEA area to include those large trees on Lot 5 in the CEA area. At some point, whoever purchases Lot 5, if anyone ever does so, will have to cut those large trees to protect the house that is to be built on that Lot. Otherwise, those large trees could fall on the house.

The above statements are true and correct.

Dated: February 22, 2008                    _____

                                            Kenneth Mc Culloch

17

**Exhibit 1 to Declaration of Kenneth Mc Culloch**