UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

**CARMEN OTERO Mc CULLOCH**,

                         Plaintiff,                  **NOTICE OF MOTION**

         -against-

**TOWN OF MILAN, TOWN OF MILAN TOWN BOARD, JOHN V. TALMADGE**, Town Supervisor, and **ALFRED LO BRUTTON, PAULINE COMBE-CLARK, DIANE MAY,** and **ROSS WILLIAMS**, Councilpersons, **TOWN OF MILAN PLANNING BOARD, LAUREN KINGMAN**, Chairman, and Members **JEFFREY ANAGOS, PETER GROSS, SHEILA MARGIOTTA, MARY ANN HOFFMAN,** and **PAULINE COMBE-CLARK, GARY E. BECK**, Zoning Enforcement Officer, Town of Milan, and **FRANK MARGIOTTA, BARBARA HUGHEY,** and **CHARLOTTE NORMAN,**

                         Defendants.

----------------------------------------------------------------------X

        **PLEASE TAKE NOTICE**, that upon the annexed Declaration of Terry Rice, dated February 29, 2007, the amended complaint herein and upon the prior proceedings heretofore had had herein, a motion will be made to this Court, to be held at the United States District Courthouse, New York, New York, on the 14th day of March, 2008, at 9:30 in the forenoon of that day, or as soon thereafter as counsel can be heard, for an order pursuant to FRCP Rule 12(b)(6), dismissing the complaint herein, together with such other and further relief as to the Court may seem just and proper.

Dated: Suffern, New York
       February 29, 2008

Rice & Amon

_____

By: Terry Rice (TR 1022)
Four Executive Boulevard
Suite 100
Suffern, New York 10901
(845) 357-4000

To: Kenneth Mc Culloch
       516 Fifth Avenue, 12th Floor
       New York, New York 10036

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

**CARMEN OTERO Mc CULLOCH**,

                         Plaintiff,                      **DECLARATION**

         -against-

**TOWN OF MILAN, TOWN OF MILAN TOWN BOARD,
JOHN V. TALMADGE**, Town Supervisor, and **ALFRED
LO BRUTTON, PAULINE COMBE-CLARK, DIANE
MAY**, and **ROSS WILLIAMS**, Councilpersons, **TOWN OF
MILAN PLANNING BOARD, LAUREN KINGMAN**,
Chairman, and Members **JEFFREY ANAGOS, PETER
GROSS, SHEILA MARGIOTTA, MARY ANN
HOFFMAN,** and **PAULINE COMBE-CLARK, GARY
E. BECK**, Zoning Enforcement Officer, Town of Milan, and
**FRANK MARGIOTTA, BARBARA HUGHEY,** and
**CHARLOTTE NORMAN,**

                         Defendants.

--------------------------------------------------------------------X

      Terry Rice, an attorney admitted to practice law in the United States District

Court for the Southern District of New York, states that the following is true, under

penalty of perjury:

      1.   I am a partner in Rice & Amon, attorneys for Defendants (hereinafter

collectively referred to as the "Town") in the above-captioned matter and am familiar

with the facts, circumstances and prior proceedings herein.  I make this Declaration in

support of the Town's motion to dismiss the amended complaint pursuant to Rule

12(b)(6).

      2.   The instant action was commenced by the filing of a summons and complaint

on or about November 5, 2007. Thereafter, the Town moved to dismiss the complaint

pursuant to Rule 12(b)(6). Following service of the motion to dismiss, Plaintiff filed an amended complaint on or about January 28, 2008, a copy of which is annexed hereto as Exhibit "A".

## INTRODUCTION

3.   The instant action arises from Ms. Mc Culloch's claimed grievances with respect to the <u>approval</u> of her six lot subdivision in the Town of Milan. Dissatisfied with a conservation easement that was a condition of the subdivision approval and asserting various complaints regarding the implementation of the approval, she has not challenged the condition in an Article 78 proceeding or appealed any of the administrative actions by which she claims to be aggrieved to the Zoning Board of Appeals and/or in an Article 78 proceeding. Instead, she has concocted Constitutional violations and violations of the Fair Housing Act. It is respectfully submitted that the endeavor to federalize routine, run-of-the-mill land use disputes is profoundly deficient and misplaced and that the neglect of state remedies further deprives the Court of jurisdiction. Moreover, it is submitted that for the reasons set forth in the accompanying memorandum of law, the substantive claims also are deficient and fail to state a viable claim as a matter of law.

## THE COMPLAINT

4.   The complaint alleges that Ms. Mc Culloch was born in Puerto Rico of Puerto Rican parents (¶ 2) and that she provided her full name of "Carmen Otero Mc Culloch" in connection with materials filed with the Planning Board (¶ 3) and in an Article 78 proceeding (¶ 4). Plaintiff alleges "upon information and belief" that the Defendants were aware that Plaintiff is a resident of New York City and Hispanic (¶ 5).

5.  Plaintiff asserts "[u]pon information and belief" that during the course of the Planning Board review of the Plaintiff's subdivision application, the Chairman of the Planning Board kept the Supervisor advised of the progress of the application and "consulted" with the Supervisor (¶ 8). The complaint further contends "upon information and belief" that "all actions" taken by the Planning Board have been with the "approval" of the Town Board (¶ 8).[1]

6.  It is asserted that Frank Margiotta, Barbara Hughey and Charlotte Norman are not employees of the Town, but are "volunteers" (¶ 10).

7.  Plaintiff alleges that she is the owner of a parcel of land consisting of 35.12 acres in the Town (¶ 14) which she acquired in January 2004 with the intent of subdividing the property into 6 lots (¶ 15). It is further asserted that the property is located in a R5 zoning district which provides for a minimum lot size of five acres (¶ 16).[2]

8.  The complaint relates that Plaintiff submitted an application for subdivision approval to the Planning Board on April 21, 2004 which sought approval for six lots consisting of one lot on which an existing house and barn were to remain and five additional lots (¶ 17). The application proposed "large areas near the [Taconic State Parkway], the edges of most of the property, and in the interior of the property, that Plaintiff indicated were to be maintained as open space.…" (¶ 18). In or about December 15, 2004, Ms. Mc Culloch instituted an Article 78 proceeding to compel the Planning Board to render a decision of environmental significance pursuant to the State

---

[1] Pursuant to Town Law §§ 276 and 277 and the Town Subdivision Regulations (Town Code Chapter 177), only the Planning Board possesses authority to review and make determinations on subdivision applications.
[2] The property presently is zoned A5A which is substantially the same as the previous R5 zoning designation.

Environmental Quality Review Act ("SEQRA") (¶ 21). Pursuant to § 177-35 of the

Zoning Law, by which the filing of an Article 78 proceeding stays further review of an

application, Plaintiff was advised in December 2004 that further proceedings on the

application were suspended pending determination of the Article 78 proceeding (¶ 22-

23).[3] Ms. Mc Culloch alleges she withdrew the Article 78 petition in June 2005 (¶ 23)

and that there were further proceedings and submissions to the Planning Board from

January 2005 to June 2005 (¶ 24).

9.   The complaint relates that the Planning Board granted conditional final

subdivision approval on June 29, 2005 (¶ 24).[4] It is asserted that among the conditions of

approval was the requirement of completion of the infrastructure depicted on the

subdivision plat within a specified period of time and that Ms. Mc Culloch enter into a

Conservation Easement Agreement regarding the approximately 17 acres of land that was

intended by Plaintiff to remain undeveloped (¶ 24).

10. The complaint further alleges that Ms. Mc Culloch had a legitimate

expectancy that she would have final approval if she complied with the conditions of

approval and further contends that she did comply with those conditions (¶ 25). Although

contending "upon information and belief" that prior to June 29, 2005, the Planning Board

provided to her a ''form" conservation easement and purportedly advised her it was a

condition of subdivision approval (¶ 26), Ms Mc Culloch claims, "upon information and

---

[3] Section 177-35 actually is a provision in the Town Subdivision Regulations, not Zoning Law, and is
substantially identical in all relevant respects to the provisions of Town Law § 282.
[4] Pursuant to Town Law § 276(4)(e), "Conditional approval of a final plat" means "approval by a planning
board of a final plat subject to conditions set forth by the planning board in a resolution conditionally
approving such plat. Such conditional approval does not qualify a final plat for recording nor authorize
issuance of any building permits prior to the signing of the plat by a duly authorized officer of the planning
board and recording of the plat in the office of the county clerk or register as herein provided." Section
177-41 of the Subdivision Regulations contains a definition of "Final Plat, Conditional Approval" that is
substantially identical and is substantively identical.

belief," that prior to the time she filed the subdivision application and for a period of three years prior thereto, the Planning Board had not required persons seeking subdivision approval to provide a conservation easement as a condition of approval (¶ 27). Plaintiff relates that the area covered by the conservation easement comprises 50.4 per cent of the area of the property (¶ 28).

11. Ms. Mc Culloch alleges, "upon information and belief," that Planning Board chairman Kingman visited the subject property on November 4, 2004 and observed trees being cut on the property along Willowbrook Road (¶ 30) and that, "upon information and belief," Zoning Enforcement Officer Beck issued a Stop-Work Order to Ms. Culloch's contractor on November 5, 2004 (¶ 31) and advised Plaintiff's representatives that the stop work order had been issued because Plaintiff had violated the conditional final subdivision approval by such cutting of trees (¶ 31-32).

12. Ms. Mc Culloch alleges "upon information and belief," that the plans presented to the Planning Board or the Planning Board approval did not prohibit the cutting of trees along Willowbrook Road (¶ 33). The complaint alleges that the foregoing treatment of Ms. Mc Culloch was different than that accorded to "local residents." (¶ 33). Plaintiff alleges that the Planning Board previously had "ordered" that she relocate the entrance of one of the two common driveways and that in order to do so, she was required to cut at least 10 trees along Willowtree Road (¶ 34).

13. The complaint alleges that the tree removal was undertaken in order to install utilities for the development and that Zoning Enforcement Officer Beck advised Ms. Mc Culloch's representatives that such plans were required to be approved by the Planning Board and that if the Highway Superintendent trees had to be removed for safety

purposes, such tree removal was required to be approved by the Planning Board (¶ 35).

Plaintiff alleges "upon information and belief" that such a requirements is illegal and

discriminatory (¶ 36) and "upon information and belief," that no local residents or "non-

minority person" who had to install utilities had been required to obtain such approvals (¶

37). The complaint alleges that in order to obtain the removal of the stop work order,

Plaintiff agreed to undertake remedial action (¶ 38). Plaintiff claims, "[u]pon information

and belief," that the order was not "entered" with the Town Clerk (¶ 38).

14. Ms. Mc Culloch alleges that she intended to complete all required

improvements within the time provided by the Planning Board so that she would not have

to post a bond and further alleges that "in whole or in part" because of such delay, the

utility installation was delayed and Plaintiff was required to post a bond instead of

completing the work in a more timely manner (¶ 39-40).

15. The complaint states that the final plat was signed by the Planning Board

chairman on June 26, 2006 and filed in the County Clerk's office on June 29, 2006 (¶

41).

16. Plaintiff also alleges that the conservation easement which she signed on June

29, 2006 was different than the one shown to her prior to the June 29, 2005 approval and

that, "upon information and belief," no person who was a Town resident or a non-

minority was required to sign the "kind" of conservation easement that Ms. Mc Culloch

"was required" to sign (¶ 42-43). It is alleged that Defendants "created their first CEA for

Plaintiff.…" (¶ 43).

17. The complaint also asserts that the Town adopted § 220-39(B)(8) of the

Zoning Law, entitled "donor donations," subsequent to the subdivision approval and that

such provision is impermissible (¶ 44-45). The complaint alleges that Ms. Mc Culloch's representatives told Mr. Kingman told that she would not make such a payment (¶ 46).

18. Plaintiff alleges that she had a potential purchaser of Lot 5 as of September 2007 who wanted to be able to cut trees in the area included within the conservation easement as part of "general maintenance" and for firewood (¶ 47). The complaint asserts that on October 1, 2007 Plaintiff faxed a letter to Mr. Kingman asking for assurances that the owners of lots in the subdivision could do so and that on or about October 5, 2007, Mr. Kingman advised Plaintiff's representatives that no live tree could be cut within the area of the conservation easement unless the owner had a Forest Management Program approved by the Department of Environmental Conservation ("DEC") (¶ 49). Ms. Mc Culloch alleges "upon information and belief" that such a condition is not imposed on local residents or non-minorities who seek subdivision approval and that Plaintiff is the only person to have had such a condition required of her (¶ 50). Plaintiff contends that such a condition is impossible to fulfill and is arbitrary and capricious (¶ 50). Ms. Mc Culloch also alleges "upon information and belief" that there is no reasonable conservation purpose served by such a restriction and that it is contrary to "generally accepted forest management practices." (¶ 53). Plaintiff asserts that DEC informed her that the parcel was too small to effectively manage in a Forest Management Plan (¶ 51).

19. Ms. Mc Culloch contends "upon information and belief" that, as a result, she lost a "potential customer" for Lot 5 (¶ 55). She further alleges that such action "when added to Defendants' prior actions" have so burdened Plaintiff's property so as to constitute a taking of more than 50% of Plaintiff's property without compensation or due process (¶ 55).

20. Based on the foregoing, the first claim, asserted against the Town, Town Board, Planning Board and Frank Margiotta, Barbara Hughey and Charlotte Norman, alleges a violation of the FHA and due process rights.

21. Ms. Mc Culloch alleges that those Defendants have treated her differently and adversely because of her place of residence and her national origin, contending that the Defendants have one standard for non-minorities and local residents and another for minorities and "City People." (¶ 57). Plaintiff further alleges "upon information and belief" that because Defendants do not believe that City People know how to respect the land, they impose unreasonable and arbitrary restrictions on City People (¶ 57). Ms. Mc Culloch further contends that most City People, like herself and minorities and most residents of the Town are white (¶ 58). She alleges that it is unlawful pursuant to the FHA to make a dwelling unavailable to a person based on such factors (¶ 58).

22. Plaintiff asserts that it was she anticipated that the market for the lots would primarily be persons from New York City (¶ 62). The complaint alleges "upon information and belief" that the Defendants intent was to keep minorities and City People "compacted together, in the City" (¶ 63) and that the purported difference in treatment is not rationally related to any legitimate state interest (¶ 64).

23. Ms. Mc Culloch contends that the alleged distinction in treatment has an adverse and stastically adverse impact against minorities because most City People and minorities and most Town residents are not (¶ 65). Ms. Mc Culloch also alleges that any rules or standards that discriminate against "City People" have a statistically significant adverse impact against minorities and that the Town Board and Planning Board know that by discriminating against New York City residents, they are more than likely

discriminating against a minority (¶ 68). Ms. Mc Culloch further asserts that the Town

and Planning Board have discriminated against a minority because Plaintiff is a minority

(¶ 68).

     24. Ms. Mc Culloch next alleges that the comprehensive plan adopted by the

Town on January 26, 2006 was invalidated in an Article 78 proceeding by decision dated

February 7, 2007 for a failure to follow "legal requirements" and that a modified version

thereof was adopted on August 13, 2007 (¶ 69).

     25. According to the allegations of the complaint, the comprehensive plan

demonstrates a "strong concern for an influx of New York City residents." (¶ 70).

Selectively quoting portions of the comprehensive plan, Ms. Mc Culloch alleges that the

comprehensive plan states that "one 'important reason' that the Town up-dated its

Comprehensive Plan was that 'Development pressure is expanding north from the New

York metropolitan areas following the Taconic State Parkway. The areas in southern and

mid-Dutchess County have already experienced a major impact, and there is a marked

increase in subdivision activity in Milan.' 1.2. It further states that ''Today, the [Taconic

State Parkway] serves as a major commuting route for those people that want to live in

the rural splendor while they commute to work in the metropolitan, area, 70 miles to the

south.'' 9.2." (¶ 70).

     26. Plaintiff further asserts "upon information and belief," that only Town

residents were "consulted" in connection with the adoption of the comprehensive plan

and that the only needs considered were those of Town residents (¶ 71). Ms. Mc Culloch

also alleges that the intent of the comprehensive plan is to "keep Milan rural," to keep

density below 150 persons per square mile, to avoid ''Explosive growth'' that "threatens

our rural character and risks causing even higher taxes to support our schools'' and to keep Milan "affordable and accessible to current residents." (¶ 71). The complaint claims that the comprehensive plan provided for developers to have higher density in return for providing for some unfits that would have to be sold or rented at reduced cost to the Town's municipal employees or the Town's senior residents. Plaintiff also claims that "upon information, and belief," that the comprehensive plan also directs that the Planning Board slow down development and delay the approval process for land use applications, unless persons agree to convey a conservation easement to the Town (¶ 72).[5]

27. Based on those allegations, Plaintiff asserts "upon information and belief," that the comprehensive plan and Zoning Law was enacted and administered with an exclusionary purpose; that the Town has not provided a properly balances and well-ordered plan for the community and that the Town has not considered regional housing needs and requirements (¶ 73).

28. Plaintiff alleges that her property has more than 900 feet of frontage along Willowbrook Road and that early in the "process" she attempted three times to obtain Planning Board approval to cut tress and brush along the road to increase sight distance (¶ 74). She contends that at the urging of Frank Margiotta, Barbara Hughey and Charlotte Norman, the Planning Board denied such requests (¶ 74). Ms. Mc Cullogh alleges "upon information and belief," that no "regulation" prohibits the cutting of brush and that the action of the Planning Board in denying her requests was arbitrary and capricious, served no legitimate state purpose and was intended to inhibit Plaintiff from being able to obtain adequate sight distance, but that she did obtain the requite sight distance (¶ 76).

---

[5] The Town respectfully refers the Court to the portions of the comprehensive plan referred to by Plaintiff for the proposition that it directs the Planning Board to delay the approval process under any circumstances. The comprehensive plan simply does not so provide.

29. Plaintiff alleges that Mr. and Mrs. Burns ("Burns") own a 6.43 acre parcel, a portion of which is across the road from a driveway on Plaintiff's property and that Mr. Burns objected to the location of that driveway on Plaintiff's property (¶ 78). The complaint asserts that because Mr. Burns objected to the location of the driveway, Plaintiff was required by the Planning Board at its December 2004 meeting to change its location and to cut 10 trees and brush in order to obtain sufficient sight distance for the new location "solely" as an accommodation to Mr. and Mrs. Burns, which is claimed to be "in direct contradiction" to the Planning Board's prior treatment of Plaintiff (¶ 79). Ms. Mc Culloch also claims that, as is related above, that Plaintiff had to cut trees along Willowbrook Road to satisfy the requirements of the Town Highway Superintendent utility company (¶ 80). She further alleges that Mr. Kingman and the Planning Board caused a Stop Work Order to be issued because the cutting of trees along Willowbrook Road violated the subdivision plans (¶ 80). Plaintiff asserts that she was required to undertake remedial work to rectify the unauthorized cutting of trees, thereby incurring additional costs and delays (¶ 80).

30. Plaintiff next contends that Paul Hughes, a long-time resident of the Town, received different treatment than her (¶ 81-88). Plaintiff essentially contends that the Hughes property, located across from the Plaintiff's property consisted mostly of wetlands- that he received a zone change from residential to a commercial designation in order to build a storage, warehouse-type facility (¶ 82); that, "upon information and belief," Mr. Kingman and the Highway Superintendent knew that Hughes had illegally filled wetlands on the property (¶ 84) and that Mr. Kingman and the Planning Board

required Plaintiff to make "major changes" in her plans so as not to interfere with Hughes' allegedly illegal actions (¶ 84-87).

31. Plaintiff further contends that when Plaintiff's representative complained to Mr. Kingman, he responded that Hughes was an old-timer and they could not do anything about what he does. (¶ 88).

32. Plaintiff next contends that a member of the pubic stated at one of the public hearings on her subdivision application that "City People" don't know how to treat the land (¶ 89) and "upon information and belief" that Frank Margiotta, Barbara Hughey or Charlotte Norman complained to one of Plaintiff's agents that "City People" don't know how to respect the land (¶ 90).

33. Ms. Mc Culloch next alleges that the Town Board and Planning Board have "consistently" imposed different requirements and standards on Plaintiff than on local residents and non-minorities (¶ 91), contending that local residents Borenstein, Napolitano, Carreola and Savoury were treated differently that her in the processing of various land use applications over an unspecified period of time (¶ 93).

34. The complaint relates scant facts with respect to the Borenstein application (¶ 94-95) and no facts with respect to the Napolitano, Carreola and Savoury applications.

35. The complaint asserts "upon information and belief" that a Negative Declaration was adopted for the Borenstein subdivision pursuant to SEQRA and a Positive Declaration was adopted for Ms. Mc Culloch's application (¶ 95-96); that a conservation easement was required of Plaintiff, but not Borenstein (¶ 97); and that the same "answers" were given in the "EAF responses" by Napolitano, Carreola and Savoury as by Plaintiff, but the Plaintiff was the only person required to do "special studies" to

justify her response (¶ 98).[6] Plaintiff also alleges "upon information and belief" that no other application was required to be reviewed by the CAC (¶ 100).

36. Plaintiff alleges "upon information and belief" that Borenstein, Napolitano, Carreola and Savoury are not minorities and are residents of the Town (¶ 99).

37. Ms. Mc Culloch next alleges "[u]pon information and belief" that "since the time of Plaintiff's original application for subdivision approval, there have been approximately 40 applications made to the MPH for land use approvals. Upon information and belief, in only four instances, all subsequent to Plaintiff's application for subdivision approval, has the MPB required an applicant to have a CEA; in no instance has the MPB imposed on these other persons a requirement that no hiving tree can be cut." (¶ 101). Plaintiff does not identify or describe the "four instances" alleged. Plaintiff alleges "upon information and belief" October 5, 2007, when Plaintiff requested that she and her successors be permitted to cut living trees for firewood, Planning Board Chairman Kingman was aware that local residents whose land had a conservation easement had the right to cut living trees pursuant to the applicable conservation easements, but "he" denied that right to Plaintiff (¶ 103).

38. The complaint next asserts "[u]pon information and belief" that a planning board is not authorized to charge an applicant for subdivision approval for the Town's

---

[6] Of course, it is reasonable on its face that there would be different answers for different properties with different characteristics and environmental issues. In addition, the SEQRA regulations anticipate a three part process whereby the applicant prepares an EAF, Part 1; the municipal agency prepares a Part 2 which characterizes potential environmental issues as "small to moderate impact" or "potential large impact" and answers "can impact be mitigated by project change." *See* 6 NYCRR 617.20. If one or more impacts identified in Part 2 is considered to be potentially large, a Part 3 must be prepared which is essentially reports to demonstrate whether a significant environmental impact may occur. If those reports indicate that there will not be a significant environmental impact, the lead agency may, as in the present matter, adopted a negative declaration which completes the environmental review of a proposal and dispenses with the requirement of the preparation of an environmental impact statement by the applicant. *See also* Gerrard Ruzow Weinberg, 1 Environmental Impact Review in New York § 3.04

expenses in connection therewith (¶ 110). Ms. Mc Culloch alleges that she was required to pay more than $22,600 into an escrow fund for the payment of Town expenses in connection with review of the subdivision application (¶ 111) which, is alleged "[u]pon information and belief" to have been used to pay for persons retained by the Planning Board, including engineers, planning consultants and others whose services are asserted to have been undertaken under the direction and control of the Planning Board (¶ 112). The complaint also asserts "[u]pon information and belief" that the Planning Board required some non-minorities and local residents to pay into an escrow fund for review of applications, but that the amounts required were "small" in comparison to the amount Plaintiff was required to pay (¶ 113). She alleges, "[u]pon information and belief" that Plaintiff was treated differently because she is a City Person and a minority. (¶ 113).

39. The complaint alleges "[u]pon information and belief" that the actions alleged have financially affected Plaintiff's "rights" in three ways (¶ 114). Plaintiff first alleges that the beneficial use of the area within the conservation easement, consisting of 17 acres, has bee taken, "thereby effectively reduc[ing] the size of the existing lots from being 5 to 7 acres to being 1 to 3 acres each." (¶ 114). Ms. Mc Culloch assests secondly, that the second "financial harm" relates to the claimed impact on Plaintiff's property that is not included within the conservation easement because, according to Plaintiff's theory, she and her successors "have reduced capability to protect against danger from falling trees, and reduced capability of protecting against invasive species, before they come onto the part of each lot that is not in the [conservation easement]." (¶ 116). Plaintiff alleges that the third financial harm results from the claimed delay of her ability to market the lots (¶ 116).

40. The complaint next alleges "[u]pon information and belief" that Frank Margiotta, Barbara Hughey and Charlotte Norman as volunteer members of the CAC provided information regarding attributes of the subject property which are claimed to be false and upon which the Planning Board based its demand that portions of the property be included within a conservation easement (¶ 117). It is claimed "[u]pon information and belief" that those statements were known to be false and that the false statements were intentional and malicious (¶ 123). Plaintiff further alleges "[u]pon information and belief" that Frank Margiotta, Barbara Hughey and Charlotte Norman conspired with the Planning Board because Plaintiff is a minority and because she is one of the "City People." (¶ 118). Ms. Mc Culloch alleges "[u]pon information and belief" that Frank Margiotta, Barbara Hughey and Charlotte Norman based their purported actions on the premise that City People do not know how to take care of the land (¶ 121).

41. As a result, Ms. Mc Culloch asserts that she is entitled to:

- A declaration that Defendants treated Plaintiff differently than local residents and non-minorities because of her national origin and place of residence be conditioning subdivision approval on the provision of a conservation easement.

- A declaration that the comprehensive plan is discriminatory and violated the FHA because it favors local residents over New York City residents which has a discriminatory effect on minorities.

- An order to permit Plaintiff and her successors to clear "some trees and brush" within the area included in the conservation easement, including live trees.

- An Award of $300,000 based on the claim that the Town deprived Plaintiff and her successors form the beneficial use of the area within the conservation easement, $90,000 for reduction in the remaining part of the property, and $5,000 per month form November 2007 "for delay in selling her lots."

- An award of $250,000 caused by additional work required by Defendants to change driveways and infrastructure, to do work that Central Huson was supposed to have done and an award of $22,600 that Plaintiff claims she was improperly charged for consultant fees and "for other consequential damages."

- Punitive damages in the amount of $500,000

- An award of an additional $30,000 or an unspecified amount as is determined at trial each from Frank Margiotta, Barbara Hughey and Charlotte Norman.

- An award of costs and attorneys' fees.

42. The second cause of action asserts against the Town, Town Board and Planning Board a taking claim and claims for violation of due process and equal protection.

43. Ms. Mc Culloch alleges that as of June 29, 2004, when conditional final subdivision approval was granted, she had a constitutionally cognizable interest in the 17 acres of land with the conservation easement and that the Defendants thereafter deprived her of any beneficial use of that area (¶ 129).

44. It is claimed that the actions of the Defendants denied Plaintiff procedural due process because they were acting pursuant to an "institutionalized policy" that discriminates against persons who are not residents of the Town (¶ 129). Ms. Mc Culloch

contends that she was not required to exhaust "post-deprivation remedies" and that the claims are ripe because "there is nothing left to be determined insofar as the nature of the wrongful acts and damages to Plaintiff (¶ 129).

45. She further alleges that the actions violated substantive due process because they were arbitrary and capricious and had no rational basis and because "post-deprivation remedies" are not available or would have been futile (¶ 129). Alternatively, Plaintiff asserts that even if "post-deprivation remedies" were available, a claim for such relief is included herein and that the Court has jurisdiction to entertain such claims (¶ 129).

46. Although not specifying to which claim it relates, Ms. Mc Culloch contends that she was treated differently because of her residence and because she is a minority and that the "expected consequence" of treating persons from New York City "different" from local persons is that minorities, such as Plaintiff, will be adversely affected and that there is no rational basis for such purported different treatment (¶ 129).

47. Plaintiff alleges that the Planning Board "purposely delayed Plaintiff's project" because Plaintiff would not agree to the conservation easement and its inclusion of 17 acres (¶ 130). The complaint further alleges "[u]pon information and belief" that the stop work order, purportedly "issued by Mr. Kingman," deprived Plaintiff of due process (¶ 131) and "[u]pon information and belief" that the order was issued pursuant to a policy of the Town and Planning Board "to delay development, by all means, including illegal means." (¶ 132). Plaintiff claims that in order to complete the infrastructure work before the winter, "the only available practical solution" was to agree to the "demands imposed by Mr. Kingman" which required additional work (¶ 134). Ms. Mc Culloch

complaints that the "action of Mr. Kingman" in causing the stop work order to be issued was arbitrary, capricious and irrational (¶ 135).

48. Plaintiff asserts "[u]pon information and belief" that the October 2007 "directive" of Mr. Kingman banning Plaintiff from cutting live trees was final "because it immediately affected Plaintiff." (¶ 137). The complaint further contends "[u]pon information and belief," that the stop work order (issued by Zoning Enforcement Officer Beck) was null and void under state law because it was not in writing, an order was not "entered by Mr. Kingman" or the Planning Board, there was no vote of the Planning Board with regard to "Mr. Kingman's directive," and there was no order "entered" showing the vote of the Planning Board on the issue (¶ 137).

49. Additionally, Ms. Mc Culloch relates that neither the Planning Board nor the Town ever indicated to her that it considered the foregoing directive" to constitute a taking (¶ 138). Plaintiff asserts "[u]pon information and belief" that the procedures of the New York State Eminent Procedures Law[7] or other possible procedures for seeking compensation for this taking of this [conservation easement] area of approximately 17 acres are not available to Plaintiff." (¶ 138). According to the allegations of the complaint, the Town effectuated a taking of Plaintiff's property and "her rights to the CEA," without complying with the provisions of the EDPL, without acknowledging there had been a taking and without providing a procedure for Plaintiff to seek relief under the EDPL (¶ 139). Without any explanation for the statement, Plaintiff asserts "[u]pon information and belief," that under time circumstances, even if "inverse condemnation procedure'' were available, it was futile for the Plaintiff to have pursued such an action

---

[7] Apparently referring to the Eminent Domain Procedure Law.

"because Defendants were charging Plaintiffs escrow account for its own costs and attorney's fees." (¶ 140).

50. Plaintiff next contends that a taking has transpired because the Planning Board has imposed exactions that have "gone too far.'' (¶ 144). Ms. Mc Culloch asserts that the Planning Board has eliminated any beneficial use that she has or could have of the area included within the conservation easement, has imposed "substantial adverse conditions adversely affecting" Plaintiffs property that is not in a conservation easement, have substantially interfered with the Plaintiff's reasonable investment-backed expectations of Plaintiff, and do not substantially advance legitimate state interests (¶ 144).

51. Parroting inapplicable case law, Plaintiff asserts that "[t]here is no essential nexus between what these Defendants have required, and are requiring of Plaintiff, and the public interest, and no proportionality between what they are requiring and the public interest that they purport to protect." (¶ 145).

52. Based on those allegations, Plaintiff seeks that same relief as was sought in the first claim.

53. The third cause of action, alleged solely pursuant to State law, seeks a declaration that the Town's comprehensive plan is invalid because it is alleged that it does consider regional housing needs, including the needs of person in New York City and favors local residents at the expense of New York City residents which, it is claimed has an adverse impact and is discriminatory against a large percentage of New York City residents who are minorities (¶ 149).

54. The fourth cause of action, also pursuant to State law, alleging a claim for intentional interference with prospective economic advantage is asserted against Frank

Margiotta, Barbara Hughey and Charlotte Norman. The complaint asserts that "[t]he subdivision proceedings before the Town Board and MPB and Plaintiff lead to a contract. The contract is embodied in the Subdivision Plats.…" (¶ 151). Plaintiff alleges that because of the actions alleged, Plaintiff was required to enter into the conservation easement and was required to undertaken studies to refute the "misrepresentations" of Frank Margiotta, Barbara Hughey and Charlotte Norman  and claims to have incurred additional expenses of at least $30,000 (¶ 152).

55. The fifth claim seeks a declaration pursuant to State law that the conservation easement does not bar Ms. Mc Culloch or her successors from cutting trees within the conservation easement even if used for firewood (¶ 154-156).

56. The sixth claim seeks a declaration pursuant to State law that the conservation easement is null and void. Plaintiff bases this claim on the recital in the conservation easement that its purpose was "To preserve and protect the open space amid forested character of the Easement Area pursuant to the values identified in the Town's master plan." (¶ 159). Plaintiff alleges "[u]pon information and belief" that the Town did not have a "valid" comprehensive plan in effect on that date because the comprehensive plan had been invalidated (¶ 160). Based on that allegation, Plaintiff contends that the conservation easement is void and seeks a declaration that it is invalid.

57. Finally, the seventh cause of action, also a claim pursuant to State law, alleges that Plaintiff was required to pay $22,600 into an escrow fund for the payment of Town expenses in connection with the review and processing of her subdivision application (¶ 162). It is alleged "[u]pon information and belief" that Defendants used such monies

improperly to pay expenses for its own attorneys, engineer and planner (¶ 163) Plaintiff

seeks a direction that the Town pay to Plaintiff the sum of $22,600.

## THE CONSERVATION AGREEMENT

58. Ms. Mc Culloch's purported grievances relate in large part to the conservation

easement agreement entered into between her and the Town. A copy of the executed

conservation is annexed hereto as Exhibit "B".[8] Among the provisions of the operative

portion of the easement are the following:

- The purpose of the easement is "to protect the natural forested and open space

  conditions of the easement." (¶ 1).

- Pursuant to paragraph 2 of the easement, the following rights were convened

  to the Town (grantee):

  - o "To preserve and protect the open space and forested character of the
    Easement Area pursuant to the values identified in the Town's master
    plan." (¶ 2(A)).

  - o "In accordance with ECL 49-0305(6), to enter upon the easement area
    at reasonable times in order to inspect the Easement Area, gaining
    access through Lots 1, 2, 3, 4, 5, and 6, to monitor Grantor's
    compliance with and otherwise assure compliance with the terms of
    this Easement, it being anticipated that the easement may be inspected
    once per year, provided that such entry shall be upon prior reasonable
    notice to Grantor, and Grantor shall not unreasonably interfere with
    Grantor's use and quiet enjoyment of the the Easement Area." (¶
    2(B)).

- Paragraph 3, "prohibited uses," provides that the following are among the uses

  and activities are prohibited:

---

[8] Documents referred to in a complaint may properly be referred to in a 12(b)(6) motion. *See Pryor v. National Collegiate Athletic Assoc.*,288 F.3d 548, 560 (3d Cir. 2002); *Koppell v. 4987 Corp.*, 167 F.3d 125, 127 (2 Cir. 1999); *Cortez Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2 Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *Thomas v. Westchester County Health Care Corp.*, 2002 WL 31641472 (S.D.N.Y. 2002); *Manhattan Telecommunications Corp., Inc. v. Dialamerica Marketing, Inc.*, 156 F.Supp.2d 376 (S.D.N.Y. 2001); *The Jordan (Bermuda) Investment Co., Ltd v. Hunter Green Investments, Ltd.*, 154 F.Supp.2d 682 (S.D.N.Y. 2001).

- o "No structures shall be placed on land within the Easement area." (¶ 3(B)).

- o "There shall be no alteration of natural wetland areas." (¶ 3(C)).

- Paragraph 4, "reserved rights," provides that:

  Grantor reserves to herself, and to her successors and assigns, all rights accruing from ownership of the Property, including the right to sell, transfer, lease, mortgage or otherwise encumber the Property, subject to this easement; the right to engage in, or permit others to engage in, all uses of the Property that are not expressly prohibited herein and are not inconsistent with the purpose of the Easement; and including the <u>unqualified right to exclude others from the land</u> by all lawful means. All rights, interests, and privileges of the Grantor in the Easement Area not specifically donated, granted, transferred and conveyed herein shall remain with the Grantor, her heirs, successors and assigns. (emphasis added).

- Paragraph further excepts and reserves form the easement:

  A. Horticulture and managed forest land, equestrian, passive recreation and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and similar activities.

  B. General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest management practices.

- Paragraph 5 contains enforcement provisions.

- Paragraph 6, "access," provides that "No right of general access to any portion of the Easement Area is conveyed by this Easement."

- Paragraph 14(D) provides that "This Agreement constitutes the entire agreement of the parties as to the subject matter hereof, supersedes all prior understandings (whether written or oral).…"

- Paragraph 14(F) provides that "The parties understand that Supreme Court, Dutchess County, New York, shall have exclusive jurisdiction of any disputes arising therefrom and that all disputes shall be tr4ied before the Court without a jury."

## COMPREHENSIVE PLAN

59. Plaintiff selectively quotes out-of-context and generalized statements from the comprehensive plan in an effort to portray a scenario that is far different that exists. It is respectfully submitted that other portions of the comprehensive plan also must be considered to understand the speciousness of Plaintiff's inaccurate characterization of the planning goals of the Town.

60. For example, the comprehensive plan "recommends three new concepts to address the problems of traditional zoning practices and to provide more flexibility and direction to future development." (p. 3.2). One of the "concepts" is to:

> Add a zoning classification for Planned Purpose
> Developments (PPDs) for three specific uses:
> • senior living
> • affordable housing
> • mixed-use traditional neighborhoods focused in the
> historical hamlets. (p. 3.2).

61. The comprehensive plan also relates that "Incentive or bonus zoning is another concept that provides a tool for the Town to accomplish its objectives to provide housing for moderate-income families or for senior citizens." (p. 3.3). The comprehensive plan further discusses that:

> Incentive zoning allows large developers to have greater density on the
> property (consistent with good design and environmental constraints) in
> exchange for providing some units that can be sold or rented at a reduced
> cost. The CPB recommends that the Planning Board be given the authority
> to grant incentive zoning to developers proposing major subdivisions. In

such cases, an agreed number of smaller or less expensive additional units (e.g., 10–20% of the total units) are built, with preference for buying or renting such properties going to municipal employees or to senior residents. Controls on future rents or sales prices can also be established. (p. 3.3).

62. The comprehensive plan also suggests that "To balance [areas where large lots are proposed to preserve open spaces], therefore, it is imperative that the Town provide some small lot and multifamily housing that is affordable for people of moderate income. (p. 3.4).

63. The comprehensive plan further relates that:

Historic growth at 25% per decade shows no sign of abating; in fact, it appears to be increasing. Existing zoning is inadequate to prevent sprawl. Rapid population increases cause significant pressure on our schools and taxes. However, large-lot zoning, taken alone, only causes sprawl to eat up the landscape faster, and large-lot zoning is not affordable to many in the community today. The CP incorporates tools to expand housing diversity and affordability, particularly for senior citizens, for young families, and for those with moderate incomes who cannot afford large-lot housing. Housing on smaller, more affordable lots and multifamily units are important elements of this effort.

64. The comprehensive plan observes that "Milan permits two- and multi-family housing across its primary zoning districts. [S]mall multifamily structures are endorsed in this plan.…" (p. 7.7).

65. It is also concluded that "The residents of the Town also want to maintain moderate-income housing and provide some affordable housing to create a diverse community and allow housing alternatives, particularly for seniors and public sector employees." (p. 7.8).

66. Regarding the goals of preservation of open space and provision of a mix of housing, including affordable housing, the comprehensive plan observes that "Many of the principles and ideas discussed by the CPB in meetings and in this document fall under

the general heading of 'smart growth.' Dr. John R. Nolon describes smart growth as 'the designation by local governments of specific areas for mixed-use development and higher density development and the designation of other areas for the conservation of open spaces and natural resources.'" (p. 7.8).

67. Among the recommendations of the comprehensive plan is "Current zoning permits multifamily dwellings, accessory apartments, and mobile homes. These offer affordable housing alternatives and the CPB recommends they remain in the zoning code with amendments where appropriate. The CPB further recommends that incentive zoning be considered as another way to increase the stock of affordable housing." (p. 7-17).

68. Similarly, "affordable housing is a problem in Milan, as it is in many areas in Dutchess County. Milan residents want to see diversity in housing available in Town. Current zoning regulations already allow for affordable housing types that are in keeping with the rural residential character of Milan. These include multiple-family homes, accessory apartments and mobile homes. The CPB concluded that we should retain quality mobile homes as a housing option in the Town.…" (p. 7-18).

**MILAN ZONING LAW**

69. The Milan Zoning Law provides for six zoning districts, that is, Very-Low-Density Agricultural District (A5A); Agricultural District (A3A); Low-Density Residential District (R2A); Highway Business District (HB); Land Conservation District (LC); and Hamlet District (HA). § 200-6.

70. Plaintiff purchased property that was and is located in a R5, no, Very-Low-Density Agricultural District.

71. As is related in § 200-6.1, the purpose of the A5A district is:

A. A5A. The purpose of the Very-Low-Density Agricultural District is to maintain the Town's rural character in areas distinguished by the presence of both small and large farms, sparse residential development, and where limitations on development are designed to protect both natural resources and open space. Clustering of residential dwellings is encouraged to maintain traditional agricultural settlement patterns and to support farming in the community.

## COMPLAINT FAILS TO STATE ANY VIABLE CLAIM

72. As is related at length in the accompanying memorandum of law, it is respectfully submitted that the complaint fails to state any viable claim because:

- Plaintiff's claims are not ripe because she has failed to obtain a "Final Decision" from the Town.

- Plaintiff's Taking claim is not ripe for the additional reason that she has not sought compensation through available state court procedures.

- The Court lacks jurisdiction over Plaintiff's endeavor to seek an interpretation of the conservation easement because the agreement specifically provides it is to be interpreted by New York Supreme Court.

- The Fair Housing Act claims are barred by the applicable two-year statute of limitations.

- The complaint fails to state a claim pursuant to the Fair Housing Act because the "City People" are not among the groups protected by the FHA.

- The complaint fails to state a claim pursuant to the Fair Housing Act because Town approved the subdivision and did not make a dwelling unavailable – Plaintiff is not aggrieved by any action of the Defendants.

- The complaint fails to state a disparate treatment claim pursuant to the Fair Housing Act.

- The complaint fails to state a disparate impact claim pursuant to the Fair Housing Act.

- Plaintiff's assertion of taking and equal protection claims precludes a substantive due process claim.

- The complaint fails to state a substantive due process claim because the allegations of the complaint fail to satisfy the "shocks the conscience" standard as a matter of law.

- The complaint fails to state a substantive due process claim because of the availability of state administrative and judicial proceedings to review her grievances.

- The complaint fails to state a procedural due process claim because of the availability of adequate state administrative and judicial proceedings.

- No taking claim exists as a matter of law because Plaintiff has not been denied of all use of her property.

- No taking claim exists as a matter of law because the conservation easement condition is not an "exaction."

- The claims against the individual Defendants are barred by the *Knorr-Pennington* doctrine.

- The individual Defendants are entitled to qualified immunity.

- The failure to allege or serve a proper and timely notice of claim bars the state law claims.

- The complaint fails to state a claim for interference with prospective economic advantage as a matter of law.

- Punitive damages may not be recovered against a municipal corporation or individuals acting in their official capacity.

73. Additionally, although it is uncertain as to whether certain individuals named in the caption of the action are intended to be sued in their personal capacities, it is clear that the complaint is devoid of any allegations of culpable conduct on the part of: the Town Board which had no jurisdiction or role in the matter; the members of the Town Board; the Zoning Enforcement Officer. Additionally, the complaint is devoid of allegations of culpable conduct on the part of the members of the Planning Board. As a result, it is submitted that the Town Board, Supervisor and Councilpersons, members of the Planning Board and Zoning Enforcement Officer should be dismissed from the action as a consequence of the lack of any allegations of culpable conduct with respect to them.

74. Declarant respectfully submits that the complaint should be dismissed in its entirety.

Dated: Suffern, New York
      February 29, 2007


                                /s/_____
                                       Terry Rice (TR 1022)