UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARMEN OTERO MC CULLOCH,

PLAINTIFF,

v.

TOWN OF MILAN, TOWN OF MILAN TOWN
BOARD, JOHN V. TALMADGE, Town
Supervisor, and ALFRED LO BRUTTON,
PAULINE COMBE-CLARK, DIANE MAY, and
ROSS WILLIAMS, Councilpersons,

And

TOWN OF MILAN PLANNING BOARD,
LAUREN KINGMAN, Chairman, and
Members JEFFREY ANAGOS, PETER GOSS,
SHEILA MARGIOTTA, MARY ANN
HOFFMAN, AND PAULINE COMBE-CLARK

And

GARY E. BECK, Zoning Enforcement Officer,
Town of Milan, And

Frank Margiotta, Barbara Hughey,
And Charlotte Norman

DEFENDANTS.

Civil Action No. 07 CIV 9780
(LAP) (RLE)

AMENDED COMPLAINT

Plaintiff, Carmen Otero Mc Culloch, for her Complaint against the defendants

alleges as follows:

## NATURE OF THE ACTION

1. This is an action pursuant to the Fair Housing Act, Title VIII of the Civil

Rights Act of 1968, 42 U.S.C. §3601 et seq. (FHA), the U.S. Constitution, Fifth and

1

Fourteenth Amendments, the Declaratory Judgment Act, 28 U.S.C. §2201, 42 U.S.C. §1983, the New York State Constitution, Article I, §§1, 6, 7, 9, and 11, and New York State common law and the New York Civil Practice Law and Rules (CPLR).

2. Plaintiff was born in Puerto Rico of Puerto Rican parents, is a citizen of the United States and a resident of New York City, residing at 2 Tudor City Place, New York, New York. She is over age 21 and has full legal capacity.

3. In materials furnished to Defendants as part of the process for subdivision approval, Plaintiff provided her full name of Carmen Otero Mc Culloch and her address as indicated above. The subdivision plat filed with Defendants showed two common driveways, one being named "Otero Drive", for her maiden surname, and the other being named "Mc Culloch Drive" for her married surname.

4. In an action under Article 78 of the CPLR against Defendants in December 2004, Plaintiff used her full name, Carmen Otero Mc Culloch. "Otero" is a Spanish surname.

5. Upon information and belief, from the information provided to them by Plaintiff, Defendants were aware that Plaintiff is a resident of New York City and Hispanic, and in fact did know this.

6. Defendant Town of Milan (Town) is a municipal corporation organized and existing under the laws of the State of New York, with its principal place of business at Wilcox Memorial Town Hall, 20 Wilcox Circle, Milan, New York 12571 in Dutchess County.

7. At all relevant times, the Town was and is governed by a the Town Board of the Town of Milan (Town Board). At the time of the events described herein, the Town

2

Board consisted of the Town Supervisor, John V. Talmadge, and four Council Members, Pauline Combe-Clark, Alfred Lo Brutto, Diane May, and Ross Williams. Each of these persons resides in the Town of Milan. Members of the Town Board are elected by vote of residents of the Town of Milan. The actions described herein were taken by the Town Board under color of state law.

8. At all relevant times, the Town had a Town Planning Board. The Town of Milan Planning Board (MPB) had as its Chairman Lauren Kingman, and as its other members Jeffrey Anagos, Peter Goss, Sheila Margiotta, Mary Ann Hoffman, and Pauline Combe-Clark. Each of these persons resides in the Town of Milan. Upon information and belief, during the course of proceedings relating to Plaintiff's Property, Lauren Kingman, the MPB Chairman, has kept the Town Supervisor, John V. Talmadge, advised of the developments relating to Plaintiff's project, and consulted with Mr. Talmadge; all actions taken by the MPB have been with the approval of the Town Board; and all actions described herein taken by the MPB were taken under color of state law.

9. Upon information and belief, at all relevant times, Defendant Gary E. Beck was the Town Zoning Enforcement Officer.

10. Upon information and belief, at all relevant times, defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman were residents of the Town, but not employees of the Town, and served as volunteers to the MPB and Town Board; Frank Margiotta and his spouse, Sheila Margiotta, who is on the MPB, reside at 1022 Willowbrook Road which is very near Plaintiff's property.

11. Original jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction is based on 28 U.S.C. §1367 (a) in that all the claims

3

presented herein are based on a common set of facts and form part of the same case or controversy.

12. Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) in that the acts described herein occurred in the District. The residences of Plaintiff and Defendants are in the District.

13. Plaintiff requests a jury trial on each claim for which trial by jury is available.

## FACTS

14. Plaintiff is the owner of a parcel of land of 35.12 acres situated in the Town, west of the Taconic State Parkway (TSP), between the TSP and Willowbrook Road, just south of Route 199 (the Property). The Property was known as 1331 Willowbrook Road.

15. Plaintiff acquired this property on January 9, 2004, with the intent of subdividing the Property into 6 lots.

16. The property is located in an area that is zoned by the Town of Milan as R5, for 5 acre lots, residential development.

17. On April 21, 2004 Plaintiff submitted to the MPB an application for subdivision approval for the six-lot subdivision that she had named "Woodland Hills", providing for five new lots, and for an existing house and barn to be on the 6th lot.

18. The plans submitted, dated April 18, 2004, contained the proposed home sites, proposed septic area sites, proposed common driveways, and large areas near the TSP, the edges of most of the property, and in the interior of the property, that Plaintiff indicated were to be maintained as open space, that is, to have no buildings.

19. At the same time that Plaintiff submitted the plans and the application for subdivision approval, she also submitted the completed Long Form Environmental

4

Assessment Form (Long "EAF") that is referenced in 6 NYCRR §617.20 and in 6 NYCRR §§617.2 and 617.14.

20. After Plaintiff's submission, there were proceedings before the MPB on May 5, 2004, June 2, 2004, July 7, 2004, September 1, 2004, October 6, 2004, November 3, 2004, and December 8, 2004. In addition, there were numerous other submissions, studies, and correspondence.

21. On or about December 15, 2004, Plaintiff commenced an action against the MPB, in the New York State Supreme Court, Dutchess County, pursuant to Article 78 of the CPLR. Among other things, she sought to compel the MPB to render a decision under the State Environmental Quality Review Act (SEQRA), since such a decision was necessary for her subdivision application to be further considered.

22. In late December 2004, the MPB advised Plaintiff that it was suspending further proceedings on Plaintiff's application for subdivision approval, pending the determination by the Court in Plaintiff's action to compel the MPB to render a decision.

23. (a) The Town's subdivision regulations provide at §177-35 that a person aggrieved by any decision of the MPB could seek judicial review "within 30 days after the filing of the Planning Board's decision in the office of the Town Clerk". (b) It further provided that "Commencement of any such proceeding would stay all further actions or proceedings". (c) The Town and the MPB effectively prevented review of any decisions by not making decisions. (d) If Plaintiff did not agree to the demands being made, the MPB did not make any rulings, nor did it file any decision in the Town Clerk's office. (e) Instead, during these delays, the MPB imposed new requirements and new studies on Plaintiff. (f) All during the course of proceedings, from April 2004 to the present, the

5

MPB has never filed any decision in the Office of the Town Clerk. (g) In January 2005, Plaintiff withdrew her action under Article 78, without prejudice, and advised the MPB that there was now no reason to delay further, and that she wanted the proceedings to proceed to completion.

24. There were further proceedings and submissions to the MPB during the period January through June 2005. On June 29, 2005, the MPB approved a resolution granting conditional final approval to Plaintiff's subdivision request. Among the conditions imposed by the MPB were that Plaintiff complete all of the infrastructure work provided for in the plans that had been conditionally approved, within a certain period of time, and that Plaintiff enter into a Conservation Easement Agreement (CEA) with the Town and the MPB with respect to an area of approximately 17 acres of Plaintiff's Property.

25. Upon information and belief, as of this date of June 29, 2005, Plaintiff had a legitimate expectancy that she would have final approval if she complied with the conditions set forth in the conditional final approval, and she thereafter did, in fact, comply with all those conditions.

26. Upon information and belief, prior to June 29, 2005, the MPB presented a "form" CEA to Plaintiff, advised Plaintiff that anyone seeking subdivision approval had to agree to a CEA, in that form, and advised her that her agreeing to a CEA in the form presented was a condition for her obtaining subdivision approval.

27. Upon information and belief, prior to the time that Plaintiff had made her subdivision application, and for at least three years prior to that time, Defendants had not required that persons seeking subdivision approval enter into a CEA as a condition of

6

subdivision approval.

28. The Proposed Lot Information Table, as it appears on the subdivision plat that was conditionally approved, and as shown on the final subdivision plat, shows as follows:

| Lot Number | Lot Area (sq. ft.) | Lot Area Acres | Area included in the Conservation Easement Per Lot Area (sq. ft.) | Percentage of Lot |
|---|---|---|---|---|
| 1 | 247,382 | 5.68 | 52,468 | 21.2 |
| 2. | 225,912 | 5.19 | 101,961 | 45.1 |
| 3. | 257,555 | 5.91 | 160,784 | 62.4 |
| 4. | 224,808 | 5.16 | 117,805 | 52.4 |
| 5. | 274,789 | 6.31 | 146,944 | 53.4 |
| 6. | 303,561 | 6.97 | 193,174 | 63.6 |
| Totals | 1,534,008 | 35.22 | 773,136 | 50.4 |

30. Upon information and belief, on Friday, November 4, 2005, Lauren Kingman visited Plaintiff's Property where work was being done by Plaintiff's contractor, Rodney Silvernail; Mr. Kingman asked Mr. Silvernail who had given him permission to cut trees along Willowbrook Road; and Mr. Silvernail told Mr. Kingman that he had been required to cut those trees by CH Energy (CH) and the Town's Highway Supervisor, so that the subdivision work provided for in the plans could be done.

31. (a) Upon information and belief, on Saturday, November 5, 2005, Defendant Gary E. Beck visited the site and served a STOP WORK ORDER on Rodney Silvernail; (b) Mr. Silvernail was working on that day, and he had expected to work on Sunday, November 6, 2005, and Monday, November 7, 2005, to do the work, including the digging of the trenches for laying the underground utilities, that had been required by CH (c) CH had advised Plaintiff months earlier that it would lay the wire for the underground utilities on Tuesday, November 8, 2005, after Mr. Silvernail completed the

7

prep work, and that such work was included in the price already paid by Plaintiff to CH..

32. Upon information and belief, on Sunday, November 6, 2005, Plaintiff's representatives met with Mr. Beck because they wanted to know why the STOP WORK ORDER had been issued by him; Mr. Beck advised that Plaintiff's representatives that Plaintiff had violated the conditional Final Subdivision Plans approved by the MPB by cutting trees along Willowbrook Road.

33. Upon information and belief, there has never been anything in any plans presented to the MPB or approved by the MPB that prohibited the cutting of trees along Willowbrook Road.

34. Upon information and belief, the treatment of Plaintiff with regard to the cutting of trees along Willowbrook Road was and is different than the treatment that has been accorded to local residents. Previously, to accommodate neighbors, the MPB had ordered that Plaintiff relocate the entrance of one of the common driveways for the project, and to do that Plaintiff was required to cut at least 10 trees along Willowbrook Road.

35. (a) Upon information and belief, Plaintiff's representatives advised Mr. Beck that they had been required to install underground utilities by those conditional Final Approved Plans, and that Plaintiff had been required to build the two common driveways by those Final Approved Plans. (b) Mr. Beck was shown the plans that CH had created, and Plaintiff's contract with CH that Plaintiff was required to execute in order to obtain electric service, including the provisions that required that Plaintiff clear the CH easement areas of trees and brush. (c) Mr. Beck advised that those plans of CH had to be approved by the MPB, and that if the Town Highway Superintendent determined that

8

trees had to be cut for safety purposes, his action also had to be approved by the MPB if he wanted to have trees cut.

36. Upon information and belief, the requirements imposed by Mr. Beck and Mr. Kingman, on behalf of the MPB, were illegal and discriminatory.

37. Upon information and belief, local residents and non-minority person who had to install utilities for a subdivision, or for any other purpose, have not been required to have the plans of the utility or the requirements of the Town Highway Superintendent approved by the MPB.

38. Upon information and belief, ultimately, in order to have Mr. Kingman and the MPB lift the STOP WORK ORDER, Plaintiff had to agree to do "remedial work", which cost more than $10,000, had to do the work that CH was scheduled to do on November 8, 2005, at additional costs, and incurred a total of at least $25,000 in additional expenses. Upon information and belief, there never was any order of the MPB entered with the Town Clerk regarding this matter, and the remedial relief required of Plaintiff.

39. Plaintiff had intended to have all the work done within the time provided for by the MPB, so that Plaintiff would not have to post a bond assuring work completion.

40. In whole or in part because of the delay caused by Mr. Kingman, the MPB, and Mr. Beck, the construction was delayed and Plaintiff had to post a bond of $38,000 to assure completion of the work that was in progress.

41. Upon information and belief, on June 26, 2006, the MPB, through Lauren Kingman, executed the Final Subdivision Plat, so that it could be filed in the Dutchess County Clerk's Office. That 5-page plat was filed in the Dutchess County Clerk's Office

9

on June 29, 2006.

42. Upon information and belief, on June 29, 2006, the Town Board, acting through the Town Supervisor, executed a CEA with Plaintiff. That same day, there was a closing, at which Plaintiff conveyed to the Town certain rights to the CEA of approximately 17 acres. Plaintiff was required to provide and pay for title insurance, closing costs, and the Town's expenses for this closing. The CEA was filed with the Dutchess County Clerk's Office on June 30, 2006.

43. The CEA that Plaintiff had been shown, prior to the conditional final approval of June 29, 2005, and told she would have to execute later, was substantially different than, and far less oppressive than the CEA that Plaintiff ultimately had to execute on June 29, 2006. When Plaintiff objected to the changes, she was told that the new, more oppressive CEA form was the same one that was required of any applicant seeking subdivision approval. Upon information and belief, no person who was a Town resident or non-minority had to sign the kind of CEA that was required of Plaintiff. Upon information and belief, Defendants created their first CEA for Plaintiff, and charged Plaintiff for the costs and attorneys' fees that they incurred in developing the original CEA and the subsequent CEA.

44. After the MPB had approved of Plaintiff's subdivision, the Town of Milan added §220-39 (B) (8) to its Zoning Ordinance, which related to "Donor donations", and stated: "The Town Board may request a donation for costs relating to acceptance and ongoing monitoring of the conservation easement."

45. Upon information and belief, this requirement of making a "donation" is illegal. The Town Law §269 provides that "All necessary expenses incurred by any such

10

(town) board in connection with the adoption and enforcement of zoning ordinance shall be a town charge"; the Town Board cannot convey to the Town Planning Board authority to do that which the Town Board itself cannot do.

46. Upon information and belief, after Plaintiff's subdivision had been approved, Lauren Kingman, acting for the MPB and the Town Board, told Plaintiff's representative that Plaintiff had to pay an "assessment" so that the Town would not be required to spend its own monies to engage in inspections of compliance with the CEA; Plaintiff's representative advised Mr. Kingman that Plaintiff would not pay any such amounts.

47. As of September 2007, Plaintiff had a potential purchaser, L. S., for Lot 5 of that 6-lot subdivision. Upon information and belief, Mr. L. S. wanted to build a solar heated home on Lot 5, and, if he purchased this Lot 5, he wanted to be able to cut trees in the area of Lot 5 that was part of the CEA as part of the general maintenance of the property, and use the cut and downed trees, and other brush for firewood. This potential purchaser, to whom Plaintiff had provided a copy of the CEA, wanted assurances that he would be able to do that.

48. Upon information and belief, the CEA permitted what L.S. was requesting. Section 4 of the CEA provides for rights reserved to the Grantor and his or her assigns. That section states:

> Specifically EXCEPTED and RESERVED from the grant of this easement are the rights and privileges described below, which are reserved to the Grantor, together with the right to grant the same or similar non-exclusive rights to others:
>
> > A. Horticultural and managed forest land, equestrian, passive recreational and open space uses. This shall include, without limitation, passive recreational use such as private trail walking, nature viewing and similar activities.
> >
> > B. *General maintenance of property, including pruning, cutting,*

11

> planting, landscaping, and clearing of trees and other
> vegetative materials in accordance with generally accepted
> forest conservation practices.

49. On October 1, 2007, Plaintiff sent a fax letter to the MPB Chairman, Lauren
Kingman, asking that he and the MPB provide such assurances, for the benefit of Mr. L.
S., and that they do so in writing, so that other potential purchasers would know that this
is permitted.    On or about October 5, 2007, Mr. Kingman advised Plaintiff's
representative that unless Plaintiff had a Forest Management Program (FMP) established
and approved by the NYS Department of Environmental Conservation (DEC), and was
acting pursuant to such a program, no live tree could be cut in the CEA.

50. This condition by the Town Board, the MPB and Mr. Kingman is impossible
to fulfill, and it is arbitrary and capricious. Upon information and belief, this condition is
not imposed on local residents or non-minorities who seek subdivision approval, and
Plaintiff is the only person ever to have this condition imposed on her.

51. Plaintiff contacted the N.Y.S. DEC. By a letter dated October 23, 2007, the
N.Y.S. DEC, through Senior Forester Barbara J. Lucas-Wilson, advised Plaintiff that:

> Unfortunately, I cannot grant your request for a Forest Management Plan for the
> 6.3 acre lot in your subdivision. This parcel is too small to manage effectively.
> Forest Management Plans that the Department of Environmental Conservation
> writes for private landowners are non-binding guidelines and recommendations
> based on a landowners goal and objectives for their forested land. If you would
> like some non-specific, general guidelines for forest management, I would be
> happy to write those up.

52. Upon information and belief, a FMP is set up with the full in-put of the owner
of the property. The owner has to determine, e.g., whether the owner is interested in
preserving one species, or in having a multitude of species, whether the owner wants to
promote growth of ground plants, or trees, or vegetables, whether there are invasive

species, sick trees, deformed trees on the property, and many other issues. These are long-term programs. No owner, such as Plaintiff, who is seeking to sell lots to the general public would logically develop such a personalized program and impose it as a requirement on whoever purchases the particular lot, and burden the purchaser with such duties. By doing so the owner would be severely restricting the part of the general public that would be interested in purchasing such a lot.

53. Upon information and belief, and as Plaintiff has been advised by officials of the DEC, there is no reasonable conservation purpose served by such a restriction, and such a restriction is actually contrary to "generally accepted forest conservation practices" because, among other things, it prevents removal of diseased or invasive trees, trees that interfere with growth of other trees, and trees that pose a danger to persons or property..

54. The same section of Plaintiff's CEA that permits for cutting of trees "in accordance with generally accepted forest conservation practices", also allows for "clearing of other vegetative materials"; if the cutting of a tree is not permitted without a NYS DEC FMP being followed, then these other activities would require such a program.

55. Upon information and belief, because of the actions by the Town, the MPB, and Mr. Kingman, Plaintiff lost a potential customer for Lot 5. Furthermore, Defendants' latest actions, when added to Defendants' prior actions, have so burdened the 17-acre part of Plaintiff's property that is in the CEA, for no good reason, that Defendants' actions have caused Plaintiff and her successors to lose all beneficial use of that part of her property; this constitutes a "taking" of more than 50% of Plaintiff's property, *i.e.*, the CEA area, without compensation and without due process.

13

**FIRST CAUSE OF ACTION – AGAINST DEFENDANTS TOWN, TOWN BOARD, MPB, AND DEFENDANTS MARGIOTTA, HUHGEY AND NORMAN FOR VIOLATION OF THE FHA AND PLAINTIFF'S DUE PROCESS RIGHTS**

56. Plaintiff incorporates with full force and effect the allegations made in ¶¶ 1-55 of this Amended Complaint.

57. (a) Upon information and belief, Defendants Town Board, MPB, Gary Beck, Frank Margiotta, Barbara Hughey, and Charlotte Norman (Defendants) have treated Plaintiff differently, and adversely, because of her place of residence and her national origin. (b) Defendants have one standard for treatment of non-minorities and local residents, that is, residents of the Town of Milan who are making subdivision applications and/or other uses of their land. (c) They have another standard for treatment for minorities and "City People" who are engaging in those same activities. (d) The term "City People", as used by Defendants and used herein, refers to persons who are residents of the City of New York. (e) Upon information and belief, Defendants do not believe that minorities and City People know how to respect the land. (f) For that reason, Defendants impose onerous, unreasonable, arbitrary standards and restrictions on minorities and City People who make subdivision applications or other uses of their land. (g) This difference in treatment is particularly odious under the FHA, the U.S. Constitution and that of New York State.

58. Upon information and belief, most City People, like Plaintiff, are minorities, and most residents of the Town are not minorities. The FHA prohibits acts by those who refuse to make available or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin. Under the FHA, it is unlawful to make unavailable a dwelling to any person based on the above factors.

14

59. A dwelling means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof. The FHA applies to enactment and application of zoning and land use regulations.

60. Plaintiff is an aggrieved person within the meaning of the FHA.

61. Plaintiff has attempted to develop building lots for dwellings in the Town.

62. Plaintiff was and is a resident of the City of New York and anticipated that the market for those lots would primarily be other persons from the City of New York.

63. Upon information and belief, Defendants intent is to keep minorities and City People compacted together, in the City, and to use conservation laws, and artificial, arbitrary, and unnecessary barriers as a guise to accomplish this.

64. Upon information and belief, this difference in treatment is not rationally related to any legitimate state interest.

**A. The difference in treatment of non-minorities and local residents vs. minorities and City People can and does have a statistically significant adverse impact against minorities**

65. Upon information and belief, this distinction in treatment has an adverse and statistically significant impact against minorities, such as Plaintiff, because most City People are minorities, and most Town residents are not minorities.

66. The 2000 Census, which is the most recent census, indicated that New York City had a total population of 8,085,742 persons as of that time; that 44% of these persons were White, 28% were African-American, 27% were Hispanic, and 10% Asian. The population density for New York City was 26,402 persons per square mile. The

15

population density for Manhattan, where Plaintiff resides, was 66,940 persons per square mile. The same Census indicated that 880,000 of the residents of New York City were Puerto Rican, like Plaintiff.

67. Upon information and belief, the 2000 Census for the Town of Milan had substantial errors. The 2000 Census was corrected due to an error in the total population count of Milan. Corrected population count results from a process called Count Question Resolution Program. Milan's total population in 2000 was 2,356, not 4,559 as originally reported. Due to the original error in total population, the U.S. Census corrected for four categories, Total population, Total Housing Units, Vacant Housing Units and Group Quarters population. They failed to correct any other data rendering the 2000 Census useless for demographic study. The original population density of Milan, based on a population of 4,559 persons was 126 persons per square mile. Using the lower figure of 2,356 as the population for the Town of Milan gives a density of 65 persons per square mile.

68. Upon information and belief, the non-minority population of Milan is approximately 78% of the total and is a substantially higher percentage than the percentage of the non-minority population of New York City. Upon information and belief, the population for each minority group in Milan is substantially less than the minority percentage of the population in New York City.

69. Upon information and belief, all of the members of the Town of Milan Town Board are non-minorities and White, as are all the other Defendants in this action.

70. Upon information and belief, any rules or standards that discriminate against "City People" can and does have a statistically significant adverse impact against

16

minorities. In fact, because 66% of the population of New York City is minorities, the Town Board and the MPB know that by discriminating against New York City residents, they are more than likely, that is, at least 66% of the time, discriminating against a minority. In the instant case, Defendants have actually discriminated against a minority, because Plaintiff is a minority.

**B.    The Defendants intend to discriminate against New York City residents, and minorities, and in favor of local residents, who are mostly whites**

69. Upon information and belief, the Town of Milan commenced work on a Milan Comprehensive Plan in 2004 and completed that plan and adopted it on January 26, 2006. That plan was declared invalid by the Dutchess County Supreme Court (J. Brands), by a decision dated February 7, 2007, for failure to follow legal requirements. Defendant Town of Milan thereafter adopted a modified version of its Comprehensive Plan on August 13, 2007.

70. The Milan Comprehensive Plan (MCP) demonstrates a strong concern for an influx of New York City residents. It states at the very beginning that one "important reason" that the Town up-dated its Comprehensive Plan was that "Development pressure is expanding north from the New York metropolitan areas following the Taconic State Parkway. The areas in southern and mid-Dutchess County have already experienced a major impact, and there is a marked increase in subdivision activity in Milan." 1.2. It further states that "Today, the TSP serves as a major commuting route for those people that want to live in the rural splendor while they continue to work in the metropolitan area, 70 miles to the south." 9.2.

71. Upon information and belief, the only residents consulted for the MCP were the Town's residents, the only needs considered were those of Town's residents, and the

17

only needs addressed in the MCP were those of the Town's residents. The intent of the Town and the MCP was to "KEEP MILAN RURAL", 7.1, to keep density below 150 persons per square mile, 3.4, to avoid "Explosive growth" that "threatens our rural character and risks causing even higher taxes to support our schools," 2.1, to have public services provided by other municipalities, but not by Milan, to keep Milan "affordable and accessible *to current residents*", 9.3, and to use the land use regulations to implement this self-centered policy. It provided for developers to have higher density in return for providing for some units that would have to be sold or rented at reduced cost to the Town's *municipal employees* or *the Town's senior residents.* 3.3.

72. Upon information and belief, the MCP also directs that the MPB slow down development, and delay the approval process for land use applications, unless persons agree to convey a CEA to the Town; *see* MCP, 2.5; 3.3; 3.4, 7-13.

73. Upon information and belief, the MCP and the Milan zoning laws have been enacted and administered with an exclusionary purpose. Defendants have not provided a properly balanced and well-ordered plan for the community, and Defendants have not considered, as they are legally required to do, regional needs and requirements.

## C. Local residents Mr. and Mrs. Burns have been treated differently than Plaintiff because of their place of residence.

74. Plaintiff's Property has more than 900 feet of frontage on Willowbrook Road. Early in the process for subdivision approval, Plaintiff attempted three times to have the MPB approve of Plaintiff's cutting of some trees and brush along Willowbrook Road, so Plaintiff could increase sight distance along that road, not only for persons using the common driveways for Plaintiff's project, but also for the benefit of other persons who were using Willowbrook Road. Each time Plaintiff made the request, the MPB, at the

18

urging of defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman, prohibited Plaintiff from taking such action.

75.  The minutes of the MPB even reference to one of these rejections. The MPB minutes of June 2, 2004 state "Mr. Mc Culloch asked if there would be a problem in clearing brush to make it safer, and Chairman Kingman said the regulations are once an EAF is submitted, no vegetation can be touched."

76.  Upon information and belief, no regulation prohibits the cutting of brush; the action of Mr. Kingman and the MPB in denying Plaintiff's request was arbitrary and capricious, served no legitimate state purpose, and was designed and intended to inhibit Plaintiff from being able to obtain the requisite sight distance, but Plaintiff obtained the requisite sight distance nonetheless.

77.  Later, on October 7, 2004, the same issue of cutting brush along Willowbrook Road was raised. By this time, both of the common driveways for the project had been set, one being "Otero Drive", to the north part of the Plaintiff's Property, and the other, being "Mc Culloch Drive", being to the south side of Plaintiff's Property. Both of these common driveways came out to Willowbrook Road.

78.  Upon information and belief, the persons who resided at 1315 Willowbrook Road are Mr. and Mrs. Burns; they have a 6.43 acre parcel and part of their property is across from the common driveway that was named Mc Culloch Drive. At the meeting of the MPB on October 7, 2004, Mr. Burns objected to the location of Mc Culloch Drive. He said "As a resident for 30 years, I have rights"; Plaintiff advised Mr. Burns at the public meeting that this was the only location possible for this common driveway and that Plaintiff had on three occasions sought permission to cut trees and brush so as to provide

19

for greater sight distance, but that such permission had been denied. In view of the fact that no trees could be cut, Plaintiff said, the proposed location of the common driveway was the only location feasible.

79.  Upon information and belief, because Mr. Burns opposed the common driveway coming out onto Willowbrook Road near his house, the MPB required Plaintiff to change the location of the common driveway, and directed Plaintiff to cut not only brush, but also approximately 10 trees so that the sight distance for the new location of the common driveway known as Mc Culloch Drive could be achieved. This action was taken by the MPB at the December 2004 meeting of the MPB solely as an accommodation to Mr. and Mrs. Burns. The MPB did not require Mr. and Mrs. Burns to pay for any "remedial work" for cutting such trees, and, in fact, required Plaintiff to cut those trees. This treatment of Mr. and Mrs. Burns was in direct contradiction to the MPB's prior treatment of Plaintiff.

80.  Still later, in November 2005, Plaintiff had to cut trees along Willowbrook Road, in order to satisfy the requirements of the Town Highway Superintendent, and CH. On this occasion, Mr. Kingman and the MPB caused a STOP WORK ORDER to issue and claimed that the cutting of trees along Willowbrook Road violated the subdivision plans. Plaintiff was required to do "remedial work" to "correct" for this cutting of trees, and the cost of that remedial work, incurred in and after November 12, 2005, and the delay in the project cost Plaintiff more than $25,000.

**D. Local resident Paul Hughes has been treated differently than Plaintiff**

81.  The common driveway at the north part of Plaintiff's property was across from property owned by Paul Hughes. Upon information and belief, Mr. Hughes is a long

20

time resident of the Town of Milan; until recently, he had been a member of the Town Zoning Board of Appeals.

82. The property owned by Mr. Hughes is at the corner of Willowbrook Road and Route 199. Upon information and belief, Mr. Hughes purchased this property on August 23, 2002, for $30,000; the reason the price was so cheap was because this property was mostly wetland and, therefore, not useable. It was zoned as residential when Mr. Hughes purchased it. Mr. Hughes had it re-zoned soon after he acquired it, so that it is now zoned Commercial, Storage, Warehouse and Distribution Facilities. Mr. Hughes then established his business, Red Hook Fence and Deck Co., at this location.

83. Upon information and belief, this property owned by Mr. Hughes has a stream going through it. That stream flows on the westerly side of Willowbrook Road, parallel to Willowbrook Road. Upon information and belief, the land along the stream, and all the land on the westerly side of Willowbrook Road to that stream, is "DEC wet-lands". This designation is for extremely sensitive land and means that there can be no filling of these areas.

84. Upon information and belief, Mr. Hughes has been filling these DEC wet-lands; Lauren Kingman and the Town of Milan Highway Superintendent know that this is DEC wet-lands and knew that Mr. Hughes had been filling these lands illegally; they had done nothing to stop him from doing so. In fact, Mr. Kingman and the MPB required Plaintiff to make major changes to her proposed sub-division so that Plaintiff's project would not interfere with Mr. Hughes' illegal and environmentally repugnant actions.

85. When Plaintiff acquired her property, there was an existing culvert that ran under Willowbrook Road from Plaintiff's property to that of Mr. Hughes. This culvert

21

was north of the location for the common driveway that was to become Otero Drive. This culvert permitted for water from Plaintiff's property to flow over to the DEC wet-lands area of Mr. Hughes' property, the same wet-lands that Mr. Hughes was illegally filling.

86. Plaintiff's original plans to the MPB called for use of this culvert. The MPB and the Town Highway Superintendent required that Plaintiff modify her plans very substantially. Plaintiff was required to provide for the existing culvert to be closed off, to have a culvert go under Otero Drive, to another catch basin area, and then to have another culvert go from there under Willowbrook Road, much further to the south, to an area of Mr. Hughes' property where he had not yet filled in the wet-lands.

87. This change required substantial additional expense for Plaintiff, and the increase in the costs for construction of the project, and amounted to more than $20,000. This work was done after the STOP WORK ORDER was lifted.

88. Upon information and belief, Plaintiff's representative addressed this to Mr. Kingman at the site when the actual installation for this extra culvert work was being done, telling Mr. Kingman that it was unfair that Plaintiff had to change the plans and incur the additional expense, and that it was unfair that Mr. Kingman and the MPB was imposing so many requirements on Plaintiff, in name of the 'environment', when it was permitting Mr. Hughes to fill in DEC wet-lands, in violation of the law; Mr. Kingman's response was "He's an old-timer. We can't do anything about what he does."

**E. Local residents and one of the volunteers for the MPB both voiced discriminatory animus against City People. The MPB has treated Plaintiff differently because she is a City Person**

89. With regard to Plaintiff's application for subdivision approval, one of the Town's residents who attended the public hearings and objected to Plaintiff's proposed

22

subdivision asserted as her objection that the project should be rejected because "City people" did not know how to treat the land, and that they clear cut woods.

90. George Vengren is an arborist who had been retained by Plaintiff as an expert for purposes of Plaintiff's subdivision application. He is from Red Hook, New York, which is the town next to the Town. During the course of proceedings, Mr. Vengren had toured Plaintiff's property with the volunteers, defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman. Upon information and belief, during that tour, one of these persons complained to George Vengren, that "City People" had purchased land near her own property and that they had cut down many trees, and that now she could see their house and they could see her house. She complained that "'City People' did not know how to respect the land".

### E. Local residents Borenstein, Napolitano, Carreola, and Savoury have been treated differently than Plaintiff

91. Defendants Town Board and MPB have consistently imposed different standards of performance and requirements on Plaintiff that they have imposed on local residents and non-minorities.

92. Plaintiff filed a FOIL request and as a result received documents relating to other sub-divisions that had been presented to the MPB during the same time period when Plaintiff's subdivision request was pending.

93. Plaintiff obtained from the MPB offices data relating to the following subdivisions: Borenstein, Napolitano, Carrezola, AMD, and Savoury. Upon information and belief, the AMD subdivision application was by an owner who was not a local resident. She abandoned her application. Upon information and belief, the owners of all these other properties were local residents.

23

94. The Borenstein project is much larger than Plaintiff's project: it has more acreage (112 acres to Plaintiff's 35 acres); it has much more forest (108 acres to Plaintiff's 26 acres); it indicated that it will be permanently removing more forest (about 14 acres of forest, while Plaintiff indicated that she would be removing 5 acres of forest); the Borenstein project indicated that it had more wetlands, including a stream that went into the Wappinger's Creek and NYS Freshwater Wetland RC-4 (about 5 acres, and Plaintiff's property had none) (Even if Plaintiff's 'pond' is counted as 'wetland', Plaintiff has less than 1/10 of an acre of wetland); the Borenstein project provided for more houses and more lots than Plaintiff's project (at least 15 for the Borenstein project and 5 new houses for Plaintiff's project).

95. Upon information and belief, the MPB issued a Negative Declaration of Significance for the Borenstein subdivision. That meant that Borenstein did not have to do any special studies. The MPB issued a Positive Declaration of Significance for Plaintiff's project, which meant that Plaintiff had to undertake many expensive studies. The Borenstein project later received preliminary and final approval.

96. The MPB required Plaintiff to change her answers on her Environmental Assessment or undertake expensive studies to justify her responses on that Form. It did not require such studies from Borenstein, although his application gave the same answers that Plaintiff gave, under similar circumstances.

97. The MPB required that Plaintiff had to place the land into a formal CEA, enforceable by the Town, and operative pursuant to the New York State Environmental Conservation Law. The Borenstein Pasture Rock Subdivision did not have to do that.

98. In their EAF responses, Napolitano, Carrezola, and Savoury gave the same

24

answers as Plaintiff to the same questions, under similar circumstances. Plaintiff was the only person that the MPB required to do special studies to justify her response.

99. Upon information and belief, Borenstein, Carrezola, Napolitano and Savoury are not minorities, are residents of Milan, and have been residents for long periods.

100. Upon information and belief, up until the time of Plaintiff's application, no persons had been required to submit to a review of his or her property by the CAC as a condition for subdivision approval. Plaintiff had to agree that the CAC be allowed to tour her property, on many occasions, and this was a condition imposed by the MPB for consideration of Plaintiff's application for subdivision approval.

**F. Local residents have not been barred from cutting any live tree.**

101. Upon information and belief, since the time of Plaintiff's original application for subdivision approval, there have been approximately 40 applications made to the MPB for land use approvals. Upon information and belief, in only four instances, all subsequent to Plaintiff's application for subdivision approval, has the MPB required an applicant to have a CEA; in no instance has the MPB imposed on these other persons a requirement that no living tree can be cut. In fact, in each of those other four instances, the MPB specifically provided in the CEA that living trees could be cut.

102. Upon information and belief, Lauren Kingman never told these local persons that they were required to have a DEC FMP in effect as a condition for these persons to cut a living tree.

103. Upon information and belief, on October 5, 2007, when Plaintiff requested that she and her successors be permitted to cut living trees for firewood, Mr. Kingman was aware that all these local residents, even though they had a CEA in effect, had the

right to cut living trees under the circumstances set forth in their CEA, yet he denied that right to Plaintiff.

104. Upon information and belief, the MPB imposed on requirements on Plaintiff that it did not impose on local persons; for example, the MPB required that Plaintiff install 65 cement monuments, at great cost, to mark every turn, of even the slightest change of 1 degree, and every tree of the CEA on Plaintiff's property.

## G. Defendants purposefully provide for local residents so that their subdivisions are not inhibited by the Town's land use rules.

105. Upon information and belief, the MPB specifically tailors its decisions so that the land use regulations will not impede local residents in their attempts to obtain a subdivision, but in a manner that will prevent minorities and City People from being treated in a similar manner.

106. Upon information and belief, local resident Morton Getman did not have enough land to create a two-lot subdivision. At the meeting of the MPB on October 19, 2005, Chairman Kingman described how the MPB intended to grant him an exception, while not establishing a precedent for others, like minorities and City People. The minutes of that meeting state:

> Morton Getman Area Variance Recommendation – Chairman Kingman distributed a review of the case. The major concern of the board members was setting a precedent for creating substandard lots. Mr. Williams, Chair of the ZBA, said he would work with Janis Gomes, Planning and Zoning Attorney, to work a resolution so it would be extremely limited, only applying to a situation with these circumstances such as where the lot was originally a 3 acre lot, the lots were combined, zoning was changed, and now the applicant wants to change the configuration back to the original lot. Ms. Williams said Ms. Gomes seems to be of the view that if the resolution is written correctly, it will not set a precedent.

107. Upon information and belief, Mr. Morton later obtained approval of the subdivision that he sought, and the approval was accomplished in such a manner that City

26

Persons and minorities would not be able to cite the Morton situation as a precedent for their own requests for approval.

**H. Payment of the Town's expenses.**

108. Town Law §269 provides that "All necessary expenses incurred by any such board in connection with the adoption and enforcement of the zoning ordinances shall be a town charge".

109. Town Law §271 provides that the Town Board may create a Planning Board and appoint the members of that Planning Board, but it also indicates that the expenses incurred by the Planning Board are Town expenses, and shall be paid from the appropriation made by the Town Board for such purpose.

110. Upon information and belief, the Town Law provides that a Town Planning Board is authorized to appoint experts and to pay them *within the appropriation* therefore; it does not authorize the MPB to charge applicants for subdivision approval for the Town's own expenses.

111. (a) As a condition for Plaintiff to apply for subdivision approval, and for those proceedings to continue from 2004 through November 2007, which is when disbursements ended and Plaintiff was given the summary of disbursements, the MPB required that Plaintiff provide money to an escrow fund. (b) During the course of Plaintiff's proceedings before the MPB, the MPB required that Plaintiff provide more than $22,600 to the escrow fund. (c) These payments were in addition to the monies that Plaintiff had to pay to the title insurance company to insure its title to the CEA for the benefit of Defendant Town, and the filing fees that Plaintiff had to pay for that.

112. Upon information and belief, the MPB (a) used the $22,600 that Plaintiff

27

provided to it, by its order, to pay for persons who were retained to act for the MPB; (b) These included engineers, attorneys, planning consultants, and others. (c) The MPB used Plaintiff's money to pay for these persons and their services, but those services were undertaken under the direction and control of the MPB. (d) When Plaintiff filed her Article 78 proceeding against the MPB in December 2004, and prior to the time that she withdrew it, the MPB used Plaintiff's money to pay for its attorneys' fees while defending against that Article 78 proceeding.

113. Upon information and belief, although the MPB did require some non-minorities and local residents to pay into an escrow fund, and used that money for payment for the MPB's own experts, the amount that these local residents were required to pay was small in comparison to the amounts that the MPB required that Plaintiff pay. Upon information and belief, the MPB has treated Plaintiff differently because she is a City Person and a minority.

114. Upon information and belief, Defendants' actions have financially affected Plaintiff's rights in three ways. First, Defendants' actions have actually "taken" from Plaintiff the beneficial use of the area of the CEA that is 17 acres, and thereby effectively reduced the size of the existing lots from being 5 to 7 acres to being 1 to 3 acres each. This "taking" has resulted in a loss to Plaintiff of an amount to be determined at trial, but which Plaintiff believes and alleges is no less than $300,000, or $50,000 per lot.

115. The second financial harm to Plaintiff arises because of the impact on Plaintiff's property that is not in the CEA. Because of Defendants' actions, Plaintiff and her successors have reduced capability to protect against danger from falling trees, and reduced capability of protecting against invasive species, before they come onto the part

of each lot that is not in the CEA. Upon information and belief, this has reduced the value of the lots and land that is not in the CEA by at least $90,000, or $15,000 per lot.

116. The third financial harm to Plaintiff is that Defendants' actions have delayed her ability to market the lots. Plaintiff alleges that the delay has caused her damages of at least $5,000 per month, from November 1, 2007 to the time when the MPB's arbitrary and capricious actions terminate.

117. Upon information and belief, Frank Margiotta, Barbara Hughey, and Charlotte Norman did a preliminary report in May 2004 stating that the forested land on Plaintiff's Property was a "climax forest", which was not true, that one of the building sites was adjacent to a location where these volunteers "observed a rare lady slipper", which was not true, that one of the proposed common driveways "would compromise the root systems of large trees", which was not true, that the "forest cover on the site is a beautiful example of an undisturbed woodland", which was not true, and that the little pond "has almost certainly been affected by filling and dredging", which was not true; this report was treated by the MPB as true and factual, and the MPB used it, and other reports and statements made by these persons to justify its demand that Plaintiff surrender control of more than 50% of her property to a CEA.

118. Upon information and belief, these defendants conspired with the MPB and acted against Plaintiff because she was a minority and because she was one of the City People. Upon information and belief, the MPB knew or should have known that the statements made in this report, and the other statements by these persons were not true, but it wanted this document, and these statements, because it furthered the intent of the MPB and these persons to burden Plaintiff's property and diminish or eliminate her

ability to sell the lots.

119. Upon information and belief, these three volunteers persisted in making false statements to the MPB throughout the proceedings that led up to the MPB's approval of the subdivision plats that were filed on June 29, 2006 and the CEA that was filed on June 30, 2006. During the November 2004 meeting of the MPB, Mr. Margiotta continued to insist that there was a climax forest on Plaintiff's property and told the MPB that he wanted to revisit the site of the project and "make sure that all the trees that he wanted to protect were in the Conservation Easement Area, and that, if they were not, he wanted to have them included". Until the CEA was actually executed, he was visiting Plaintiff's property, identifying trees he liked, and telling the MPB to add them to the CEA. The MPB acceded to his requests, and during the following months Mr. Margiotta added more trees to the CEA that he had been instrumental in having imposed.

120. Upon information and belief, thereafter these defendants continued with their false statements during the period when Plaintiff had to make the infrastructure to the project, which was not completed until September 2007.

121. Upon information and belief, these volunteers acted based on the premise that City People were irresponsible and did not know how to take care of the land, and that opposition to such developments by any means, including the making of false statements, was justified and 'good'.

122. From the beginning, these volunteers, who called themselves the Conservation Advisory Council, sought to have a CEA and harsh, arbitrary and unnecessary restrictions imposed on Plaintiff and her proposed development. At the end of their first report they stated this: "Conservation easement considerations and/or

reconfigueration of the lots would lessen CAC concerns regarding this proposed subdivision. For example, some of the sensitive flora could be protected via a conservation easement swath through the subdivision." "Because this subdivision raises some serious environmental concerns, the developer should be asked to consider a cluster housing arrangement instead."

123. Upon information and belief, the statements made by these persons in their initial report, and thereafter, were a sham; they were known to be false when made. Upon information and belief, this process of obstruction by making false statements was intentional and malicious. Prior to the commencement of one of the meetings before the MPB, one of Plaintiff's representatives told defendant Mr. Margiotta that Plaintiff could not find any "Lady slipper" near the site of house number 3, as indicated in his report; his response was a jocular "I guess the deer ate it".

124. Plaintiff had to have an arborist, George Vengrin, and an environmental expert, Michael Nowicki, do studies contradicting the statements by these defendants, and demonstrating that this Property was previously used as pasture land, and that this was not a climax forest.

125. Upon information and belief, the Forester of the N.Y.S. DEC walked Plaintiff's property on October 16, 2007, and she gave an oral assessment similar to the written assessment that had been made by George Vengrin.

126. The actions of these three volunteers caused harm to Plaintiff by causing her to incur at least $30,000 in additional costs to retain experts to refute the claims made by these defendants, to make changes to engineering plans, and for other costs directly related to these false statements.

31

127. Upon information and belief, Defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman are not public officials, and the claims asserted against them are not claims for which any notice is required to be provided to them pursuant to any state or local law prior to the commencement of the action. Upon information and belief, the actions taken by these Defendants were not privileged and they were not otherwise shielded from liability and damages caused by their wrongful actions. Upon information and belief, the claims asserted against Defendants Town Board, MPB and Gary Beck are not claims for which any notice is required pursuant to any state or local law prior to the commencement of this action and they are not otherwise shielded from liability for their actions.

128. Plaintiff requests a jury trial on this claim.

**WHEREFORE,** Plaintiff requests that the Court:

(a) Issue a declaratory judgment that Defendants have treated Plaintiff differently than local residents and non-minorities, because of her national origin and place of residence, in imposing on her a requirement that she agree to the CEA as a condition for subdivision approval, and in taking the other adverse actions against her;

(b) Issue a declaratory judgment that the MCP is discriminatory and in violation of law in violation of the FHA because it favors local residents over New York City residents, that this has a discriminatory effect on minorities;

(c) Order Defendants to permit Plaintiff and her successors the right to clear some trees and brush in the 17-acre CEA, including the cutting of some live trees, in accordance with general forest maintenance practices;

(d) Order Defendants to pay to Plaintiff the sum of $300,000 because Defendants

32

have deprived Plaintiff and her successors from the beneficial use of the CEA, an additional $90,000 for the reduction in the value of the remaining part of her property, and an additional $5,000 per month, from November 2007 for delay in selling her lots.

(e) Order Defendants to pay damages of $250,000 caused by the additional work required by Defendants to change driveways and infrastructure to accommodate Mr. Hughes, Mr. and Mrs. Burns, to do work that CH was supposed to have done, and for which it had been paid, but which it did not do because Defendants issued the STOP WORK order, for the additional work that Plaintiff had to do in order to have Defendants remove the STOP WORK order, to reimburse Plaintiff for most of the $22,600 that she was improperly charged, and which was paid from her escrow account to the Town's engineer, attorneys, land planner and other consultants, and for other consequential damages incurred by Plaintiff because of Defendants' illegal actions;

(f) Order Defendants to pay punitive damages in the amount of $500,000;

(g) Order Defendants Frank Margiotta, Barbara Hughey, and Charlotte Norman to pay Plaintiff an additional $30,000, or such amount as is determined at trial;

(h) Order all Defendants to pay reasonable costs and attorney's fees to Plaintiff pursuant to the provisions of the FHA.

(i) Grant such other relief to Plaintiff as the Court deems just and proper.

**SECOND CAUSE OF ACTION - AGAINST THE TOWN, TOWN BOARD AND THE MPB FOR 'TAKING', FOR VIOLATION OF PLAINTIFF'S RIGHTS TO DUE PROCESS AND EQUAL TREATMENT UNDER THE LAW, AND PURSUANT TO 42 U.S.C. §1983**

128. Plaintiff incorporates with full force and effect the allegations set forth in ¶¶ 1-127 of this Amended Complaint.

129. Upon information and belief, as of June 29, 2005, when conditional final

33

approval was granted to Plaintiff's subdivision, and at all times thereafter, (a) Plaintiff had a constitutionally cognizable interest in the CEA, *i.e.*, the area of approximately 17 acres that was included within her original 35 acre parcel; (b) thereafter, Defendants deprived Plaintiff of any beneficial use that Plaintiff could possibly make of this CEA area; (c) Defendants were acting under color of state law when they did this; (d) their actions denied to Plaintiff procedural due process, because Defendants were acting pursuant to an institutionalized policy that exists in the Town, and that is set forth in the MCP and implemented by the Town Board and the MPB, that discriminates against persons who are not residents of the Town, and in favor of persons who are residents of the Town; (e) because this deprivation was in violation of Plaintiff's rights to procedural due process, even if there were available to Plaintiff post-deprivation remedies under state law, Plaintiff does not have to exhaust those remedies before commencing this action; (f) Plaintiff's claims are "ripe" for adjudication now, because there is nothing left to be determined insofar as the nature of the wrongful acts and the damages to Plaintiff; (g) Defendants' acts were also in violation of Plaintiff's rights to substantive due process, because these acts were arbitrary and capricious, and had no rational basis; (h) because of Defendants' own actions, post-deprivation remedies were not available to Plaintiff or it would have been futile for Plaintiff to pursue such post-deprivation remedies; (i) alternatively, even if post deprivation remedies were available to Plaintiff, a claim for such post-deprivation remedies is presented in this case, in this Amended Complaint, and this Court has jurisdiction to entertain such claims, even if they are considered under state law, not as a matter of original jurisdiction under 28 U.S.C. §1331, but under the supplemental jurisdiction that this Court has under 28 U.S.C. §1367(a); (j) the difference

34

in treatment of Plaintiff has been because of her residence, and because she is a minority; (k) the expected consequence of treating persons from New York City different from local persons is that minorities such as Plaintiff will be adversely affected; (l) there is no rational basis for imposing on Plaintiff and/or City People, and/or minorities, requirements that are not imposed on local residents and non-minorities; Defendants' actions have impinged on Plaintiff's constitutional rights.

130. Upon information and belief, the MPB purposely delayed Plaintiff's project because Plaintiff would not agree to the conditions that it was demanding, namely, that Plaintiff agree to devote a substantial part of her property, that is, more than 50% to a CEA.

131. Upon information and belief, the STOP WORK order issued by Mr. Kingman was in deprivation of Plaintiff's right to due process and caused damages to Plaintiff. Upon information and belief, although this was issued under the name of the Town's Zoning Enforcement Officer, Defendant Beck, it was issued at the behest of Mr. Kingman, and Mr. Beck advised Plaintiff that he had no authority to withdraw it, and that only the MPB, of which Mr. Kingman was Chairman, could withdraw it.

132. Upon information and belief, this order was issued pursuant to the policy of the Town and the MPB to delay development, by all means, including illegal means.

133. At the time that this order issued, Plaintiff was seeking to complete construction on the internal common driveways, before the asphalt plants closed for the winter. Upon information and belief, these plants generally closed in late November or early December. Plaintiff wanted to complete the infrastructure within certain time frames, so that Plaintiff would not have to post a letter of credit.

35

134. Upon information and belief, the only practical solution available to Plaintiff at the time the STOP WORK order was issued was to agree to the demands imposed by Mr. Kingman, which required extra plantings and infrastructure work.

135. The action by Mr. Kingman in causing the STOP WORK order to issue was arbitrary and capricious. It was irrational for him to cause it to issue.

136. As a result of this arbitrary and capricious action, Plaintiff suffered damages, as described previously in this Amended Complaint.

137. Upon information and belief, the directive of Mr. Kingman in October 2007 banning Plaintiff from cutting any live trees was "final", because it immediately affected Plaintiff. Upon information and belief, that order was null and void under state law because it was not in writing, no order was entered by Mr. Kingman or the MPB, there was no vote of the MPB with regard to Mr. Kingman's directive, and there was no order entered showing the vote of the MPB on this issue, and indicating how each member voted on this issue.

138. The MPB and the Town never indicated to Plaintiff that it considered this directive to constitute a "taking". Upon information and belief, the procedures of the New York State Eminent Procedures Law or other possible procedures for seeking compensation for this taking of this CEA area of approximately 17 acres are not available to Plaintiff. The New York State Eminent Domain Procedure Law § 101 states that:

> It is the purpose of this law to provide the *exclusive* procedure by which property shall be acquired by exercise of the power of eminent domain in New York state; to assure that just compensation shall be paid to those persons whose property rights are acquired by the exercise of eminent domain; . . . There must be a determination of the need and location of any public project, and offer and negotiations when private property rights are being taken

139. Upon information and belief, the Town, Town Board, and the MPB

effectuated a "taking" of Plaintiff's property, her rights to the CEA, without complying with the provisions of the EDPL, and without providing acknowledging that there had been a "taking", and without providing a procedure for Plaintiff to seek relief under the EDPA.

140. Upon information and belief, under the circumstances presented in this case, even if "inverse condemnation procedure" were available, it was futile for Plaintiff to have pursued such an action because Defendants were charging Plaintiff's escrow account for its own costs and attorney's fees.

141. Upon information and belief, if there is any procedure that is available for Plaintiff to invoke, Plaintiff has done so in this action.

142. The Fifth Amendment of the United States Constitution provides "nor shall private property be taken for public use, without just compensation".

143. The Takings Clause and the Equal Protection Clause are applicable to the states through the Fourteenth Amendment to the U.S. Constitution.

144. Even if the government does not seize or occupy a property, a government regulation can work a taking if it "goes too far". The MPB has imposed exactions that have "gone too far". They have eliminated any beneficial use that Plaintiff has or could have of the CEA, have imposed substantial adverse conditions adversely affecting Plaintiff's property that is not in the CEA, have substantially interfered with the reasonable investment backed expectations of Plaintiff, and Defendants' actions do not substantially advance legitimate state interests.

145. There is no essential nexus between what these Defendants have required, and are requiring of Plaintiff, and the public interest, and no proportionality between

37

what they are requiring and the public interest that they purport to protect.

146. Plaintiff requests a jury trial on these claims.

**WHEREFORE,** Plaintiff requests that the Court order the same relief as previously requested in the First Cause of Action, plus such other relief as the Court deems just and proper:

## THIRD CAUSE OF ACTION – FOR A DECLARATORY JUDGMENT THAT THE MCP IS NULL AND VOID

147. Plaintiff incorporates with full force and effect the allegations in ¶¶1-146 of the Amended Complaint.

148. The New York Town Law §263 requires that zoning laws and amendments thereto must be made in accordance with the Town's comprehensive plan. The purpose of that requirement is to ensure that the zoning regulations are established and implemented to benefit not only the residents of the Town but also the regional needs.

149. The MCP does not take into consideration the regional needs, including the needs of the persons in New York City. In addition, it favors local residents at the expense of New York City residents, and this favoritism has an adverse impact and is discriminatory against the large percentage of New York City residents who are minorities.

**WHEREFORE,** Plaintiff respectfully requests that the Court declare the MCP invalid, because it discriminate against Town residents and against residents of New York City, and because it does not take into consideration the needs of persons in the region, including the needs of persons in New York City.

## FOURTH CAUSE OF ACTION – AGAINST DEFENDANTS MARGIOTTA, HUGHEY AND NORMAN FOR INTENTIONAL INTERFERENCE WITH PLAINTIFF'S PROSPECTIVE ECONOMIC ADVANTAGE

38

150. Plaintiff incorporates with full force and effect the allegations set forth in ¶¶1-149 of the Amended Complaint.

151. The subdivision proceedings before the Town Board and the MPB and Plaintiff lead to a contract. The contract is embodied in the Subdivision Plats that were signed in this case by Lauren Kingman, as Chairman of the Town of Milan Planning Board, by Plaintiff and her professional engineer and surveyor. This contract sometimes also includes and makes reference to a CEA as in this case. These subdivision plats reflected the work that was to be done by Plaintiff as part of the Subdivision.

152. The actions of these defendants interfered with Plaintiff's prospective contract and her actual contract with the Town. Because of the actions by defendants, as previously described, Plaintiff was required to enter into the CEA, and Plaintiff was required to undertaken studies to refute the misrepresentations of these defendants. Plaintiff incurred additional expenses of at least $30,000 because of Defendants' actions

WHEREFORE, Plaintiff requests that the Court:

a. Order these defendants to pay damages in an amount of at least $30,000 or such other amount as is established at trial.

b. Order such other relief as the Court deems just and equitable.

## FIFTH CAUSE OF ACTION – FOR A DECLARATORY JUDGMENT THAT THE CONSERVATION EASEMENT AGREEMENT DOES NOT BAR PLAINTIFF OR HER SUCCESSORS FROM CUTTING LIVE TREES FOR THE GENERAL MAINTENANCE OF THEIR PROPERTY

153. Plaintiff incorporates with full force and effect the allegations set forth in ¶¶1-152 of the Amended Complaint.

154. The CEA permits for Plaintiff and her assigns, under the heading of General

Maintenance, to take actions, "including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with generally accepted forest conservation practices".

155. Upon information and belief, Defendants do not regularly require that an applicant for subdivision approval must agree to a CEA as a condition for subdivision approval, but in the four instances where Defendants have imposed such a condition, the Defendants have permitted the applicant to cut trees, and to do so without the need to have a DEC FMP.

156. The conditions that Defendants have imposed on Plaintiff are arbitrary and capricious and cause damage to Plaintiff and her successors, are not reasonably related to any legitimate municipal purpose, and are impossible to accomplish. Defendants impose on Plaintiff and other City People a different standard than that applied to local residents.

WHEREFORE, Plaintiff requests a Declaratory Judgment that Plaintiff and her assigns may cut trees in accordance with generally accepted forest conservation practices, and that they do not have to have a NYS DEC FMP in place in order to do that, and that they may use the wood and any other materials that they cut for any purpose they chose, including, but not limited to, using it for firewood.

## SIXTH CAUSE OF ACTION – FOR A DECLARATORY JUDGMENT THAT THE CONSERVATION EASEMENT AGREEMENT IS NULL AND VOID

157. Plaintiff incorporates with full force and effect the allegations set forth in ¶¶1-156 of the Amended Complaint.

158. Plaintiff was forced to accept the CEA in whatever form the Defendants presented it as a condition for being granted subdivision approval.

159. The CEA provided in paragraph 2, relating to the rights of the Grantee,

40

which was the Town of Milan, that the purpose was "To preserve and protect the open space and forested character of the Easement Area pursuant to the values identified in the *Town's master plan*".

160. Upon information and belief, the Town did not have any valid Master Plan as of the date that it forced Plaintiff to agree to this CEA. The Town enacted a Master Plan to replace its previously existing Master Plan, but the new plan that purportedly was in effect as of this time was later struck down as illegal by the Dutchess County Supreme Court, Judge Brands. Therefore, the CEA is null and void because it was not authorized by law.

**WHERFORE,** Plaintiff requests that the Court:

(a) Enter a Declaratory Judgment that the CEA is invalid;

(b) Enjoin the Town, the Town Board, and the MPB from enforcement of the

CEA;

(c) Grant to Plaintiff such other relief as is just and equitable.

## SEVENTH CAUSE OF ACTION – FOR RECOVERY OF $22,600 IMPROPERLY DEMANDED OF PLAINTIFF

161. Plaintiff incorporates with full force and effect the allegations in ¶¶1-160 of the Amended Complaint.

162. Defendants required that Plaintiff pay money into an escrow fund as a condition for Plaintiff to seek subdivision approval.

163. Upon information and belief, Defendants used monies deposited with Defendants improperly, to pay expenses for its own attorneys, engineer and Town Planner and the amounts so expended was approximately $22,600.

164. Upon information and belief, Defendants owe to Plaintiff reimbursement for

41

such improper expenses.

**WHEREFORE,** Plaintiff respectfully requests that the Court order that Defendants pay to Plaintiff the amount of $22,600, or such other amounts as the Court determines were not properly charged against Plaintiff, together with interest thereon from the date that such payments were made, to the present time, together with such other relief as the Court deems to be fit and proper.

Dated: January 24, 2008

Respectfully submitted,

_____ /s/ _Kennett M Culloch_

Kenneth Mc Culloch (3372)
Attorney for Plaintiff
516 Fifth Avenue, 12th Floor
New York, N.Y. 10036
Tel. 212-398-9508
e-mail KMcCulloch@BRGSLAW.com