UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

CARMEN OTERO MC CULLOCH,

                                  **Civil Action No. 07 CIV 9780 (LAP) (RLE)**

          **PLAINTIFF,**

                                    **ATTORNEY'S DECLARATION**

      v.

TOWN OF MILAN, TOWN OF MILAN TOWN
BOARD, JOHN V. TALMADGE, Town
Supervisor, and ALFRED LO BRUTTON,
PAULINE COMBE-CLARK, DIANE MAY, and
ROSS WILLIAMS, Councilpersons; TOWN OF
MILAN PLANNING BOARD, LAUREN KINGMAN,
Chairman, and Members JEFFREY ANAGOS,
PETER GOSS, SHEILA MARGIOTTA, MARY ANN
HOFFMAN, AND PAULINE COMBE-CLARK;
And GARY E. BECK, Zoning Enforcement Officer,
Town of Milan; And Frank Margiotta, Barbara
Hughey, And Charlotte Norman

                    **DEFENDANTS**.
_____

## DECLARATION OF KENNETH MC CULLOCH IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

       Kenneth Mc Culloch, an attorney admitted to practice in the United States District Court for the Southern District of New York, declares under penalties of perjury that the statements made herein are true and correct.

       1.  I am the attorney for Plaintiff Carmen Otero Mc Culloch (Plaintiff). I make this Declaration in opposition to Defendants' motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure (Fed.R.Civ.P.) Rule 12 (b) (6).

       2.  The Declaration filed in support of the motion to dismiss by Terry  Rice, Defendants' attorney (Rice Declaration), asserts that Plaintiff has "concocted . . .

violations . . . to federalize routine, run-of-the-mill land use disputes. . ." *Id*.¶3. Defendants acknowledge that Plaintiff cannot "generally cut down live trees" on her property, Defendants' Memo in Support of Motion to Dismiss (Defendants' memo), p. 26, but seek to trivialize the significance of this and every other imposition imposed against her, and ignore that Plaintiff's claims arise from violation of the Fair Housing Act, 42 U.S.C. §3601 *et seq*. (FHA) and other civil rights statutes, as though this is no "big deal". The Rice Declaration is inaccurate and omits many key facts.

3. Discrimination is a "big deal". The Town of Milan (Town) has 65 residents per square mile.[1] New York City has 26,402 residents per square mile, and Manhattan, where Plaintiff resides, has 66,940 residents per square mile. Defendants see enormous pressure coming from New York City, to populate their Town. Even worse, as the Town sees it, there is likely to be an enormous influx of minorities, foreigners and the other "undesirables" who populate New York City but who can hardly be found in the Town.

4. The Milan Comprehensive Plan (MCP)[2] demonstrates a strong concern for an

---

[1] The statistics noted in this memo were asserted in the Amended Complaint at ¶¶69-73, and obtainted from U.S. Census data accessed by me via the internet.

[2] The Milan Comprehensive Plan (MCP) is referenced in the Amended Complaint at ¶¶69-73. Plaintiff's Third Cause of Action seeks a declaratory judgment that the MCP is null and void. Her Sixth Cause of Action seeks a declaratory judgment that the Conservation Easement Agreement (CEA) is null and void because the MCP is void. In footnote 8, at what is actually page 21 of the unnumbered Rice Declaration, Defendants state "Documents referenced in the Complaint may properly be referred to in a 12(b) (6) motion," and thereafter provide citations to authority that are not repeated here, but those same authorities support Plaintiff's referencing to the MCP and to the Town's own regulations as part of this response. Plaintiff has provided a copy of the text (but not the pictures) of the MCP as Exhibit 1 to this Declaration. The complete MCP is available on-line at www.milan-ny.gov, and by then clicking under "Town Planning", and then to "Comprehensive Plan". The decision of Judge Brands of the Dutchess County Supreme Court, dated February 7, 2007, declaring the former MCP null and void is also referenced in the Complaint at ¶69. It is Exhibit 2.

influx of New York City residents. It states at the very beginning that one "important reason" that the Town up-dated its Comprehensive Plan was that "Development pressure is expanding north from the New York metropolitan areas following the Taconic State Parkway. The areas in southern and mid-Dutchess County have already experienced a major impact, and there is a marked increase in subdivision activity in Milan." 1.2. It further states that "Today, the TSP serves as a major commuting route for those people that want to live in the rural splendor while they continue to work in the metropolitan area, 70 miles to the south." 9.2.

5. Plaintiff has alleged that her property abuts the TSP. *See* Amended Compl.¶11.

6. The MCP indicates that the only persons who received the "Community Values Survey" that formed the basis for the MCP were the Town's residents, 1.3, and the only needs considered were those of the residents of Milan. "Milan's citizens value the rural quality of life the Town offers and want to keep Milan rural." 2.1. The intent of the Town and the MCP was to "KEEP MILAN RURAL", 7.1, to keep density below 150 persons per square mile, 3.4, to avoid "Explosive growth" that "threatens our rural character and risks causing even higher taxes to support our schools," 2.1, to have public services provided by other municipalities, but not by Milan, to keep Milan "affordable and accessible *to current residents*", 9.3, and to use the land use regulations to implement this self-centered policy. The MCP provided for developers to have higher density in return for providing for some units that would have to be sold or rented at reduced cost to the Town's *municipal employees* or *the Town's senior residents.* 3.3.

7. The MCP on its face shows that it has been enacted to favor local residents and to inhibit an influx of persons from the New York metropolitan area. This is

discriminatory, and evidence of discrimination regarding one aspect of housing is relevant to determining whether there has been discrimination in another area of housing. Defendants have not provided a properly balanced and well-ordered plan for the community, and Defendants have not considered, as they must, regional needs and requirements.

8. Defendants' aim in zoning and administration of its zoning and land use regulations might be summed up by the phrase "that each community should take care of its own first", an objective which is constitutionally impermissible. *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 649 (2nd Cir. 1971), *cert. denied* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971). A municipality may not enact zoning regulations, nor administer them, exclusively for the benefit of its residents while ignoring regional needs. The Town of New Castle tried to do the same thing that the Town of Milan is doing today. New Castle banned apartment houses, (Milan has done the same thing in its MCP, 7-7, and its zoning ordinances) because it was experiencing the same kind of growth which Milan feels at this time, and had the same concerns, that is, an influx of City People. In *Berenson v. Town of New Castle*, 38 N.Y. 2d 102, 378 N.Y.S.2d 672 (1975), the New York Court of Appeals rejected the New Castle zoning, finding that ". . . residents of Westchester County, as well as the larger New York City metropolitan region, may be searching for multiple-family housing in the area (New Castle) to be near their work and for a variety of other social and economic reasons. There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met". *Id.* at 111.

9. Treating persons differently, on the basis of residency has been rejected, and

ruled to be a violation of the U.S. Constitution. "The goal of preventing an influx of outsiders is constitutionally impermissible. The residency requirement is not rationally related to the goal of planning". *Cole v. Housing Authority*, 435 F.2d 807 (1st Cir. 1970), at 813; *see also, Allen v. Town of North Hempstead*, 121 Misc. 2d 795, 469 N.Y.S.2d 528, 533 (one-year residency requirement to be eligible for certain senior citizen housing is constitutionally impermissible); *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (a durational residency requirement may not be enacted for the purpose of rewarding long-term residents for past contribution to the community).  In the instant case, Plaintiff also seeks to invalidate residence favoritism for local Milan residents and residence restrictions for residents of New York City. As in the cases above, she has invoked the U.S. Constitution as the basis for her claims. As in the cases above, she had utilized 42 U.S.C.  §1983 as the mechanism for invoking the U.S. Constitutional protections available to her and to others similarly situated.

10. Discrimination against persons on the basis of residency is also a violation of civil rights laws when the use of that factor has a statistically significant adverse impact against minorities or any protected group. *Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792 (3d Cir. 1991); *United States v. City of Warren,* 759 F. Supp. 355 (E.D. Mich. 1991); *U.S. v. Cicero*, 786 F.2d 331 (7th Cir. 1986); *U.S. v. Elmwood Park,* 43 FEP Cases 995, 1987 WL 9586 N.D.Ill. 1987). In the *Town of Harrison* case, the Town's police force was largely white. The Town precluded persons who were not residents from applying for positions as police officers. This policy was found to be discriminatory because there was a substantial representation of African-Americans in Newark, and they were precluded from being considered for these positions. There was no defense that

justified the policy.

11. The Town has used conservation regulation as a subterfuge to hide its real intent. It proudly proclaims that Milan residents want to keep the Town "the way it is". The MCP notes that housing for senior citizens is a problem, 7-7, and then "recommends some senior housing units as a planned purpose development alternative, with set-asides granting first priority to *Milan residents* who might wish to relocate to such housing". 7-16. This is the action held to be illegal in *Allen v. Town of North Hempstead*, *supra*.

12. The MCP notes that its services are provided by other Towns, 8.2, notes that only 1% of the entire Town is zoned for commercial development, *id.*, notes that strip malls should not be allowed even in the commercial areas, *id.*, and makes no provision as of right for rehabilitation centers, nursing homes, group homes, housing for the impaired, shopping centers, and other uses that the public in general needs. It does not want City problems, or New York City's huddled masses. The presumptions that Defendants have articulated and acted upon is that (a) City People, that is, New York City residents, *see* Amended Complaint ¶57(d),  do not know how to take care of the environment; and (b) they do not know how to take care of themselves, and the Town wants no part in addressing the problems of City People. *See* MCP.

13. The Town wants people who can afford large estates, pay a great deal in taxes, but not use much in resources, like schools. Even when the "rules" are stated to be the same for local residents as they are for "City People", Defendants make sure that the rules are bent, or not applied at all, to local residents. *See* Complaint ¶¶74-127.

14. This case is a "big deal" because this kind of provincialism and exclusionary practices has no place in the U.S. Defendants are nothing less than modern-day Nativists,

using land use regulations rather than violence to achieve their exclusionary goals. The same practices used against Plaintiff have a chilling effect on other minorities and City People, letting them know in no uncertain terms that they are not wanted in Milan.

15. The Amended Complaint has alleged that the Town has an institutionalized policy of using land use regulations, and the MCP to accomplish this and delay.

16. The parts of the MCP set forth previously show an intent to favor local residents in housing regulations and an intent to restrict access to housing for City People. Other references to the MCP show how the MCP uses delay as a tool to implement its policy. The MCP states that "By *slowing* residential development, school taxes will rise less rapidly. On the other side of this equation is the addition of new, large-lot homes that more than pay their way in taxes." 2.5. To better provide for large-lots, the MCP proposed a zoning overlay, so that any lot would need at least 10 acres. 3.3. The MCP proposed that the Town Board "pass zoning and subdivision regulations that *require* developers to . . .  use conservation subdivisions. . . . Town regulations and Planning Board procedures *will expedite the application process for developers who further the vision of Milan and plan their subdivisions accordingly"*. 3.4. It further provides that "Offering builders the option to either complete a conventional subdivision plan . . . or to use a net building acreage formula that can work to the builder's advantage . . . *by expediting the approval process*". 7-13.

17. The speed of the application process should be the same, as long as the project complies with the pertinent rules and regulations. Bowing to Defendants' illegal demands for a CEA, or any other illegal demands, because that is the Town's "vision", should not cause a change in the time that the process takes.

18. The Amended Complaint alleged facts showing that the Town's discriminatory plan was implemented against Plaintiff. It alleged that the MPB purposely delayed Plaintiff's project because Plaintiff would not agree to the conditions that it was demanding, namely, that Plaintiff agree to devote a substantial part of her property, that is, more than 50% to a CEA. *Id.* at ¶¶ 21-24. This was part of the Town's plan to delay development unless and until Plaintiff acceded to the CEA, part of the Town's "vision".

19. I have three copies of the Defendants' Zoning and Subdivision Regulations. I obtained copies at different times to assure that my copy always included any changes that might have been made. Defendants' Zoning and Subdivision Regulations were designed and intended to assure that the Town's taxpayers bear no share of the expense for carrying out the Town's mandated functions. The Town's Zoning Ordinance, §200-68 (B), provides for the MPB to have authority as follows regarding use of consultants.

> Consultant review. In its review, the Planning Board may consult with the Town Zoning Enforcement Officer and/or Building Inspector, the Superintendent of Highways, the Conservation Advisory Council, other local and county officials and its designated private planning and engineering consultants, in addition to representatives of state agencies, including, but not limited to, the State Department of Transportation, the State Health Department and the Department of Environmental Conservation.

20. There is no mention of using attorneys as consultants and no mention of charging the applicants for the services of consultants. There is no standardized schedule of fees for a subdivision application set by this regulation, nor does the Town Board direct the MPB to adopt such a standardized schedule.

21. I have the Town of Milan Subdivision Regulations, and §177-13(F) of those Regulations relates to the consultant review of the preliminary plat. It states:

> Consultant review. In its review of a preliminary plat for a major subdivision, the Planning Board may consult with the Town Zoning Enforcement Officer, the

Town Superintendent of Highways, local fire departments, the Conservation Advisory Council and the Board's planning and engineering consultants, in addition to representatives from town, county and/or state agencies. Reimbursable costs incurred by the Planning Board for consultation fees, particularly for planning and engineering consultants, shall be charged to the applicant. Such reimbursable costs shall be paid by the applicant prior to final plat approval, in addition to the required application and recreation fees. Maximum amounts for such reimbursement costs, by project and size, shall be in accordance with the fee schedule. (Refer to Article XI. Fee Schedule.)

In those Regulations, §177-14(I) relates to consultant review for final plats. It has the same language as above, but where §177-13(F) says "preliminary plat" above, §177-14(I) section says "final plat".  At the bottom of the pages where §177-13(F) and §177-14(I) appear, the document states 9-30-99, which I understood to mean that this page was last revised on September 30, 1999.

22. (a) I looked for the Fee Schedule referenced which establish the maximum amounts that could be charged. Since this schedule was part of the Zoning and Subdivision Regulations, I believe it should have been provided to me each time that I purchased these documents from the Town. I went to Article XI of the Milan Subdivision Regulations, but that part, which was also identified as "§177-39. Subdivision Fees", stated only as follows: "Subdivision fees shall be as defined in the Town of Milan Fee Schedule." There was a footnote 8 next to this, and on the bottom of the page, to explain footnote 8, it stated "Editor's Note: See Ch. A208".

 (b) I then called to the Secretary for the Milan Planning Board, Karen Buechele. She is very knowledgeable about everything relating to the MPB, but she said she knew nothing about this Fee Schedule.

(c)  I then wrote a letter to the Secretary of the Town Board, the Town Clerk, Catherine Gill, on March 7, 2008. In that letter I stated:

Dear Ms. Gill,

I called to Karen Buechele yesterday with a question. She could not answer the question but she thought you might be able to answer. That is why I am writing to you.

The Milan Subdivision of Land regulations, §177-13 and §177-14, relate to retention of consultants. I have attached a copy of these provisions. At the end of these sections, they each state:

Maximum amounts for such reimbursement costs, by project and size, shall be in accordance with the fee schedule. (Refer to Article XI. Fee Schedule.)

I looked at Article XI of the Milan Subdivision Regulations, which is §177-39 of the Milan Subdivision Regulations. It states "Subdivision fees shall be as defined in the Town of Milan Fee Schedule" It then has a footnote, and in the footnote it states "Editor's Note: See Ch. A208". I have included a copy of that page also. I looked for a chapter A208 in the Zoning Ordinance and in the Milan Subdivision Regulations and could not find any such reference. I have three copies of these documents, obtained from the Milan Planning Board at various times, so I have changes and additions, but I have never seen this Fee Schedule that is referenced here. Karen is very knowledgeable about everything having to do with the Planning Board, but she did not know what was being referenced. She thought that this might be something that the Town Board has. Do you know what this Fee Schedule is? Can you send me a copy? I would like to have it as soon as possible, by fax, to the fax number above. Ordinarily I would not mind making a FOIL request for this item, but I need it quickly. I think that it should have been with the Milan Zoning and Subdivision Regulations, and I have already purchased three copies of those documents at various times, so I am not seeking to avoid paying. If there is a charge, I will pay it. As you requested in the past, I will pay when you tell me what the cost is. Thank you for your help in this matter.

(d) I then called to Catherine Gill later in the morning of March 7, 2008. She

confirmed to me that she had received my faxed letter. I asked if she knew about the Fee

Schedule that was referenced there. She said she thought she might but that she wanted to

check. I asked her to fax me a copy and advised her that I had already paid for three

copies of the Zoning and Subdivision Regulations but had never received a copy of this

maximum fee schedule. She said she would check and get back to me. She has not called

back, and she has not faxed me a copy of this Fee Schedule. This maximum fee schedule

is pertinent to consideration of Defendants' motion to dismiss, because Defendant seeks

to dismiss in its entirety Plaintiff's Seventh Cause of Action which claims that Plaintiff was improperly charged for consultant fees. I do not believe it is fair nor appropriate for Defendants to be making such a motion regarding this claim while Defendant has not produced to me nor to the Court a copy of this maximum fee schedule.

(e) On March 12, 2008, I made a request for production of this Maximum Fee Schedule for the years 2004-2008 to the Town pursuant to the New York State Freedom of Information Law (FOIL).

(f) I do not know what the Fee Schedule is, nor do I know what the maximum amount is that the MPB can charge for a subdivision application. I was aware of all the proceedings before the MPB involving Plaintiff's Subdivision application, but I was never told about the maximum fee schedule. I have reviewed minutes of the MPB. In the minutes of one of those meetings there was reference to a proposal by Mr. Kingman that the amount that should be deposited for a lot line adjustment should be increased to $1000, that the amount for deposit for a minor subdivision should be $5000, and that the amount that should be deposited for a major subdivision, up to 10 lots, should be increased to $10,000.   I do not know that this proposal was ever adopted. If Mr. Kingman's intent was to assure that the maximum amount provided for in the Fee Schedule be deposited at the commencement of proceedings, then it would appear that the amounts on that Fee Schedule for a six-lot subdivision, such as that of the Plaintiff, was less than $10,000 as of April 2004 when she commenced the application process. I believe that Mr. Kingman's intent was to assure that the maximum fee be increased to those amounts. A provision of the Town's Zoning Regulations §200-67 (B)(2) has a general heading of "Application Procedure" and this section states:

(2) Required fee. A complete application for site plan review and approval shall include the applicable fee in accordance with the fee schedule established and annually reviewed by the Town Board. (ftnt 62).

The footnote 62 at the bottom of the page states "Editor's Note: See Ch. A208, Fees."

On the basis of information currently available to me, I suspect that Plaintiff was charged far more than the maximum fee permitted by the Town's Zoning Regulations. When Plaintiff commenced the subdivision application process, she was required to deposit $3,000. Since the regulations provide that the maximum fee be provided at the time of the application, I suspect that the reason that this $3000 was required of Plaintiff when she started the application process was because $3000 was the maximum application fee amount permitted as of that time. I also suspect that Mr. Kingman was fully aware that Plaintiff's escrow account was being used illegally, because he was the person who directed Karen Buechele, the secretary to the MPB, to require that Plaintiff supplement her escrow account in order for the MPB to continue to process Plaintiff's application. Assuming all of the above is true, it is likely that Mr. Kingman's actions would be considered *ultra vires* and illegal. Mr. Kingman might be personally responsible for payment of approximately $18,600 to Plaintiff. This is another reason why Plaintiff's claim for punitive damages against Mr. Kingman should not be dismissed.

23. Defendants have stated as fact in their memo of law in support of their motion to dismiss that the Town can charge whatever it wants and whatever expenses it has incurred for consultants. The Milan web-site confirms that this is what the Town does. Under the heading of "Milan Offices: A Closer Look", the Town's official newspaper describes "Milan's Planning Board and Zoning Board of Appeals". It states:

The Planning Board receives professional assistance in processing applications from the Town Planner, the Town Engineer, and the Planning Board Attorney. The applicant pays for these services so there is no cost to the Town.

I do not believe that the Town's actions or contentions in this regard are legal. I also believe that Plaintiff has been charged amounts illegally. In support of the motion for injunctive relief that Plaintiff filed on February 25, 2008, I provided as Exhibit 14 a copy of documents that I received from the MPB. It was a summary disbursement sheets, showing the amounts that had been paid from Plaintiff's escrow account, and the parties to whom the payments had been made. This showed disbursements of approximately $22,600 that was spent from Plaintiff's escrow account. Much of those expenses were for items that pre-dated the consideration of the Plaintiff's subdivision application for preliminary approval, and much of those expenses was for expenses that post-dated the date of final approval of Plaintiff's subdivision application.

24. (A) Nothing in either §177-13 or §177-14 authorizes any charges to the developer, except for *review* for the preliminary and/or final approval. The MPB regulations provide no basis for charging Plaintiff for work done by the consultants prior to these approvals, or subsequent to such reviews, nor for work for the Town's attorneys to draft a Conservation Easement Agreement (CEA), title insurance for the CEA that Plaintiff had to convey to the Town, or anything like that.  Plaintiff has alleged in her Amended Complaint that she was required to pay such charges, and that "she was required to provide and pay for title insurance, closing costs, and the Town's expenses for this closing", *see* Amended Complaint ¶42,  as a condition of subdivision approval. Based on the above, I do not believe that the Town charged standardized fees for Plaintiff's subdivision application.

(B) In the Town's Zoning Regulations, at §200-39(B)(8), there is a section entitled "Donor donations" which states that "The Town Board may request a donation of costs relating to acceptance and ongoing monitoring of the conservation easement". The date on the bottom of this page is 05-30-06. I believe that this section did not exist when Plaintiff initiated her application for subdivision approval, and that it was added later. I say this because I looked at the first copy of the Zoning Regulations that I obtained, and it has as §200-39 a section headed "Off-street parking for commercial vehicles while loading and unloading". Plaintiff has alleged in the Amended Complaint at ¶¶44-46 that Mr. Kingman demanded that Plaintiff pay an assessment for the Town's expenses in monitoring compliance with the CEA, and that Plaintiff refused to make such a payment. For the reasons stated in the Amended Complaint, Plaintiff believes that this provision in the Milan Zoning Regulations is also illegal.

25. (A) The elements necessary for Plaintiff to state a claim for violation of the FHA under the disparate treatment theory are that Plaintiff allege that she is a minority, that the Defendants were aware that she was a minority, that defendants acted against her during the subdivision process because she was a minority, that defendants denied to her or otherwise made unavailable to her the right to develop dwellings or lots for dwellings, because of her national origin, and that she suffered harm because of defendants' actions. The phrase "otherwise make unavailable" has been interpreted to reach a wide variety of housing practices, including discriminatory zoning restrictions or the interpretation or application of zoning restrictions.

(B) The elements necessary to state a claim for violation of the FHA under the disparate impact theory are that Plaintiff allege that she is the member of a group, that

Defendants treat the group differently than persons not in the group, that the members of the group are largely minorities, that the persons who are treated better are largely non-minorities, that the application of the standard has a statistically significant adverse and disparate impact on the members of the protected group, and that Plaintiff has been adversely affected because of the actions by the Defendants.

26. The paragraphs of the Amended Complaint where Plaintiff made the allegations necessary to allege a claim for violation of the FHA are as follows:

Plaintiff is a minority, *i.e.*, Puerto Rican, and a resident of New York City. ¶2. Defendants knew that Plaintiff was a minority and a resident of New York City. ¶5. Defendants knew this from her surname, "Otero", which was on the common driveways for the project and from her address which was on her application for subdivision approval. ¶4. The plans that contained this information were presented to the MPB in April 2004. ¶18. Plaintiff also used her full name, including her Puerto Rican surname, when she filed the Article 78 action against the Defendants in December 2004. ¶4. Plaintiff's application for subdivision approval constituted action that is covered by the FHA. ¶59. Use of residence in making decisions on land use and planning and housing, and favoring local residents, and trying to restrict City People, has a statically significant adverse impact on minorities, such as Plaintiff. ¶57-70. The Defendants have an institutional bias in housing and land use decision-making in favor of local residents and against City People. ¶69-73.

27. Plaintiff has been treated differently and adversely because of her national origin and her place of residence.

(1) The evidence in the MCP showing that the Town discriminated in favor of

local residents and tried to restrict access to the Town for persons from the New York Metropolitan area carries forward to each aspect of the decision-making.

(2) The MPB required that she enter into a CEA as a condition for subdivision approval. ¶26. Prior to this time, the MPB had not required persons who were seeking subdivision approval to enter into a CEA. Plaintiff was the "first" treated this way ¶27.

(3) Defendants created their first CEA just for Plaintiff. ¶43. The MPB approved a much larger subdivision by a local resident, Borenstein, just prior to the time that it considered Plaintiff's application for subdivision approval. ¶¶94-97. Borenstein did not have to enter into a CEA. *Id.* There was no rational basis for requiring Plaintiff to enter into a CEA.

(4) The MPB required that Plaintiff permit the Conservation Advisory Council (CAC) to enter her property as a condition for entertaining her subdivision application. ¶100. Prior to the time that Plaintiff made her subdivision application, the MPB had never required this as a condition for entertaining a subdivision application. ¶100. This was another "first".

(5) Plaintiff completed an Environmental Assessment Form (EAF) in which the statements and answers are made under oath. ¶19. Defendants required that she change some answers, and, because she would not do so, it required her to do studies. ¶96. The MPB did not impose the same requirements on Borenstein, even though he gave the same answers to the same form questions. *Id*. The MPB did not require local residents Napolitano, Carrezola, and Savoury to change their answers on the EAF, even though their answers were the same as Plaintiff's answers. ¶98-99.

(6) When Plaintiff tried to cut brush along Willowbrook Road, she was not allowed

to do so, and was told that this could not be done while her subdivision application was pending. ¶74. When it was convenient and advantageous to local residents, who invoked the fact that they were residents for 30 years and that this gave them some rights, the MPB required that same brush be cut, and that even trees be cut, even though Plaintiff's subdivision application was still pending. ¶34; 77-80. Later, when Plaintiff had to cut trees in the same area, because this was required by the utility company and the Town Highway Superintendent, Mr. Kingman reverted to the "no cut" rule, and caused the Town to issue a STOP WORK order. ¶31-34.

(7) Plaintiff was required to divert the culverts that carried water from her property. This was for the convenience of a local resident, who had been filling DEC wetlands. ¶¶81-88. When Plaintiff complained about the dual standard of treatment, Mr. Kingman said "He's an old timer, we can't do anything about him.

(8) Plaintiff had entered into a CEA that specifically stated that she could cut trees in the CEA area. ¶48. Other persons, who were local residents, had the exact same language in their CEAs, but Plaintiff was ordered not to cut any live trees on her property and the other local residents did not receive any such order. ¶50.

(9) Plaintiff was told that the plans for the installation of utility lines had to be approved by the MPB. ¶35. These requirements were not only illegal, ¶36, but they were discriminatory because "local residents and non-minorities who had to install utilities for a subdivision have not been required to have the plans of the utility company approved by the MPB". ¶37.

(10) Plaintiff was told that she had to execute a "form" CEA as a condition for subdivision approval. ¶43. She was then required to execute a "Form" CEA that, she

learned later, was different in some parts from any other CEA that the MPB had ever required anyone to execute. ¶44. In fact, persons who had those other "form" CEAs have not been barred from cutting live trees, and all those persons are local persons.¶101.

(11) Plaintiff was required to mark the boundaries of the CEA with 65 cement markers that were difficult and expensive to install. Local residents, even the few who were required to have a CEA, were not required to have so many markers. ¶104.

(12) Defendants manipulated the land use approval process to favor local residents, such as Morton Getman. ¶¶105-107. They also manipulated it to disfavor and harm Plaintiff.

(13) Plaintiff's construction of the infrastructure for the project was stopped by the Chairman of the MPB's directive to the Town's Zoning Enforcement officer, Gary Beck, that he issue such an Order. The order was issued because Plaintiff cut trees, and did so, along Willowbrook Road. There was no basis for issuance of the STOP WORK order. ¶¶30-34. Previously, to accommodate local persons, the MPB had required trees along Willowbrook Road, in the same area to be cut. ¶34.

(14) The MPB required that Plaintiff pay all the Town's expenses for attorneys, land planners, and engineering work. ¶¶111-113. This was illegal. ¶¶161-163. Any expenses charged to local residents were small in comparison to those charged to Plaintiff. ¶113.

28. Plaintiff's claim under 42 U.S.C. §1983 requires that she allege that the Defendants acted under color of law, that they subjected her to a deprivation of her rights secured by federal laws or the Constitution, and that she allege that she was injured by such conduct. The rights that Plaintiff claims she had were the right to equal protection

and due process. Plaintiff identified each of the defendants, except Frank Margiotta, Barbara Hughey and Charlotte Norman, as being Town officials and acting under color of law. ¶¶6-9. The facts enumerated above in ¶¶25-26 *infra* also constitute facts that state a claim for relief under 42 U.S.C. §1983.

29. The allegations made in the following paragraphs of the Amended Complaint demonstrate why there was no remedy available to her, or why it was futile for Plaintiff to try to use the processes that might otherwise be available to her to grieve the discriminatory actions of Defendants: 21, 22, 23, 27, 137-141. *See also*, ¶¶23-24 *infra.*

30. Plaintiff has alleged sufficient facts to support her claim for punitive damages against Mr. Kingman and Frank Margiotta, Barbara Hughey and Charlotte Norman. The pertinent allegations against Mr. Kingman are in the Amended Complaint at ¶¶23, 27, 30-40, 44-46, 49-50, 55, 75-80, 88, 101-103, 106-107,116, 130-133-137. These other defendants are not public officials, so special allegations for punitive damages against them are not necessary. Even so, such allegations are made against these other persons in these paragraphs of the Amended Complaint. ¶90, 117-127.

31. Defendants have claimed that Plaintiff's claims are time-barred. Defendants' Memo, p. 4. The Amended Complaint alleges that the most recent series of events of discrimination occurred in September and October 2007. *Id.* ¶49, 51-53, 120. Plaintiff filed her complaint on November 5, 2007, less than two weeks after receiving the November 23, 2007 letter from the New York State Department of Environmental Conservation (DEC) advising that it would not do a Forest Management Program (FMP) for Lot No. 5 of Plaintiff's property, the lot for which she had a prospective purchaser. November 3 and 4, 2007 was a week-end, so this Complaint was filed within 30 days of

October 5, 2007, the date that Mr. Kingman advised of the condition, and just two weeks after Plaintiff's receipt of the DEC letter. *Id.*

32. The Amended Complaint alleged that imposition of this prohibition in what had previously designated as the 17-acre CEA *totally* eliminated any beneficial purpose to Plaintiff and her successors that could have been served by the area within the CEA, adversely affected the non-CEA areas, and drastically reducing the value of the remaining portions of the lots. *Id.* at ¶¶114-116; 129. These allegations establish, contrary to Defendants' argument at p. 24 of their legal memo, that Plaintiff has claimed, as provided in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992), that "all economically beneficial use", ¶129(b) of this 17-acre CEA area has been taken.

33. Defendants assert that the "trigger" date for filing this action was June 29, 2005, because that was the date that Defendants granted conditional final approval of the subdivision. *See* Defendants' Memo, at p. 4. The allegations in the Amended Complaint show that this argument is without merit.

34. As of June 29, 2005, Plaintiff could only *start* building the infrastructure that she had been required to undertake as a result of the alleged discriminatory treatment, acts like the changing of the culvert, to accommodate the local person Paul Hughes, ¶¶81-88, and changing the driveway and cutting trees along Willowbrook Road to accommodate local residents Mr. and Mrs. Burns. ¶¶74-80.

35. As of the current time in this case, the Court only has to determine whether the action is timely; it does not even have to consider the "continuing violation" theory to determine that. *At a minimum*, substantial acts that caused damages to Plaintiff are within

the two-year limitation period provided for in the FHA.[3]

36. The Amended Complaint alleged that even when Plaintiff was doing this work, Mr. Kingman caused a 'STOP WORK' order to issue, on November 5, 2005, which was also within 2 years of the filing of the Complaint. ¶31. That 'STOP WORK' order was also discriminatory, illegal, and arbitrary and capricious. ¶¶35-40. The trees

---

[3]The following acts were within the two year period prior to this commencement of this action:

(1) the issuance of the STOP WORK order, on November 5, 2005, which continued in effect until it was rescinded;

(2) the 'remedial' work that Plaintiff had to agree to do in order to have the STOP WORK order rescinded;

(3) the extra costs that Plaintiff had to incur because of the STOP WORK order, because the delay caused Plaintiff to "lose" CH as the contractor for placing the utility lines (CH schedules its work months in advance and because Plaintiff was not ready for it, at the time that had been scheduled, Plaintiff either had to wait months again, or pay someone else to do the work that CH had already been paid to do);

(4) the costs for the Letter of Credit that Plaintiff had to obtain, because Plaintiff could not complete the work in the time provided for by the Town's subdivision regulations, because of the delay caused by the STOP WORK order, so Plaintiff had to post the L/C and request an extension;

(5) the work that Plaintiff had to do to accommodate Paul Hughes and Mr. and Mrs. Burns, which was part of the work stopped by the STOP WORK order;

(6) damages caused by the imposition of the CEA that was a condition of the Final Approval of June 26, 2006, and because the CEA required of Plaintiff as a condition of Final Approval was much more onerous than the CEA that had been shown to Plaintiff earlier;

(7) the damages that occurred because of Mr. Kingman's directive of October 5, 2007, which banned the cutting of any live tree in the CEA (This damage was (a) the complete elimination of any value to Plaintiff of the 17-acre CEA, (b) a severe diminution in value to the balance of the lots, and (c) a delay in Plaintiff's ability to market those lots);

(8) the assessment against Plaintiff of $22,600 for the Town's own expenses for the town planner, consultants, engineers, and attorney's fees, including the attorney's fees incurred by the Town for its defense to Plaintiff's earlier Article 78 proceeding, and this was timely because Plaintiff did not receive the accounting of how her escrow account funds were disbursed until November 2007;

(9) the Closing costs and fees in June 2006 that Plaintiff incurred when the Final CEA was approved and had to be conveyed to the Town; and

(10) the additional work that Plaintiff had to do to delineate the CEA because of Defendant Frank Margiotta's continuing to visit Plaintiff's property, after November 5, 2005, to identify additional trees that he wanted to have included in the CEA.

that Plaintiff had caused to be cut had already been cut, and there was no threat that any other trees would be cut. The 'STOP WORK' order was used by Mr. Kingman solely to impose additional planting and other work requirements on Plaintiff, and these other conditions were never part of the plans that had been conditionally approved. ¶38.

37. The Final Subdivision Plat was not signed by Mr. Kingman until June 26, 2006. *Id.* at 41. The final CEA was not filed with the Dutchess County Clerk's office until June 30, 2006. *Id*. at 42.  The final work was not done, and the final inspection was not done by the Town's engineer until September 2007.

38. The Amended Complaint alleged that Defendants acted in violation of New York State law by requiring her to pay for costs that the Town should have paid. *Id.* ¶45. Neither the Amended Complaint nor the motion to dismiss indicates when this occurred, so there are no facts to rule that this claim is time-barred. In fact, Plaintiff did not receive an accounting for the disbursements from her escrow account until after November 5, 2007.

Dated: March 12, 2008

_____/s/_____

Kenneth Mc Culloch (KM 3372)