Town of Milan Comprehensive Plan                   7. Residential Development

Chapter Highlights:

Residential development is at the core of the issues facing Milan. The Town's growth and its impact on environmental resources and rural quality of life are therefore central to this comprehensive plan. Historic growth at 25% per decade shows no sign of abating; in fact, it appears to be increasing. Existing zoning is inadequate to prevent sprawl. Rapid population increases cause significant pressure on our schools and taxes. However, large-lot zoning, taken alone, only causes sprawl to eat up the landscape faster, and large-lot zoning is not affordable to many in the community today. The CP incorporates tools to expand housing diversity and affordability, particularly for senior citizens, for young families, and for those with moderate incomes who cannot afford large-lot housing. Housing on smaller, more affordable lots and multifamily units are important elements of this effort. The plan also recommends tools that enable the Town to manage growth in a controlled way while protecting our environmental resources and our rural residential character. The tools proposed will make more compact development possible in Milan's historic hamlets through the adoption of a planned purpose development concept. This concept applies only when willing owners propose development that the Town finds consistent with its objectives. Across the balance of the town, the CPB proposes a Rural Space Overlay Zone that, when coupled with a requirement for siting homes in conservation subdivisions, will protect our environmental resources, prevent sprawl, provide a restraining effect on small landowner property taxes, and limit future growth in town—all consistent with maintaining our rural character. The intent of these proposals is to put Milan's future in the hands of Milan's people, not in the hands of outside developers leaving with their profits at the community's expense.





Town of Milan Comprehensive Plan                    7. Residential Development

**Residential Development**

**A.  Introduction**

The 2000 Town Values Survey clearly revealed the residents' vision of the future of Milan. Open space, forest, agricultural lands, and scenic beauty were most important resources for the Town to protect. This puts the residents' priorities on a collision course with the effects of projected population growth and residential construction. To accommodate the anticipated growth, and at the same time preserve Milan for future generations, zoning and land use regulations must be implemented to slow residential build-out to manageable levels. If growth is allowed to spiral out of control, the quality of community life becomes diminished.

Housing criteria should reflect the goals of the community. The people of Milan want to preserve the unique environmental values and rural character of the area. Protecting open space is an integral part of maintaining Milan's rural character. The key issues facing our community are a function of population growth.  Growth affects all aspects of Town planning and operations: transportation, housing, community services, commercial development and the general quality of life.  How we manage it will shape the composition and quality of Milan for generations to come.

**B.  Existing Conditions and Trends**

1) Population. The population of the mid-Hudson Valley has increased about 1% per year over the last 50 years, according to Michael DiTullo of Mid-Hudson Pattern for Progress.  Dutchess County has actually grown faster than that and Milan much faster.  Although Milan's population growth has been erratic over the last century, since 1960 the population growth rate of the Town has increasingly exceeded growth in Dutchess County. As seen in Table 7.1 below, reflecting decennial census data, the population growth rate in the 1990s was three times the County's growth rate.

Table 7.1 Population By Decade 1900–2000

|      | Milan      |             | Dutchess County |             |
| ---- | ---------- | ----------- | --------------- | ----------- |
| Year | Population | Growth Rate | Population      | Growth Rate |
| 1900 | 950        |             | 81,670          |             |
| 1910 | 893        | -6.0%       | 87,661          | 7.3%        |
| 1920 | 704        | -21.2%      | 91,747          | 4.7%        |
| 1930 | 622        | -11.6%      | 105,462         | 14.9%       |
| 1940 | 695        | 11.7%       | 120,542         | 14.3%       |
| 1950 | 806        | 16.0%       | 136,781         | 13.5%       |
| 1960 | 944        | 17.1%       | 176,008         | 28.7%       |
| 1970 | 1,322      | 40.0%       | 222,295         | 26.3%       |
| 1980 | 1,668      | 26.2%       | 245,055         | 10.2%       |
| 1990 | 1,895      | 13.6%       | 259,462         | 5.9%        |
| 2000 | 2,356      | 24.3%       | 280,150         | 8.0%        |

Source: U.S. Census Bureau

Over the decade of the 1990s, Milan, with its small population base, has been the fastest growing town in Dutchess County, growing at three times the rate of neighboring towns.  Increases of this size threaten to rapidly change the rural character of the Town. As shown in Table 7.2, Census Bureau estimates for 2003 again show Milan to be the fastest growing of its neighboring towns.

Town of Milan Comprehensive Plan						7. Residential Development

Table 7.2 Population In Neighboring Towns

| TOWN | 1990 | 2000 | % Change | Est. 7/1/03 | % Change |
|---|---|---|---|---|---|
| **Milan** | **1,895** | **2,356** | **24.3%** | **2,527** | **7.3%** |
| Clermont | 1,443 | 1,726 | 19.6% | 1,798 | 4.2% |
| Pine Plains | 2,287 | 2,569 | 12.3% | 2,674 | 4.1% |
| Red Hook | 9,565 | 10,408 | 8.8% | 10,990 | 5.6% |
| Clinton | 3,760 | 4,010 | 6.6% | 4,168 | 3.9% |
| Rhinebeck | 7,558 | 7,762 | 2.7% | 8,118 | 4.6% |
| Stanford | 3,495 | 3,544 | 1.4% | 3,798 | 4.6% |
| Gallatin | 1,658 | 1,499 | -9.6% | 1,471 | -1.9% |
| Total | 31,611 | 33,874 | 7.2% | 35,454 | 4.7% |

Source: U.S. Census Bureau

Most population estimates available for the Town and Dutchess County have actually been too conservative. Projections by Claritas Inc., and Cornell Institute for Social and Economic Research for Milan and Dutchess County report population projections that have been significantly exceeded in their early years. The only population estimate that appears at all reasonable is the U.S. Census estimate for Milan for 2003, which shows growth estimated at 7.3% for the 3 years since the last census. (see Table 7.3). (The 2000 census showed that such annual population estimates were significantly understated in the 1990s.) Extended over the decade, this would produce growth of over 25%, faster than the decade of the 1990s, bringing Milan's population to nearly 3,000 in 2010. Even this level of growth may prove conservative, given known subdivision activity in Milan.

Table 7.3 Milan Population Projection

|  | Milan | | Dutchess County | |
|---|---|---|---|---|
| Year | Population. | Growth Rate | Population | Growth Rate |
| 1960 | 944 |  | 176,008 |  |
| 1970 | 1,322 | 40.0% | 222,295 | 26.3% |
| 1980 | 1,668 | 26.2% | 245,055 | 10.2% |
| 1990 | 1,895 | 13.6% | 259,462 | 5.9% |
| 2000 | 2,356 | 24.3% | 280,150 | 8.0% |
| 3-Year Population Estimate | | | | |
| 2003 | 2,527 | 7.3% | 290,805 | 3.8% |
| 10-Year Population Projection | | | | |
| 2010 | 2,975 | 26.3% | 317,550 | 13.3% |

Source: U.S Census Bureau populations and estimates; mathematical projection

Projecting Milan's rate of population increase over the last 40 years to the year 2030 (see Table 7.4) would roughly double Milan's current population to nearly 5,000, approaching the upper level of the State's density classification of a rural community; including part-time residents would likely exceed it.

Town of Milan Comprehensive Plan                    7. Residential Development

Table 7.4 Milan Long-Range Population Projections

| Year | Population. | Growth Rate |
|---|---|---|
| 1960 | 944 | |
| 1970 | 1,322 | 40.0% |
| 1980 | 1,668 | 26.2% |
| 1990 | 1,895 | 13.6% |
| 2000 | 2,356 | 24.3% |
| 3-Year | Population | Estimate |
| 2003 | 2,527 | 7.3% |
| 10-Year | Population | Projection |
| 2010 | 2,975 | 26.3% |
| 2020 | 3,719 | 25.0% |
| 2030 | 4,648 | 25.0% |

Source: U.S Census Bureau populations and estimates; mathematical projections

New factors are emerging that could greatly increase Town growth. Many of these were unforeseen when the last comprehensive plan was completed in 1986. There has been very substantial growth in lower Dutchess County, particularly along the Taconic Parkway corridor. The amount of land available for future development and housing to our south has been significantly reduced, thus making the more open undeveloped land in Milan a logical target for population growth in the region. An additional factor that could never have been anticipated was the events in New York City on September 11, 2001. There has been a significant exodus from the city to all points north since that occurrence. Once considered off the beaten track and remotely located, Milan now sits squarely in the bull's-eye of regional expansion. Past comprehensive plans and current zoning laws had no way to anticipate the onslaught of development and population growth Milan now faces. When judging population projections, this new high-growth reality must be taken into account.

2)  School-Age Children. One of the impacts of rapid growth is the increase in school-age children as young families establish residence in the Town.  Generally, new homes tend to have more school-age children than existing homes.  That impact is seen for Milan in the 1990–2000 Census data.  While the Town population increased by 24.3%, the number of school-age children (ages 5–17 census categories) increased by a huge 77% in the decade.  This contrasts with a 21.3% increase in these age groups in Dutchess County. Though we are not able to break this data out by the three school districts that serve Milan, the population in the Pine Plains and Rhinebeck schools have not seen the growth that Red Hook has experienced; it is expected the largest number of these children attend the popular Red Hook Central District schools.

3)  Part-time Residents.  Milan has always had a significant population of weekender and part-time residents that goes uncounted in the survey due to the number of "seasonal, recreational, and occasional" use residences in the Town.  Of the 1,090 housing units in the 2000 census, 177 of the 208 reported as "vacant -- for seasonal, recreational or occasional use" were part-time residences. This is an increase since 1990 of 108 such units. Between 1990 and 2000 Milan had a 157% increase in the number of part-time residences, as compared to a 54% increase over the same time period in all of Dutchess County. Because some part-time residents choose to report Milan as their permanent address, the total number of part-time residents is probably higher. Part-time residents must be incorporated into density considerations to evaluate growth in the Town accurately.

Town of Milan Comprehensive Plan                7. Residential Development

One factor in examining the impact of population trends is the fiscal benefit of these part-time and weekend residents, who represent some 15–20% of our dwelling units. They pay full Town and school taxes, yet most of them never use the schools and may require fewer Town services than full-timers. The appeal of Milan to many of its weekend residents is the rural atmosphere, natural beauty and open, undeveloped spaces. If Milan's population were to grow to a point where it no longer had these characteristics, the Town would presumably lose its appeal to many weekenders. This could add significant strain on the schools and Town services as part-time residents leave and full-time homeowners with children move in.

4) Residential Build-Out. Surveys consistently indicate that the number-one goal of Milan residents is to maintain the Town's rural character. New York State defines "rural" as having a density of less than 150 people per square mile. Currently, Milan's population density is 65; when seasonal residents are factored in, the figure jumps to 80. To understand the possibilities of growth under Milan's current zoning, consider the 2003 Build-Out Analysis (Table 7.5 below). It shows a building potential of 2,356 new lots in Milan. Multiplying this by 2.62 (current average residents per household) plus the current population yields a future population potential of 8,529 people, which would bring the number of residents per square mile to 236. At that point, Milan will have become another suburban community. One indicator of the growth surge in Milan is the number of subdivision applications approved: 28 in 2003 and 72 in 2004.

TABLE 7.5  2003 Milan Build Out Analysis

| Zone* | Min. Lot Size | Total Buildable Acres** | Minus 20%** | # Pot. New Lots |
|---|---|---|---|---|
| R2A | 2 | 631 | 505 | 252 |
| A3A | 3 | 4,587 | 3,669 | 1,223 |
| A5A | 5 | 4,299 | 3,439 | 688 |
| HA | 1 | 230 | 184 | 184 |
| LC | 5 | 58 | 47 | 9 |
| **TOT** | | **9,805** | **7,844** | **2,356** |

Source: Dutchess County Environmental Management Council, 2000, updated 2003

*R2A, Low-density residential zoned to permit 2-acre building lots
A3A, Agricultural land zoned to permit 3-acre building lots
A5A, Very low density agricultural land zoned to permit 5-acre building lots
HA, Hamlet district zoned to permit 1-acre building lots
LC, Land conservation district zoned to prohibit residential construction.
**Total buildable land excludes environmentally and administratively constrained land that cannot be built on; the 20% reduction to that is an attempt to reduce the total buildable by a factor to reflect the need for infrastructure, odd lots sizes and preference of some residents for larger lots.

5) Housing Availability. The 2000 census recorded 1,090 housing units in Milan: 697 (67.9%) were owner-occupied, with 15 vacant and for sale only; another 185 (21%) were renter-occupied, with a vacancy rate of only 0.5%. Data for the 208 vacant homes at the time of the 2000 census shows 177 of them to be for seasonal, recreational or occasional use, representing 16.2% of Milan's housing. Excluding these "vacant" homes, Milan has a very tight housing environment with a vacancy rate of only 2.8%, in contrast to 3.6% in Dutchess County.

According to the Milan assessor's office, 670 parcels are assessed at $250,000 and under, with 243 of those at $150,000 and under. There are 30 improved parcels (with houses) assessed at $75,000 and under (although the condition and marketability of these is questionable) and 30 mobile homes. The median

mortgage is $1,124 and the median rent $675. The 2000 census reported 29 apartments with rents under $500/month. This data suggests that there is a significant amount of moderately priced and affordable housing in Milan.  The assessor reports, however, that homes coming on the market sell for well above assessed value in most cases, despite recent significant increases in full assessment values.

6)  Housing Prices. The picture painted by residential sales is very different than the assessor data. In a 2003 article, Michael DiTullo of Mid-Hudson Pattern for Progress stated that Dutchess County's real estate market value had risen by more than 50% since 1999 due to both population increase and lack of supply.

In Milan, the assessor reports that the median selling price for a home increased from $178,000 to $258,000 between 1999 and 2003, an increase of 44%.  Recently available data for 2004 shows a further jump of 23% to $317,500; a five-year increase of 78%! Of 57 total homes sold in Milan in 2004, there were only five homes that sold for under $150,000, and only nine under $200,000. The average selling price was $412,200. When reviewing similar data for the County, the Dutchess County Smart Growth Housing Task Force report concluded that "we are beginning to have a disconnect between the housing needs of many of our residents and the housing we are building."

7) Affordable Housing.  At the time of the 2000 census, the average household had 2.62 persons, with median household income of $54,491 and mean household income $65,250. Almost one-third of the households in Town had an income of less than $35,000. In 1999, 10% of households and 4.8% of families had income of $15,000 or less, with 17 families (2.8%), and a total of 105 individuals (4.6%), at or below the poverty level. These rates are lower than comparable figures for Dutchess County, with 5.0% and 7.1% respectively.

Dutchess County's Smart Growth Housing Task Force report, issued in 2001, states, "Considering the significant increase in median sales prices in the past two years, the median income household can no longer afford the median priced home . . . ."

The Task Force also reports that, county-wide, 7.3% of the population in the year 2000 had not lived in Dutchess County one year earlier.  This significant influx of people is higher than surrounding counties.  One of the confounding factors in Milan is that house sales include many to weekenders and part-time residents who are not included in the population and income statistics.

Randall Arendt, in the book, *Rural by Design*, cites the level for affordable housing as a mortgage payment that is no more than 30% of the average household income.  He does not include property taxes and other home ownership costs in the 30%; many other experts believe it is important to include these costs in any calculation of total housing cost used to assess affordability. Formulas that include property taxes bring the "affordable" home prices, in the case of a Milan home in the Red Hook school district in 2004, to $237,000. To look at the median household in this same way, only half of households could afford a house valued above $198,000. As noted above, only nine of 57 homes in 2004 sold below this level.

As Arendt states: "The grim reality is that housing is not affordable to many people unless they already own a home, which they can trade for another. Without home equity, a family trust fund, or two very good salaries, most people these days are not able to qualify for home mortgages. In many parts of the country, house price inflation has clearly outpaced salary increases, widening the affordability gap for every year that passes." While the numbers do not indicate an affordability crisis in Milan, concern is expressed by some that housing in Milan appears to be increasing in cost beyond the means of those at the median household income level. Certainly for those at lower income levels, the issue is a growing problem, deserving of attention in Town planning.

A very different definition of affordable housing is provided in the book *Well Grounded: Using Land Use Authority to Achieve Smart Growth*, by John Nolon, Director of Pace University's Land Use Law Center. It defines "affordable housing" as "Housing developed through some combination of zoning incentives, cost-effective construction techniques, and governmental subsidies which can be rented or purchased by households who cannot afford market-rate housing in the community." One of the virtues of this definition is that it recognizes two important factors: (1) the Town cannot determine the market value of housing in the community, however, (2) there are actions the Town can take when planning for the future to help provide some level of affordable housing. In this plan we refer to affordable housing in the context of people's ability to obtain housing, and to actions the Town can take to ensure there is a level of housing available to moderate-income households earning less than the median household income.

8) Senior Housing. Although Milan has a slightly lower percentage of senior citizens than does Dutchess County overall, with 264 people aged 65+ in the 2000 census (11.2% of the population), it is well-known that baby boomers will soon swell the seniors' ranks. While many residents indicate they would like to stay in Milan as they age, they cite the lack of any senior housing in Milan and concerns with the rising cost of taxes. Thirty-seven percent of the 2000 survey respondents mentioned the need for senior housing. Today's Milan seniors are outspoken in voicing a desire to see some sort of affordable senior housing.

9) Historic Housing. Over 85% of Milan residents have indicated that it is important to maintain historic structures. Little progress has been made in this area since the 1986 Master Plan recommendations were published.

10) Multifamily Housing. Milan permits two- and multi-family housing across its primary zoning districts. While small multifamily structures are endorsed in this plan as one of our affordable housing solutions, surveys and conversations with Town residents reveal that large multifamily housing (apartment buildings) is not desirable and should not be encouraged. These buildings are inconsistent with the rural character of the Town.

11) Mobile Homes. Allowing mobile homes in the Town was viewed as negative by over 72% of the residents in one Town survey, who also felt their placement should be restricted to designated areas in Town. The CPB has concluded that mobile homes should be allowed as per current regulations as an available affordable housing option; however, mobile home parks should not be allowed in future zoning regulations.

## C. Goals and Vision

If Milan is to implement the vision and overriding wishes of its residents it must sensibly control the number and location of new lots and devise a better way to approach development. The current zoning and land-use regulations, if left unchanged, will result in a suburban, built-out Milan in the future, like most other communities in Dutchess County. If Milan's residents value rural atmosphere, uncongested roadways, and forests and fields not ravaged by 21st century sprawl, then new, innovative zoning regulations must be implemented.

All surveys (the 1986 Master Plan survey, the Town's 2000 questionnaire, and Comprehensive Plan outreach discussions) indicate that the paramount goal of Milan's residents is to KEEP MILAN RURAL. Milan's citizens want to retain the rural character of their Town and to protect the environmental and scenic resources that make Milan a unique residential community. Today, rapid growth threatens those values. Dr. John Nolon, Director of the Land Use Law Center at Pace University, recently commented on the crisis of neighborhood character erosion and land disappearance: "The crux of the issue comes down to local zoning laws that define how land can be used. The laws simply must be changed" (*Poughkeepsie Journal,* February 27, 2005).

Town of Milan Comprehensive Plan                    7. Residential Development

The CP recommends zoning changes that would help make the future vision of Milan's citizens a reality. The CPB took into consideration the impacts rezoning would have on all landowners, balancing the rural quality of life so appreciated by Milan's citizens, the financial impacts with respect to property values and taxes, and the need to provide affordable housing for a diverse population.

The Need for New Zoning

Milan's zoning cannot stay the same and protect the Town from the encroachment of suburban sprawl and the degradation that sprawl brings to the scenic and natural environment. Fortunately, the Town still has time to make the zoning changes that can stop sprawl before it starts and allow the Town to retain its rural residential character.

The most important step is to change zoning to create larger lot development, utilizing conservation subdivision design consistent with Greenway Compact guidelines. This will protect the environmental assets of Milan, maintain open space, and help keep population growth to a density that is consistent with retaining rural character. Large lots are attractive to weekenders, but Milan does not want to become a community of just part-time residents. The residents of the Town also want to maintain moderate-income housing and provide some affordable housing to create a diverse community and allow housing alternatives, particularly for seniors and public sector employees. Many communities today are pursuing modern versions of traditional development patterns that enhance compact residential centers while taking steps to preserve open space in the surrounding rural environment.

Many of the principles and ideas discussed by the CPB in meetings and in this document fall under the general heading of "smart growth."  Dr. John R. Nolon describes smart growth as "the designation by local governments of specific areas for mixed-use development and higher density development and the designation of other areas for the conservation of open spaces and natural resources. That would include regulations that guide development into the designated development areas and away from the conservation area. . . . Smart growth contrasts with conventional local zoning, which normally lays out a grid-like pattern for the remaining open space development in the community calling for relatively low density single use development." A smart growth approach is to identify and protect open space areas the Town sees as critical.

The criteria can be environmental, as in wetlands, wildlife and watershed protection; aesthetic, as in scenic open views, protecting ridgelines or a particular landscape element; and/or economic, as in protecting agricultural lands. The Town should make it a priority to find additional ways to protect its open space.

1.  Rural Space Overlay Zoning: A Tool for Smart Growth.  We propose the creation of a Rural Space Overlay Zone (RSO). The new zone will substantially reduce the number of future subdivisions and  new homes that can be developed, thus protecting the environmental resources of the Town and managing density growth to preserve rural character. A number of alternative methods to implement this recommendation were examined by the CPB; all propose to limit subdivision on included properties to a maximum of one lot for each 10 acres.  The alternatives considered include the following:

> A) Basic 10-Acre Overlay. All parcels equal to or greater than 10 acres are zoned for subdivision into a number of lots not to exceed one for each whole 10 acres (e.g., 25 vacant acres = subdivision into two lots; 55 vacant acres = five lots, etc.).

> B) 10 Acres with Minimum of One. The same as above, but with the provision that no  parcel over 10 acres that exists today would be prevented from any further subdivision.  This eases the impact on properties between 10 and less than 20 acres, which otherwise would not qualify for

further subdivision under the basic formula above. Under this alternative, no property owner with more than 10 acres would be precluded from all future subdivision of the property.

C) 10 Acres with a Transition Provision for Parcels Greater than 10 but Less than 20 Acres. The same as the first scenario, except that someone owning less than 20 acres would be allowed to develop the first 10 acres of the property under today's existing zoning. This is another way to ease the impact of prohibiting building on an already developed parcel, and of easing the impact on smaller landowners holding between 10 and 20 acres. The practical effect for properties included in the overlay zone is to increase the number of allowable subdivisions. By zone, the number of additional lots would be four in R2A, two or three in A3A, and one in A5A.

For each of the three scenarios above, the Rural Space Overlay Zone (RSO) would cover 80% of the residentially zoned acreage, yet affect only 25% of the properties in Milan.

D) 10-Acre Overlay on Parcels of 15 Acres or Larger. In this scenario, instead of putting all parcels over 10 acres in the RSO, all parcels over 15 acres go into the zone. (For the purposes of this scenario, the "minimum of one" in scenario B above is also assumed.) This moves the impact to fewer parcels (17% of properties) and covers 72% of the acreage available for residential development.

E) 10-Acre Overlay on Parcels of 20 Acres or Larger. The same concept as D above, but moving the cutoff for inclusion in the RSO higher. This provides yet another way to ensure that no parcel that can today subdivide is prevented from doing so in the future. Even fewer parcels would be included in the zone—198 or 12% of the parcels—and less total land would be covered—65% of the Town's residential acreage.

Details and explanation of calculations for all alternatives and with varying assumptions are included in the appendix to the plan. Using the formula developed for the CPB analysis produces approximately the same number for build-out of today's zoning as does the EMC projection cited earlier in this chapter (see Table 7.6 below).

These alternatives produce varying levels of total residential properties projected at full build-out. The total build-out under the Rural Space Overlay ranges from a low of 859 additional lots in the Basic overlay to 1,347 additional lots in the Ten-Acre Overlay with the provision that owners with property between 10 and less than 20 acres can develop the first 10 acres under today's zoning (scenario C). We provide these alternatives for the Town Board's use in crafting the proposed Rural Space Overlay Zone. Each of the alternatives will make a substantive contribution to the protection of Milan's natural resources and preservation of rural character.

The CPB recommended option B, the 10 Acres with Minimum of One subdivision described above. While there was public support for the CPB's report and the RSO, a number of citizens commented on their concern that property owners be able to subdivide to provide lots for their family. The Town Board has concluded that option E, the 10 Acre Overlay on Parcels of 20 Acres or Larger provides the best balance of benefits with relative conformance to the density benchmark discussed in Chapter 2. The Town Board prefers this alternative because:

- It provides subdivision alternatives to all current landowners, either under current zoning or the proposed RSO.
- It approximates the number of potential subdivisions and build-out that reaches the density benchmark the CPB suggested, roughly doubling Milan's population.
- It is readily understandable.
- It is easier to administer than some other alternatives.

The CPB also considered the alternative to increase the minimum lot size for all zones in Town except the hamlets. Such an approach would increase significantly the number of nonconforming, and thus unbuildable, lots in Town. The impact on small landowners would be substantial. This approach would also fail to deal with the issue of sprawl, and would simply force the same amount of development to chew up larger portions of the landscape.

An additional alternative was proposed by the 2005 Town Board in their modified plan. They proposed to implement an RSO at 30 acres, but to allow the first 30 acres to be developed under existing zoning -- i.e. 3 or 5 acre lot size. While they provided no analysis of the impact of their proposal, examination by the Planning Board and further analysis using the model developed by the CPB found that future build-out would significantly overshoot the density benchmark, and the reduction in potential subdivision would not justify RSO implementation.

The 20 acre alternative will therefore be used for demonstration and discussion of the impact of the Rural Space Overlay Zone (RSO). The point of this analysis is not to be precise with the numbers, as they are theoretical and only as good as the underlying assumptions. The purpose of providing them is to give people a sense of the impact that such a rezoning proposal can have in the long term.

First, it is important to understand that the RSO, in the 20 Acres alternative (scenario E), covers all properties in the residential zones greater than 20 acres, except hamlet zones (HA) and land that is not otherwise protected (state-, county-, and Town-owned, utility-owned, cemeteries and churches, and land protected by conservation easement or other perpetual use). In Table 7.6 below, the number of maximum potential additional lots projected is derived by calculating the number of parcels in each zone by size, and multiplying by the number of subdivisions possible under the theoretical maximum in the zone. For example, a parcel with 8.5 acres in the A3A zone would be entitled to one additional subdivision (one lot exists, an additional lot is allowed for a full three acres, permitting one additional lot; there is insufficient land to meet the requirements for a third lot). The same calculation would be made for a parcel of 55 acres in a 10-acre zone: one lot exists, four more can be created. (These calculations are not shown here, but are in the appendix.)

In alternative E, the total number of lots is then reduced by 23%, an assumption made to estimate the impact of land that is unbuildable due to environmental constraints; this factor matches closely the EMC analysis cited earlier in Table 7.5. The total number of lots is further reduced by an assumed 20%, as was done in the EMC analysis, to reflect the needs for infrastructure, odd lot sizes, personal preference, etc.

The results of these calculations are in the right column in Table 7.6 below, and can be contrasted with the additional lots produced using the same formula for today's zoning. Instead of creating a maximum potential build out of 2,345 more lots in Milan under today's zoning, the number using the RSO would be reduced to 1,067.

| Table 7.6 Milan Build-Out Under RSO (20 Acres) v. Existing Zoning | | | | | | |
|---|---|---|---|---|---|---|
| | **Existing Zoning** | | | **RSO** | | |
| Zone | # Lots Max Pot Lots Exist | Minus 23% Environment Constraints | Minus 20% Infrastructure & Other | # Lots Max Pot RSO | Minus 23% Environment Constraints | Minus 20% Infrastructure & Other |
| A3A | 2103 | 1619 | 1295 | 475 | 366 | 293 |
| A5A | 1544 | 1189 | 951 | 101 | 78 | 62 |
| R2A | 101 | 78 | 62 | 28 | 22 | 17 |
| LC | 6 | 5 | 4 | 2 | 2 | 1 |
| HA | 54 | 42 | 33 | 54 | 42 | 33 |
| RSO | | 0 | 0 | 1024 | 788 | 631 |
| TOT | 3808 | 2932 | 2345 | 1684 | 1297 | **1037** |
| | | EMC 2003 = | 2356 | | % Reduction = | -55.8% |

This is not the whole story. There are undeveloped lots in town today that can be developed, and there obviously are existing homes. The total number of homes in Milan under existing zoning (using the same methodology to reduce the maximum possible undeveloped lots by 23% for environmental constraints and 20% for other factors), yields a total of 3,579 potential residences. The future maximum potential number of homes under the RSO (see Table 7.8 below) would be 2,271, a reduction of 36% from today's zoning. Using the average number of people per household from the 2000 census -- 2.62 -- this manages total Town population to a future level of approximately 5,950 people, versus 9,377 under today's zoning. The population density using RSO works out to be 165 people per square mile, as contrasted with 260 under existing zoning.

| Table 7.7 Potential New and Total Homes in Milan Under Existing Zoning | | | |
|---|---|---|---|
| | Developed Residential Lots Existing | Potential Building on Undev Lots Exist | Potential Additional Residences Lots Exist | Potential Total Residences Exist Zoning |
| A3A | 599 | 106 | 1295 | 2000 |
| A5A | 325 | 99 | 951 | 1375 |
| R2A | 18 | 4 | 62 | 84 |
| LC | 3 | 2 | 4 | 9 |
| HA | 66 | 12 | 33 | 111 |
| RSO | 0 | 0 | 0 | 0 |
| TOT | 1011 | 223 | 2345 | **3579** |
| | | | Pop(x 2.62)= | 9377 |
| | | | density = | 260 |

| Table 7.8 Potential New and Total Homes in Milan Under RSO 20 compared to Existing Zoning | | | | | | |
|---|---|---|---|---|---|---|
| | Developed Residential Lots Existing | Potential Building on Undev. Lots RSO | Potential Additional Residential Lots RSO | Total Potential Residences RSO | # Potential Additional Res. RSO v. Existing | % Increase Lots/Zone |
| A3A | 572 | 106 | 293 | 971 | 399 | 70% |
| A5A | 287 | 99 | 62 | 448 | 161 | 56% |
| R2A | 18 | 4 | 17 | 39 | 21 | 117% |
| LC | 3 | 2 | 1 | 6 | 3 | 100% |
| HA | 66 | 12 | 33 | 111 | 45 | 68% |
| RSO | 65 | 0 | 631 | 696 | 631 | |
| TOT | 1011 | 223 | 1037 | 2271 | 1260 | 125% |
| | | Pop(x 2.62) = | | 5950 | % Pop. reduction= | -36.5% |
| | | Density = | 165 | | | |

The maximum potential distribution of homes by zoning district under the RSO is shown in Table 7.8 above. All zoning districts display a healthy increase in the number of homes for the future, an important consideration for those concerned about their children's ability to afford a home in Milan in the future. The largest number of potential future homes (631) will be on the 65% of the land represented by the RSO. These lots when developed can be expected to carry tax assessments that will ease the tax burden on smaller property owners. To complete this summary of the RSO and how it operates, Table 7.9 is provided to permit a comparison between the results calculated for the five alternatives and compared to existing zoning.

| Table 7.9 Comparison of RSO Alternatives and Existing Zoning | | | | | | |
|---|---|---|---|---|---|---|
| | # Lots in RSO | % Tot. Res. Lots in RSO | % Res. Land in RSO | Potential Max Homes | Potential Population | Max. Pop. Density |
| *Existing Zoning* | *0* | *0* | *0* | *3579* | *9377* | *260* |
| *Basic RSO (10)* | *416* | *25%* | *80%* | *2080* | *5450* | *151* |
| *RSO Min. of One* | *416* | *25%* | *80%* | *2099* | *5499* | *152* |
| *RSO Dev. 10 acres* | *416* | *25%* | *80%* | *2242* | *5874* | *163* |
| *RSO Over 15 Min. of One* | *274* | *17%* | *72%* | *2159* | *5657* | *157* |
| ***RSO Over 20*** | **198** | **12%** | **65%** | **2271** | **5950** | **165** |

Town of Milan Comprehensive Plan                               7. Residential Development

One of the advantages of the RSO is that it is distributed throughout the town, providing open space and environmental benefits in all areas of Milan. Subdivision and construction on lots of less than 20 acres is not affected by this overlay zone. Of 1,705 total parcels in Town, 1,507, or 88%, are not affected by this proposed zoning change. This proposal enables the Town to protect its environmental resources and preserve rural character. It does so without affecting the majority of property owners while it protects smaller landowners and preserves their interest in subdividing.

Two other potential sources for more housing are not included in the projections above. The Town contains 282 unimproved and nonconforming (i.e., too small for the zoning district in which they are located) lots. Of these lots, those existing on county maps prior to the introduction of zoning in 1976 can, under Milan's zoning code, be developed. Many of these 282 lots will not be buildable, or will not predate zoning. Some small number, however, such as those created many years ago in the Carvel development, will be buildable. Also, the Planned Purpose Development tools proposed in the plan could result in additional dwelling units in Town. As was noted at the beginning of this analysis, *the point is not to be precise with the numbers, as they are theoretical and only as good as the underlying assumptions. The purpose is to give people a sense of the impact that such a rezoning proposal can have in the long term*.

A note of caution is appropriate with respect to the assumptions used in the above analyses, particularly with respect to the 23% reduction for environmental constraints. As fewer lots are allowed on large properties, it is likely that buildable land for the allowed number of units will be found and reductions for environmental constraints will therefore in reality be less than for smaller lot zoning. It is recommended that annual assessments of actual experience be completed by the Milan Planning Board to evaluate the effectiveness of this zoning technique relative to the benchmark density.

Some citizens have expressed concern that multi-dwelling unit parcels that preexist zoning, could be severely restricted from further subdivision. It is not the intent of the RSO to create an unreasonable burden in such special circumstances, which will be limited. When implementing this zoning, flexibility should be permitted to avoid rigid application in such special circumstances

With respect to the impact of the RSO on land values, a number of local real estate professionals have indicated that large-lot subdivisions tend to maximize land returns to the owners. Recently in Milan several builders have been in front of the planning board asking to combine smaller lots into larger ones because they are worth more. Also, large-lot land prices can be expected to increase as people see that Milan is protecting the rural and environmental character of the Town. The natural outcome of this is that larger lots can expect to see assessments increase as properties sell and new market values are established. Assessment increases on large residential properties have the effect of reducing the relative tax burden across other property holders.

The CPB suggests that all properties within the rural overlay be evaluated for environmental restraints when proposed for development. Offering builders the option to either complete a conventional subdivision plan as the basis for establishing the number of homes able to be sited on a property or to use a net buildable acreage formula can work to the builder's advantage by maximizing the building lots permitted, or by expediting the approval process before the Planning Board. Applying this scientific approach to site assessment fosters the adoption of conservation subdivisions (a form of cluster development that incorporates environmental considerations). Such conservation subdivisions, discussed below, will permit the siting of homes on less than 10 acres, while preserving more environmentally sensitive lands and open space to protect Milan's rural character.

The Rural Space Overlay Zone, when coupled with conservation subdivisions, provides powerful tools to accomplish the central comprehensive plan objectives defined by Milan's citizens: To maintain Milan's rural residential character and to protect the natural resources and scenic beauty of the Town.

Town of Milan Comprehensive Plan                     7. Residential Development

<u>2. Conservation Subdivisions.</u> Conservation subdivision is a process that assesses environmental constraints and evaluates available developable land to enable construction of housing in a way that best accomplishes the conservation and open space objectives of the community. Conservation subdivision allows somewhat higher housing density on a portion of a parcel in exchange for greater preservation of undeveloped space and protection of natural areas.

Dr. John R. Nolon of Pace University Land Use Law Center states that "development should fit into its natural surroundings, rather than becoming a dominant element in the countryside." To this end, a plan to subdivide should be reviewed to "identify and maintain the essential open space system of each location. Cluster subdivisions, with smaller average lot sizes, will preserve the important natural characteristics of the site and forever provide residents with a more rural setting than a conventional subdivision. Some sites will be more complicated than others, but identifying whether the site is part of the Town's open space system is the necessary first step in fitting it in.

Once site characteristics are fully understood, then suitable areas for development are delineated. Within these areas, house lots and roads are located. Only as a last step are the lot lines drawn in." A town can allow for low-density conventional development but also require conservation subdivisions under specified conditions. Towns must set guidelines for the type and amount of land (typically 30–50%) that goes into open space in any subdivision; this approach avoids protecting only narrow strips of land. Milan currently requires that at least 40% of the total area being subdivided be reserved as permanently protected open space; the CPB believes this should be maximized whenever possible and should be substantially higher than 40% for conservation subdivisions.

Conservation subdivisions must be reviewed and approved according to zoning regulations, which could allow for incentives that grant density bonuses when conservation easements and open space protections are used.

We recommend that Greenway Compact Guidelines and the applications of the four-step approach outlined in *Rural by Design* by Randall Arendt be used to achieve this goal. These four steps are:

1. Identifying conservation areas
2. Locating house sites
3. Aligning streets and trails
4. Drawing the lot lines

Conventional zoning has been referred to as "planned sprawl." It results in a strip development process that sites subdivisions along existing roadways with separate driveways; it denies scenic open spaces to the residents of a community by putting them behind backyards. In contrast, conservation developments utilizing interior streets or shared driveways protect the viewshed and provide necessary wildlife habitat. Conservation subdivisions contribute to better land use and develop less land, while allowing the same number of housing units that would be permitted under conventional subdivision ordinances. As a result, landowners and developers are not penalized financially for using a conservation subdivision strategy. This approach is particularly appropriate in rural areas that wish to remain rural while accommodating additional growth; conservation subdivisions place development in less sensitive areas and preserve forested land, steep slopes, wetlands and valuable landscape features. This development approach can also save the developer and the Town infrastructure costs by reducing the length of roads and utility lines to new developments; the cost for site development, particularly for infrastructure can be considerably lower than for conventional development. Towns can require developers to submit both a conventional and a conservation subdivision plan so that the Town and the developer, working together, can identify areas in a site that might fit the Town's designation for open space, environmentally sensitive areas, unique landscapes or other preservation criteria. Milan should require that developers submit both types of plans.

Town of Milan Comprehensive Plan                7. Residential Development

Randall Arendt, in *Rural by Design*, states that "there is a growing body of evidence that property values actually tend to increase as a result of the provision of open space within and around developments." Often, cluster subdivisions have been described as "golf course communities without the golf course." According to Arendt, "In a research project conducted by the Center for Rural Massachusetts, it was found that homes in a cluster subdivision appreciated 12.7 percent faster than similar homes in subdivisions without open space over a 21-year period."

3.  Hamlet Districts. The residents of Milan want housing that is affordable for both the young and the old to remain available to the broad cross-section of our population. Today, more compact development is encouraged in the hamlets of Rock City and Lafayetteville. Both areas are located on our primary east–west transportation corridor. Both hamlets have lost the vigor of their earlier days and would benefit from revitalization. They both can play a key role in providing a balanced housing inventory for Milan's current and potential residents, while the town overall retains the rural character and quality of life so appreciated by Milan citizens.

Recommendations of the Dutchess County Smart Growth Housing Task Force state: "Many municipal zoning ordinances are exclusionary, making no land available for homes on small lots, town houses or multi-family housing. Local municipalities should review and change their master plans and zoning ordinances to provide land for such housing. Ideally, such land would be allocated adjacent to existing population centers, services and water and/or sewer."

Fortunately, Milan's Zoning Code already establishes the hamlets as areas whose purpose is consistent with these smart growth recommendations. The hamlet district "purpose" reads:

> The Town of Milan recognizes the unique historic and architectural character of its unincorporated hamlet areas and wishes to preserve and enhance the hamlet centers of Lafayetteville and Rock City through the establishment of a Hamlet (HA) Zoning District. It is the intent of this zoning district to:
> 1. Encourage the development of traditional mixed-use hamlets that will serve as focal points of community life for residents.
> 2. Provide areas where residential, commercial and office uses can be intermingled and mutually supportive.
> 3. Avoid strip commercial development
> 4. Maintain and accentuate the historic character of the Town by encouraging development which adheres to the existing historic, architectural and cultural fabric of the hamlet and incorporates historic design principles.
> 5. Promote a wide range of housing opportunities for Town residents by providing options to single family housing.
> 6. Diversify and strengthen the Town tax base by promoting commercial uses.

Milan's hamlet areas are intended to provide a range of housing opportunities that are more affordable due to smaller lot size and more compact development. They are also intended to encourage mixed use, small commercial activities where they can serve a neighborhood. In Milan's case, the hamlets provide the balance to meet the needs of the broad cross-section of today's and future residents, and make it possible to reduce the density of development across the larger rural landscape of Milan.

Unfortunately, however, current zoning standards for the district do not provide the flexibility to enable the hamlets to play their intended role in town. For example, multiple dwelling units require substantial acreage to compensate for their density and setbacks from the road do not permit commercial sidewalk access

4. Planned Purpose Development. To enable the hamlet areas to develop in the ways outlined in zoning, and consistent with smart growth principles, flexibility in zoning is required beyond that in today's code. To accomplish this flexibility, the CPB developed a new zoning concept called a "planned purpose development" (PPD). The PPD is a more specific form of "planned unit development" found in some zoning codes, but tailored to Milan. When a PPD area is established, the Town permits builders to apply for modifications to zoning that allow greater creativity in planning and designing developments in specific situations.

The Smart Growth Network defines a PUD as "Provisions (which) allow land to be developed in a manner that does not fit into the use, bulk, and open space requirements of any of the standard zoning districts. The PUD allows greater flexibility and innovation than conventional standards because a planned unit is regulated as one unit instead of each lot being regulated separately."

According to John Nolon's book *Well Grounded*, this type of "zoning provision permits large lots to be developed in a more flexible manner than is allowed by the underlying zoning; may allow developers to mix land uses, such as residential and commercial . . . to develop the parcel at greater densities, and with more design flexibility than is otherwise allowed in the underlying zoning district." On the other hand, as Nolon points out, "such provisions often require developers to compensate for the impacts of their projects by setting aside significant and usable open space, providing infrastructure needed to service the development, or offering other community facilities and services." Such provisions can provide a platform from which to meet both the developer's objectives and the interest of the Town and the residents in a cooperative fashion.

The CP recommends that PPDs be allowed only for specific purposes -- to create senior housing; to enable the flexibility necessary to encourage affordable housing; and to permit the development of a traditional walking neighborhood.

A. Senior Housing. As was noted earlier, there is a lack of senior housing in Milan. The Town has attempted to address this need in the past through provisions for accessory apartments, ECHO housing, and limited multiple family structures. We support the continued use of these strategies with somewhat more flexible conditions for the establishment of accessory apartments, as discussed below. However, we believe that in our aging society, we need to do more. Thus the CPB recommends some senior housing units as a planned purpose development alternative, with set-asides granting first priority to Milan residents who might wish to relocate to such housing. Most logically these would be in the hamlet areas (where small, service oriented, mixed use commercial development can locate in close proximity to housing) but could be located elsewhere in town. In such areas, multiple unit housing (owned or rental) can be constructed that is easy to maintain, and in ready contact with the surrounding community without vehicle access.

Current zoning only permits one use that is specific to senior housing – 'Nursing or convalescent home.' However, today's seniors are much more healthy and active than seniors in the past, they are living longer, and they have a wide variety of interests. There are many new alternatives for senior housing such as Over 55 Active Communities, Senior Cooperative Communities, Senior Cottage Communities, Traditional Assisted Living, and Greenhouse Assisted Living. As "boomers" age there will be additional ideas and opportunities developed. At this point, no one knows which alternatives are suitable for Milan, which approaches the seniors would like to see developed, and where they should be located. Milan should be prepared to consider any serious application to construct appropriate scale senior housing that is proposed by means of a PPD.

B. Affordable Housing. The Milan community is a diverse mixture of citizens: Long time residents and new arrivals, children and seniors, full time residents and weekenders, farmers and executives, landowners and renters, and a variety of religious, ethnic and cultural backgrounds. This diversity is

critical to the social health of the community. However, this diversity can not be maintained if the cost of housing rises beyond the means of many of its citizens. The current housing market is rapidly driving up the cost of housing beyond what many people can afford. Using the US Department of Housing and Urban Development's affordability formula[1], the Milan median household income of $54,491 per year, and taxes and overhead typical to the Milan area, the maximum affordable home price for the Milan median income household is $143,813. Based on 2004 housing sales, only 5 homes sold for less than this price therefore 91% of the homes were out of reach for the median income family. This presents a particular problem to young families seeking to obtain their first home.

Current zoning permits multifamily dwellings, accessory apartments, and mobile homes. These offer affordable housing alternatives and the CPB recommends they remain in the zoning code with amendments where appropriate. The CPB further recommends that incentive zoning be considered as another way to increase the stock of affordable housing. However, considering the small size of the Town and the housing market pressures outside the Town, there is not much the Town can do to directly affect housing prices.

Across the country there is private sector interest in providing affordable housing. There are many varied approaches taken by these for-profit ventures, such as cottage communities, mixed use areas, and clustered communities, and there are new approaches constantly being developed. If there is to be any significant impact on affordable housing in Milan it will most likely be the result of private investment. But at this point it is not known which alternatives would be suitable for Milan, which approaches the citizens would like to see developed, and where they should be located. For this reason the CPB recommends a PPD for affordable housing to enable the Town to consider any serious proposal.

C. Traditional Walking Neighborhood. In *Well Grounded,* by Dr. John Nolon, a traditional walking neighborhood is discussed as one that provides for pedestrian-friendly mixed-use areas, with buildings that face the street and are located at maximum rather than minimum setbacks to bring them close to sidewalks. Such centers are within walking distance of residential areas providing a diversity of housing types. They offer an excellent opportunity to create "flex housing" -- two-story, street-front buildings with a small commercial space on the ground floor and housing above. Traditional walking neighborhoods are typically viewed as having a radius from the center of ¼ to ½ mile, approximately a 5-10 minute walk. The Town owns land at the intersection of South Road and Route 199; a small unused portion of this site could serve as a catalyst for the development of such an area.

Today, the minimum lot size in a hamlet is one acre. To permit development on lots of less than one acre would require construction of expensive water treatment facilities, the cost and maintenance of which the Town is unable to bear. Making an agreement with a developer, however, who will construct a water treatment system and/or construct a number of affordable units as part of a planned purpose development, provides a viable way forward. The planned purpose development options described above can provide a needed degree of flexibility. Such agreements can and should specify a number of units reserved on a priority basis as the Town desires -- for example, for seniors or as affordable housing for municipal or emergency service employees. Current zoning does not allow for the sort of multiple unit housing necessary for senior housing. However, individual or small group senior housing in a compact planned purpose development would be appropriate, and should first be made available to current Milan residents. Allowing zoning flexibility -- always consistent with the larger interests of the Town and its residents -- will enable new types of carefully planned development. The Town need only allow such projects in cooperation with a responsible developer willing to comply with the Town's approach and serve Town interests while serving his own.

---

[1] See "Affordable Housing in Milan: Is It Possible with Current Zoning", 7-13-05, L Kingman, in Appendix)

Regulations will need to be developed to implement the planned purpose development concept as part of Milan's Town Code. These regulations should be developed through public dialogue with the residents of the hamlets and the Town, and criteria for the use of the Planning Board and Town Board when considering a planned purpose development application should be established.

5.  Affordable Housing Options and Incentive Zoning.  As noted above, affordable housing is a problem in Milan, as it is in many areas in Dutchess County. Milan residents want to see diversity in housing available in Town.  Current zoning regulations already allow for affordable housing types that are in keeping with the rural residential character of Milan.  These include multiple-family homes, accessory apartments and mobile homes. The CPB concluded that we should retain quality mobile homes as a housing option in the Town, despite some contrary views, as one mechanism to provide affordable options.  Residents make clear, however, that mobile home parks are in not in keeping with the vision of Milan for the future.  In addition to the existing options, the CPB recommends that the Town adopt incentive zoning or density bonuses and other appropriate techniques and use its influence in connection with future planned purpose development proposals and conservation subdivisions to expand the availability of affordable housing.  Allowing developers of large projects a modest percentage of bonus units could, over time, modestly increase the stock of affordable housing.

The above zoning proposals will lead Milan to a responsible, balanced land-use plan that respects the interests of homeowners and honors the wishes of its residents to avoid sprawl and suburbanization, to protect the Town's natural resources and to provide more affordable housing options for seniors, young families and those of moderate income.   The proposed Rural Space Overlay Zone is identified on a map contained in the appendix, as is a map depicting the ¼ and ½ mile radii from our two major hamlet intersections.

6.  Additional Zoning Proposals. In addition to these major changes in Milan's approach to zoning, the CPB recommends changes to zoning in a number of other areas.

A. Rezoning of parcels adjacent to the Lafayetteville hamlet.  The CPB recommends that the small parcels along North Road and east of the Taconic State Parkway be zoned hamlet. We recommend that the large parcel east of North Road that was previously zoned R2A and apparently rezoned through a map error in 2003 to A5A, be returned to its original R2A classification. These rezoning actions are wholly consistent with concepts of a compact, mixed-use area that could evolve to become a traditional walking neighborhood and support some senior and affordable units.

B. Accessory dwelling units (ADUs). An ADU is created by converting part of, or adding onto, an existing detached single-family home, or by converting part of or all of a secondary building  (garage, barn, etc.) into a residential housing unit on the same building lot.

ADUs help maintain a balanced approach to housing needs. Flexibility in accessory housing should be allowed while protecting the rights of neighbors, as well as the interests of Town residents. Generally, current regulations regarding accessory apartments achieve that balance and should remain unchanged. However, the committee would like to ease the burden that a five-year waiting period for converting existing nonresidential building to accessory apartments status (200 1E) can entail. We are concerned, however, that such apartments not become common and used as a form of rental housing. For this reason, the CPB recommends that accessory apartments require that either the principal dwelling or the accessory unit be owner-occupied on a continuing basis as a condition of granting and renewing special-use permits for these units.

Multiple dwellings of up to four units should be encouraged only in the designated PPDs of Town. An accessory apartment should be permitted.

C. Conservation homesteads.  In return for protecting a very large lot with a conservation easement in perpetuity, the owner may be permitted to construct a very limited number of additional secondary dwellings.  Such secondary dwellings are another avenue through which affordable housing can be provided while moderating tax increases.

D. Historic houses. Milan needs to take more action to preserve its historic housing.  A 1981 Department of Interior directive states, "The historic buildings in a community are a tangible link with the nation's past that help provide a sense of identity and stability that is often missing in this era of constant change. Preservation is an anchor that keeps communities together and reestablishes pride and economic activity." Preserving what historic structures we have should be part of a long-term sustained effort to conserve Milan's rural character. Successful protection of the Town's heritage will benefit residents in the long term, as recognized by other municipalities' comprehensive plans. These structures provide a physical and psychological link to our past, educational benefits, tourism, and increased property values over time.

Milan should encourage those owning historic homes or considering buying one to maintain period authenticity in the outward appearance of their homes, and make such owners aware of the 1980 New York State Register of Historic Places. Restrictions on historic properties listed in the NYS register as opposed to the federal register are minimal; federal income tax credit for costs of substantial rehabilitation, and wider access to funding from various sources, are benefits of such listing.

Summary

Managing residential development in a way that preserves the unique natural resources of the Town and maintains our rural character in the face of rapid and accelerating growth is a central challenge facing Milan.  Our fellow citizens have told us how important this is to them, and the CPB has proposed some novel and far-reaching zoning changes that we believe balance the interests of all of Milan's citizens.  The Comprehensive Plan includes proposals to protect broad expanses of rural landscape and sensitive environmental lands, while permitting the Town to roughly double its population in the future. The plan ensures that provision is made for affordable housing for moderate-income residents and provides tools that can expand the availability of housing for seniors and young families.  These proposals also respond to the anxiety that many residents have regarding taxes, especially school taxes, by creating high-value properties that will contribute substantially to Milan's tax levy and help restrain the growth of taxes for smaller land owners.

**D. Recommendations**

1. Implement a rural space overlay zone to manage density and control growth in Milan, preserving the rural residential character and environmental resources of the Town.
2. Amend the Zoning Code to adopt conservation subdivisions as a tool to protect open space and other environmental resources of the Town.
3. Request an annual Buildout Report from the Planning Board - in consultation with the Tax Assessor's Office, and Building Inspector - to monitor the effectiveness of zoning and subdivision regulations in managing the growth of Milan, and to make suggest zoning code changes as required.
4. Allow for planned purpose developments (PPDs) in designated areas of Town to better accommodate specific Town needs.
5. Encourage neighborhood participation in further planning for the hamlet areas. Adopt incentive zoning or density bonuses to stimulate additional housing alternatives for moderate-income families and seniors.
6. Amend the Zoning Code to permit the granting of a variance for conversion of an accessory structure to an accessory apartment in less than five years upon demonstration of use for immediate family members in need.

7.  Amend the Zoning Code to limit the number of multi-family dwellings to no more than two units with the exception of future PPD areas.
8.  Permit conservation homesteads with secondary homes subject to the normal subdivision process requirements, in return for agreement to extinguish subdivision rights on very large properties.
9.  Continue acreage requirements established in the current zoning code for apartments, except in conjunction with a PPD.
10. Offer developers the opportunity to submit a conventional subdivision plan or accept a net buildable area formula as the base for establishing the number of lots permitted in conservation subdivisions when they are required by the Planning Board.
11. Create a Milan Historic Register and explore mechanisms to preserve historic structures; encourage listing on the NYS Register of Historic Places.
12. Eliminate zoning that allows mobile home parks.

**E.  Implementation Strategies**

Managing density is a central strategy of this Comprehensive Plan. Preserving the rural residential character of Milan and protecting its natural resources can only be accomplished by new directions in town planning and zoning. Continuing review of the effectiveness of the measures outlined and the enforcement of regulations should be a primary focus of the Town's administration.  Additional funding will be required to complete the work associated with the development of new zoning concepts; the Town Board should pursue available avenues to obtain such funding under the Quality Communities Program, the Clean Air/Clean Water Bond Act, Transportation Enhancement Act, Greenway Compact and other grant programs to implement the recommendations regarding housing and residential opportunities. Further detail regarding the implementation of these recommendations is provided in Chapter 9, Land Use Plan.