**Town of Milan Comprehensive Plan**             **9. Land Use Plan**



Chapter Highlights:

A Comprehensive Plan can set the direction for the Town for the future, but it is only effective in doing so when the Town Board adopts the Plan recommendations and follows that with the enactment of implementing regulations. Each step of the way requires the formal input of the public in hearings and the consideration of environmental consequences under New York State's Environmental Quality Review Act. The plan took a great deal of work to prepare; however, in a sense, the real work must now begin . . . and as outlined, there's a lot to do.





## A.  Introduction

1.  The Lay of the Land

The land that is contained within the jurisdictional boundaries of Milan has existed, virtually unchanged, for eons.  The natural elements of wind, rain, and snow, together with the plant life, very slowly and relentlessly made small changes in the face of the land as the centuries passed. Wildlife and native peoples lived and died for countless generations and made no permanent mark on the land. Then, less than four hundred years ago, Western Europeans began settlement of the area now known as Milan. Trees were cut and rocks quarried for homes and outbuildings. Forests were cleared for crops and grazing. Streams were dammed for mills. Roads were constructed between the settlements.  The land began to be altered with hand tools and manpower. The population was sparse and the changes small, but the alterations were more drastic than those that nature had worked over the past millennia. The population grew steadily and, with the Industrial Revolution and the invention of power equipment, the pace of clearing and building accelerated.  The automobile required the paving of roads and enabled the population to grow as residents could be employed much further from home.  Milan was set on a course of growth and increasing development that continues unabated today.

The Town of Milan is a gem of natural beauty located in northern Dutchess County between the towns of Red Hook and Rhinebeck on the west, and Pine Plains on the east.  It shares an agricultural heritage with its neighbors but its steep slopes and thin soils limited the success of its farms.  Although there are two small hamlets today, there has never been a population center of any significance and the Town has historically had the lowest population density in Dutchess County.

The towns of Rhinebeck and Red Hook prospered from their location on major water, rail, and road routes connecting Albany and New York City. The current Route 9 is the former Albany Post Road stage route that has existed since colonial times.  Milan was isolated from major transportation routes until the building of the Taconic State Parkway, a WPA project and part of Roosevelt's New Deal in the 1930s. Terminating in Milan at Route 199, the TSP was a major transportation artery that went nowhere and banned commercial traffic.  With trucking prohibited, Milan did not realize the significant commercial growth that usually accompanies a major transport terminus and trans-shipping point.  A large number of gas stations, motor courts, and diners sprang up to serve the folks that traveled Route 199 to continue their trip to or from Albany. But this transient traffic did not provide any significant or permanent boost to the economy of Milan. Some of the buildings are still in use today but many are now residences.

When the TSP was completed to the NYS Thruway it provided a scenic route for passenger traffic from the New York metropolitan area to the New England and Adirondack recreation areas. Today the TSP serves as a major commuting route for those people that want to live in the rural splendor while they continue to work in the metropolitan area, 70 miles to the south.

In the late 1990s the Mid-Hudson Valley grew in popularity as a center for recreational and cultural activities, especially the towns of Rhinebeck, Red Hook, Kingston, and Woodstock. The Town's natural beauty, rural character, proximate location to neighboring attractions, and easy access from the south drew many second-home buyers from the New York metropolitan area and today nearly 20% of the housing stock is held as second homes.  During this same time period, southern Dutchess County experienced a marked increase in new homes as people moved north from the metro area, seeking a better quality of life and a lower cost of living.  The September 11, 2001 tragedy in New York City sparked an unprecedented growth of new homes in southern Dutchess that has been moving northward at an unwavering rate.  This growth has reached Milan.  Many residents have recently received solicitations from out-of-state firms to sell their property.  Out-of-state real estate developers have been searching the Town tax rolls for parcels for large-scale development.  The Town assesses property at true value and

maintains a 100% equalization rate, yet land consistently sells at multiples of its assessed value. During calendar year 2003, the Town Planning Board reviewed seven subdivision proposals for a total of 28 new lots, of which 21 lots were within three major subdivisions. In 2004 the Planning Board reviewed 12 subdivision proposals for a total of 72 new lots, of which 64 lots were within eight major subdivisions. This is a 300% year-to-year increase of lots in proposed major subdivisions. In addition, the Durst Corporation has proposed a 2000+ acre golf resort for the area that includes 400 acres in Milan.

Milan's natural beauty derives from dense wooded slopes, rolling hills, sweeping vistas, and numerous watercourses. This is a fragile and easily damaged beauty because of the steep slopes, thin soils, distant views of the Catskill and Berkshire mountains, and pervasive wetlands. When Milan's Zoning Code was adopted in 1975, it was respectful of the natural environment and natural habitats. Since then much more has been learned about the natural environment of Milan and its limited ability to support development, even at the Town's lowest residential density of five acres. Ironically, the fragile natural features that are the heart of the beauty and rural character that draw people to the Town can easily and irretrievably be destroyed and lost forever by misguided development.

The Comprehensive Plan Committee chartered the Conservation Advisory Council to perform a natural resources inventory for the Town to identify the areas most appropriate for development and the areas that must be protected from development. This inventory will be considered together with other information and requirements to design a blueprint for future growth in the Town. There will likely be substantial areas that must be protected from development while other areas will be suitable for various development densities, including possible growth centers, mixed-use districts and traditional neighborhoods. The allowable uses of any area should be compatible with the social, cultural and historical character of the area and closely tied to the natural features of the land and the types of development it can reasonably sustain.

2. The Hierarchy of Land Use

A) *The Comprehensive Plan* provides the "architecture" for land use in the Town. The Comprehensive Plan documents the Town's vision and goals for land use and sets out specific recommendations.

In Chapter 2, the Town's visions and goals are listed as:

1) Maintain the rural character of Milan
2) Remain (primarily) a Residential Community
3) Enable small-scale and limited commercial activity
4) Protect open space and natural resources
5) Keep Milan affordable and accessible to current residents

Chapter 3 establishes the importance of environmental protection and introduces new zoning concepts, such as Planned Purpose Development, the Rural Space Overlay Zone, and Incentive Zoning, as tools to enable the realization of the Town's goals by means of the Land Use Regulations.

*Land Use Regulations* are the laws developed to implement the requirements of the Comprehensive Plan. These regulations are designed to ensure that the day-to-day land-use decisions of the Town's boards and officials are consistent with, and in support of, the Comprehensive Plan's visions and goals. The most common land-use regulations are the zoning code, zoning map(s), and the subdivision code, but they can also include regulations for ridgelines, wetlands, steep slopes, timber harvesting, excavating, etc.

B) The land-use regulations are implemented through land-use *Boards and Officials*. Examples are the Planning Board, Zoning Board of Appeals, Building Inspector, and Zoning Enforcement Officer. Each of

these entities is authorized by Town Law to be responsible for enacting and enforcing specific sections of the land-use regulations.

C) Land-use *Processes* are the recognized mechanisms for the implementation of land-use regulations. To subdivide a lot, the owner would apply to the Planning Board and follow the subdivision process. To build a house, the applicant would apply to the Building Inspector for a building permit and follow the permitting process.

D) *Enforcement* is the foundation of the land-use hierarchy and absolutely critical to achieve the vision and goals of the Comprehensive Plan. All of the regulations, processes, boards, and officials are of questionable value if the regulations are not practically enforceable or if the Town is unwilling or unable to provide the enforcement resources or funding. Before any land use regulation is enacted into law, at least three questions must be answered:

    1. Is this regulation enforceable?
    2. What is the enforcement mechanism and how is it funded?
    3. Will it be enforced?

If there are not satisfactory answers to all three questions, the law should not be enacted.

3. The Requirements

By New York State law, all Town land-use regulations must be supported by the Comprehensive Plan. Each chapter of the Comprehensive Plan documents the vision and goals for its area of interest and provides recommendations and suggested implementation strategies. The land-use regulations are drafted consistent with the Comprehensive Plan. The visions, goals, recommendations, and implementation strategies of all the chapters are considered together to draft a comprehensive set of land-use regulations.

In addition to the requirements of the Comprehensive Plan, the land-use regulations must not be in conflict with federal, state or county laws and should recognize the Greenway Design Guide and other appropriate and voluntary guides.

**B. Existing Conditions And Trends**

1. Current state of zoning & subdivision regulations.  Nearly all of Milan's current land-use regulations are contained within the zoning and subdivision codes. In general, these codes are quite comprehensive, clearly support the goals of the current and proposed Comprehensive Plans, and have some provisions that make them unique when compared to neighboring towns, such as accepting conservation easements and authorizing the Planning Board to require cluster development under specified conditions.

Although the codes have served the Town well, there are some deficiencies that need to be addressed. First, there are a number of inconsistencies and errors that were likely introduced as the codes were iteratively updated and amended over the years. Second, there are areas of land-use regulation, such as Planned Purpose Development, that were not identified as requirements in the current Comprehensive Plan that must be added. Third, existing portions of the codes must be updated to meet the changing local requirements in such areas as protection of natural resources.

It is not intended to scrap the current codes and draft new ones from scratch. They are well understood and the deficiencies and contradictions are known and can be easily fixed. The current codes will serve as a serviceable foundation for the new land-use requirements and enable a smooth transition to the new regulations by the boards and officials.

The current zoning districts are:

| | | |
|---|---|---|
| HA | Hamlet - Rock City and Lafayetteville |
| HB | Highway Business – designated commercial lots adjacent to Route 199 |
| R2A | Residential 2 Acre – Low density residential district |
| A3A | Agricultural 3 Acre – Low density mixed residential and agricultural |
| A5A | Agricultural 5 Acre – Very low density mixed residential and farming |
| LC | Land Conservation – Preservation of environmentally constrained land |
| LI | Light Industrial – Floating district for light industrial uses |

This Comprehensive Plan recommends:

- Eliminate the LI district and move acceptable light industrial uses into the commercial use category.
- Eliminate the LC district and replace it with a series of comprehensive overlays of areas of environmentally constrained development such as wetlands, steep slopes, viewsheds, thin soils, etc., in order to guide development and provide more flexibility than the current LC restrictive definition.
- Keep the HA district and designate specific areas for potential future priority growth and senior housing.
- Keep the R2A district and restrict it to the currently designated locations.
- Keep the A3A and A5A districts.
- All lots within the HA, R2A, A3A, and A5A will be subject to the Rural Space Overlay Zone when adopted if they meet the RSO criteria.
- Keep the HB district but do not add more lots to the district and remove lots that are environmentally unsuitable for commercial development.

There are a number of known errors on the current zoning map; these should be corrected.

2.  Development pressures. During the late 1980s some large subdivisions were approved in Milan.  The housing market was cratered by the recession of the early 1990s together with significant cuts in IBM employment. Consequently, most of these new lots were not developed and remained vacant until very recently.  The prosperity of the late 1990s, the emergence of telecommuting and flexible work schedules, and the shock of 9/11/2001 spurred a wave of interest in purchasing primary residences and second homes in the Mid-Hudson Valley.  This wave has moved steadily northward and is lapping at Milan's door.

Milan's ecology is complex and rarely is a parcel suited for conventional subdivision development.  However, many developers press to develop subdivisions with the same rapidity and minimal environmental review they have experienced in some other Dutchess County communities.  The Planning Board needs a full complement of land-use tools to ensure that all development conforms to the visions and goals of the Comprehensive Plan.

**Town of Milan Comprehensive Plan**                                            **9. Land Use Plan**

### C. Goals and Visions

This Comprehensive Plan brings together Milan's goals and visions for Natural Resources, Historical Resources, Residential Development, Infrastructure, and Commercial Development. The role of the land-use plan is to develop a comprehensive set of regulations that realizes all these goals.

The Comprehensive Plan identifies many goals. The practical limitations of resources and funding require that the recommendations be implemented on a schedule determined by the priority of each recommendation. Three timeframes are envisioned for implementation:

1. <u>Immediate.</u> A number of actions are urgent to accomplish in 2006 following adoption of the Comprehensive Plan. The Town has extended moratoriums which are due to expire in February and June on the floating light industrial zone and major subdivisions which are due to expire in October and December, respectively. The revision to the zoning code to eliminate the floating light industrial zone and selected light industrial uses needs to be done before February. The proposed rural space overlay zone needs to be implemented before July 2006, when a number of large major subdivision applications are expected. To support the goals of maintaining rural character, protecting natural resources, and implementing the rural space overlay zone, it is critical that the provision for conservation subdivisions is adopted and that a revision of the subdivision regulations is completed. These items are noted with a single asterisk * in the list of recommendations below.

2. <u>Near term.</u> Other important items should be accomplished in the near term, 2006. Many of these actions complement the Immediate items noted above and should be adopted as soon as the work can be completed. These include such items as the completion of the natural resources inventory, the adoption of water resources regulations, ridgeline regulations, critical environmental areas, and other zoning map updates and revisions, including priority growth areas and planned purpose development. These items are shown with a double asterisk ** below.

3. <u>Medium priority.</u> Items to be accomplished as they can be undertaken in conjunction with the above priority items, or as the work can be completed over the next two to three years. These items are shown with three asterisks *** below.

4. <u>Other.</u> Items that are important but which should be implemented as time and resources permit so as not to delay the adoption of higher priority items. These items are shown with four asterisks **** below.

### D. Recommendations

The visions, goals, and requirements of the Comprehensive Plan must be realized as Town laws and regulations so they can be effectively administered by the Town boards and officials. There are five areas that need to be addressed:

   1. Land Use Maps
   2. Conservation Advisory Council
   3. Zoning
   4. Subdivision
   5. Enforcement

1. <u>Land Use Maps.</u> The land use maps are critical to the planning and permitting processes. They will be an essential resource to assist the Planning Board members when they evaluate new subdivision and site plan applications, especially when conducting the mandated NY State Environmental Quality Review.

**Town of Milan Comprehensive Plan**                               **9.  Land Use Plan**

They will also be valuable to the Building Inspector as he reviews new building applications to ensure appropriate structure siting.  The maps must include all of Milan. Recommended deliverables are:

   a) A zoning map revised to correct past errors and minimize upzoning hardship while minimizing potential new lots.*
   b) Maps to identify environmentally constrained land areas (e.g., constrained soils, agricultural soils, wetlands, old-growth forests, steep slopes, ridgelines) **
   c) Habitat maps **
   d) Official map of all public and private roads including a comprehensive list of all road names **
   e) Maps to identify sensitive archeological areas and historic sites ***
   f) An "ideal" land use map based upon the above maps and additional information ***
   g) Map of proposed green corridors–e.g., trails and wildlife migration ****

2.  Conservation Advisory Council.  Environmental considerations are critical when processing most land use applications, such as subdivisions and site plans, especially when conducting SEQR.  Early CAC involvement helps flag potential problems and impacts and enables a smoother process to the benefit of both the Town and the applicant.  The CAC advice can be especially important when significant environmental impacts may exist and a positive declaration of significance is warranted.  Their science-based approach provides a solid fact-based recommendation that the lead agency can use to expedite a satisfactory solution.

> The CAC should be actively involved in the review of every application before the Planning Board that requires an environmental assessment. *

Most of the new environmental regulations and overlays will apply to individual home construction as well as subdivisions and site plans.  SEQR does not apply to single home projects.  The first step in building a new home is to obtain a building permit from the Building Inspector.  The Building Inspector's permit checklist must now include review for location in a regulated area, such as the Ridgeline Overlay.  The builder will have to comply with the requirements of these regulations.  Because of the uniqueness of many situations, the CAC will need to be consulted to recommend a solution.

> The CAC's role in the Building Permit and Certificate of Occupancy processes must be defined in Town law. **

3.  Zoning.
   a) Zoning districts:
      1) Add Rural Space Overlay Zone *
      2) Review and revise existing districts including the Land Conservation District. **
      3) Add Planned Purpose  Developments–Senior Housing, Affordable Housing, and Traditional Walking Neighborhood **
   b) Create new zoning district map(s) *
   c) Route 199
      1) Prevent strip development.*
      2) Designate scenic and historic sections as CEA's. **
      3) Rezone environmentally constrained HB lots. **
      4) Partner with Red Hook and Pine Plains to develop a Rte. 199 Corridor Management Plan.***
      5) Nominate Route 199 as a "New York State Scenic Byway." ****
   d) Minimize the impact of commercial uses on residential properties.
   e) Revise and amend zoning code.
      1) Add Conservation Subdivisions. *
      2) Add Zoning Incentives for subdivisions *

- 3) Add Rural Space Overlay. *
- 4) Correct existing errors, omissions, and inconsistencies. **
- 5) Revise the table of permitted uses and bulk and area table. **
- 6) Review/revise Sign regulations. **
- 7) Remove from Zoning the current provisions no longer supported by the Comprehensive Plan, e.g.:
    - Light Industrial District – Floating Zone *
    - Mobile Home Developments **
- 8) Formally integrate Greenway Design Guidelines into code. **
- 9) Review/revise regulations for commercial uses in hamlets **
- 10) Add Planned Purpose Development. **
    - Define categories
        - Senior Housing
        - Affordable Housing
        - Mixed Use Traditional Walking Neighborhood.
    - Define Town Board and Planning Board approval processes.
- 11) Add Ridgeline controls and overlay district. **
- 12) Add Water resources controls and overlay district. **
    - Add guides for chemical fertilizers, herbicides, insecticides, and fungicides. ***
- 13) Add Light pollution controls. **
- 14) Add Steep slopes controls and overlay district. **
- 15) Add Logging and land clearing controls. **
- 16) Add Excavation controls. **
- 17) Add Scenic resource protection and overlay district. **
- 18) Revise Accessory Apartment regulations. **
- 19) Review/revise Parking regulations. ***
- 20) Add Home business regulations. ***
- 21) Add Conservation Homestead Regulations. ****

f) Environmental regulations
  1) Integrate the CAC into environmental review processes. *
  2) Critical Environmental Areas **
     - Define local process to establish.
     - List registered Critical Environmental Areas in zoning appendix.
     - Define relationship to non-SEQR processes (e.g., building permits).
  3) Use Part 2 of the SEQR EAF to determine impact on growth and character of the community and address mitigation of any significant impacts to cost or quality of services **
  4) Identify Milan amendments to the NYS environmental review process (SEQR). ***

4. <u>Subdivision.</u>
   a) Integrate the CAC into environmental review processes. *
   b) Require applicants to submit both conventional and conservation subdivision plans. *
   c) Add early (sketch phase) public information sessions. *
   d) Move start of environmental considerations to front of process. *
   e) Update access specifications (roads, common drives, and driveways). *
   f) Establish formal fire and emergency services review of subdivisions. *
   g) Add a "net buildable area" process optional alternative for determining maximum lots permitted. **
   h) Formally integrate Greenway Design Guidelines into code. **
   i) Establish road naming process for Town and private roads. **

5.  Enforcement.
    a) Establish post-approval subdivision monitoring and enforcement backed by appropriate bonding requirements.*
    b) Review and revise fee schedules to support needed enforcement **

6. Town of Milan Code.
    a) Assess the costs of regulatory administration and ensure that fees and assessments are set accordingly.*
    b) Add noise and hours of operation for commercial uses. **

**E.  Implementation Strategies**

The recommended regulations, maps, and processes must be developed for Town Board review and approval. These materials will be developed by the Town Planner, the Town Planning Board Attorneys, and other professionals as required. Where appropriate, members of the Planning and Zoning Boards and CAC will contribute as well as other Town officials, such as the Building Inspector, ZEO, Town Highway Supervisor, etc.  Knowledgeable residents will also be asked to participate, especially as members of focused task committees and as reviewers.  Outside agencies, such as DC Planning and the Pace Land Use Law Center, will be asked to participate as appropriate.

The cost of developing these regulations and any associated studies and materials, can be considerable. Grants are available from private, non-profit, and government sources to defray the costs of development of the regulations and ensure quality results.  The Town should identify appropriate grant resources and proactively pursue funding for critical projects and goals.

It may be possible to develop some of these regulations as discrete pieces while others will have to be developed as part of a comprehensive effort.  Changes to the zoning regulations, as a minimum, must be thoroughly reviewed within the Town, referred to DC Planning and the Planning Board, referred to adjacent towns (where appropriate), and presented at a public hearing before the Town Board can vote for adoption.

Time and timing will be critical factors in adopting the highest priority items before the moratoriums expire later this year.  This will require careful planning and coordination of all proposals, focused reviews, and short review cycles in order to complete the high-priority items.