# Moderately-Priced Housing in Milan

Prepared by:

## Ad Hoc Committee on Affordable Housing

October 2007

<u>Committee Members</u>

Peter Goss
Arthur Michaels
Laurence Steel
Ross Williams (Town Board Chair)
Piper Woods

<u>Also Participating</u>

Lauren Kingman, Planning Board Chair
Diane May, Town Board Member

<u>With Special Thanks to</u>

Anne Saylor
Dutchess County Dept. of Planning & Development

i

October 2007

Executive Summary

Two considerations led the Town Board to establish an ad hoc Affordable Housing Committee (the Committee) to provide recommendations to the Town Board. Following introduction of the Rural Space Overlay recommended in the Comprehensive Plan, there was considerable concern expressed in public hearings about its impact on future housing costs; second, legal guidance was provided by the Land Use Law Center that it was essential to address housing affordability at the same time that the Town addressed density.

The Comprehensive Plan identified 5 goals, the Town's vision for the future:
1. Maintain the rural character of Milan
2. Remain (primarily) a residential community
3. Enable small-scale and limited commercial activity
4. Protect open space and natural resources
5. **Keep Milan affordable and accessible to current residents**

The Committee focused on this last goal. It was the Committee's initial view that there was substantial affordable housing in town, and that needed recommendations were largely provided in the plan. Looking at assessed values in the Town, one would assume a reasonable level of affordable housing. However, the Committee learned that housing has been selling for almost 60% over its assessed value. There has been little affordable housing coming on the market in recent years.

The Committee did a substantial amount of research and the members and other participants attended a combined two weeks of seminars and training on the alternatives available to address what is a serious local, regional, and national problem. The Committee in particular thanks Diane May and Lauren Kingman for their steady participation with the Committee and their contributions.

It was first important for the Committee to grapple with what affordable housing means in the context of Milan. Housing that is 'affordable' to low income families is generally not housing that is available in the marketplace. Low income families usually require subsidized housing; such housing is generally located in areas of high density with infrastructure available to support those families, such as mass transportation, medical clinics, and social services. Milan is clearly not a town with these characteristics that should consider providing this type of affordable housing. However, it is not families that can afford only subsidized housing that the Committee was concerned with, but rather the working families and seniors living on limited incomes. Milan needs to ensure that we have moderately priced housing that is affordable to these families. Thus the name of our report -- The Moderately-Priced Affordable Housing Report.

We were very fortunate to have the assistance of Anne Saylor, housing specialist with the Dutchess County Department of Planning and Development. She provided data on the population of Milan citizens who are "cost burdened" by their housing. A family is considered "cost burdened" if they must pay more than 30% of their family income for housing. The statistics she provided are summarized in the chart below.

| Households | # | Elderly Cost Burdened | % | # | All Others Cost Burdened | % | # | Total Households Cost Burdened | % |
|---|---|---|---|---|---|---|---|---|---|
| Renters | 24 | 12 | 50% | 143 | 60 | 42% | 167 | 72 | 43% |
| Owners | 185 | 77 | 42% | 505 | 116 | 23% | 690 | 193 | 28% |
| | | | | | | | | | |
| Tot. HH's | 209 | 89 | 43% | 648 | 176 | 27% | 857 | 265 | 31% |
| | | | | | | | | | |
| Spend >50% | | 22 | 11% | | 34 | 5% | | 56 | 7% |

About 20% of housing in Milan is rental. Of those renting, 43% were cost burdened in 2000; for seniors, 50% of those renting were spending more than 30% of their family income for housing. Seventy-nine percent of Milan residents live in owner-occupied housing. Of those, 28% of them were cost burdened, and, significantly, 42% of seniors who own their own homes were found to be cost burdened. Combining these numbers, 43% of seniors are cost-burdened – i.e. spending more than 30% of their income on housing, while almost 1 in 3 households in the Town were, as well. When a different cutoff is used, spending 50% of household income on housing, the data reveals that 11% of senior households exceed that level of spending for their homes, leaving little for other necessities. These few statistics generated from using Census and Real Property data makes the point on the need for action. They were more severe than the Committee had anticipated and we had extensive discussions about the Town and the nature of housing costs in our housing market.

There are unique features to the Milan housing market. First, we are very vulnerable to the impact of higher income buyers from the southern Hudson Valley and New York City area. Our beautiful landscape with excellent access via the Taconic State Parkway brings many to our area who outbid current residents for available housing. Our local residents generally work in a more local and lower paying employment market. Second, housing development tends to occur in a different pattern than in most other areas. Subdivisions tend to occur primarily for the sale of individual lots to prospective homeowners who custom build on the lots created. Generally, large suburban 'subdivisions', built on spec, have not yet been constructed in Milan. Even the Carvel project proposes this method of building for their single family homes.

Recognition of these conditions led the County to recommend a number of actions that could help the Town maintain its current level of rental housing and retain diversity in the Town's housing stock. The Committee considered these carefully and reviewed the current zoning code to determine opportunities for greater flexibility in housing alternatives. There are a number of actions the Committee recommends that can provide such greater flexibility in the area of conversions from one to two-family, in acreage requirements for multiple family dwellings, and additional flexibility in permitting accessory apartments. These can be addressed in the short term.

The County also recommends that some level of rezoning to permit higher density housing, preferably in the vicinity of the hamlets, is warranted. While the Committee agrees that there really is no way to control housing cost other than to permit limited areas of higher density, thus enabling lower cost land and lesser taxes, these recommendations can only be implemented when the community comes to a reasonable consensus on how to do so. It would be hoped that incentives to builders for additional lots (bonus density) could bring needed moderately-priced homes. Milan does not need large numbers of new rentals to keep pace with other development and maintain our 20% ratio of rental opportunities. As a guide, if 10 new homes are built per year, the Town should also realize 2 new moderately priced rental opportunities.

Any proposals to increase density in some areas, and provide limited multi-family housing are sure to be controversial, and should be developed with community input. Such alternatives, however, must be on the table if Milan is to maintain a balance of housing diversity.

From a community perspective, a balance in our zoning that provides a diversity of housing for working families and seniors is very important. It is imperative to address moderately priced affordable housing if we are to restrict density overall in Town to retain our rural character, as the legal view of exclusionary zoning also necessitates that balance. Failing to take appropriate action to maintain our housing diversity will make it impossible to limit the density across Milan, a central tenet of the Comprehensive Plan. Failing will, in a very real sense, cost us the town we love.

This report provides a starting point, and the appendices provide a broad perspective on alternatives to address the housing issue in Milan. To begin to address the issues raised in this report, the Committee recommends the Town Board establish a standing Density and Housing Committee, and recommends they be charged with initiating a more detailed review of housing in Milan, and with initiating an education and dialogue process that can bring the community to level of consensus that will enable the Town to move forward to address these issues.

October 2007

Contents:

Committee Members and Participants……………..  *i*
Executive Summary………………………………..  *ii*
Contents………………………………………….  *iv*
Introduction ……………………………………..  1
Literature and Best Practices……………………..  3
Moderately Priced Affordable Housing
     in Milan: Discussion and Analysis…………  8
     Affordable housing…………………………..  9
     Milan's Housing Stock………………………  10
     Housing Cost versus Income………………  10
     Current Zoning Regulations…………………  12
     Development Incentives/Mandates…………  13
     Target Beneficiaries…………………………  14
     Zoning District………………………………  15
     Other mechanisms……………………………  16
     Tax implications………………………………  17
Summary………………………………………….  17
Recommendations…………………………………  18
Conclusion………………………………………..  21


Appendices List (filed separately)…………………  22
Other Resources Cited……………………………  23

October 2007

Introduction

The ad hoc Committee on Affordable Housing (the Committee) was established in October 2006 to review needed actions in the Town of Milan to deal with affordable housing. The 2006 Comprehensive Plan dealt with the concern for the affordability of housing, and citizens raised concerns in this area during the public hearings in July 2006 with respect to the Rural Space Overlay district proposed in the Comprehensive Plan and in a local law introduced that month. Further, the Town was advised by Dr. John Nolon of the Pace University Land Use Law Center that dealing with affordable housing was imperative if the Town wished to avoid a legal finding of 'exclusionary zoning'. While it had been the Town Board's intention to deal with these separately, this advice resulted in a decision to consider zoning changes in an integrated manner. Thus, this committee was established to provide the Town Board with guidance regarding actions it should recommend to address the "affordable housing" issue.

The Committee began its work by trying to better understand the issue. It invited Anne Saylor, housing planner with Dutchess County Planning and Development, to meet with us and assist in the process. Anne has been of great assistance, attending 3 meetings of the Committee and providing her expertise in the form of an analytical report on Milan housing using data from Real Property Services.

In addition, Diane May (Town Board Member) and Lauren Kingman (Town Planning Board Chair) have participated regularly with the Committee as it has pursued these objectives. Two of the Committee members, Larry Steel and Arthur Michaels, and Diane May attended a Pace Land Use Law Center seminar on the subject of Workforce Housing. Ross Williams and Lauren Kingman attended a Dutchess County sponsored update for graduates of the Pace Land Use Law Center program, which included a ½ day seminar on workforce housing and Diane May attended their municipal officials training program, 3 days that focused on workforce, or moderately-priced housing. Piper Woods attended meetings in Rhinebeck where they are struggling with the same issue. Rhinebeck approached the issue from the perspective that open space and affordable housing are not mutually exclusive and must be planned for together to provide the right balance.

Other communities in northern Dutchess are struggling with this same issue. Amenia has recently adopted new zoning with provisions for workforce housing; Pine Plains has proposed similar zoning. We have learned the issue of affordable housing is difficult for rural communities without extensive infrastructure to address in today's housing market. We have also learned that one size doesn't fit all.

Housing is defined broadly to include single, two-family or multi-family homes, owned or rented, and rental apartments. One of the questions first faced by the Committee was the definition of what is meant by the term 'affordable housing' – affordable to whom? In the private housing market, we learned that today's

market prices can not be made affordable to low income people without subsidy. Subsidized housing is generally located in more urban areas where infrastructure can support low income people through high density occupancy in areas with concentrated employment opportunity, and with established transportation and other infrastructure that is available without substantial cost. That is not Milan. We are not a reasonable location for the construction of subsidized housing.

The housing the Committee focused on, therefore, is housing for people who have the income to obtain and pay for private market housing at the lower and medium cost levels. It is, as the seminars above implied, housing for people in the workforce, or senior citizens who have been in the workforce, and who should be able to afford housing without undue "burden". Housing cost burden is generally defined as spending no more than 30% of household income on housing. Usually only households with income above 70% of median income can escape being burdened by housing cost.

Below that level, there is not, without substantial burden on household income, a reasonable private housing market solution in the Town of Milan, as difficult as that may be for some to accept.

For the above reasons, the Committee feels that Town efforts should be focused on 'moderately priced housing', rather than affordable housing; we have titled our report accordingly and will refer throughout to MPH, moderately priced housing.

In preparing this report, the Committee began with a review of the comprehensive plan, and with a review of some of the housing data available for Milan. We discussed who our target audience is when we talk about MPH, and we reviewed some of the actions taken by other municipalities to deal with the issue. We then developed a laundry list of options for Milan, and reviewed the status of current zoning before concluding on recommendations for the Town Board. Lauren Kingman and Anne Saylor have provided very helpful analyses and their work; their analyses, as well as other reference materials, are provided in the appendix for further review.

<u>The Comprehensive Plan</u>

> *"The grim reality is that housing is not affordable to many people unless they already own a home, which they can trade for another. Without home equity, a family trust fund, or two very good salaries, most people these days are not able to qualify for home mortgages. In many parts of the country, house price inflation has clearly outpaced salary increases, widening the affordability gap for every year that passes."* [1]

---

[1] Randall Arendt, <u>Rural by Design</u>, as quoted in the Milan Comprehensive Plan Report.

The Comprehensive Plan Report prepared by the Milan Comprehensive Plan Special Review Board in 2005[2] dealt specifically with the subject of affordable housing[3].  The Plan concluded that, "While the numbers do not indicate an affordability crisis in Milan, concern is expressed by some that housing in Milan appears to be increasing in cost beyond the means of those at the median household income level. Certainly for those at lower income levels, the issue is a growing problem, deserving of attention in Town planning.  In the comprehensive plan, affordable housing was viewed "in the context of people's ability to obtain housing, and to actions the Town can take to ensure there is a level of housing available to moderate-income households earning less than the median household income."

Among the recommendations of the housing section of the Comprehensive Plan are the following:
- Allow for planned purpose developments (PPDs) in designated areas of Town to better accommodate specific Town needs.
- Encourage neighborhood participation in further planning for the hamlet areas. Adopt incentive zoning or density bonuses to stimulate additional housing alternatives for moderate-income families and seniors.
- Amend the Zoning Code to permit the granting of a variance for conversion of an accessory structure to an accessory apartment in less than five years upon demonstration of use for immediate family members in need.
- Amend the Zoning Code to limit the number of multi-family dwellings to no more than two units with the exception of future PPD areas.
- Continue acreage requirements established in the current zoning code for apartments, except in conjunction with a PPD.

The MPH Committee began with the information in the Comprehensive Plan, analyzed further the income and housing cost data, and examined what could be learned from other's experience.  The Committee discussed at length the unique nature of Milan (topography, infrastructure, lack of a town center) and the interrelated issues of protecting Milan's rural character, while enhancing the ability of moderate income families to obtain housing that does not place an unreasonable burden on the budgets of working families.  Clearly there is a balance to be attained in dealing with these important values of the community.

<u>Literature and Best Practices</u>

The Committee reviewed a broad range of references and literature to understand housing cost issues and strategies to deal with them.  We began with the work of two widely recognized authorities on the subject of managing development and

---

[2] This report, with only minor changes, was originally adopted as the Milan Comprehensive Plan 2006, and was readopted  by the Town Board as the Milan Comprehensive Plan 2007.
[3] See Appendix A: Excerpt of Comprehensive Plan, Chapter 7, relating to Housing Prices, Availability, Affordable and Senior Housing.

avoiding sprawl: *Well Grounded* by John Nolan and *Rural by Design* by Randall Arendt. (See Appendix B & C, respectively)

In chapter 6 of *Well Grounded,* Nolan discusses ways to balance development and conservation. Nolan points out that communities can identify areas that are appropriate for development and large open areas that are appropriate for conservation. Within development areas, zoning incentives can be applied to achieve, among other desirable community goals, affordable housing. Nolan specifically identifies incentive zoning, cluster zoning, and planned unit development as useful approaches to increasing the amount of affordable housing in a community. He notes that incentive zoning based on bonus density has been successfully used in a number of New York communities as a way to get developers to provide affordable housing. A major question raised by incentive zoning is how to track the affordable housing over time to be sure the occupants remain eligible and the cost remains affordable.

In chapter 9 of *Well Grounded,* Nolan discusses the issue of affordable housing and exclusionary zoning. He points out that there is no standard definition of affordable housing, but that local governments are still expected to encourage its development.

Randall Arendt devotes an entire chapter of *Rural by Design* to affordable housing. He points out that the affordability gap is a national problem that has been getting worse ever since the mid-1980s. His solutions include creative ways to put smaller houses, two-family houses, and multiple-unit homes into compact neighborhood layouts. Arendt provides an excellent discussion of accessory dwelling units, calling them a "hidden resource."  However, local zoning can make it difficult for homeowners to create accessory apartments. Another potential source of apartments would be mixed use retail construction, with apartments above the shops. Other potential ways to create affordable housing include land trusts. His examples and case studies of affordable housing solutions are interesting but seem to relate mostly to multi-unit developments that include some affordable housing as part of incentive zoning, and seem to require subsidies or land purchases from the municipality.

We also reviewed the *Smart Growth Housing Task Force Report* presented by the Dutchess County Department of Planning and Development in 2001 (see Appendix D). The report analyzes the demographics of Dutchess County.  It points out the county-wide and region-wide need for more affordable housing and suggests ways to achieve more affordable housing. The report mainly recommends that municipalities use incentive zoning/density bonuses to create moderately priced homes and change zoning laws to allow accessory apartments.

Several sources deal with the issues of affordable housing as these have played out in the courts, however one that was provided participants in the municipal leader training program attended by Diane May is a summary by Jacobowitz  &

Gubits, LLP, entitled "Addressing Workforce Affordable Housing and Inclusionary Zoning"; a copy is included as Appendix E for reference.[4]

Members of the Committee also relied on Anne Saylor, housing coordinator for the Dutchess County Department of Planning and Development who attended several committee meetings. She provided general background on the topic, reviewed a presentation she had made to the American Planning Federation (see Appendix F), and made available copies of model laws in the process of development by her agency. These laws (see Appendix G) are designed to lay out the process by which affordable housing is defined and a process established to select potential owners (from a housing cost and income eligibility perspective) and to restrict price escalation to ensure such housing, once created, remains affordable in the future. Early discussions with Anne brought consensus with the Committee that such model laws were too complex for a town like Milan to administer and, in contrast to southern Dutchess County, did not fit the patterns of development in Milan.

Anne subsequently provided the Committee with very useful data and guidance with respect to housing patterns, cost, and income for the Milan community. Recognizing the unique nature of Milan, she also provided her thoughts on appropriate actions to meaningfully address moderately-priced housing needs in our rural town environment. This information will be covered in subsequent sections of this report.

We reviewed information obtained from the Land Use Law Center seminar attended by three committee participants, particularly focused on housing surveys and other town practices. (For selected materials, see Appendix H.) One case study in these materials of particular interest relates to proposed, now adopted, new zoning in Amenia.[5]

Like Milan, development in Amenia is limited by wetlands, steep slopes, and lack of municipal water and sewer systems. Rural character is a prime community concern. The lack of wastewater treatment limits the amount of high-density housing that could be developed. The Town has tried but failed to purchase land for a wastewater system. Amenia has a larger town center and several hamlets, as well as a large area of municipal property on the former Wassaic Developmental Center, and also has rail service.

Amenia's zoning law seeks to create affordable housing mostly by adding density incentives. Their zoning code would mandate that at least 10% of units in developments of 20 or more units be classified as workforce housing. A developer would have the option of paying a fee instead or could count on-site employee

---

[4] Another reference book was distributed to participants entitled "Affordable Housing Law Book", also published by the Land Use Law Center. It is not included in the appendix due to its length, however, it can be made available through Diane May for future Town work on this subject.
[5] Provided as a handout, this case study is taken from: Guccion, Mary, "Town of Amenia", Affordable Housing Law Book , Pace Land Use Law Center, pp. 92-95. (see Appendix H)

housing toward the mandate. The Wassaic property gives Amenia a way to develop a walkable community, with central water and wastewater system, that can accommodate affordable housing. Though Milan and Amenia are similar in many ways, Amenia has a more ready opportunity to provide moderately-priced housing.

The currently proposed zoning in Pine Plains (see Appendix I) provides a similar model that would mandate that subdivisions of 10 or more lots include 10% of the total number of lots or dwelling units as moderately-priced units, and they provide a density bonus of 10% to balance the mandate with an incentive. The proposed law defines eligibility (to purchase a home, household annual income at or below 100% of Dutchess County median family income for a family of a particular size; to rent a moderately-priced unit, income must be at or below 80% of median family income.) Resale price is controlled for 40 years under the proposed zoning code.

The Town of Rhinebeck has approached the issue of affordable housing by addressing it through a committee whose charter is to address the "Two Keys to a Livable Community: Open Space and Affordable Housing". Their intent is explained in the Executive Summary of "The Town of Rhinebeck Open Space and Affordable Housing Implementation Plan"( see Appendix J):

> "Recognizing that the challenges to open space and housing affordability are interdependent, the report recommends a comprehensive and shared set of strategies. These strategies, coupled with those of the Rhinebeck Plan as a whole, will foster a climate where preserving natural resources and nurturing a diverse community is kept foremost. ...

> "The prime innovation of the Rhinebeck Plan and this Implementation Plan is the search for shared solutions to an apparent conundrum that as land is preserved the more desirable (hence more valuable and more costly ) living in Rhinebeck will become; and as the more housing that is induced to leverage missed-income development, the less open space preservation might be possible. These plans recognize that the current housing, even on lots of one and three acres, is very expensive and that more innovative zoning is required to promote housing that is affordable."

The approach Rhinebeck has taken is not unlike the dilemma that Milan has addressed with this committee. Earlier, a Town of Milan Open Space Committee issued to the Town Board on December 4, 2006, a report entitled "Milan Open Space Plan – Report". This Moderately-Priced Affordable Housing Report, when coupled with the open space report and Milan's Comprehensive Plan lays a foundation similar to the approach taken in Rhinebeck.

Red Hook has worked over the last five years to convert an old industrial brownfield site, the Perx property, to affordable and senior housing as Red Hook Commons. This project, scheduled for initial occupancy in September 2007, is a

classic example of rehabilitating and using deserted space - "infill" – to meet low cost housing needs with the help of the County to clean up the polluted site, State grants, Federal tax credits and a willing developer. In this case, the County provided the property at essentially no charge, and helped facilitate the grants and clean-up (see Appendix K). While such redevelopment represents an opportunity recommended by advisory and planning organizations, it is an option not readily available in Milan, given the nature of Milan and our existing infrastructure.

Examples from other towns are highlighted in the various materials in the Appendices.

One particularly informative paper by the Land Use Law Center, "Rural and Small-Scale Affordable Housing: Local Issues, Strategies, Resources" (see Appendix L) addresses specifically the issue of rural communities. Some examples of the useful perspective it provides include the following:

> "Rural communities may have a much smaller tax base than non-rural communities and a population dispersed over a much wider area. Public transportation is often lacking. Residents must travel farther to find work and must commute longer distances. Some rural communities in New York – particularly communities on the edge of metropolitan areas – are experiencing growing income inequality, as middle- and high-income families move from more expensive cities or suburbs or buy second homes in the country. Because of rinsing land and housing prices and stagnant wages, local workers are priced out of the local housing market and must find homes farther away. Not only young people looking for their first job but older workers are leaving rural communities because housing is unaffordable."

> Quoting Harvard's Joint Center for Housing Studies, State of the Nation's Housing 2006, "In today's environment, perhaps the biggest housing challenge of all is to create the political will to make a more concerted assault on the nation's affordability problems."

> Dutchess County ... The Fair Market monthly rent is $1,060. Working 40 hours a week, 52 weeks a year, a renter must earn $20.38 an hour to afford this rent and utilities without paying more than 30 percent of income for housing. A minimum wage renter must work 121 hours a week, 52 weeks a year to afford this rent.

Community decisions on the right approaches are difficult politically. As pointed out in the Pace Land Use Law Center publication "Meeting Housing Needs", citizen resistance can be a significant impediment to affordable housing:

"A glaring problem preventing the development of much needed affordable housing is the concept of NIMBY ('Not In My Back Yard'). Understandably, residents worry that the character of their community and the quality of life they enjoy may be adversely affected if affordable housing is introduced.

Residents often believe that the provision of affordable housing is synonymous with large-scale construction of high-rise apartment and condominium buildings, increased noise and traffic levels, and the invasion of lower-income "outsiders" all of which could alter the character of their community.

"… Residents are also concerned that the addition of multifamily and other types of affordable housing will lower property values. Such fears are rooted in the belief that the erection of new structures and the increase in population and traffic caused by the influx of new residents will adversely affect the aesthetics and overall character of the community. Experience proves that most of these fears are unfounded."[6]

Our research indicates that *moderately priced* housing is a substantial issue in Milan and Dutchess County as it is throughout the region. We also find that the issue is very complex and politically difficult. However, equally clear is the fact that it must be dealt with if Milan is too address growth pressures by lowering allowed density in some areas of town to maintain our rural character.

<u>Moderately Priced Affordable Housing in Milan: Discussion and Analysis</u>

The Committee first met on September 27, 2006 to develop recommendations that would enable the Town to avoid a finding of exclusionary zoning as a result of adoption of the Rural Space Overlay district. In addition to the Rural Space Overlay (RSO) district to limit density, Planned Purpose Development districts were recommended in the the Comprehensive Plan to accommodate higher density neighborhoods and senior housing. After an RSO law was introduced, it was tabled by the Town Board. On the advice of the Pace Land Use Law Center, the Board concluded that a wiser course would be to enact comprehensive zoning changes to address housing needs as well as density limitations to protect the Town's rural character. The Committee initially believed that there was considerable 'affordable housing' in Milan; we hoped to complete our work in a matter of weeks. We learned that a relatively high proportion of our citizens, particularly seniors, whether renting or homeowners, are considered 'cost-burdened' by the commonly used benchmark of no more than 30% of family income for housing.

In this section, we will address the questions the Committee has considered, data available, our analysis, and some of the discussion that has led us to decide on what recommendations should be made to the Town Board. The questions that developed in the course of the Committee's discussions include the following:

---

[6] Stauffer, Matthew, ed., Chap. 3 "Impediments to Affordable Housing", <u>A Local Leader's Guide to Meeting Housing Needs</u>, Starting Ground Series, Pace University Law School Land Use Law Center, 2003, p. 19. (For Future Committee and Town work, this reference can be obtained from Diane May.)

- What is meant by 'affordable housing'?
- What is the housing stock in Milan?
- How serious is the problem of housing cost to people in Milan?
- How can our current zoning regulations be changed to ease the affordability gap?
- Should there be development incentives/mandates for 'moderately priced' or 'workforce' housing?
- If the Town were to develop housing programs, who are the target beneficiaries?
- Should the Town establish a zoning district for 'moderately priced' or 'workforce' housing?
- What other mechanisms are available to assist in the provision of housing?
- What are the possible tax implications of a moderately-priced housing initiative?

The balance of this section will address each of these.

Affordable housing

As discussed above, affordable housing is relative to the income of the household unit. Government and planning guidelines suggest that housing, to be affordable – i.e. to not create a 'cost burden' to the household – should ideally not exceed 30% of household income. Private sector housing - whether single or multiple family, owned or rental - can only to 'affordable' to a point, as the builder, seller, or landlord, operates in a market economy and will make housing available only when a reasonable return can be realized. For low income households in today's real estate market, there is no private sector 'affordable housing' that will meet this definition. The only alternative for the provision of 'affordable housing' in such cases is through government subsidy. Government subsidies are typically made available in locations with high density, where there is infrastructure to support low income families, such as public transportation, subsidized medical clinics, etc. Milan, and other rural communities without such infrastructure are unsuitable locations for such government subsidized housing.

Today's 'housing crisis', as portrayed in the media, is more focused on the ability of moderate income families, often headed by working single parents, or young families, or senior households, to be able to purchase market rate housing in their communities that does not present a 'cost burden' to the household budget. The focus is on moderately priced housing (also referred to as workforce housing), or for that particular segment, senior housing. Thus the focus of the Committee's discussion and analysis has been the provision of moderately priced housing, what in Milan's rural context is 'affordable housing'.

Milan's housing stock:

As was discussed in the Comprehensive Plan, one can get the impression when reviewing the market value assessment of Milan's housing stock that there is ample affordable housing in Milan.  Using assessment roles for 2006 the Committee found 46% of the homes in Milan assessed for less than $250,000 and 25% for less than $200,000. However, when reviewed in the context of sales, preliminary data provided by the County (see Appendix M) indicates that homes in 2006 sold for 59% more, on average, than their assessed value.  Given this pattern, only approximately 10-15% of homes would be available on the market for $250,000 or less.

In the 2000 Census, approximately 21 % of Milan households lived in rental housing, down only slightly from the 1990 figures.  The median rental price in the 2000 census was $675/ month; of the 160 renters in the survey, 80 would have paid more and 80 less.  This rental equates to an income without burden of at least $24,300 or an average hourly wage for 40 hours a week, 50 weeks a year of $12.15.   For seniors living on social security, or young families with minimum wage workers, the median rental in Milan is a significant burden.

According to Dutchess County data for Milan, "The value of prices of homes has increased dramatically since 2000.  In 2006 the median sales price for a single family home (17  sales) on 10 acres or less was $332,500.  This is $47,500 less than the 2005 median of $380,000 (19 sales).  It should be noted that the decrease in the sales price could be a function of the small sample size."[7]  It should also be noted that reported sales prices do not include the value of custom homes built by new land owners, or those on greater than 10 acres, both of which would be expected to be higher.

Housing Cost versus Income:

It is important to put housing cost in the context of income.  The median family income in Milan in the year 2000 was $65,250.  Median household income was lower at $54,491.  In 2006, the County estimates that median family income would be $75,600 (see Appendix N).  In the County overall, the 2000 Census revealed that the median income of those who live in Dutchess but work elsewhere was 31% more than those who live and work in Dutchess County. This would suggest a median family income for those who live and work in Milan of about $58,000, although there is no way to tease out at the municipal level what these median income levels would actually be.  At that level single family ownership can only be accomplished with a high cost burden, even for those at this 'in-county' median income.  For people living in Milan and working in Dutchess County, the degree of housing difficulty is likely greater than median income would suggest.

---

[7] Anne Saylor, Dutchess County Department of Planning and Development, "Town of Milan Housing", 2007.  (See Appendix N.)

One of the issues Anne Saylor (Dutchess County Planning) discussed with the Committee is the impact of our proximity to the NYC marketplace for second homes, and to lower Hudson Valley housing costs; these bring more highly paid people working in the NY Metropolitan area to our town seeking homes. It is likely that Milan residents are simply outbid for homes by such prospective buyers in the Milan marketplace. It is simply a fact of location and the lower relative prices of housing here in contrast to housing in these commutable locations. There are any number of anecdotal stories of high offers to bear out these concerns.

County data (from "Milan Moderately Priced Housing Matrix" (see Appendix O) would indicate that only those households with an income above the median family income ($66,100) could afford a 3 bedroom single family home without cost burden. In the context of the housing data discussed above, half of the families in Milan (including those who work outside the County) could not afford to purchase 85-90% of the homes.

The home ownership rate in Milan is 79%, so clearly more people own homes today than the above figures would suggest. Is that simply a function of having bought homes in the past, protecting people from more recent market price increases? Unfortunately, that does not appear to be the case. Data provided by Dutchess County Planning from analysis of 2000 Census data, reveals that 28% of homeowners were cost burdened by the housing costs they were then paying. Elderly homeowners are hit the hardest - 42% of elderly households in Milan are housing cost burdened.

Rental housing is an obvious alternative to single family home ownership. However, the percentage cost burdened by their rental housing is even higher than for single family home owners – 43% of renters are cost burdened, and 50% of the elderly who rent are cost burdened. One of eight renters were severely cost burdened (defined as paying more than 50% of income for housing) in 2000. As indicated in the County report, "… a household would need to make $32,800 to afford a median priced one-bedroom and $42,800 to afford a median priced two-bedroom (rental). Clearly the rents are out of the range of many young people, municipal employees, health care workers, retail employees and seniors on fixed incomes."

For such households, obtaining traditional private sector housing is burdensome, in some cases, extremely so. Overall, using 2000 census income information, the County analysis concludes that "19% of Milan's population is at income levels where it is traditionally difficult for households to afford safe and decent rental housing. There is another 21% that were in a category where it may be difficult to afford rental housing, and is difficult, if not impossible, for them to purchase a home."

Anne Saylor cautioned the Committee that Milan can't solve the affordability problem caused by the markets and proximity to NYC. We can work at the

margins to provide options within the market's structure such as easing existing provisions for accessory apartments, by providing two and multiple-family housing flexibility, and, also, some zoning for multiple-family rental housing.

Current Zoning Regulations:

Milan has provisions in its zoning code for accessory apartments, two-family and multiple-family homes, for conversions of existing structures, and for ECHO housing for seniors.  However, these provisions are frequently more prohibitive than they need to be and, perhaps as a result, are not commonly used.  Such zoning provisions have the potential to enable lower cost rental and intergenerational family housing.  Lauren Kingman, Chair of the Milan Planning Board, who has acted as an ex-officio member of the Committee, prepared an analysis of zoning provisions ("Overview of Enablers of Moderate Priced Housing", see Appendix P) that covers inconsistencies in our regulations, and restrictions that limit the utilization of these mechanisms for the creation of moderately priced, more affordable housing in Town.

Zoning in the Town has its highest permitted density in the hamlets of Rock City and Lafayetteville, where one acre development is allowed.  There are no provisions to permit, except with a variance or under clustering provisions, residential density of less than one residential structure per acre.  Property values and associated taxes are higher than could be experienced with selective higher density.

The report prepared for Milan by Dutchess County Planning ("Town of Milan Housing", see Appendix N), makes a number of recommendations with respect to Milan zoning to achieve the goals of the Comprehensive Plan.  The report concludes that the growing disconnect between home prices and the ability of local families to afford the median priced home, coupled with the number of cost burdened renters and owner-occupied senior households suggests the need for additional moderately priced rental and owner-occupied housing opportunities.  "Under the proposed zoning (i.e., RSO) which will increase amount of large lot zoning, this trend is likely to be exacerbated unless it is mitigated by other measures."  The measures recommended by the County are designed to achieve the various goals of the Comprehensive Plan, maintain a balance of housing stock, and provide for some level of moderately priced rentals and owner-occupied housing.  They include the following:

- Zone a modest amount of land for multi-family housing, preferable in and around the hamlets.  (See "Zoning District" below)
- Allow accessory units to single family homes.
- Permit the construction of two-family homes.
- Provide incentives for the construction of moderately-priced rentals and for moderately priced homeownership.

Development Incentives/Mandates:

The Committee reviewed initiatives undertaken by other municipalities to generate affordable housing in their communities, and we reviewed the model law under preparation by Dutchess County Planning to mandate affordable housing in the course of approving large subdivisions. Even when major subdivisions occur, most of Milan's new housing development comes as the result of the sale of individual lots to prospective homeowners who contract to construct single family homes. Under this real estate market scenario it is difficult to establish effective developer mandates. The Committee explored potential mechanisms for mandated development of moderately priced housing under this scenario with both Dutchess County Planning and representatives from the Pace Land Use Law Center and could develop no meaningful mandates that we believed would be generally applicable to Milan.

Also weighing on this consideration was the administrative burden that could be placed on the Town with the creation of protected price housing, as is evidenced in the County model law and regulations (see Appendix G). It is likely that Dutchess County will provide an administrative umbrella under contract with a non-profit housing corporation for municipalities who undertake affordable housing initiatives of this sort. It is the Committee's view that such an initiative is appropriate for later, should other actions prove insufficient over time to maintain the balance of housing stock suggested by the County.

The Committee does believe, however, that incentives for the construction of moderately priced housing are appropriate. After considerable discussion, the Committee concluded that the option for a developer to obtain an additional market rate lot, when committing to include one moderately priced affordable home in a major subdivision application would be a win-win for the Town and the developer; this incentive would apply when subdividing under the cluster provisions of the zoning code to ensure the provision of open space and to maintain rural character. The development of the subdivision regulations to guide this process would be the charter of the Planning Board. Homes developed in this manner could be managed under the administrative structure being developed by the County. However, it would be necessary for the Town to decide what percentage of the median home price would apply, the term of price escalation control and amount of allowed escalation, and the priorities for selection of candidates (see target beneficiaries below).

One of the variants that the Committee discussed with some degree of enthusiasm is the potential for development of a two-family home, of similar design to other single family units in a subdivision, with the second unit intended to be a rental unit which would offset the carrying cost of the primary unit occupied by the homeowner.

Target beneficiaries:

Early in its discussions, the Committee focused on the question of *who* it is that the Town should be trying to assist with its housing efforts.  Some towns undertake initiatives to provide moderately priced housing through incentives or mandates, and the County has a model law and administrative guidance for Towns doing so.  Such regulations require a way of establishing who gets priority for such housing.  Since incentives or mandates are an option for Milan to consider, the Committee developed a matrix of who would be candidates to benefit from such housing, and established a point system on how to prioritize selection, as depicted in the table below.

To be eligible, any applicant's family income level would need to be less than the maximum family earnings cap as determined by the Town, usually on the basis of percent of the median income.  Applicants would also need sufficient income to afford the housing offered under the program.  Having met the income threshold, applicants would be selected based on the total points they were awarded under the matrix above, derived to give weighted preference based on 1) where they reside at the time of application, with preference given to local residents; 2) where they worked, with preference given to town employees and then other public service employees; and 3) based on other considerations, such as giving special preference to volunteer emergency workers, veterans and senior citizens.  It was the view of the Committee that programs such as this would only be practical, given Milan's size, only if they were administered through the County or other regional agency.

| Suggested Moderately Priced Affordable Housing Priority Matrix | | | | | |
|---|---|---|---|---|---|
| Residence | | Employment | | Other Factors | |
| Town | 10 | Town employee | 10 | Vol. Fire or Rescue | 10 |
| or | | School Dist employee | 8 | | |
| | | Health services employee | | | |
| County | 5 | | 5 | Veteran | 5 |
| | | Other gov't employee | | | |
| or | | | | | |
| | | Milan business employee | 3 | | |
| | | | | Senior | 2 |
| Other | 1 | Bus.employee - Adjacent Town | 1 | Relative/Milan Res. | 1 |
| (Household) | | (Individuals combined) | | (Multiple factors permitted) | |

Zoning District:

Included in the County's recommendations above is the proposal that some modest amount of land be zoned for multi-family housing, preferably in and around the hamlets.   This proposal is similar to the proposal made in the Comprehensive Plan to allow zoning for Planned Purpose Developments.  During the deliberations of the Comprehensive Plan Board, there were identified 4 properties that were proposed in the first draft of the Plan Report (March 2005) to be placed in a zoning district designed to encourage the development of higher density traditional walking neighborhoods and senior housing.  The Town Board at that time objected to the designation of specific properties and felt such a zoning district should be allowed in other areas as well.  The final Comprehensive Plan Report, as presented to the Town and adopted finally in 2007, endorsed the PPD approach without designating any specific parcels.

In fact, there are only 4 parcels that today make sense with respect to the County's recommendations and the Comprehensive Plan's description of PPD's. Each of these properties are of a size that could accommodate modest numbers of multi-family structures, given the provision for central water and wastewater disposal. One of those is the front of the property owned by the Town in the southwest quadrant of the South Road/199 intersection.

The advantage of the PPD approach is that the Town can retain approval control on the design of any development that is to occur as a condition of granting a PPD, and, with a properly designed plan, would be able to establish conditions with respect to moderately priced and senior housing.  Of course, the decision to develop or sell to someone who would develop such a community rests with the property owner.  In the case of the Town Park, the Town holds all the cards, and could initiate a model smart growth, traditional neighborhood development, should the community support such an initiative.  However, it is expected that such a proposal would be politically controversial and should be the subject of community dialogue after a series of educational workshops are offered to acquaint residents with the concepts and site possibilities.

At this time, the Committee proposes adopting the PPD provisions of the Comprehensive Plan to establish the zoning district recommended by the County. However, any action to initiate development of a traditional walking neighborhood on Town Park land should come only after substantial dialogue, discussion and a level of consensus in the community.  Such an initiative could provide the best option for the creation of moderately priced housing for young families and seniors with other quality of life benefits to the entire community.

October 2007

Other mechanisms:

There are a number of other options that the Town Board may wish to consider that can complement the recommendations of the County and this Committee.

**Transfer of development rights:** "Provisions in a zoning law that allow for the purchase of the right to develop land in a sending area and the transfer of those rights to land located in a receiving area."[8]  For example, with Milan's current zoning, there could be designated "sending" areas, selected because they will help preserve Milan's rural character if they remain un- or less developed, with designated "receiving" areas that would  be suitable as a result for moderately-priced affordable housing alternatives with the greater density permitted.

**Community Land Trust:** "Community Land Trusts (CLT's) are a special type of land trust whose primary focus is to create affordable housing and to maintain its affordability over the long term. (see Appendix Q)They typically achieve this goal by removing (or reducing) land costs as an element of housing rental and sale prices.  This is normally done by purchasing land with their own private funds (sometimes supplemented by public monies) and making it available at reduced or zero cost to qualified buyers.  It can be accomplished by negotiating with local governments for zoning density increases, which would typically be tied to a restriction on  the use of the land for a specific number of subsidized housing units.

**Mandate of Moderately Priced Housing**:  Although the Committee has determined that mandated construction of moderately-priced housing is not appropriate at this time, the alternative exists for the Town to determine - as many other Dutchess County towns have done - to require the construction of moderately-priced, controlled  cost escalation housing units  as a criteria for approval of large major subdivisions, perhaps 10% of dwelling units when over ten units are proposed.  Our pattern of development has rarely seen such large subdivision actions, although, as the Carvel project makes apparent, such activity can be expected on an occasional basis in the future.

**State Environmental Quality Review (SEQR):** The SEQR process provides a number of options that could encourage and facilitate the development of moderately-priced housing in Milan.  One option is to complete a Generic Environmental Impact Statement at the time of passing new zoning that lays out the parameters desired by the Town in those rezoned areas.  As long as development is proposed that is consistent with the GEIS, the application can be 'fast-tracked' in the SEQR process.  Another approach is to adopt unique Town SEQR Type 1 requirements for projects that do not meet the Town's intent in such areas.  In effect, SEQR can be used to provide a 'carrot and stick' approach to encourage the attainment of specific development objectives.

---

[8] Well Grounded, p. 426.

Tax Implications:

One of the rationales for keeping Milan's population density low, in addition to maintaining our rural character, is to restrain the growth of property taxes, particularly school taxes. To the degree that the Town encourages moderately-priced affordable housing, the reverse is true. The simple math is that more children in lesser taxed new dwelling units will have the effect of increasing taxes incrementally for all tax payers. It is therefore a question of balance.

If the Town takes no action, the market price escalation driven by Milan's proximity to the lower Hudson Valley and New York City can be expected to continue, pricing many families, particularly young and seniors, out of housing as the Town grows. Large lot zoning and land protection to limit future density, taken alone, can be expected to compound the affordability issue. To responsibly address diverse housing needs, while also managing growth to limit future density and control tax escalation, requires that the Town take action on both, striking the right balance.

## Summary:

The Committee learned a great deal in the course of its deliberations. The key questions answered above lead directly to the recommendations in the section to follow. However, the Committee believes it is worthwhile to itemize some of the things learned during our work.

1. Affordable housing is an issue that can not be addressed solely by single-family market-priced homes.
2. Affordable single-family housing for families earning less than median incomes can't be built on lots in Milan's primary residential zoning districts.
3. Providing reasonable solutions requires actions to maintain a balance of some reasonable number of rental units.
4. Appropriate solutions vary by community.
5. Milan does not have the infrastructure, ready low-income employment market, or community services that would support housing for those families whose income is sufficiently low as to require housing subsidy in today's market.
6. Milan has a predominant development pattern that is different than most communities – most subdivision is undertaken to facilitate the sale of lots, not homes, and development is typically individual homeowner construction.
7. Given the size of most subdivisions, it would would not be appropriate in Milan for mandate of affordable housing. Were the Rural Space Overlay to be adopted in some form to lower development density, it would further reduce the number of large major subdivision applications.
8. It is important to balance, in the eyes of the courts, the interests of current residents of the Town and the interests of future potential residents.

9. The County suggests that we should seek to maintain the traditional balance of rental (20%) v. single-family home ownership.
10. The Dutchess County Department of Planning and Development recognizes the unique nature of the Town of Milan, and the limitations that Milan faces in providing moderately-priced affordable housing alternatives. Their recommendations are tailored to Milan and encourage the Town to take the modest steps consistent with our topography, infrastructure and community character. They provide the basis on which Milan can demonstrate the balance required to provide diverse housing as we proceed to protect the rural character of the Town.
11. As with most things, there are costs associated with acting, and with not acting, to address the housing needs and the development pressures on the Town. We must act on both, for inaction will in a very tangible way "cost us our Town".

## Recommendations

The Committee has a number of recommendations for the Town Board's consideration. The most important of these recommendations is that the Town create a standing Density and Housing Committee, drawn from a cross-section of the citizens, chaired by a Town Board Member with a charter to take necessary actions to build a reasonable consensus on the need for moderately-priced housing initiatives *while also preserving the rural residential character of the Town.* The approach to link these issues is similar to that taken in Rhinebeck; concepts for consideration are explored in a publication by The Conservation Fund entitled "Conservation-Based Affordable Housing" (see Appendix R).

This Density and Housing Committee may find it necessary to complete a more current and detailed housing survey than did our ad hoc committee. A critical element of their work must be to facilitate a dialogue with the community by providing information sessions and community workshops to address specific aspects of the affordable housing issue. Such information sessions may include the following topics:

- Understanding the housing challenge in our community
- Smart growth principles; the management of density and community character
- Traditional walking neighborhoods and community control of development
- Central water and wastewater options and technology
- Zoning options for moderately-priced housing

Flowing from those meetings may be workshops that result in revisions to the comprehensive plan and the development of new initiatives consistent with ideas and directions discussed.

At this time, the Committee agrees with the recommendations made by Dutchess County Planning and Development and believes they provide meaningful actions for the Town. It is important to put these recommendations in the context of Milan.

October 2007

The County recommends that the Town maintain the rental to owner occupied housing that we have in Town, approximately 20%. Depending on our rate of growth, that implies only a small number of additional units per year. This should be the perspective with which these recommendations are reviewed. To flesh out the recommendations of the County (see above), the Committee suggests the following more specific ideas.

- *Zone a modest amount of land for multi-family housing, preferably in and around the hamlets*. As outlined above, the PPD in the comprehensive plan provides a positive response to this County recommendation. It is not the only possibility; other options would include a transfer of development rights provision with the receiving locations to be hamlet or 2 acre (R2A) parcels; the potential for these transfers could be extended by rezoning additional land for hamlet and R2A use.
- *Allow accessory units to single family homes*. Milan's Zoning Code already provides for accessory units. However it is the view of the Committee that these provisions are overly restrictive and can be modified to further the objective of providing more affordable housing through accessory apartments. Such dwelling units are particularly appropriate for singles, for young starting families and for senior citizens.
- *Permit the construction of two-family homes*. The Town does permit two-family home construction today, but does not permit the conversion of single family to two-family dwellings. We believe that should be changed to permit such conversions.
- *Provide incentives for the construction of moderately-priced rentals and for moderately priced homeownership*. The incentives the Committee endorses are provisions for an extra lot when proposing a major subdivision and an agreement to construct a moderately-priced dwelling. Of particular interest to the Committee was the concept of constructing a two-family home, or permitting the construction of a new home with an accessory apartment that could appear visually the same as the other homes constructed in the subdivision. It might be constructed on a smaller lot with conservation subdivision flexibility or a zoning variance. The concept is that the unit has less land to be taxed, and provides a rental income stream to the owner, enabling the creation of two more affordable units, one owned, one rented. Should the Town determine to make available such moderately-priced affordable housing to only those with specified qualifications and/or to protect the thus constructed affordable housing through control of cost escalation, it should do so only when a county or inter-municipal sponsored housing authority is available to administer the program.

More specifically, the following zoning code changes are suggested for consideration.

Accessory Apartments -- §200-17.

1. As a first step, an inventory of accessory apartments should be undertaken to determine what is already available.   It is the Committee's sense that there are numerous 'off-the-books' accessory apartments today and the Town has no way of responsibly evaluating the state of affordable housing as it exists.  The Town might want to grant an amnesty period to determine the true number of accessory apartments that exist in Milan, and establish a penalty for future accessory apartments that come to the attention of the Town after the amnesty period for failing to obtain the necessary special use permit prior to construction.

2. The Committee further recommends that the Town simplify the process by which an accessory apartment is constructed to make more such housing available.  Section 200-17.(E) should be changed to eliminate the waiting time for building an accessory apartment.

3. Also, accessory apartments should be included under conversions and these sections of the code, today in conflict, should be made consistent.

4. The policy of owner occupancy should be continued and there should be a renewal process established should there be a change in ownership.

5. Further, §200-17.(D) & (G) should be altered to bring them into agreement and should be changed to permit additions with the limit of an accessory apartment to be no more than 30% or 1200 sq. ft. maximum of an existing structure.

6. A control on the number of accessory apartments allowed in the Town in any given year has been established in some other towns and may also be considered if the Town Board is concerned that there could be too many created.

Conversion of existing structures -- §200-23.

1. It is recommended that the Town permit conversion of single family homes to two family homes, without requirement for additional acreage.

2. The terminology with respect to accessory apartments conflicts in this section with the accessory apartments section of the code above, and needs to be brought into common usage; these sections should also be consistent with the language and provisions of the Multiple Dwelling section.

Multiple Dwellings -- §200-37.

1. It is suggested that residential density be modified to permit greater flexibility in the hamlet and R2A districts.

2. There is no definition of what a group of dwelling units is; perhaps it would simplify and bring consistency to say that the first two dwelling units must meet the underlying minimum zoning requirement, and each additional unit will require an additional acre. This could be varied by zoning district to permit higher density in some areas, lower in others. For example, it might require only ½ acre additional in the hamlet and R2A districts, but acreage complying with the underlying zoning in the 3 and 5 acre districts for each additional dwelling unit.

Conclusion:

The Committee thanks the Town Board for the opportunity to consider this important issue for the Town's future. We believe we have laid a foundation for the Town to move forward on an initiative to provide additional moderately-priced housing for working families and senior citizens. This will not be an easy process for the Town Board, or for those citizens who involve themselves in developing these solutions. However, as recently expressed in a Poughkeepsie Journal article, "Housing Issue Needs Leaders" (see Appendix R):

> "Public officials ... have to show leadership. Conference attendees correctly harped on the fact that sometimes public perception and resistance kills affordable housing ideas. Neighbors fear a dip in their home values and/or cite the 'usual suspects' of concerns – more traffic congestion, swelling enrollments that drive up taxes, etc. Municipalities have to overcome these obstacles by identifying logical places for affordable homes, usually near town centers and public transportation and utilities, and then work with developers to see that they get built."

Leadership in this case falls to the Town Board. The members of the Committee are each prepared to help in the further work we have outlined.

October 2007

## Town of Milan Committee Report:  Moderately-Priced Housing Index to Appendices

A) Excerpt, <u>Town of Milan Comprehensive Plan</u>, Chapter 7, "Housing and Residential Development".

B) Nolon, John R., <u>Well Grounded</u>, Chapter 6: "Balancing Development and Conservation", and Chapter 9: "Limitations on Local Land Use Authority".

C) Arendt, Randall, <u>Rural by Design</u>, Chapter 10, "Affordable Housing".

D) Dutchess County Department of Planning and Development, <u>Smart Growth Housing Task Force Report</u>, December 2001.

E) Cappello, John C, Esq., "Addressing Workforce Affordable Housing & Inclusionary Zoning", Jacobowitz & Gubits, LLP (Counselors at Law).

F) Saylor, Anne, "Inclusionary/Moderately Price Housing Ordinances", Presentation to the American Planning Federation.

G) Dutchess County Department of Planning and Development, Draft Model Laws for Municipal Moderately Priced Housing Initiatives.

H) Pace Land Use Law Center, Selected Materials, "Affordable Housing – LULA Workshop".

I) Town of Pine Plains Zoning Commission, <u>Final Draft Zoning Law</u>, (Index and Section 8, "Supplemental Regulations for Moderately-Priced Housing"), Reported to the Town Board, July, 19, 2007."

J) Phillips Preiss Shapiro Assoc., Inc. (Prepared for the Town of Rhinebeck Open Space and Affordable Housing Committee), "Town of Rhinebeck Open Space and Affordable Housing Implementation Plan", (Index and Executive Summary), July 2007.

K) Three articles on the Red Hook Commons project from the Poughkeepsie Journal and Gazette Advertiser

L) Land Use Law Center, "Rural and Small-Scale Affordable Housing: Local Issues, Strategies, Resources", 2007.

M) Milan Sales Analysis Reports, All Milan School Districts.

N) Saylor, Anne, Dutchess County Department of Planning and Development, "Town of Milan Housing", 2007.

O) Saylor, Anne, "Milan Moderately Priced Housing Matrix", 2007.

P) Kingman, Lauren, "Overview of Enablers of Moderate Price Housing", a memorandum dated January 13, 2007.

Q) Burlington Associates in Community Development, LLC, "Key Features of the 'Classic' Community Land Trust", Burlington Community Land Trust, <u>www.bclt.net</u>.

R) Briechle, Kendra J., "Conservation-Based Affordable Housing", The Conservation Fund,

S) "Housing Issue Needs Leaders", <u>Poughkeepsie Journal</u>, June 15, 2007

## Other Resources Cited

**Arendt, Randall, <u>Rural by Design</u>, American Planning Association, Planners Press, 1994.

*Bacher, Jessica A., senior ed., <u>Affordable Housing Law Book,</u> Real Estate Law Institute of the Land Use Law Center, Pace University Law School, 2006.

**Nolon, John R., Well Grounded: Using Local Land Use Authority tso Achieve Smart Growth, Environmental Law Institute, 2001.

*Stauffer, Matthew, ed., <u>A Local Leader's Guide to</u> <u>Meeting Housing Needs</u>, Starting Ground Series, Pace University Law School Land Use Law Center, 2003.

***The Town of Milan Comprehensive Plan, 2007

***The Rhinebeck Plan, June 2005 draft.

| | |
|---|---|
| * | Available from Diane May for Committee and Town work |
| ** | Available from Ross Williams for Committee and Town work |
| *** | Available from the Town Clerk of the respective towns |

# Moderately Priced "Affordable" Housing

Town of Milan
Ad Hoc Housing Committee
October 1, 2007

---

## Committee Members

The Committee:
Peter Goss
Arthur Michaels
Larry Steel
Ross Williams (Town Board Chair)
Piper Woods

Also participating:
Lauren Kingman (Planning Board Chair)
Diane May (Town Board)

With special thanks to:
Anne Saylor, Dutchess County Dept. of
Planning & Development Housing Specialist

page 2 of 8      October 2007

---

## Background

- Committee established to develop recommendations to the Town Board

- Public Concern expressed in RSO Public hearings

- Legal concerns if fail to deal with 'affordable housing' issue when changing zoning to limit density ... Land Use Law Center

- Comprehensive Plan goals ... a vision for Milan
  1) Maintain the rural character of Milan.
  2) Remain (primarily) a Residential Community.
  3) Enable small-scale and limited commercial activity.
  4) Protect open space and natural resources.
  5) **Keep Milan affordable and accessible to current residents**

- Expect whatever is done to be controversial ... community dialogue and consensus are critical

page 3 of 8      October 2007

---

## Research and Learning

- Evaluated local housing data from the assessor

- Extensive review of literature (see report appendices)

- 5 members and participants attended a total of 2 weeks seminars and workshops

- DC Planning & Development Housing expert
  ➤ Attended 3 of our Committee meetings
  ➤ Provided Milan Housing Report and County recommendations

- Reviewed our current zoning for opportunities to provide useful alternatives

page 4 of 8      October 2007

## "Affordable Housing"

- Have to ask the question, "affordable to whom"?
- Housing affordability must be viewed in the context of income.
- Common use of 'cost burden' as measure of affordability: >30% of household income, >50% = "severe cost burden"
- Median household income in Milan = $63,230 (County estimate)
- Median family income in Milan = $75,342
  - ... median family income = $5,920/month?
- Cost burden for median household = $1580/month
  - ... including taxes, utilities, rent or mortgage.
- People below 80% of median income ($50K) would not be expected to be able to own a home, starting out today. Therefore, rental opportunity is critical to housing.
- Most households below 50% median income (<$30K), would be 'severely cost-burdened (spending more than 50% of household income on housing)
- Low income housing is generally appropriate only for places with extensive infrastructure – public transportation, social services, available employment without a car, etc. - and can only be 'affordable' when subsidized.
- The housing Milan needs will provide moderately priced alternatives to working families and seniors, including rental units.

October 2007

---

## The Housing Issue in Milan

➢ Assessment data would suggest available housing at modest cost

➢ Actual sales – 60% over assessments ... little available affordable housing

➢ County analysis using Census and Real Property data reveals extent of issue

| | Elderly | | | All Others | | | All | | |
|---|---|---|---|---|---|---|---|---|---|
| Households | # | Cost Burdened | % | # | Cost Burdened | % | # | Cost Burdened | % |
| Renters | 24 | 12 | 50% | 80 | 45% | | 104 | 48% | |
| Owners | 185 | 77 | 42% | 1,605 | 25% | | 1,790 | 26% | |
| Tot Hrs | 209 | 89 | 43% | 1,685 | 27% | | 1,894 | 29% | |
| Spend >50% | | 22 | 11% | 185 | 7% | | 207 | 11% | |

➢ About 20% of households are renters... many cost-burdened (i.e. spend >30% of income on housing). 50% of senior renters cost-burdened.

➢ Almost one-third of all households are cost burdened by housing.

➢ One in 9 seniors pay more than 50% of income for housing.

October 2007

---

## Committee Recommendations

- There are some short-term, low impact zoning 'fixes' that can be undertaken
  ➤ The county also recommends ...
    - allowing single to two-family conversions
    - reducing acreage restrictions on conversions to multifamily housing
    - permitting more flexibility in accessory apartments
  ➤ The county also recommends ...
    - zoning a modest amount of land for multifamily housing, both rental and owned, preferably in and around the hamlets
    - providing incentives (bonus density) for construction of moderately priced rentals and homes
  ➤ Before doing so, the committee recommends the Town Board establish a standing Density and Housing Committee to:
    - Do more in-depth study of housing and needs in Milan.
    - Examine Planning & Zoning Alternatives.
    - Begin an education and dialogue process with the community.
    - Develop a consensus on how Milan can legally maintain its rural character while balancing the need for a moderately-priced housing to support a diverse community.

October 2007

---

## Summary

➢ The 'affordable housing' issue in Milan is real and calls for a 'moderately-priced housing strategy.'

➢ There are some relatively straight forward zoning changes the Town Board can make to ease the pressure.

➢ There are longer range recommendations that require the establishment of a Density & Housing Committee to focus dedicated effort on:
  ✓ understanding the issues and alternatives
  ✓ working with the community to build understanding
  ✓ coming to a reasonable community consensus on how to proceed to limit density while providing needed moderately-priced housing opportunities

October 2007

**Town of Milan Comprehensive Plan**                    **1. Introduction**

Further input was sought from the public through a booth manned by CPB members at Community Day in September 2004. A regional workshop, conducted in October 2004, was attended by four neighboring towns and representatives of the Dutchess County Planning and Development Department, State Senator Leibell's office, and the Greenway Council. The participants provided valuable guidance and helped to prioritize the 3 top issues for the Milan Comprehensive Plan. These can be summarized as:

1) Plan for open space . . . avoid sprawl.
2) Avoid "cookie cutter" zoning.
3) Keep dialogue open with surrounding towns and continue intermunicipal cooperation.

The Commissioner of the Dutchess County Department of Planning and Development, Roger Akeley, endorsed the use of several of the new planning and zoning concepts outlined in this document. He specifically commented on avoiding sprawl, the importance of compact growth centers to the preservation of rural character, and the importance of requiring preservation of open space in development regulations.

The CPB conducted three public workshops (two in November 2004, and one in January 2005) to review the preliminary recommendations of the Board with the community. The workshops focused on four concepts, which will be discussed in subsequent chapters:

1) The establishment of a maximum desired density for the purposes of town planning.
2) The creation of priority growth area(s) in the town.
3) The establishment of a large lot zoning overlay zone (a Rural Space Overlay Zone).
4) The establishment of Planned Purpose Development districts for two purposes: traditional walking neighborhoods and senior housing/assisted living.

The public provided substantial support for these new directions. The most common concern noted was population density. Two of the sessions also reviewed individual committee recommendations in breakout groups. Again, the public was highly supportive of the committee's directions.

A draft of the plan was prepared and delivered to the Town Board for review on March 11, 2005. It was simultaneously made available to the public at no charge through the Town web site, at Town Hall and in the local libraries.

On April 9, 2005 the CPB Chair participated in a Lafayetteville community discussion sponsored by the Town Supervisor. This discussion occurred in a heated environment due to the publication of an anonymous opposition flyer that misstated the contents of the CPB's draft plan. A committee of volunteer citizens met with the Supervisor the next week to discuss what they would like to see going forward for Lafayetteville. The meeting was well attended and valuable feedback was received by the CPB, which has been incorporated into this recommended plan.

Public hearings were held on April 14 and April 16, a weeknight and a Saturday morning, to permit as many to attend as possible. A total of 43 people made 54 comments at these sessions, with many others present to listen. A majority of the total comments were positive, and a large proportion of the speakers were supportive of the plan. The CPB considered all comment, both positive and negative, made in the Public Hearings. A record of those comments is provided in the appendix. CPB responses regarding some of the issues raised are also provided in the appendix.

A major study of gravel and sand resources in Milan, conducted by a consulting geologist hired by Red Wing Sand and Gravel, was submitted at the final public hearing on April 16, 2005 and a meeting with the CPB was suggested by Art Brod, a consultant retained by Red Wing. Despite the late submission of this information, the CPB invited Red Wing representatives to make a presentation to the CPB and the

**Town of Milan Comprehensive Plan**          **3.  Course Changes for Milan**

D.  Conservation Subdivisions

The CPB recommends that the Town Board pass zoning and subdivision regulations that will require developers to protect our environmental resources and rural landscape through the use of conservation subdivisions. Under New York State law, conservation subdivisions are a form of clustering. The goal of a conservation subdivision is to site the development in ways that retain valued natural features of the land. Today, conservation subdivisions can be required by the Planning Board; they should be required for all development proposals in the proposed Rural Space Overlay Zone. Setting clear environmental standards in our Comprehensive Plan, Town regulations and Planning Board procedures will expedite the application process for developers who further the vision of Milan and plan their subdivisions accordingly.

E.  Density Planning Guidelines

The Comprehensive Plan Board recommends that the Town establish a density benchmark as a guide for future planning and assessment of the effectiveness of the tools outlined. The U.S. Census can provide only an imperfect measure of the Town's actual developed status, since approximately 20% of the Town's population (weekenders and part-time residents) is recorded elsewhere in the census. If we are to use the Census as a measure of density, it would seem prudent to adopt a density benchmark of 120 people per square mile, about twice the population recorded in the 2000 census. The real population, in terms of housing developed, would bring the total population, including those not counted in the Milan census, to approximately 150 per square mile. Workshop feedback has strongly endorsed keeping the level below 150, including all housed populations, to preserve the natural resources and rural character of Milan. This density benchmark is intended only as a planning guideline. It is neither practical nor legal to legislate population size. Having a population benchmark in mind, however, can be useful for examining the effectiveness of zoning and land use decisions over time, and can inform future changes to the comprehensive plan.

F.  Summary

This Comprehensive Plan is intended to serve the interests of all the citizens of Milan. The CPB developed these recommendations with the public's input in the plan process as well as from research into trends and conditions that exist today. Keeping Milan rural is the central priority of Milan's citizens, which relates very closely to the need to protect our environmental resources and open space.

To accomplish these, the CP proposes limiting development on large rural properties in Milan. The resulting large lots will be of high value, and will also pay relatively higher taxes for our schools and local governments, potentially reducing the relative burden on landowners with smaller properties. The plan also reflects residents' desire to live in a diverse community and for our current residents and their children to have an opportunity to be able to find and afford housing in Milan. Town government does not have the authority to control market prices, and today large lots are no longer affordable for many of the town's residents. Without large lots, however, we will sacrifice our rural residential character and the landscape that makes Milan unique and valued by its citizens. To balance this, therefore, it is imperative that the Town provide some small lot and multifamily housing that is affordable for people of moderate income. We believe this plan, when implemented, will provide the tools to make these goals possible.

**Town of Milan Comprehensive Plan**                    **6. Infrastructure**

development causes the need for new schools or additions and additional bus routes. Further perspective on school taxes is addressed separately in a paper in the appendices.) Development is, in turn, a function of land-use decisions made by municipal officials. While Milan can control some of the increase in school taxes by restraint in residential development, school taxes are ultimately beyond the control of any one municipality when school districts draw students from multiple municipalities and counties, as is the case in the three school districts supporting Milan. This is an area where regional discussion and cooperation is important to the well-being of the citizens of each municipality.

7) Water and Wastewater Treatment Systems. Any water or wastewater system can become a burden to town taxpayers.  In Milan there is only one small community water system, located on the Carvel property; their requirement for future water system development awaits the Carvel plan and findings of the environmental impact statement.  Most Town residences are serviced by individual wells; the maintenance of clean water is a concern of the newly appointed Town Conservation Advisory Council. In some circumstances, common or shared systems may be appropriate to enable efficient development of clustered subdivisions. Given the lack of community water supply, it is important that adequate water is available to provide fire-fighting capability.

The potential need for central water or wastewater treatment systems in conjunction with proposed compact development in priority growth areas with planned purpose development is a controversial subject. Part of the concern is the cost of potential required connection to such a system. As pointed out in the Lafayetteville meetings, residential lots of less than one acre and commercial operations are not practical from a health and safety perspective without some type of central wastewater treatment system. Today many new technologies for small-scale wastewater treatment that have minimal aesthetic impact on the community are available. In many situations, such systems can be a more environmentally sound and healthy alternative to engineered septic or mound systems. More information should be provided by the Town, working with Dutchess County, to enable the community to weigh the benefits such systems could bring to land-use opportunities in the priority growth areas.  In particular, it is recommended the Town explore the potential role of the Dutchess County Water and Wastewater Authority.  The CPB understands that Dutchess County is willing to manage such facilities in municipalities, at least in some circumstances.  The County's "Smart Growth Housing Task Force Report" of December 2001 recommended that: "The County should use funds from the Partnership for Manageable Growth to assist with the financing of water and/or sewer installation for moderately priced homes on small lots, townhouses or multifamily housing. The availability of water and sewer is essential to the development of moderately priced housing on small lots and this program will help municipalities bring such services to a site by providing matching grants for pre-construction/feasibility studies and construction projects."

8) Recreation. Milan is blessed with large protected state, county and Town lands for recreational purposes, including three state multiple use areas, a county park -- Wilcox Park -- and the Town Recreation Park.

Jackie Reynolds, Milan's Recreation Department Chair, reports that the Town Park has a Little League field and a softball field that are regularly used evenings during the spring and summer, principally by three leagues: Little League baseball, the Girls Taconic Softball Little League, and the Dutchess County Volunteer Firemen's Softball League. A basketball court is used for pickup games, and space is available for a volleyball court. There is a playground that gets limited use; its vitality would be enhanced by a new merry-go-round and a few unique pieces of equipment for variety.  An obsolete merry-go-round has been removed and new playground equipment will be installed in 2006.

The surrounding larger towns where students go to school offer much competition that addresses recreational needs.  The schools and larger towns have organized recreation departments and swim programs not available in Milan where youth tend to go to participate in recreational offerings with their schoolmates.  Similarly little demand is noted in Milan for soccer fields and tennis courts—our citizens

Town of Milan Comprehensive Plan           7. Residential Development

Chapter Highlights:

Residential development is at the core of the issues facing Milan.
The Town's growth and its impact on environmental resources and
rural quality of life are therefore central to this comprehensive
plan. Historic growth at 25% per decade shows no sign of abating;
in fact, it appears to be increasing.  Existing zoning is inadequate
to prevent sprawl.  Rapid population increases cause significant
pressure on our schools and taxes. However, large-lot zoning,
taken alone, only causes sprawl to eat up the landscape faster, and
large-lot zoning is not affordable to many in the community today.
The CP incorporates tools to expand housing diversity and
affordability, particularly for senior citizens, for young families,
and for those with moderate incomes who cannot afford large-lot
housing.    Housing on smaller, more affordable lots and
multifamily units are important elements of this effort. The plan
also recommends tools that enable the Town to manage growth in
a controlled way while protecting our environmental resources and
our rural residential character. The tools proposed will make more
compact development possible in Milan's historic hamlets through
the adoption of a planned purpose development concept.  This
concept applies only when willing owners propose development
that the Town finds consistent with its objectives.  Across the
balance of the town, the CPB proposes a Rural Space Overlay
Zone that, when coupled with a requirement for siting homes in
conservation  subdivisions,  will  protect  our  environmental
resources, prevent sprawl, provide a restraining effect on small
landowner property taxes, and limit future growth in town—all
consistent with maintaining our rural character.  The intent of these
proposals is to put Milan's future in the hands of Milan's people,
not in the hands of outside developers leaving with their profits at
the community's expense.







Town of Milan Comprehensive Plan                    7. Residential Development

A very different definition of affordable housing is provided in the book *Well Grounded: Using Land Use Authority to Achieve Smart Growth*, by John Nolon, Director of Pace University's Land Use Law Center. It defines "affordable housing" as "Housing developed through some combination of zoning incentives, cost-effective construction techniques, and governmental subsidies which can be rented or purchased by households who cannot afford market-rate housing in the community." One of the virtues of this definition is that it recognizes two important factors: (1) the Town cannot determine the market value of housing in the community, however, (2) there are actions the Town can take when planning for the future to help provide some level of affordable housing. In this plan we refer to affordable housing in the context of people's ability to obtain housing, and to actions the Town can take to ensure there is a level of housing available to moderate-income households earning less than the median household income.

8) <u>Senior Housing.</u> Although Milan has a slightly lower percentage of senior citizens than does Dutchess County overall, with 264 people aged 65+ in the 2000 census (11.2% of the population), it is well-known that baby boomers will soon swell the seniors' ranks. While many residents indicate they would like to stay in Milan as they age, they cite the lack of any senior housing in Milan and concerns with the rising cost of taxes. Thirty-seven percent of the 2000 survey respondents mentioned the need for senior housing. Today's Milan seniors are outspoken in voicing a desire to see some sort of affordable senior housing.

9) <u>Historic Housing.</u> Over 85% of Milan residents have indicated that it is important to maintain historic structures. Little progress has been made in this area since the 1986 Master Plan recommendations were published.

10) <u>Multifamily Housing.</u> Milan permits two- and multi-family housing across its primary zoning districts. While small multifamily structures are endorsed in this plan as one of our affordable housing solutions, surveys and conversations with Town residents reveal that large multifamily housing (apartment buildings) is not desirable and should not be encouraged. These buildings are inconsistent with the rural character of the Town.

11) <u>Mobile Homes.</u> Allowing mobile homes in the Town was viewed as negative by over 72% of the residents in one Town survey, who also felt their placement should be restricted to designated areas in Town. The CPB has concluded that mobile homes should be allowed as per current regulations as an available affordable housing option; however, mobile home parks should not be allowed in future zoning regulations.

## C. Goals and Vision

If Milan is to implement the vision and overriding wishes of its residents it must sensibly control the number and location of new lots and devise a better way to approach development. The current zoning and land-use regulations, if left unchanged, will result in a suburban, built-out Milan in the future, like most other communities in Dutchess County. If Milan's residents value rural atmosphere, uncongested roadways, and forests and fields not ravaged by 21st century sprawl, then new, innovative zoning regulations must be implemented.

All surveys (the 1986 Master Plan survey, the Town's 2000 questionnaire, and Comprehensive Plan outreach discussions) indicate that the paramount goal of Milan's residents is to KEEP MILAN RURAL. Milan's citizens want to retain the rural character of their Town and to protect the environmental and scenic resources that make Milan a unique residential community. Today, rapid growth threatens those values. Dr. John Nolon, Director of the Land Use Law Center at Pace University, recently commented on the crisis of neighborhood character erosion and land disappearance: "The crux of the issue comes down to local zoning laws that define how land can be used. The laws simply must be changed" (*Poughkeepsie Journal,* February 27, 2005).

Town of Milan Comprehensive Plan                    7. Residential Development

critical to the social health of the community. However, this diversity can not be maintained if the cost of housing rises beyond the means of many of its citizens. The current housing market is rapidly driving up the cost of housing beyond what many people can afford. Using the US Department of Housing and Urban Development's affordability formula[1], the Milan median household income of $54,491 per year, and taxes and overhead typical to the Milan area, the maximum affordable home price for the Milan median income household is $143,813. Based on 2004 housing sales, only 5 homes sold for less than this price therefore 91% of the homes were out of reach for the median income family. This presents a particular problem to young families seeking to obtain their first home.

Current zoning permits multifamily dwellings, accessory apartments, and mobile homes. These offer affordable housing alternatives and the CPB recommends they remain in the zoning code with amendments where appropriate. The CPB further recommends that incentive zoning be considered as another way to increase the stock of affordable housing. However, considering the small size of the Town and the housing market pressures outside the Town, there is not much the Town can do to directly affect housing prices.

Across the country there is private sector interest in providing affordable housing. There are many varied approaches taken by these for-profit ventures, such as cottage communities, mixed use areas, and clustered communities, and there are new approaches constantly being developed. If there is to be any significant impact on affordable housing in Milan it will most likely be the result of private investment. But at this point it is not known which alternatives would be suitable for Milan, which approaches the citizens would like to see developed, and where they should be located. For this reason the CPB recommends a PPD for affordable housing to enable the Town to consider any serious proposal.

C. Traditional Walking Neighborhood. In *Well Grounded*, by Dr. John Nolon, a traditional walking neighborhood is discussed as one that provides for pedestrian-friendly mixed-use areas, with buildings that face the street and are located at maximum rather than minimum setbacks to bring them close to sidewalks. Such centers are within walking distance of residential areas providing a diversity of housing types. They offer an excellent opportunity to create "flex housing" -- two-story, street-front buildings with a small commercial space on the ground floor and housing above. Traditional walking neighborhoods are typically viewed as having a radius from the center of ¼ to ½ mile, approximately a 5-10 minute walk. The Town owns land at the intersection of South Road and Route 199; a small unused portion of this site could serve as a catalyst for the development of such an area.

Today, the minimum lot size in a hamlet is one acre. To permit development on lots of less than one acre would require construction of expensive water treatment facilities, the cost and maintenance of which the Town is unable to bear. Making an agreement with a developer, however, who will construct a water treatment system and/or construct a number of affordable units as part of a planned purpose development, provides a viable way forward. The planned purpose development options described above can provide a needed degree of flexibility. Such agreements can and should specify a number of units reserved on a priority basis as the Town desires -- for example, for seniors or as affordable housing for municipal or emergency service employees. Current zoning does not allow for the sort of multiple unit housing necessary for senior housing. However, individual or small group senior housing in a compact planned purpose development would be appropriate, and should first be made available to current Milan residents. Allowing zoning flexibility -- always consistent with the larger interests of the Town and its residents -- will enable new types of carefully planned development. The Town need only allow such projects in cooperation with a responsible developer willing to comply with the Town's approach and serve Town interests while serving his own.

---

[1] See "Affordable Housing in Milan: Is It Possible with Current Zoning", 7-13-05, L Kingman, in Appendix)

Regulations will need to be developed to implement the planned purpose development concept as part of Milan's Town Code. These regulations should be developed through public dialogue with the residents of the hamlets and the Town, and criteria for the use of the Planning Board and Town Board when considering a planned purpose development application should be established.

5.  Affordable Housing Options and Incentive Zoning.  As noted above, affordable housing is a problem in Milan, as it is in many areas in Dutchess County. Milan residents want to see diversity in housing available in Town. Current zoning regulations already allow for affordable housing types that are in keeping with the rural residential character of Milan. These include multiple-family homes, accessory apartments and mobile homes. The CPB concluded that we should retain quality mobile homes as a housing option in the Town, despite some contrary views, as one mechanism to provide affordable options. Residents make clear, however, that mobile home parks are in not in keeping with the vision of Milan for the future. In addition to the existing options, the CPB recommends that the Town adopt incentive zoning or density bonuses and other appropriate techniques and use its influence in connection with future planned purpose development proposals and conservation subdivisions to expand the availability of affordable housing. Allowing developers of large projects a modest percentage of bonus units could, over time, modestly increase the stock of affordable housing.

The above zoning proposals will lead Milan to a responsible, balanced land-use plan that respects the interests of homeowners and honors the wishes of its residents to avoid sprawl and suburbanization, to protect the Town's natural resources and to provide more affordable housing options for seniors, young families and those of moderate income. The proposed Rural Space Overlay Zone is identified on a map contained in the appendix, as is a map depicting the ¼ and ½ mile radii from our two major hamlet intersections.

6.  Additional Zoning Proposals. In addition to these major changes in Milan's approach to zoning, the CPB recommends changes to zoning in a number of other areas.

A. Rezoning of parcels adjacent to the Lafayetteville hamlet.  The CPB recommends that the small parcels along North Road and east of the Taconic State Parkway be zoned hamlet. We recommend that the large parcel east of North Road that was previously zoned R2A and apparently rezoned through a map error in 2003 to A5A, be returned to its original R2A classification. These rezoning actions are wholly consistent with concepts of a compact, mixed-use area that could evolve to become a traditional walking neighborhood and support some senior and affordable units.

B. Accessory dwelling units (ADUs). An ADU is created by converting part of, or adding onto, an existing detached single-family home, or by converting part of or all of a secondary building (garage, barn, etc.) into a residential housing unit on the same building lot.

ADUs help maintain a balanced approach to housing needs. Flexibility in accessory housing should be allowed while protecting the rights of neighbors, as well as the interests of Town residents. Generally, current regulations regarding accessory apartments achieve that balance and should remain unchanged. However, the committee would like to ease the burden that a five-year waiting period for converting existing nonresidential building to accessory apartments status (200 1E) can entail. We are concerned, however, that such apartments not become common and used as a form of rental housing. For this reason, the CPB recommends that accessory apartments require that either the principal dwelling or the accessory unit be owner-occupied on a continuing basis as a condition of granting and renewing special-use permits for these units.

Multiple dwellings of up to four units should be encouraged only in the designated PPDs of Town. An accessory apartment should be permitted.