SUPREME COURT: STATE OF NEW YORK
COUNTY OF DUTCHESS

---

CARMEN OTERO MC CULLOCH,

              PLAINTIFF

-against-

TOWN OF MILAN, TOWN BOARD OF THE TOWN OF MILAN, JOHN V. TALMAGE, Town Supervisor, and ALFRED LOBRUTTON, PAULINE COMBE-CLARK, DIANE MAY AND ROSS WILLIAMS, Councilpersons, And

TOWN OF MILAN PLANNING BOARD, LAUREN KINGMAN, Chairman, and Members JEFFREY ANAGOS, PETER GOSS, SHEILA MARGIOTTA, MARY ANN HOFFMAN, PAULINE COMBE-CLARK And GARY E. BECK, Zoning Enforcement Officer, Town of Milan, And

Frank Margiotta, Barbara Hughey And Charlotte Norman

              DEFENDANTS.

Civil Action No. 07 CIV 9780 (LAP) (RLE)

---

## AFFIDAVIT OF JANIS M. GOMEZ ANDERSON

Janis M. Gomez Anderson, being duly sworn, deposes and says:

1. I am an attorney duly licensed to practice law before the Courts of this State and admitted before the Southern District of New York.

2. I am associated with Van DeWater & Van DeWater, LLP.

3. During the times in question in this matter, Van DeWater & Van DeWater, LLP represented the Planning Board of the Town of Milan. During the years 2006 and 2007, Van DeWater & Van DeWater, LLP was also attorneys to the Town Board of the Town of Milan.

4. Part of the firm's work as Planning Board attorney was to negotiate conservation easements with applicants before the Planning Board who agreed to enter into a conservation easement with the Town of Milan as part of the subdivision approval process before the Planning Board.

5. As part of this process, we provided a form easement to applicants so that they did not have to start from scratch. The form was meant to provide a basis from which to begin negotiations. We provide the same service for common driveway agreements and other documents commonly used during the subdivision process.

6. The form for conservation easements, just as other forms used by the Town, has evolved over time.

7. Although a form was given to the applicants to start the process for the Quarfelt (Haggerty), Stonewood (Napolitano), Woodland Hills (McCulloch), Hidden in the Hill (Savoury) and Carrezola Subdivisions, each conservation easement was individually negotiated with the applicant or the applicant's representative and agreed to by the applicant, typically on advice of counsel.

8. In all, I participated in the negotiation of five conservation easements with applicants for the Town of Milan. One each for the Quarfelt, Stonewood, Hidden in the Hills, Woodland Hills, and Carrezola Subdivisions.

9. As explained more fully below and supported by the exhibits to the February 22, 2008 Declaration of Kenneth McCulloch ("McCulloch Declaration) and to this affidavit, Plaintiff in this case actually had the benefit of reviewing both forms of conservation easement, and she *chose*, or Kenneth McCulloch chose on her behalf, to execute the earlier form that did not

include the language regarding refraining from cutting trees in excess of five (5) inches in diameter at breast height.

10. In early 2005, before I personally became involved doing work for the Town of Milan Planning Board, Peter Dranginis, who was formerly of counsel to Van DeWater & Van DeWater, LLP, provided a form easement to Kenneth McCulloch for the Woodland Hills Subdivision.

11. McCulloch is the husband of and attorney for Carmen McCulloch who is the plaintiff in this case and who was the applicant for the Woodland Hills Subdivision. McCulloch represented plaintiff before the Milan Planning Board, and he represented her in the negotiations with our office regarding the conservation easement.

12. In August, 2005, the Town of Milan Town Board passed a resolution authorizing the Planning Board to work with the applicant and owner of the Woodland Hills Subdivision property on a conservation easement. Minutes of the August 8, 2005 Town Board meeting are attached as Exhibit 1. Although the draft form sent to McCulloch indicated that the Town Board had "agreed to accepted this Conservation Easement" it is clear from the minutes that the conservation easement was not finalized at that time, and the Town Board had only agreed in concept to accepting a conservation easement.

13. Around that time, I was asked by the Planning Board Chairman, Lauren Kingman to work on finalizing the conservation easement. On November 1, 2005, I e-mailed McCulloch the form of conservation easement that our office was using at that time for his review and use. It is attached as Exhibit 5 to the McCulloch Declaration. At that time, I was not aware that McCulloch had received a previous version of the form of conservation easement from our office that had been sent to him by Mr. Dranginis.

14. In my e-mail to McCulloch, I specifically made it clear that the terms of the easement could be negotiated: "I have attached a draft conservation easement for the Woodland Hills Subdivision for your use. Please review it and let me know if you have any questions <u>or proposed changes</u>." (emphasis added)

15. McCulloch did not respond to my November 1, 2005 e-mail, and I followed up with another e-mail on February 2, 2006, which is attached hereto as Exhibit 2.

16. McCulloch responded on February 4, 2006 by e-mail, a copy of which is attached as Exhibit 3. In this e-mail he indicated that he already had an approved conservation easement.

17. On February 6, 2006, after clarifying the situation with the Planning Board chairman, I sent McCulloch another e-mail explaining the conservation easement process had not been completed. This e-mail is attached as Exhibit 6 to the McCulloch Declaration. Along with the e-mail, I sent another copy of the draft conservation easement, in use at that time in the Town, which I indicated was "generally the form used by the Town of Milan for conservation easements." It was the same draft I sent on November 1, 2005.

18. On March 29, 2006, McCulloch sent a letter to James E. Nelson, a partner at Van De Water & Van DeWater, LLP, expressing his position with respect to the conservation easement. A copy of this letter and all of the exhibits to it are attached as Exhibit 4. I was out on leave after surgery at that time but was doing limited work from home.

19. The main difference between the old form (the one sent by Mr. Dranginis) and new form (the one sent by me) of conservation easement was that several new provisions had been added to the new form, most of which were added to maximize the protection of conservation easement areas. The new provisions in the form were highlighted by McCulloch

using parentheses in the copy of the draft attached to his April 30th letter to James E. Nelson, a copy of which is attached as Exhibit 5 hereto.

20. In McCulloch's March 29th letter, he objected to using the new form.

21. In the letter, McCulloch stated at page 2, "We are not satisfied with the new Conservation Easement." The "new Conservation Easement" McCulloch referred to contained the language regarding refraining from cutting trees in excess of five (5) inches in diameter at breast height. He rejected that form of easement in his letter.

22. During the month of April, McCulloch and James Nelson engaged in telephone negotiations regarding the easement agreement. I worked with Mr. Nelson and the Planning Board Chairman to determine what terms in the new form of easement we believed were critical to the Town.

23. On April 30, 2006, Mr. Nelson received another letter from McCulloch, a copy of which is attached as Exhibit 5. As noted above, McCulloch attached to this letter a copy of the new form of easement that had been sent to him and highlighted with parenthesis all of the changes it contained as compared to the old form of easement.

24. At page 2 of this letter, at the bottom, McCulloch specifically objects to the inclusion of the "five inches diameter at breast height" restriction that he now claims was purposefully left out of the easement to treat Plaintiff differently than others. He believed the language was too restrictive:

> P. 9. In the Conservation Easement that we agreed to there is no mention of trees five inches in diameter. If the owner wants to put in his vegetable garden but has to cut a tree that is five inches or more in diameter, he now has to have permission. It would be cheaper for him to buy his vegetables than to go through such a time-consuming process adversarial process.

25. It was my legal opinion then, as it is now, that the inclusion of the "five inches diameter at breast height" restriction was less restrictive, not more restrictive, than if the language was left out.

26. McCulloch did not want this language added to the conservation easement.

27. In addition, McCulloch made nine other objections to the new form of easement. See Exhibit 5 hereto.

28. After reviewing the letter with me, Mr. Nelson responded to Mr. McCulloch's April 30th letter by fax on May 2, 2008. A copy of the fax is attached as Exhibit 6. McCulloch responded by fax. A copy of that fax is attached as Exhibit 7 hereto.

29. Based on McCulloch's objections and Mr. Nelson's negotiations with him, we agreed with McCulloch that the best course of action was to work from the original form of easement and to add only those additional provisions from the new form of easement that Mr. Nelson and I believed were critical to protect the Town and to which McCulloch would agree.

30. The items included: a specific statement in the rights of the Town as to how it would access the property to monitor compliance with the conservation easement; a provision allowing the Town to delegate its inspection responsibilities to a third party and providing notice to the grantor of same; a limitation on rifle ranges and the use of motorized vehicles in conservation easement area as required by the Town of Milan Code; a reverter clause also required by the Town of Milan Town Code; a provision for existing conditions to be documented; and the requirement that the grantor would pay for the recording fees and title report.

31. The Town agreed in the negotiation not to require the several items from the section on prohibited uses in the new form of easement including E, F, G, H and J on pp. 6-7 on

the easement attached to McCulloch's April 30th letter, despite the fact it was required of others. See Exhibit 5 hereto.

32. Based on these negotiations, on May 3, 2006, using the original form of easement sent to McCulloch as the base document, I made revisions to that document adding in the language the Town believed was necessary for the conservation easement that McCulloch had agreed to. I e-mailed the draft to McCulloch on that day for his review.

33. On May 4, 2006, I had a telephone call with McCulloch to review the easement.

34. On May 5, 2006, I made additional revisions to the easement based on my conversation with McCulloch. I e-mailed the draft to McCulloch and included a redline draft which showed the changes that were made to the document to which he had originally agreed so that it would be entirely clear to what plaintiff was agreeing. A copy of this e-mail and the attachments are attached as Exhibit 8, 8a and 8b.

35. McCulloch responded on May 5, 2006, "I received your e-mail and read the message. Go ahead. I trust you now that I have talked with you." A copy of that e-mail is attached as Exhibit 9.

36. At no time during my discussions with McCulloch did he ask that the language regarding refraining from cutting trees in excess of five (5) inches in diameter at breast height be included in the final version of the conservation easement. Clearly, he objected to the language's inclusion in the agreement. See Exhibit 5 hereto.

37. After McCulloch approved it, the easement was passed on to the Town Board for public hearing and approval.

38. McCulloch himself signed the conservation on behalf of his wife using her power of attorney.

39. McCulloch's implication in paragraph 16 of his declaration that Plaintiff, or he on her behalf (again, it was McCulloch who executed the conservation easement using his wife's power of attorney) was duped into signing an agreement different than that signed by other applicants is patently false and belied by the evidence.

40. In fact, Plaintiff asks the Court to issue an opinion containing this untruth, when the exhibits provided by McCulloch himself belie the claim. At ¶26 of the proposed order McCulloch submitted, he asks the Court to hold:

> Assuming, however, that the provisions of the CEA for these other subdivisions, and the "Form" CEA, were more permissive to the Grantor, Defendants acted improperly, and in a discriminatory manner, in not providing the "Form" CEA language to plaintiff after telling her that the "Form" CEA was the one she would have to execute, but in giving the "Form" CEA to these other persons.

41. Exhibits 4 and 5, attached to this affidavit, clearly show that Plaintiff had the opportunity to view both forms of conservation easement used by the Town, the early one that had been provided to McCulloch, and the later one provided to both to McCulloch and other applicants that contained additional language.

42. McCulloch was never told Plaintiff had to sign a specific form of easement. He negotiated the terms of the easement.

43. McCulloch rejected the possibility of using the new form, and agreed only to some minor revisions to the old form.

44. Any suggestion by McCulloch that this was anything other than a negotiation between sophisticated attorneys is ludicrous.

45. McCulloch was given two forms of the easement. He believed one was more favorable to his client and insisted on using that form. The Town believed certain additional provisions were necessary over the original form and insisted those be included. An agreement

was reached, and McCulloch, using his wife's power of attorney, executed the conservation easement on her behalf.

46. McCulloch now seeks to be allowed to harvest trees for firewood from the conservation easement area, which is clearly not allowed under any of the conservation easements to which the Town is a party except for the Hidden in the Hill agreement. The applicants in Hidden in the Hill wanted to be able to cut firewood, and developed a plan to which the Town agreed that allowed them to do that. A copy of the Hidden in the Hill Conservation Easement is attached hereto as Exhibit 10. The relevant information is at pp. 9-10 and 10-12. Part of that plan requires that a timber management plan be developed. See Exhibit 10 at p. 11 (paragraph iv). No other applicant for a conservation easement sought such provisions in their easement. Had they, the Town would have negotiated with them and reached an agreement that was appropriate to the case.

47. It is unclear why McCulloch sought Lauren Kingman's opinion as to what was allowed under the easement agreement. The agreement is between Carmen McCulloch and the Town Board, not the Planning Board.

48. It is my understanding that Mr. Kingman sought to provide information to McCulloch that would allow Plaintiff (or buyers of Plaintiff's property) to cut firewood.

49. It further my understanding that when DEC explained to McCulloch that it could not help him, rather than approach Mr. Kingman again, or more appropriately rather than approach the Town Board, the other party to the agreement, he rushed to sue the Town.

50. There is a provision in the conservation easement signed by McCulloch on behalf of his wife that allows for the amendment of the agreement. It is unclear why McCulloch did not approach the Town Board and seek to amend the agreement before rushing to sue the Town for

over an agreement that he negotiated, agreed to and signed. The absurdity is that Plaintiff is suing regarding the fact that a provision which her representative specifically negotiated to exclude is not in the agreement.

51. McCulloch claims in his Declaration at ¶26 that he was charged for work on the Carrezola Subdivision. Plaintiff was not billed for the work on the Carrezola Subdivision, but it does appear that he was overbilled by $25.00.

52. Page 3 of that legal bill is not attached to McCulloch's affidavit, but is attached hereto as Exhibit 11, with pages 2, 4, and 5. Page 3 notes at top, that the phone call mentioned at the bottom of page 2 was charged to each of three Milan Planning Board files.

53. I reviewed the Haggerty, Woodland Hills and Carrezola Planning Board files in our billing records, and it appears that the Haggerty and Carrezola files were not billed separately for this phone call, thus it was appropriate for a portion of this entry to be billed to those applicants.

54. A review of the Woodland Hills billing file reveals that Plaintiff was charged in that billing for the phone call. A copy of that bill is attached as Exhibit 12. Accordingly, it appears that he should not have been billed the additional $25.00 for that phone call. (Page 5 of the bill shows that he was billed $25.00 for a portion of the total entry of $123.50.) I will be contacting the Town Supervisor to arrange for a refund of the $25.00. It should be noted that at no time prior to this motion did Plaintiff indicate there was a concern over this billing entry. Had she done so, it would have been remedied upon review.

55. It has come to my attention that during a conference call between the attorneys on this matter and the Court, McCulloch claimed that his escrow was billed for litigation expenses. The previous lawsuit filed by McCulloch was filed on December 15, 2004. It was dismissed

voluntarily by McCulloch on January 10, 2004. Attached as Exhibit 13 is a redacted copy of our office's billing to the Town of Milan on that litigation matter, Matter No. 9725-013. The invoice is number 25293. Clearly, invoice number 25293 does not show on the list of invoices paid by Plaintiff attached as 14 to the McCulloch Declaration. Furthermore, invoice 25292, Exhibit 12 attached hereto, and 23695, a copy of which is attached as Exhibit 14 hereto, which were paid from Plaintiff's escrow (Matter #9725-012) clearly has a gap for the period between December 14, 2004 and January 10, 2004, when the litigation was ongoing.

56. McCulloch also alleges at paragraph 30 that Morton Getman (whom he refers to as Mr. Morton instead of as Mr. Getman) was treated differently because the Town made an effort not to set a precedent.

57. A few facts need to be known, Mr. Getman sought a subdivision that would make one of the two lots substandard in size. He would need a variance from the Zoning Board of Appeals to accomplish this. Planning Board members were concerned that making a positive recommendation to the Zoning Board of Appeals would create a precedent in the Town that would allow all applicants to obtain variances to have substandard lots, thus thwarting the Town's zoning regulations regarding lot size in their entirety.

58. I was asked for advice and explained that if a decision of the Zoning Board of Appeals were drawn narrowly to the facts of the case, then a precedent would not be set allowing for variances on all future applications seeking approval for substandard lots, it would only set a precedent for variance applications with similar facts. It was to this legal opinion that Mr. Williams was referring. The minutes and the Planning Board recommendation are attached as Exhibit 15.

59. Contrary to what McCulloch claims, the Planning Board did not want to take a chance on setting a precedent to allow a subdivision which would create a substandard lot, even for Mr. Getman, a long time resident, and recommended to the Zoning Board that it <u>deny</u> the variance. See Exhibit 15.

60. The Zoning Board of Appeals denied Mr. Getman's variance request for a substandard lot, and Mr. Getman sued to challenge that decision.

61. It was only after the settlement of an Article 78 lawsuit challenging that decision that the Zoning Board of Appeals granted the variance, and the Planning Board approved the subdivision.

62. Finally, I do not know if any of the defendants to this lawsuit were ever aware that Carmen Otero McCulloch is Hispanic. Certainly, her being Hispanic was never discussed by me with any of the defendants in this case. To my knowledge, her middle name was never used during the application process, although I believe one of the private roads may bear her middle name. The only reason I became aware that Mrs. McCulloch is Puerto Rican is that McCulloch himself told me when he inquired of my ethnic origin because of my middle name.

63. I never dealt directly with the Plaintiff, Mrs. McCulloch, Certainly, I never treated Kenneth McCulloch any differently than I have the representative of any other applicant before the Milan Planning Board. Furthermore, I was never asked by any of my clients to treat McCulloch, Plaintiff, or my work on this application any differently than any other application.

JANIS M. GOMEZ ANDERSON

Sworn to before me this
12th day of March 2008

Notary Public

TRACEY L. RICKER
Notary Public, State of New York
No. 01RI4879862
Qualified in Dutchess County
Commission Expires December 15, 20__