UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————

CARMEN OTERO MC CULLOCH,

                              **PLAINTIFF,**

          v.

**TOWN OF MILAN, TOWN OF MILAN TOWN
BOARD, JOHN V. TALMADGE, Town
Supervisor, and ALFRED LO BRUTTON,
PAULINE COMBE-CLARK, DIANE MAY, and
ROSS WILLIAMS, Councilpersons, And**

**TOWN OF MILAN PLANNING BOARD,
LAUREN KINGMAN, Chairman, and
Members JEFFREY ANAGOS, PETER GOSS,
SHEILA MARGIOTTA, MARY ANN
HOFFMAN, AND PAULINE COMBE-CLARK
And GARY E. BECK, Zoning Enforcement Officer,
Town of Milan, And**

**Frank Margiotta, Barbara Hughey,
And Charlotte Norman**

                        **DEFENDANTS**.
———————————————————————

Civil Action No. 07 CIV 9780
(LAP) (RLE)

**REPLY DECLARATION OF KENNETH MC CULLOCH IN FURTHER
SUPPORT OF PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

Dated: March 14, 2008

                          Respectfully submitted,

                          Kenneth Mc Culloch (3372)
                          Attorney for Plaintiff
                          516 Fifth Avenue, 12th Floor
                          New York, N.Y. 10036
                          Tel. 212-398-9508
                          e-mail KMcCulloch@BRGSLAW.com

Kenneth Mc Culloch, an attorney admitted to practice in the State of New York, declares under penalties of perjury, that the statements made herein are true and correct.

1.   I make this Declaration in Reply to the Defendants' submissions filed on March 12, 2008 opposing Plaintiff's motion for injunctive relief. The papers submitted by Defendants included a memo of law, and affidavits from Lauren Kingman, III, R. Peter Hubbell, Jr., John Morabito, and Janis Gomez Anderson, and the Declaration of Terry Rice, Defendants' attorney. Some of the Exhibits to the Anderson Affidavit, *i.e.*, Exhibits 4, 5, 8, 8a, 8b, and 10, were missing from the electronically filed papers, so I have not had the opportunity to consider those or reply to them.

2.   In ¶4 of his Declaration, Mr. Rice states "As is related in the accompanying affidavits, the facts are not as averred by Ms. Mc Culloch".  For purposes of this motion, the facts are, indeed, as averred by Plaintiff, except insofar as they are contradicted by Defendants. Based on all the facts, those presented by Plaintiff, and not contradicted by Defendants, and those presented by Defendants themselves, Plaintiff's motion should be granted.

3.   There is a morass of material, much of it irrelevant, submitted by Defendants in opposition to Plaintiff's motion. Defendant Lauren Kingman, Chairman of the Milan Planning Board (MPB), now claims that he misunderstood the capacity in which I had written to him by letter dated October 1, 2007. That letter is Exhibit 3 to the Declaration of Kenneth Mc Culloch in Support of Plaintiff's Motion for Injunctive Relief (KJM Opening Decl.). Excerpts from that letter are set forth here to show that Mr. Kingman knew precisely the capacity in which he was being addressed.

4.   The letter was addressed to "Lauren Kingman, Chairman, Town Planning Board".

It stated, in part, as follows:

> Recently an issue has arisen that we think requires clarification **from the Planning Board** regarding precisely what is meant by the terms of the Conservation Easement. We think it is to our own best interests, and **that of the Planning Board**, and that of prospective purchasers, to have this clarified.

> Specifically, may the owner of a Lot in Woodland Hills that includes land that is part of the Conservation Easement Area (all of the lots have at least parts in the Conservation Easement Area) cut down trees for firewood, for personal use, prudently, and as part of a forest management program on his or her own land? We think that the answer is "Yes", but **we would like to have the Planning Board say so, and do so in writing, to avoid having this question raised in the future**, as it is being raised now. * * *

> Larry (Strickland, the potential buyer) said that he is very conservation minded, and that he wants to be able to gain part of the heat for his prospective house from firewood. He said he knows about conservation. **He is talking about thinning out the underbrush and the smaller trees in a way that would be good for the remaining trees, and also allow him to have firewood.**

> It is not important that my wife and I think that this can be done. **What is important is that you and the Planning Board say that this can be done.** If Larry and his wife have this perception, that this may create a problem with the Town, then it is likely that others have that concern also. . . . The perception of potential purchasers, however, is not something that we have control over. Even if Larry and his wife were to tell me that they are not interested in this lot, for some other reason, **we would still want to have this subject clarified, because it affects other potential purchasers.**

> We have purposely avoided mention of particular words or language in the Conservation Easement because that language apparently can and does lead to confusion. We would like to have this clarified, for now and the future, and we **request the assistance of you and the Planning Board to do so**.

5. That letter was written October 1, 2007, more than 5 months ago. Plaintiff asked for an answer in writing, and one was not given. Plaintiff thought that Mr. Kingman answered the letter, orally, but now Defendants and Mr. Kingman say that whatever he said had no significance.  Defendants did not answer Plaintiff's letter in their Response Papers. Defendants are required to file any orders with the Town Clerk, yet they do not even put them in writing, let along file them with the Town Clerk. Defendant utilize

myriad ways to try to stymie Plaintiff in gaining any relief whatsoever, yet the only relief

that Plaintiff can possibly obtain is relief ordered by this Court.

      6.   Mr. Rice states at ¶7 of his Declaration:

> . . . in the first instance, the agreement (Conservation Easement Agreement) is between Plaintiff and the Town of Milan, not the Planning Board. Any advice related by Mr. Kingman was purely gratuitous since the Town, through the Town Board, is the relevant party. Plaintiff did not seek the interpretation of the Town Board as to the meaning of the terms, did not request that the Town Board modify the terms and certainly did not address his complaints to the Supreme Court Dutchess County.

      7.   Mr. Kingman states in ¶4 of his Affidavit that:

> … In the first instance, I do not believe that it is up to me to interpret the conservation easement. The conservation easement was entered into between Ms. Mc Culloch and the Town Board and it provides that any interpretation or disputes shall be determined by the Supreme Court, Dutchess County. However, Mr. Mc Culloch wrote to me and requested my input and in an effort to be of assistance I advised him of my opinion.

      8.   As the letter itself makes clear, I was not seeking "input". I was seeking a

definitive ruling that could be shown to prospective purchasers, such as Larry Strickland.

      9.   Defendants do not deny receiving the letter on October 1, 2007 and that Mr.

Kingman spoke with Mr. Mc Culloch on October 5, 2007 about the letter. Instead, they

present a stupid, specious "spin" to what was being sought by Plaintiff. The letter makes

perfectly clear that Plaintiff was seeking a clarification from the *Milan Planning Board*.

Mr. Kingman's personal views were not sought. The letter was addressed to him, *as*

*Chairman of the Milan Planning Board*. He answered on October 5, 2007. He did not say

in his oral communication that he was giving only his personal opinion. He does not say

now that he told Mr. Mc Culloch at that time that he was only giving his personal

opinion. He says only now, for the first time, that the opinion given was his personal

opinion. He did not tell Mr. Mc Culloch at that time, when he responded orally on

October 5, 2007, that the letter had to be addressed to the Town Board. He does not say now that he told this to Mr. McCulloch on October 5, 2007. Only now does he say that the matter is one that is to be addressed by the Town Board. It ill-behooves him now to "spin" this letter as some kind of informal request. An informal request, and an informal answer would have been useless to Plaintiff.

8.  Mr. Kingman's Affidavit at ¶5, states:

> I advised him that in conformance with the provisions of the conservation easement agreement, live trees and brush could be cut in accordance with "generally accepted forest conservation practices". In other words, dead, diseased, dangerous or invasive trees and brush could be cut if reasonably necessary and consistent with "generally accepted conservation practices."

Mr. Rice goes states in ¶10 of his Declaration:

> Mr. Kingman advised Mr. Mc Culloch that in conformance with the provisions of the conservation easement agreement, live trees and brush could be cut in accordance with "generally accepted forest conservation practices". *Accordingly,* dead, diseased, dangerous or invasive trees and brush could be cut if reasonably necessary and consistent with "generally accepted conservation practices". (Emphasis added).

9.  One reading these affidavits might assume that Defendants are saying that Plaintiff and her successors are "safe", and would be considered to be within their rights if they cut trees that were diseased, dangerous, or invasive, and that this would be consistent with "generally accepted conservation practices". One might also assume that Defendants are prepared to consent to an injunction that says that. Those are false assumptions.

10. Mr. Kingman, having sworn in his Affidavit, at ¶4, that "I do not believe that it is up to me to interpret the conservation easement", is in no position to do that in his Affidavit. If Mr. Kingman's "opinion" was "purely gratuitous" when given before to Plaintiff on October 5, 2007, it is just as "purely gratuitous" when given to the Court

now. Mr. Rice, in his Affidavit, certainly cannot quote Mr. Kingman, and say "Accordingly", as though Plaintiff and her successors can act in the manner described in Mr. Kingman's Affidavit. Having argued that only the Town Board can say how this provision will be interpreted, and chided Plaintiff for failing to address her letter to the Town Board, Defendants are grossly remiss in not presenting an Affidavit from someone authorized to act for the Town Board to the Court, and Plaintiff, setting forth a definitive, written, interpretation from the Town Board about what they think this language means.

11. As Plaintiff stated in her letter of October 1, 2007 to Mr. Kingman, it is not what Plaintiff thinks the language of the CEA means. Plaintiff sought a definitive interpretation so that she could present it to Mr. Strickland, the customer for Lot 5, and to all others thereafter, so that they could be assured about what the language in the CEA means in practical terms -what can they do, and not do, in the CEA. Mr. Kingman told me, as I stated in the KJM Opening Decl. ¶10, that no live tree could be cut unless and until there were a Forest Management Program (FMP) created by the DEC and action was taken in accordance with that FMP. He now says something substantially different about what he told me. We are more than 5 months into this action, and Defendants still do not give a definitive answer. That is why the Court should grant the relief requested.

12. Mr. Kingman states in ¶6 of his Affidavit that "A potential purchaser apparently also wanted to be able to cut fire wood as desired. Obviously, the ability to cut firewood whenever desired would effectively undermine the effectiveness and purpose of the conservation easement." First, having told the Court that any opinion that Mr. Kingman has about the meaning of the conservation easement is "purely gratuitous", it is senseless and useless for Defendants to present any further opinion from Mr. Kingman about what

is or is not intended by the conservation easement or the CEA. Second of all, Plaintiff was not asking for an interpretation that Mr. Strickland be able to cut firewood *whenever he desired*. Plaintiff said in her letter *He (Mr. Strickland) is talking about thinning out the underbrush and the smaller trees in a way that would be good for the remaining trees, and also allow him to have firewood.  See* KJM Opening Decl. Exhibit 3, p. 2.

13. What Mr. Strickland was "talking about", as related by Plaintiff to Mr. Kingman, was precisely what the Defendants have specifically permitted in their "Form" CEA, *see* Exhibit 5 to Mc Culloch's Opening Declaration, Form CEA, p. 5 of 11, ("trees may be removed (without permission of Grantee) which endanger public safety, are diseased, damaged or fallen, or *need to be cleared to ensure the health of other trees. . .*"). It is precisely what is provided for in the Quarfelt CEA, *see* Mc Culloch's Opening Declaration, Exhibit 10, p. 9; it is in the Savoury CEA, *see* Mc Culloch's Opening Declaration, Exhibit 11, p. 10; it is in the Napolitano CEA, *see* Mc Culloch's Opening Declaration, Exhibit 12, p. 5; and it is in the Carrezola CEA, *see* Mc Culloch's Opening Declaration, Exhibit 13, p. 7.  If a person who cuts trees that interfere with the growth of other trees uses them for firewood, or burns them as rubbish, is not dictated by the "Form" CEA, nor by the terms of the CEAs that other persons had. In fact, using them for firewood would seem to be more in conformance with "generally accepted conservation practices" than just burning them as waste.

14. In ¶6 of his Affidavit, Mr. Kingman seeks to buttress his "interpretation" of what is or is not allowed by the terms of Plaintiff's CEA by referencing to the CEA of "another individual". Mr. Kingman does not say who that is, but his reference, in addition to be legally useless, since he has sworn that only the Town Board can address the

interpretation of a CEA, is also misleading. The Savoury CEA, KJM Opening Decl., Exhibit 11, is the only CEA that talks about "harvesting trees". It has three categories of cutting that were provided for in the Savoroury CEA. The first is cutting "in accordance with generally accepted forest conservation practices". *Id.* at pp. 9-10. This is what is in Plaintiff's CEA. The second category is cutting of trees with a diameter up to 5 inches in diameter, whether or not they are diseased, invasive, a danger to the public, or interferes with the growth of other trees, *and* the cutting of any tree if it is diseased, invasive, a danger to the public or interferes with the growth of other trees. *Id.* at p. 10. Plaintiff believed, and still believes, that this is encompassed within the first category definition. The third category permitted by the Savoury CEA, gives the Grantor the right to "selectively harvest trees from the conservation easement area in accordance with the following conditions:". *Id.* at 10-11. This third category allows for the cutting of trees, even if they are more than five inches in diameter, and even if they are healthy, do not pose a danger, and even if they are not impeding the growth of other trees. This situation is entirely different from Plaintiff's situation. Mr. Kingman required a DEC-approved FMP in order for Plaintiff to cut *any live tree*. Further, he did not give Plaintiff the option of having a FMP established by a DEC approved forester, as was the case in the Savoury CEA. *Id.* p. 11. The FMP for Plaintiff had to be established and implemented by the DEC.

15.  In ¶8 of his Affidavit, Mr. Kingman ventures another opinion that is without fact basis and contrary to common sense. He says "the entire Mc Culloch tract (35 acres) was large enough for approval of a forest management plan". Mr. Rice, in his Declaration at

¶11, address this and states "According to his (Mr. Kingman's) understanding, a forest management plan could be approved by DEC for the 35-acre subdivision."

16. Defendants imply that Plaintiff could have and should have sought a FMP for the entire 35 acres. There is no basis in the record, nor in logic for this contention. First, as can be seen by the letter above, when Plaintiff wrote to Mr. Kingman on October 1, 2007, she was inquiring about Lot 5. Second, there is no reason why she would want to establish a FMP that encompassed any part of other lots. As she has alleged in the Amended Complaint, at ¶52, "a FMP is set up with full in-put of the owner of the property. The owner has to determine, *e.g*., whether the owner is interested in preserving one species, or in having a multitude of species, . . ." Plaintiff had six lots for sale. She had no idea what potential purchasers of any lot would want to do, pursuant to a FMP or otherwise. Every time she further restricts the options available to the purchasers, she limits the market for the lots. Plaintiff had no desire to encumber the area that was, and is, unencumbered by conservation restrictions. That is the area of less than 17 acres that is not already in the CEA.  Under Mr. Kingman's reasoning, Plaintiff could end up with a DEC FMP that provided that neither Plaintiff nor her successors could cut, for example, any locust trees anywhere on the 35 acres and had very detailed limitations about what could be done. One can gain some sense of the limitations that Mr. Kingman would have had imposed on Plaintiff, via the DEC FMP *for cutting any tree at all* by looking at the detail of the Savory CEA, Mc Culloch's Opening Declaration, Exhibit 11, pp. 10-12, and that does not even include the detail that is provided for in a DEC FMP.

17. Mr. Kingman states in ¶7 that "I never heard back from Mr. Mc Culloch with

respect to the issue". Given that he had no authority to interpret the CEA, which was the issue that Mr. Mc Culloch had presented to him, one can only wonder why Mr. Kingman would expect that he would hear back from Plaintiff. Having sent Mr. Mc Culloch on a fruitless quest to the DEC, why would he expect to hear back from Mr. Mc Culloch? Further, despite the conduct of Mr. Kingman, I did try to contact him again. After learning that the DEC would not do a FMP for Lot 5, I went to the offices of the MPB and sought out Mr. Kingman. He was not there, but Karen Buechele, the Secretary to the MPB was there. I told her I wanted to see Mr. Kingman and she said he was away on a trip and that she did not expect him back for some time. I then told her that the DEC had denied our request for a forest management program, that no trees could be cut in the CEA area, and that this meant that no lots could be sold. I also told her we would have to take action. I know Karen Buechele from talking with her numerous times. She is super smart, and very perceptive. My experience is that she also tells Mr. Kingman everything that she thinks that he should know. I felt sure that she told Mr. Kingman what I had to say. On that same trip, since I could not see Mr. Kingman, I tried to see the Town Supervisor. I usually try to avoid doing something like that, because many officials take offence when someone "goes over their head". The Supervisor was not in, so I never saw him either.

18. I sought out Mr. Kingman regarding this issue, prior to initiating this legal action, despite prior bad experience with Mr. Kingman. When he had caused the STOP WORK order to issue, I met with him. Even though Plaintiff's actions in cutting the trees along Willowbrook Road had been perfectly legal and proper, and Mr. Kingman's actions improper, Mr. Kingman demanded that Plaintiff engage in other work, not called for by

the plans, which already had final approval. It would have taken far too long to initiate an Article 78 proceeding, so Plaintiff agreed to do the extra work. If and when I met with Mr. Kingman regarding this issue of Plaintiff not be allowed to cut any live tree, I felt sure that he would do this type of thing again, and that again it would be without basis. Finally, Mr. Kingman leaves this statement with a not-sequitur. He does not say what he would have done if Plaintiff had actually seen him again.

19. In ¶10 of his Affidavit, Mr. Kingman describes why he told Plaintiff that she could not cut any brush along Willowbrook Road. Mr. Rice addresses this in his Declaration, at ¶12, stating that "Plaintiff also complaines (sic) regarding a stop work order associated with her cutting of trees. As is related by Mr. Kingman, he reasonably based his opinion on the SEQRA regulations, 6 NYCRR §617.3(a), and the Subdivision Regulations."

20. This argument and justification is totally specious. It is necessary to understand the sequence in the subdivision approval process to understand that. The first step is to obtain sketch plan approval. *See* Milan Subdivision Regs. §177-10. The next step is to have the SEQR review. *Id.* §177-11. (That section states "The Planning Board shall initiate the SEQRA process … upon completion of the sketch plan stage of the application process. . . . All requirements of SEQR shall be completed prior to any action on the preliminary plat by the Planning Board".)  The next stage, after completion of the SEQRA review, is the consideration of the plans for preliminary approval. §177-13. Sometimes the Planning Board, contrary to §177-11, proceeds with consideration for preliminary approval, even while the SEQRA stage is still in process. In such instances, according to the Milan Subdivision Regulations, § 177-13(G), "The preliminary plat

application shall not be considered complete until either a negative declaration has been filed . . . . , or until a draft environmental impact statement has been accepted by the Planning Board."

21. Any cutting along Willowbrook Road never had any relationship to any conservation easement because none of the frontage along that road had ever been in any conservation easement area. There were three instances regarding the cutting of trees along Willowbrook Road. The first was when Plaintiff wanted to cut brush along Willowbrook Road. Plaintiff noted that she had tried three times to cut brush and that in each instance it had been denied. Amended Complaint, ¶74. She even quoted, in ¶75 of the Amended Complaint from the MPB minutes of June 2, 2004, where the MPB minutes stated "Mr. Mc Culloch asked if there would be a problem in clearing brush to make it safer, and Chairman Kingman said the regulations are once an EAF is submitted, no vegetation may be touched." *Id.* at ¶75. Plaintiff believes that this invocation of SEQRA by Mr. Kingman, at this time, was not proper, because as of this time, *i.e.*, June 2, 2004, the SEQRA process had not even started. Other parts of the MPB minutes for June 2, 2004 state "Chairman Kingman said at this point, this proposal meets the requirements for sketch plan and we will look into the preliminary approval process." Since the sketch plan approval had not been completed until June 2, 2004, the SEQRA process had not yet started until that date, at the earliest, and the prohibition of cutting brush prior to that date was premature.

22. The second instance of cutting of brush and trees was not for the benefit of Plaintiff, but to satisfy the demands of the neighbors, Mr. and Mrs. Burns. This is described in the Amended Complaint, at ¶¶77-79. As of this time, which was December

2004, the SEQRA process was definitely in progress. The regulations that Mr. Kingman cite in his Affidavit at ¶10, were clearly applicable. This work, clearing brush and at least 10 trees along Willowbrook Road, had to be done between December 2004 and before preliminary approval could be granted in June 2005, because the plans had to show that the requisite site distance for the relocated Mc Culloch Drive was actually achievable. Nevertheless, Mr. Kingman required that the common driveway that is Mc Culloch Drive be relocated, that this be done, even though it required cutting brush and trees, that this was done to satisfy Mr. and Mrs. Burns, and that this be done while the SEQRA process was still "open"..

23. The third instance pertinent to cutting of trees along Willowbrook Road arose in October 2005. This time, Plaintiff was cutting trees along Willowbrook Road, as required by the utility and the Town Highway Supervisor. *See* Amended Complaint, ¶80; *see also*, ¶¶30-40. However, by this time, the SEQRA process was completed. As Plaintiff has alleged, *id.* ¶¶24-25, the preliminary approval had been granted on June 29, 2005. One of the conditions was that Plaintiff "complete all the infrastructure that was provided for in the plans. .. " *Id.* ¶25. That was necessary so that Plaintiff could go from preliminary approval to final approval. As of this time, *i.e.*, October 5, 2005, because there was already preliminary approval, it was improper to invoke SEQRA. As Mr. Kingman states in his own Affidavit, at ¶10, "§177-6( C ) of the Subdivision Regulations provide among other things, clearing of roads or utilities or the clearing of trees and shrubbery for a proposed subdivision may not occur until preliminary subdivision approval has been granted." Well, preliminary approval had in fact been granted, on June 29, 2005. As of that date, June 29, 2005, any regulation of SEQRA regarding not touching the vegetation

lapsed. It has to be that way, otherwise no one could do the infrastructure to go from preliminary approval to final approval. For Mr. Kingman to state that "Consistent with those regulations (the SEQRA regulations he noted earlier in ¶10), I did not believe that it would be permissible for Plaintiff to undertake such activities" is without basis.

In sum, yes, there are SEQRA regulations regarding disturbance of vegetation, but Mr. Kingman invokes these and other regulations, as he sees fit, to benefit local persons, and to the detriment of City People, like Plaintiff.

24. Mr. Kingman makes the self-serving, conclusory statement that that neither he nor anyone involved in this case has ever acted other than properly. This is not a fact statement, it is a legal conclusion, and, as such, is not entitled to any weight. Furthermore, the Amended Complaint is replete with instances of disparate treatment, some of which pertain to Mr. Kingman personally. In discrimination cases, once a *prima facie* case of disparate treatment is alleged, the defendant must articulate a legitimate non-discriminatory reason for his or her actions. If the defendant does that, then the claimant shows that Mr. Kingman's articulated reason is a subterfuge and that the real reason is discrimination. In the paragraphs immediately above, Plaintiff has shown that Mr. Kingman articulated a reason for taking the actions that he did, to benefit Mr. and Mrs Burns, and she has shown that the articulated reason is a subterfuge. She has also shown that the real reason was discrimination, because Mr. Burns had invoked his local resident status, "As a resident for 30 years we have rights" and he prevailed on that basis. In addition, Mr. Kingman is accused of having ignored the violations of the DEC wetlands law, to favor Mr. Hughes, and to have require Plaintiff to relocate Otero Drive so as not interfere with Mr. Hughes' illegal filling of DEC wetlands. When I raised the

unfairness of this to Mr. Kingman, his retort was "He's an old-timer. We can't do anything about what he does." *See* Amended Complaint, ¶88. Mr. Kingman does not deny saying this, nor does he deny the allegations relating to the disparate treatment afforded Plaintiff as opposed to the treatment of Mr. and Mrs. Burns.

25.  The representations of Mr. Kingman in ¶2 of his Affidavit regarding the genesis of the conservation easement are sophistry, and the representations of Mr. Rice in ¶8 of his Affidavit are utterly false. Since Mr. Rice has no personal knowledge of the history of this subject, his statements in this regard are without legal value.

26. Mr. Kingman states in ¶2 of his Affidavit that "Mr. Mc Culloch or other agents represented Ms. Mc Culloch in her dealings with the Planning Board. The subdivision plan proposed by Plaintiff depicted protected open space." Yes, and No. The original plans submitted by Plaintiff showed a corridor along the Taconic State Parkway as an area where there would be no construction. It was 100' feet in depth, and it ran along the east side of the 35-acre parcel, contiguous with the lands of the TSP.  It was not proposed that this be embodied in any kind of written agreement, nor that it be part of any Conservation Easement Agreement. To go from that beginning to what Defendants demanded as a condition for granting subdivision approval is absolutely without basis. However, it is only by carefully reading each sentence of the Kingman and Rice Affidavits that one can see that their statements are accurate, but misleading. The conclusion that Plaintiff consented to what Defendants ultimately required is implied, but not true.

27. Over the opposition of Plaintiff, Mr. Kingman and the MPB said they had the

right to require that Plaintiff's subdivision be treated as a "Cluster Development" pursuant to §177-27 of the Milan Subdivision Regulations. That section states that:

> The Planning Board is further authorized under §278 of the New York State Town Law and §220-22B of the Town Zoning Law, to require the use of the cluster concept when it finds that the intention of these Subdivision Regulations and the Zoning Law to preserve significant open space resources will be accomplished. The Planning Board may require the use of the cluster concept when one or more of the following conditions exist: (it then listed 8 different conditions.)

28. Ordinarily, when one thinks of a "cluster development', one thinks of housing concentrated in one part of a property. In Plaintiff's development, the house locations were spread out. There was not any clustering. In fact, the location of the proposed houses never changed. They were the same when Plaintiff started as they were at the end. The only thing different was that Mr. Kingman and the MPB chose to call this a "cluster development" because another provision relating to "cluster development" required that 40% of the total property of a "cluster development" be devoted to "open space".

29. None of the 8 conditions to imposing a "cluster development" on Plaintiff were present, but Mr. Kingman and the MPB manufactured one. The number 8 condition allowed for imposition of a "cluster development" if "Significant environmental impacts identified through the State Environmental Quality Review Act (SEQRA) may be mitigated." There were no such impacts, but Mr. Kingman and the MPB used the report of the Conservation Advisory Council as a basis for saying that there were such impacts.

30. Mr. Kingman and the MPB then increased the amount of land to be devoted to "open space" from 40% to more than 50% by demanding that Plaintiff establish "building envelopes" for each lot, and that all land not in the building envelopes be categorized as "open space". Plaintiff did not voluntarily consent to this, either, but the MPB delayed

proceedings and indicated that the delays would continue unless and until Plaintiff consented to this.

31. The MPB then demanded that all the "open space" be placed into a Conservation Easement. Plaintiff did not consent to this, but again proceedings were delayed and Plaintiff was told that this was a condition for going forward. The MPB then added the requirement that every place in the conservation easement area where the angle of the line changed by even one degree had to be marked with a cement monument, and that there be a separate survey done, marking the metes and bounds of the CEA.

31. In her Article 78 proceeding, which was filed on December 15, 2004, Plaintiff describes the monthly process by which Defendants demanded what they ultimately obtained. As of that time, this progression still was not complete. However, the Fourth Cause of Action in that Petition is headed "Fourth Claim – For A Declaratory Judgment That Respondents Cannot Compel Petitioners To Limit Disturbance To A Building Envelope, To Dedicate At Least 40% Of Their Property To Open Space, And To Place All The "Open Space" Into A Conservation Easement Under The NYS ECL".

32. Everything alleged in that Petition was known by me to be true, except where I stated the fact as to be on information and belief. I filed that Article 78 in December 2004, went away for the Christmas Holiday, and returned at the beginning of 2005 to find a letter from the Town's counsel advising me that all proceedings before the MPB were suspended until the Article 78 proceeding was adjudicated. In the first and second claims in that Article 78 proceeding, the relief sought was to have Defendants render the determination of significance under SEQRA, and to render a negative declaration of significance. In other words, one main purpose of that Article 78 proceeding was to

compel Defendants to act. When I received the notice that the Defendants were now going to use the existence of this Article 78 proceeding as a further excuse for delay, Plaintiff unilaterally withdrew it, without prejudice. This is alleged in the Amended Complaint, ¶21.

33. Mr. Kingman was a defendant in that prior Article 78 proceeding. He knows the facts alleged there. For him to even imply that Plaintiff voluntarily consented to every demand made would be a falsehood. During the Vietnam war, many persons "volunteered" for military duty. They did so because if they did not do so, they would be drafted into military service and have no options about what branch of service they entered, or anything else. Plaintiff "volunteered" to convey more than 50 % of her property into a Conservation Easement Agreement for the same reasons that persons volunteered for military service during the Vietnam war era.

34. As alleged in the Amended Complaint, ¶23, Defendants have enacted a provision of the Town's subdivision regulations, §177-35, that states that a person aggrieved by any decision of the MPB could seek judicial review "within 30 days of the filing of the Planning Board's decision in the office of the Town Clerk".  The problem is that the Town, as alleged in the Amended Complaint, ¶23, does not file its decisions with the Town Clerk. Mr. Kingman's "STOP WORK" order was never filed, the decisions delaying proceedings were never filed, Mr. Kingman's directive that there could be no cutting of trees unless there was a DEC FMP was never filed.

35. In opposing the instant motion, Defendants persist in this charade of not making decisions. Certainly, no decision by Mr. Kingman and the MPB has been filed in the Clerk's office. Plaintiff has been harmed, but Defendants claim no one made a decision to

harm her, and they have not filed any decision that harmed her. Mr. Kingman says he did not make a decision, that he was merely trying to be helpful. That is absurd. If he did not have the authority to render his decision that Plaintiff could not cut any tree without having in place a DEC FMP, he should have said from the beginning that he did not have that authority.

36. Defendants claim that the Town Board has not made a decision interpreting the CEA, so, Defendants argue, any action is premature. Defendants, quite simply, are playing a "shell game", but the pea is not under any of the shells. Whatever process Plaintiff invokes is the wrong process. This, basically, is what a denial of due process is. Even now, when the position of the Defendants, on the merits, is absurd, and actually prevents Plaintiff from engaging in activities that would foster conservation and be consistent with "generally accepted conservation practices", Defendants do not admit to the merits of Plaintiff's claims, and try diversion after diversion.

37. Defendants seek to inject discourse regarding Plaintiff's claims for $22,600 that was charged to her into this motion. That subject is totally irrelevant to the issue presented here. Furthermore, contrary to Defendants' contentions, Plaintiff was charged for any and all work done by the Town's attorneys in defending against the Article 78 proceeding. The billing entry is dated 12-31-04 JEN. That is Jim Nelson, a partner with Van De Water & Van De Water, who is counsel for the MPB. The entry reads "Reviewed petition. Diary, with LRS. Letter re coverage." I believe this charge was for reviewing Plaintiff's Article 78 Petition, and that the other reference was to sending a letter to the insurance carrier. The charge was for .90 hours and the amount was $85.50. This was included in the bill dated May 20, 2005 that was charged against Plaintiff's escrow

account. The total amount billed was $114.00 and that was charged against Plaintiff's escrow account on May 20, 2005. Since the Petition was withdrawn early in 2005, there was no need to do any other work. There are other bills for services by the Town's attorneys, and those total more than $7000.

38. The Affidavit of John Morabito indicates that he was assigned a very specific task, as identified in ¶2 of his Affidavit. His conclusion in ¶13 of his Affidavit is wrong. Plaintiff never intended to construct single family residences on her lots. She intended to sell the lots. The lots are large because Milan wants the lots to be large. This property owned by Plaintiff is in an area that is zoned for 5-acre residential development. Every lot had to be at least 5 acres. The large lot concept is what Milan seems to want. It is preparing to enact a " 10-acre overlay" zoning provision. Once enacted, it would apply to any large properties, no matter what the zoning, and any lots would have to be at least 10 acres.

39. Mr. Morabito's comments about multi-family housing are interesting. Carmen Mc Culloch was the N.Y. Deputy Regional Director for the U.S. Department of Housing and Urban Development during part of the time that the subdivision proceedings were pending. While she was at HUD, she told me that HUD had done a study that showed that there was no affordable housing anywhere in Dutchess County. She told me also that HUD had money available to assist municipalities in construction of central sewerage and water treatment systems. She said that not many towns were applying for the funds. While I was in Milan for other business on one occasion, I mentioned to the Town Supervisor that my wife worked for HUD and that HUD had funds available for central sewage and water treatment facilities. I told him this would help Milan if it wanted to

develop affordable housing. He told me that he did not think that was what the people wanted.

40. The Affidavit of Mr. Hubbell is addressed in Plaintiff's memo of law and is not addressed here.

41. The Affidavit of Janis M. Gomez Anderson basically states that there is a broad range of what is or is not permitted by Defendants in these Conservation Easement Agreements and that people get "good" ones or "not-so-good" ones, based on how well they negotiate. She says that I negotiated out of a "good" one into one that was "not-so-good", so I may have negotiated away some "rights" that Plaintiff otherwise would have had. *See* Anderson Aff't, ¶25. This certainly is an acknowledgment of disparate treatment. Such a system is rife with potential abuse.

42. The potential for abuse arises because, no matter what the language in any CEA, the Town is the ultimate arbiter of what the language means. These CEAs are so vague that they allow for a broad interpretation. As can be seen, Plaintiff's CEA provides for

> General Maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with *generally accepted forest conservation practices.*

43. The other CEAs provide

> General Maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with *generally accepted forest conservation practices,* but no living tree with a diameter in excess of five (5) inches diameter at breast height measured from the down slope side may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damaged or fallen, or need to be cleared to ensure the health of other trees. All clearing of trees and vegetation shall be conducted in conformance with sound land and forest management practices to minimize erosion and adverse impacts on natural resources.

44. Ms. Anderson now says that it is her legal opinion that the language in ¶43

above is less restrictive, not more restrictive, than the language in ¶42 above. She never said that to me during our discussions. She does not indicate, however, what she thinks is allowed by Plaintiff's CEA, or what is allowed by the other. The very fact that one applicant could and would end up with a "better" CEA than another allows for substantial abuse. Negotiations are within the control of two parties, not one. Given the vague language in Plaintiff's CEA, it is apparent that Defendants are not going to permit Plaintiff to do anything, not remove diseased or invasive trees, not trees that interfere with the growth of other trees, or that endanger the public, unless and until Plaintiff prevails in litigation to establish her right to do so. The fact remains that Plaintiff is the only person with a CEA that has had to initiate legal action to cut trees.

45.   Plaintiff's CEA is different. Plaintiff did not negotiate to have a "different" CEA. I asked Ms. Anderson whether anyone else had entered into a CEA like the one that Plaintiff was being asked to execute and she told me that Carrazeola had done so.

46.   Ms. Anderson states in ¶46 of her Affidavit that "Mc Culloch now asks to be allowed to harvest firewood from the conservation easement area. That is not an accurate representation. As stated earlier, the letter to Mr. Kingman stated, "*He (Mr. Strickland) is talking about thinning out the underbrush and the smaller trees in a way that would be good for the remaining trees, and also allow him to have firewood.*"

47.   Ms. Anderson criticizes Plaintiff to rush to file this lawsuit. The Town Code, *see* ¶34 supra provides that a legal action must be commenced within 30 days, and Defendants have moved to dismiss this Complaint as barred by the statute of limitations.

Dated: March 14, 2008                    _____/s/_____

                                                     Kenneth Mc Culloch