UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

CARMEN OTERO MC CULLOCH,

                                    Civil Action No. 07 CIV 9780
                                          (LAP) (RLE)

        PLAINTIFF,

     v.

TOWN OF MILAN, TOWN OF MILAN TOWN
BOARD, JOHN V. TALMADGE, Town
Supervisor, and ALFRED LO BRUTTON,
PAULINE COMBE-CLARK, DIANE MAY, and
ROSS WILLIAMS, Councilpersons; TOWN OF
MILAN PLANNING BOARD, LAUREN KINGMAN,
Chairman, and Members JEFFREY ANAGOS,
PETER GOSS, SHEILA MARGIOTTA, MARY ANN
HOFFMAN, AND PAULINE COMBE-CLARK;
And GARY E. BECK, Zoning Enforcement Officer,
Town of Milan; And Frank Margiotta, Barbara
Hughey, And Charlotte Norman

        DEFENDANTS.
_____

### DECLARATION OF K. J. MC CULLOCH IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

Kenneth Mc Culloch, an attorney admitted to practice in the United States District Court for the Southern District of New York, declares under penalties of perjury that the statements made herein are true and correct.

1. I am the attorney for Plaintiff Carmen Otero Mc Culloch (Plaintiff). I make this Declaration to reply to the Affidavit of Janis M. Gomez Anderson that was submitted by the Town of Milan et al (Defendants) in opposition to Plaintiff's motion for injunctive relief.

2. Defendants were required to file their Response to Plaintiff's motion by

1

March 12, 2008, and Plaintiff was required to file her Reply by March 14, 2008. Defendants' Response filed late on March 12, 2008 did not include the Exhibits 4, 5, 8, 8a, 8b and 10 to the Anderson Affidavit, and I so advised the Court in the Declaration filed on March 14, 2008.

      3. On March 13, 2008, about noon, I advised Defendants' counsel by fax that I had not been able to obtain these exhibits because they were not part of the ECF filing. Thereafter, I turned all my attention to responding to what was accessible to me. On Monday, March 17, 2008, I went back to other work, saw that Defendants' counsel had e-mailed to me the missing documents, and I am now in a position to address the statement made in the Affidavit of Ms. Anderson.

      4. Ms. Anderson states that Plaintiff could have had either the Conservation Easement Agreement (CEA) in the form that she has it, or the form that four other persons have, that it was an either-or, that she selected poorly and should not now be heard to complain, and that the CEA that the others have is "better" for the person granting the CEA. That is not true.

      5. Plaintiff never had an either-or choice. Plaintiff was presented with the Form CEA that she executed by the attorneys for the Milan Planning Board (MPB), Van DeWater & Van DeWater. This was in early 2005, before the MPB granted conditional final approval to Plaintiff's project. I say in my letter that is Exhibit 4 to the Anderson Affidavit that Ms. Anderson was the person who presented this to me, but she says that it was Peter Dranginis, an attorney who worked at her law firm, but who no longer works there. I will not dispute that part of her Affidavit.

      6. Peter Dranginis, acting for the MPB, presented the form CEA to Plaintiff and

2

told us that this had to be agreed to as part of the subdivision approval process. On behalf of the Plaintiff, I agreed to it. That CEA then went to the MPB, and it was approved by them. In fact, one of the conditions for obtaining conditional final approval was that Plaintiff agree to this CEA.

7. Thereafter, this CEA had to be presented to the Town Board. The MPB had to first recommend that the Town Board approve of this CEA, in this form, and the Town Board then had to have its own vote to approve it. The Town Board has its own attorney, a Ms. Murray. After I originally presented the CEA to the Town Board, they requested that I initial each page, signifying that I, on behalf of Plaintiff, agreed to that page. I did as requested, the Town Board voted on approval of the CEA, and approval was granted.

8. The conditional final subdivision approval was on June 29, 2005, and the approval by the Town Board was by resolution adopted on July 11, 2005.

9. As of this time, everything for the subdivision was done, and everything was co-dependent. There was a valid and binding CEA, and the validity of the final approval of June 29, 2005 was dependent upon that. The Town Supervisor had to sign the CEA, but such signing is a ministerial act. The law in this regard is clear.

10. Town Law §64(6) prescribes the authority of a Town Board to enter into contracts on behalf of the town as follows:

> Award and execution of town contracts. [The Town Board] may award contracts for any of the purposes authorized by Law and the same shall be executed by the supervisor in the name of the Town after approval by the Town Board.

The New York Court of Appeals has described the ministerial function of the Town Supervisor in this process, stating:

> [s]ubdivision 6 of section 64 of the Town Law reposes exclusive authority in the

3

town board to award contracts; and it further provides that "the same *shall* be executed by the supervisor in the name of the town *after* approval by the town board (emphasis added). The section does not recognize any discretion on the part of the supervisor to pass on the award of contracts; in fact it is quite the opposite, in effect, by instructing him or directing that he act. The ministerial nature of the supervisor's function is further emphasized by section 29 of the Town Law which delineates the powers and duties of the supervisor. Despite the breadth of the responsibilities outlined there, nowhere does there appear any authority or responsibility to agree to or to have any discretionary authority in anywise relating to the execution of contracts authorized or adopted by the board.

*In the Matter of Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y. 2d 144 (1979)

11. When Ms. Anderson wrote to me in November, 2005, regarding Plaintiff's entering into a CEA I ignored her communication because it was irrelevant. Plaintiff already had a valid and binding CEA. If Plaintiff did not already have a valid CEA, then Plaintiff would not be in compliance with the requirements of the MPB's Subdivision Regulations, which would mean that the final approval was void. After all the duplicitous acts by Defendants, Plaintiff was not going to afford them any excuse to invalidate the final approval. This was especially true because she had already spent more than $100,000 on infrastructure work. For Ms. Anderson to send a 20-page CEA and ask that Plaintiff enter into that, in substitution for the existing approved CEA, would have required Plaintiff to concede that the existing CEA was not valid. She would not do that.

12. The reason Plaintiff rejected the CEA that was proffered by Ms. Anderson are set forth in very great detail in the letter from Kenneth Mc Culloch to James Nelson, who is a partner in Van DeWater & Van DeWater, dated March 29, 2006. That letter and the exhibits to it are Exhibit 4 to the Affidavit of Ms. Anderson. After going through all of the above in detail, and referencing to the exhibits to establish that what he was saying was true, Mr. Mc Culloch concluded by stating:

> By e-mail, Ms. Gomez advised me that she did not consider the Conservation Easement that has formed the basis for all of the above to have been "finalized". She has sent me a new, twenty-page Conservation Easement that she wants to be substituted for the existing 11-page Conservation Easement that has been the basis for all of the above approvals. This new Conservation Easement, *see* "H", recites at p. 2 that "Whereas, by resolution dated August 8, 2005 the Town Board of the Town of Milan agreed to accept this Conservation Easement". This new Conservation Easement did not exist as of August 8, 2005. The only Conservation Easement that existed as of that time, and that was before the Town Board as of that time, was the Conservation Easement that is "B". As I said, Lauren and the Town Planning Board are satisfied with the Conservation Easement that is "B". We are satisfied with the Conservation Easement that is "B". We are not satisfied with the new Conservation Easement. Moreover, we do not want to change the documents that have led us to this stage, and achieved for us final approval, after public hearing and other processes. To do so, we believe, would jeopardize the validity of the entire process by which the Town's Boards have acted, and the public has been kept advised of what is happening. Lauren told us to contact you. I called you on Monday and Tuesday, March 27 and March 28, 2006, but I have not been able to speak with you. Therefore, I have sent this letter today.

13. I did not do, nor would I agree to do anything on behalf of the Plaintiff to jeopardize the approvals that we had. Whether the CEA proposed by Ms. Anderson was better or worse for Plaintiff was not the issue. The issue was that the proposed CEA was not the CEA that had the approvals. In her Affidavit, Ms. Anderson seeks to fault Plaintiff for not seeking to change the CEA. *See* Anderson Affidavit, ¶36. Of course, Plaintiff could only seek to renegotiate the CEA by jeopardizing the validity of the CEA that was already approved and part of the foundation for the final approval granted on June 29, 2005.

14. Ms. Anderson states in ¶20 that "In Mc Culloch's March 29th letter, he objected to using the new form". That is misleading. I objected to using *any* CEA that was different than the CEA that had all the approvals and that had been the basis for the granting of the conditional final approval. In ¶21 she says: "In the letter, Mc Culloch stated at page 2, "We are not satisfied with the new Conservation Easement Agreement."

She then goes on to say that the reason I objected to the new CEA that she was proposing was because it contained the language that restricted the cutting of trees to trees that were 5 inches in diameter. That was not what was stated, nor meant. The letter dated March 29, 2006 states "We are satisfied with the Conservation Easement that is "B". We are not satisfied with the new Conservation Easement." Nothing in the entire letter mentions the 5 inches in diameter limitation on cutting of live trees. Further, I did not want to put forth any support for a possible claim that it was I, on behalf of Plaintiff, that repudiated the original CEA that already had all the approvals. In ¶9 Ms. Anderson swears that Plaintiff *chose* to have the form CEA that she has, and that she could have had the "form" CEA that the others had. As indicated, the only way that Plaintiff could have had the second type of CEA was by abandoning the CEA that she had, thereby jeopardizing the validity of the final approval of June 29, 2005 that she already had.

15. Defendants and Ms. Anderson have a distorted and incorrect understanding of contracts. She states in ¶19 of her Affidavit that "The main difference between the old form (the one sent by Mr. Dranginis) and the new form (the one sent by me) was that several new provisions had been added to the new form, most of which were added to maximize the protection of conservation easement areas". Mr. Mc Culloch did a comparison of both CEAs and it is Exhibit 5 to the Anderson Affidavit. There were many differences. However, it is irrelevant for purposes of this motion how the second CEA drafted by Ms. Anderson differed from the first CEA that had been drafted by Mr. Dranginis. If the MPB and the Town Board had approved one contract, and Plaintiff had approved that contract, then both parties were bound by that contract. Unfortunately for Plaintiff, the MPB thinks it can do whatever it wants, whenever it wants, regardless of

what it has agreed to. If it does not get what it demands, it just delays.

16. Ms. Anderson states in ¶29 of her Affidavit that she and Mr. Nelson decided that the "best course of action was to work from the original form of easement and to add only those additional provisions from the new form of easement that Mr. Nelson and I believed were critical to protect the Town and to which Mc Culloch would agree." The "negotiations", as Ms. Anderson states, were about the minimum that the Town would take, and not about Plaintiff would get that was "better" than what she already had.

17. I did not want to agree to anything different, and I did not ask for anything different. On behalf of the Plaintiff, I agreed to some additions to CEA that Ms. Anderson demanded. I had many discussions with Ms. Anderson, and learned that she had also worked in the N.Y. County District Attorney's office, as had I, many years before she was there. For that reason, my original apprehension that the MPB and Ms. Kingman were going to try to use the fact that the CEA was changed as a basis for claiming that the final approval of June 29, 2006 was null and void was somewhat mitigated. It was in that context that I wrote in an e-mail, "Go ahead. I trust you now that I have talked with you."

18. None of the other persons who have a CEA had ever been confronted with the same situation that Plaintiff had. They did not have a CEA approved in one form, the form that was given to Plaintiff, and used as a basis for final approval. The one and only form that was presented to these persons was the second CEA.

19. I believe that the draftsmanship in both versions of the CEA, the one that Plaintiff has, and the one that Napolitano, Savoury, Carrezola, and Quarfelt have, is very sloppy. Plaintiff's CEA, Exhibit 2, p. 6 to McCulloch Opening Declaration, states that Plaintiff, as Grantor, may engage in "General Maintenance of property, including

pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials in accordance with *generally accepted forest conservation practices*". Thinning of trees is "in accordance with generally accepted forest conservation practices". This is so even if the trees that are thinned out are used for firewood. If Defendants intended that it be otherwise, they should have said so. Defendants have used a key term, *generally accepted forest conservation practices,* without giving a definition of what it means, and with the Defendants having Draconian enforcement powers that can be used against anyone who disagrees with their interpretation of what is meant.

   The language in the other CEAs states:

> General maintenance of property, including pruning, cutting, planting, landscaping, and clearing of trees and other vegetative materials only in accordance with *generally accepted forest conservation practices* **but** no living tree with a diameter in excess of five (5) inches diameter at breast height measured from the downward slope side may be cut without permission of Grantee, *except* trees may be cut without permission of Grantee, except trees may be removed which endanger public safety, are diseased, damaged or fallen, or need to be cleared to ensure the health of other trees.

   20. Ordinarily, when the term "but" is used, it is used to signify an exception to a rule that has been previously set forth. Using that standard for construction, it would seem that the term *generally accepted forest conservation practices* could under certain circumstances allow for the cutting of trees that are more than five inches in diameter, but that the drafter intended to limit the cutting of trees to five inches in diameter except in situations where the trees endangered the public safety, were diseased, damaged or fallen, or need to be cleared to ensure the health of other trees.

   21. If the term *generally accepted forest conservation practices* did not contemplate that trees or more than five inches could be cut, then the drafter would have used the term "and" instead of "but" after the term *generally accepted forest conservation*

*practices* when representing that trees up to five inches in diameter could be cut.

22. For the reasons stated, Plaintiff believes that the term *generally accepted forest conservation practices* contemplates the possibility that trees larger than 5 inches in diameter may be cut under certain circumstances. In addition, I have been told by Michael Callan of the NYS DEC that there can be situations in which one would cut even a healthy tree of more than 5 inches in diameter, and be acting in accordance with *generally accepted forest conservation practices.* He gave as an example, the cutting of invasive trees or the cutting of some trees to thin out the woods so that other trees could prosper.

23. I did a detailed letter to Mr. Nelson identifying the interpretation problems presented because of the CEA. It is Exhibit 5 to the Anderson Affidavit. In that letter I posited a situation of an owner who wanted to plant a vegetable garden. The CEA, both versions, allows for the "planting of . . . vegetative materials", and say that such action is consistent with *generally accepted forest conservation practices*.  This letter was not to argue for a change to the CEA, but, rather, to demonstrate all the problems in going from the existing, approved CEA to the CEA that Ms. Anderson was presenting.

24. Ms. Anderson pretends in ¶ 47 of her Affidavit to be mystified as to why I contacted Mr. Kingman regarding what could be done in the CEA area. As can be seen from both exhibits 4 and 5, Mr. Kingman was the person whom both I and the attorneys for the MPB were contacting regarding the construction of the CEA and its interpretation. The MPB makes the real decisions, and then recommends to the Town Board whether the Town Board should or should not approve of a CEA. In fact, if the MPB never approves of a CEA, it never gets presented to the Town Board. And Mr. Kingman is the person

who speaks for the MPB.

Dated: March 18, 2008				_____/s/_____

						Kenneth Mc Culloch (3372)